1  BERTRAM FIELDS (SBN 024199)
   BFields@ggfirm.com
2  RICARDO P. CESTERO (SBN 203230)
   RCestero@GreenbergGlusker.com
3  JAMES R. MOLEN (SBN 260269)
   JMolen@GreenbergGlusker.com
4  GREENBERG GLUSKER FIELDS
     CLAMAN & MACHTINGER LLP
5  1900 Avenue of the Stars, 21st Floor
   Los Angeles, California  90067-4590
6  Telephone:  310.553.3610
   Fax:  310.553.0687
7
   Attorneys for Plaintiffs
8  Golden Boy Promotions LLC and Bernard Hopkins

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  GOLDEN BOY PROMOTIONS LLC        Case No. _____
    and BERNARD HOPKINS,
13                                   **COMPLAINT FOR SHERMAN ACT
                   Plaintiffs,       VIOLATION AND UNFAIR
14                                   COMPETITION**
         v.
15                                   **JURY TRIAL DEMANDED**
    ALAN HAYMON, ALAN HAYMON
16  DEVELOPMENT, INC., HAYMON
    SPORTS, LLC, HAYMON BOXING
17  MANAGEMENT, HAYMON
    BOXING LLC, HAYMON BOXING:
18  MEDIA GROUP HOLDINGS LLC,
    WADDELL & REED FINANCIAL,
19  INC., WADDELL & REED, INC.,
    IVY ASSET STRATEGY FUND,
20  WRA ASSET STRATEGY, IVY
    FUNDS VIP ASSET STRATEGY,
21  RYAN CALDWELL, and DOES 1
    through 20,
22
                   Defendants.
23

24

25       Plaintiffs allege as follows:

26                      **INTRODUCTION**

27       Al Haymon, acting through his wholly owned companies and backed by

28  powerful venture capital firms, seeks to monopolize professional boxing in the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

United States and to drive out all competition.  To accomplish this, Haymon, a former music industry promoter now called "the Rasputin of boxing," has repeatedly violated the fundamental federal and state laws that regulate boxing and ensure fair competition, including the Muhammad Ali Boxing Reform Act and the Sherman Act.  Haymon seeks to create a monopoly by illegal, predatory and anti-competitive conduct.  He has blatantly ignored the "firewall" required by federal and state law to separate managers from promoters, by illegally functioning as both a promoter and a manager.  While falsely pretending that he is not a promoter, Haymon has forbidden hundreds of boxers he manages to sign with any other promoter; and he has acted to cut off legitimate promoters not only from promoting boxers he manages, but also from essential network television of boxing matches and from the quality arenas necessary for the effective presentation of their bouts.  His illegal conduct, designed to eliminate all competition, also constitutes an "unlawful . . . business act or practice" constituting "unfair competition" under California Business and Professions Code Section 17,200 et seq.

Golden Boy is a boxing promoter founded and owned by boxers.  Its founder was Oscar De La Hoya, a United States Olympic Gold Medalist and ten-time world champion in six different weight divisions.  De La Hoya's co-owner is Bernard Hopkins, another legendary boxer, who has held championship belts in two different weight divisions.  Haymon is determined to drive De La Hoya, Hopkins, Golden Boy and every other competitor from the boxing business, so that he and his powerful backers can control it, a result that will irreparably harm the interests of boxers, consumers, arenas, television networks and, of course, other promoters and managers.

## THE PARTIES

1.     Plaintiff Golden Boy Promotions LLC ("Golden Boy") is a California limited liability company with its principal office in Los Angeles County, California.  It is a boxing promoter licensed in the States of California and Nevada.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    Plaintiff Bernard Hopkins ("Hopkins") is a championship professional boxer, a co-

2    owner of Golden Boy and a resident of Los Angeles County, California.

3        2.    Defendant Alan Haymon conducts the activities alleged hereinbelow

4    primarily through Alan Haymon Development, Inc., Haymon Sports, LLC,

5    Haymon Boxing LLC, Haymon Boxing Management LLC and Haymon Boxing:

6    Media Group Holdings LLC, limited liability companies Haymon owns or controls

7    (collectively, the "Haymon Defendants").  Plaintiffs are informed and believe and,

8    on that ground, allege that Al Haymon is a resident of California and that Alan

9    Haymon Development, Inc., Haymon Sports, LLC, Haymon Boxing LLC, Haymon

10   Boxing Management LLC and Haymon Boxing: Media Group Holdings LLC are

11   limited liability companies with their principal place of business in either California

12   or Nevada.  The Haymon Defendants function illegally as both boxing promoters

13   and boxing managers in California, Nevada and elsewhere.  They have done

14   substantial business in California and their activities have a significant impact on

15   California, including businesses and activities alleged hereinbelow.

16        Plaintiffs are informed and believe and, on that ground, allege that

17   defendants Waddell & Reed Financial, Inc. and Waddell & Reed, Inc. (collectively

18   "Waddell") are Delaware corporations in the business of supplying venture capital

19   to businesses through controlled entities.  Waddell financed and aided the Haymon

20   Defendants through Ivy Asset Strategy Fund, WRA Asset Strategy and Ivy Funds

21   VIP Asset Strategy (the "Waddell Funds").  These are investment funds

22   established, owned and controlled by Waddell and their investors.  Ryan Caldwell

23   ("Caldwell") is manager of the Waddell Funds (the Waddell Funds, Caldwell and

24   Waddell are sometimes called the "Waddell Defendants" in this Complaint).  The

25   Waddell Defendants have provided more than four hundred million dollars to

26   finance the unlawful activities of the Haymon Defendants alleged hereinbelow and

27   have also advised, aided and abetted the Haymon Defendants in carrying out such

28   activities and have conspired with them to do so.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

3.     The true names and capacities of defendants named herein as Does 1 through 20 are unknown to plaintiffs who therefore sue said defendants by such fictitious names.  Plaintiffs will ask leave of this court to amend this complaint to show their true names and capacities when the same have been ascertained. Plaintiffs are informed and believe, and, on that ground, allege, that Does 1 through 20 were responsible, in some manner, for defendants' misconduct for which they are liable to plaintiffs.

## JURISDICTION AND VENUE

4.     This Court has original jurisdiction over Plaintiffs' federal antitrust claims, which arise under the Sherman Antitrust Act (15 U.S.C. §§ 1, 2) and the Clayton Act (15 U.S.C. §§ 15, 26).  28 U.S.C. §§ 1331, 1337(a).  This Court has supplemental jurisdiction over the related claims for the violations of California statutory law herein alleged, because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  28 U.S.C. § 1367(a).

5.     Venue in this Judicial District is proper under 28 U.S.C. § 1391(b) in that a substantial part of the acts and circumstances giving rise to this action occurred in Los Angeles County.

## FACTUAL ALLEGATIONS

6.     This complaint is based upon the acts of the defendants commencing on January 1, 2015.  Defendants' conduct prior thereto has been alleged in some instances to establish defendants' knowledge, motive and/or intention in carrying out their unlawful activities thereafter.

## The Professional Boxing Industry

7.     Professional boxing is a multibillion dollar industry.  Professional boxers in the United States are not uniform in their skills, experience or earning ability.  At one end of the spectrum are fighters who have just entered the ranks of professional boxers.  They struggle to obtain bouts for small sums while they hone

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

their skills.  At the other end of are champions and top contenders who earn significant sums for matches presented in major arenas and broadcast live on television.  Other boxers fall between these two tiers of the boxing world.

This action deals primarily with "Championship-Caliber Boxers" – that is professional boxers who, during the last three years, have demonstrated through such factors as purse size, television rights, viewership, ticket revenue and other objective factors to be "the cream of the boxing business."  See *International Boxing Club of New York v. United States*, 358 U.S. 242 249, 252 (1959).

Those who deal with professional boxers and their bouts are divided into two disparate professions – boxing managers and boxing promoters.  And they form two different markets:  the market for managers, and the market for promoters.  The need to separate these two professions and markets and keep them separated is required by sound public policy and is specifically mandated by an Act of Congress and by legislation in California, Nevada and elsewhere.

The Muhammad Ali Boxing Reform Act (the "Ali Act"), requires that there be a strict "[f]irewall between promoters and managers."  15 U.S.C. § 6308(b).  The Ali Act expressly prohibits managers from having "a direct or indirect financial interest in the promotion of a boxer," and from being "employed by or receiv[ing] compensation or other benefits from a promoter."  Id. §§ 6308(b)(1)(B)(i)–(ii). California, Nevada and New York, for example, have similar statutes and regulations.  All three states prohibit persons from acting as both manager and promoter.  See Calif. Code Regs. title 4, § 396; Nev. Admin. Code § 467.104; 19 N.Y. Code Rules and Regs. § 207.19.  No one is allowed to function in the market for boxing managers and the market for boxing promoters, a "firewall" that benefits both boxers and consumers.

### Managers

8.     Under the Ali Act, a "manager" is "a person who receives compensation for service as an agent or representative of a boxer."  *Id*. § 6301(5).

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

A manager is a fiduciary required to be devoted to his or her clients' best interests. Before any boxing match – particularly highly publicized bouts between Championship-Caliber Boxers – a boxer faces a complex series of contracts and transactions, including a key contract with the bout's promoter.  This can be difficult, especially for fighters who are not experienced in the business side of boxing or who lack significant formal education.  A manager's professional role (and ethical responsibility) is to represent the boxer in these various negotiations and the boxer's other boxing related dealings.

9.     The manager typically receives a percentage of the boxer's "purse" for each bout.  The "purse" is the amount of money the boxer receives from the promoter of a fight, who guarantees the purse.  Because the manager's compensation is ordinarily tied to the purse, the manager is incentivized to negotiate the best terms possible from the promoter for the benefit of the boxer and himself.

10.     Many states require boxing managers to be professionally licensed, and have promulgated regulations governing managers' conduct.  In California, for example, managers must pass a written examination administered by the State Athletic Commission in order to be licensed.  See Calif. Code Regs. title 4, § 218(a).  In Nevada, managers must apply for a license as provided in Nev. Admin. Code § 467.012.

11.     The Haymon Defendants hold an overwhelmingly dominant position in the market for professional boxing managers.  They manage numerous Championship-Caliber Boxers, including many current and former world champions and the foremost challengers for their championship belts.  Plaintiffs are informed and believe and, on that ground, allege that every fighter managed by the Haymon Defendants is required to sign an agreement granting those defendants total control over the boxer's career and revenue-generating abilities.  No other boxing manager represents more than a handful of Championship-Caliber Boxers

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

1  and none obtains the extraordinary rights the Haymon Defendants demand from all

2  of their boxers.

3      The Haymon Defendants' total domination of the market for managing of

4  Championship-Caliber Boxers is why Al Haymon has been called "the most

5  powerful man in boxing"[1] and "the Rasputin of boxing"[2] as well as being called

6  "the Terminator" for his apparent ability and willingness to damage or destroy the

7  careers of any boxer he manages any time he wants.[3]  No other manager in

8  professional boxing represents anywhere near as many boxers, or exercises

9  anywhere near as much raw and potentially destructive power.

10                          **Promoters**

11      12.    Promoters perform a fundamentally different role from managers.  The

12  Ali Act defines "promoter" as "the person primarily responsible for organizing,

13  promoting, and producing a professional boxing match."  15 U.S.C. § 6301(9).

14  Unlike managers, the function of a boxing promoter is not to represent or advise

15  boxers.  On the contrary, they contract with boxers, through their managers, to

16  participate in one or more bouts in return for negotiated compensation paid by the

17  promoter.  In negotiating such contracts, promoters occupy a position adverse to

18  both boxers and managers.  Promoters make money primarily from selling tickets,

19  television rights, and sponsorship rights for a bout, and from other promotional

20  activities.  The promoter assumes the financial risk of a bout.  His profit depends on

21  his ability to generate more money than he spends in promoting each fight.

22      13.    The Ali Act imposes strict requirements on promoters.  For example,

23  the Act prohibits coercive contracts between promoters and boxers, requires

24

25  [1] Snowden, *Is HBI vs. Al Haymon Boxing's Next Big Fight?*, BLEACHER REPORT,
Mar. 12, 2015, http://bleacherreport.com/articles/2393981-is-hbo-vs-al-haymon-

26  boxings-next-big-fight.  Sports Business Journal 4/20/2015
http://www.sportsbusinessdaily.com.

27  [2] Goldman, Boxing Insider Mar. 19, 2014; http://www.boxinginsider.com.

28  [3] http://12asaltos.com April 22, 2015.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

promoters to make extensive financial disclosures to state boxing commissions and to boxers, and imposes an obligation on promoters to notify the relevant state boxing commission before any professional boxing match is held. *Id.* §§ 6307b, 6307e, 6310. And of course, a promoter cannot act as a manger of a boxer or even "have a direct or indirect financial interest in the management of a boxer." *Id.* § 6308(b)(1)(A).

14. States also regulate promoters. In California, for example, a promoter must demonstrate, among other things, that he possesses "financial responsibility" and the "necessary knowledge and experience to act as a promoter" in order to obtain a license. Calif. Code Regs. title 4, § 213. Additionally, the relationship between a boxer and promoter must be set out in a signed written contract on the form approved and signed by and filed with the State Athletic Commission, containing contract terms limited by the California Code of Regulations and enforced by the Commission. *Id.* § 222, et seq.

15. As alleged hereinbelow, the Haymon Defendants, already dominant in the market for managing Championship-Caliber Boxers, are attempting to monopolize the market for promoting the bouts of such boxers. Before they began that unlawful attempt, the market for promoting such boxers was traditionally competitive. If Haymon is allowed to continue his unlawful and anticompetitive conduct, all legitimate promoters will be driven from the promotion market.

**The Reason for the Mandatory "Firewall" Between Managers and Promoters**

16. The Ali Act's "firewall" between boxing managers and promoters was intended to remedy severe problems that had long plagued the boxing business.

Because the amount a promoter makes is, in part, a function of how much it pays the boxers – that is, how big of a "purse" the promoter guarantees – promoters and boxers sit on opposite sides of the bargaining table. The promoter does not owe a fiduciary duty to the boxer. Rather, it is the manager's job to represent the boxer against the promoter in negotiating promotional contracts or contracts for a

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    specific bout.  In order for a manager to effectively perform his duty as a fiduciary,

2    he should not and cannot simultaneously sit on the other side of the table, acting as

3    (or on behalf of) a promoter or even have any "direct or indirect financial interest"

4    in a promoter.

5          17.    Before the era of protective legislation, boxing managers often crossed

6    the line between management and promotion, frequently leading to disastrous

7    results for boxers who, all too often, ended up physically damaged and penniless,

8    or, like the great heavyweight champion Joe Louis, who, after making many

9    millions for others, ended his days humiliatingly serving as a "greeter" in the lobby

10   of a Las Vegas hotel.

11         18.    In enacting the Ali Act, Congress intended to protect boxers, the

12   boxing industry, and the public from abusive, exploitive, and anticompetitive

13   behavior.  According to the Senate Report, establishing a strict "firewall" between

14   managers and promoters was imperative:  "[I]t remains essential that . . . the

15   manager serve and protect the interests of the boxer.  They should not be serving

16   the financial interests of the promoter, while simultaneously taking a 33% earnings

17   cut from the boxer for biased representation as manager.  It is not plausible for a

18   boxer to receive proper representation and counsel from a manager if the manager

19   is also on the payroll of a promoter.  This is an obvious conflict of interest which

20   works to the detriment of the boxer and the advantage of the promoter.  The

21   Committee received testimony about instances wherein boxers had suffered

22   significant career and economic injury due to their manager's clear conflicting

23   interests.  ***A manager must be a determined advocate for the boxer's interests and***

24   ***not be influenced by financial inducements from a promoter***."  S. Rpt. No. 106-

25   83, at 9 (June 21, 1999) (emphasis added).

26         19.    And, of course, the deleterious effect of a manager functioning as an

27   unlicensed promoter is compounded if the manager denies his boxers the right to

28   contract with the promoter of their choice.  In enacting the Ali Act, Congress also

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  sought to promote fair and open competition in the boxing industry.  The express

2  purpose of the Act was to "reform unfair and anticompetitive practices in the

3  professional boxing industry."  Pub. L. No. 106-210, 114 Stat. 321 (2000).  The

4  Senate Report specifically condemned exclusive long-term contracts that restricted

5  boxers' ability to choose a promoter, stating that "***athletes would be better served,***

6  ***as would open competition in the sport, if boxers were free to contract with those***

7  ***promoters they personally choose***."  S. Rpt. No. 106-83, at 7–8 (June 21, 1999)

8  (emphasis added).  In promoting fair competition, the Ali Act benefits not only

9  professional boxers, but everyone with a stake in the boxing business, as well as the

10  public at large.

### The Defendants' Illegal, Tortious, and Anticompetitive Conduct

12      20.    While managing numerous Championship-Caliber Boxers, the

13  Haymon Defendants not only have an illegal "direct or indirect financial interest in

14  the promotion of" those boxers, they have actually functioned, and are actually

15  functioning, as unlicensed promoters for those boxers, using their illegal dual role

16  to exclude legitimate promoters from business opportunities essential to their ability

17  to compete.  For example, Al Haymon was widely recognized as and accurately

18  called the "main promoter" of the immensely lucrative bout on May 2, 2015

19  between Floyd Mayweather and Manny Pacquiao.[4]  By such tactics, the Haymon

20  Defendants intend to effect a total monopoly of the boxing business.

21      21.    Thus, the Haymon Defendants are using their dominance in one

22  business to take over and monopolize another business that federal and state law

23  prohibit them from even entering.  They are intentionally leveraging their dominant

24  position as managers of Championship-Caliber Boxers to acquire, maintain, and

25  expand their power in the business of promoting such boxers.  With massive

26  funding and guidance from the Waddell Defendants, who advise, aid, abet and

27

28  [4]  Bill Dwyre, Los Angeles Times April 4, 2015 pp. D1-2.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1    conspire with them, the Haymon Defendants seek to buy up and monopolize the

2    entire vertical channel – from "locking in" all the top boxing talent, to "tying out"

3    legitimate promoters from all the top boxers and boxing matches, excluding

4    legitimate promoters from the best venues and from the exhibition of their bouts on

5    network television.

6          22.    Before the events on which this action is based, defendants sought to

7    eliminate competition in the business of promoting Championship-Caliber Boxers

8    by acquiring total ownership of Golden Boy and sidelining De La Hoya as a

9    competitor. To that end, Waddell offered to purchase 100% of the equity interest in

10    Golden Boy through another Waddell controlled fund, but conditioned its offer on

11    obtaining an onerous and lengthy non-competition agreement from De La Hoya.

12    Plaintiffs are informed and believe and, on that ground, allege that, in fact, the

13    intended buyers of Golden Boy were the Haymon Defendants, that Waddell was to

14    finance the acquisition of Golden Boy with the Waddell controlled fund as the

15    nominal buyer, and that the involvement of the Haymon Defendants was to be

16    concealed, since their acquisition of Golden Boy, a major promoter, would violate

17    the law and perhaps expose defendants' scheme to monopolize the promotion

18    business. Defendants' proposed acquisition of Golden Boy was not completed,

19    because De La Hoya refused to accept the onerous, anti-competitive restrictions on

20    his boxing related activities demanded by the proposed buyers.

21          23.    Not having acquired Golden Boy, defendants determined to drive it

22    from the American boxing business and are now moving ahead with their plan to

23    gain total control of that business. Managing an extraordinary number of

24    Championship-Caliber Boxers has already given the Haymon Defendants a

25    dominant share of the management market. Now, the Haymon Defendants actively

26    seek to leverage that dominant share into a monopoly of the promotional market, by

27    means of illegal, predatory and anti-competitive acts designed to eliminate all

28    competition in that market. For example, while falsely claiming they are not

promoters, the Haymon Defendants have prevented the numerous boxers they manage from signing contracts with any other promoter – even where such contracts are required by law.

24.     By leveraging their dominant position as managers to preclude all of their boxers from freely contracting with legitimate promoters of their choice, the Haymon Defendants effectively exclude legitimate, licensed promoters from accessing and promoting most Championship-Caliber Boxers.  This, in turn, allows Haymon to act illegally as both the manager and unlicensed promoter of such boxers without facing competition.  Because Haymon possesses immense power in the boxing management business, the effect of this "tie out" arrangement on the business of promoting Championship-Caliber Boxers is substantial, resulting in many millions of dollars of lost revenue to legitimately licensed promoters.

25.     In addition to excluding legitimate promoters from the contractual relationship with boxers required by law, the Haymon Defendants are seeking to exclude legitimate promoters from every facet of the boxing business essential to success in the business of promoting Championship-Caliber Boxers.  For such boxers at the top of their profession, national television broadcasts of their bouts are a critical and essential component of their careers.  As a part of their widespread and illegal activities as unlicensed promoters of Championship-Caliber Boxers, the Haymon Defendants, funded, advised, aided and abetted by Caldwell and the other Waddell Defendants, have already purchased air time on almost every major television network in the U.S. and are using that owned and controlled network time for the presentation of nationally televised boxing matches featuring the Championship-Caliber Boxers they manage.  They intend to make such arrangements with every major U.S. network.  Reversing the ordinary flow of money from the network to the promoter, defendants pay the networks to broadcast their bouts, rather than having the networks pay them.  Defendants pay all costs of the broadcasts and matches, even providing the boxers' purses.  The Haymon

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

1  Defendants' presentation of such matches on network television is patently an act
2  of promotion by a boxing manager contrary to both federal and state law.  These
3  boxing shows promoted by the Haymon Defendants are, of course, broadcast to and
4  widely viewed in California.

5  The Haymon Defendants buy up such time on the major networks and
6  illegally promote such boxing matches on network television as a device to
7  preclude legitimate promoters from doing so and to lure such boxers away from
8  other promoters, so as to drive such competitors from the promotion business and
9  thus to further their attempts at monopolization.  The Haymon Defendants also
10  violate federal and state laws by requiring boxers to sign "coercive contracts."  For
11  example, boxers cannot participate in the Haymon Defendants' own televised bouts
12  unless they sign multi-year contracts with the Haymon Defendants

13  Defendants paid out vast sums to acquire such air time on virtually every
14  American television network, incurring temporary losses estimated in the hundreds
15  of millions of dollars, in order to dominate and control the promotion of boxing on
16  American network television and further their ability to effect a monopoly.  Once
17  they have achieved the monopoly position they seek, defendants will exercise their
18  economic power to reverse the financial arrangements, recoup their losses, pay less
19  to boxers and reap massive profits, far in excess of their temporary losses, by
20  charging supracompetitive prices to networks, sponsors and consumers.  As
21  defendants themselves have put it, they are "turning the model completely upside
22  down" and acting as "the irrational player for a while" in order to profit
23  handsomely in the long run.

24  The Haymon Defendants have also acted to "lock up" access to the major
25  U.S. television networks for boxing matches by inducing the television networks
26  whose time they have purchased, or are seeking to purchase, for such televised
27  bouts to deal exclusively with the Haymon Defendants and not to deal with other
28  promoters.  The major U.S. networks who are tied up by agreement with the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1   Haymon Defendants, or who are likely to reach such an agreement with the

2   Haymon Defendants, have acquiesced in this and deny air time for the fights of

3   legitimate promoters.

4          Even with respect to boxing matches other than those they promote on their

5   own television shows, the Haymon Defendants also function regularly and illegally

6   as promoters of bouts featuring the Championship-Caliber Boxers they manage.

7   They arrange and contract for the bouts, the arenas, the sponsors and, here again,

8   they arrange and contract for the critical television broadcasts of such bouts.  Such

9   televised matches are broadcast to and widely viewed in California.  In all of the

10  foregoing situations, the Haymon Defendants are functioning, illegally as the

11  promoters of the bouts in which the Championship-Caliber Boxers they manage

12  participate.  And, of course, the Haymon Defendants have more than just a "direct

13  or indirect financial interest in the promotion of" all such bouts, which, in itself, is

14  illegal.

15         With respect to some of the boxing events they promote, the Haymon

16  Defendants seek to create the false impression that they are not really the promoters

17  by employing licensed promoters, controlled or dominated by them, to "front" for

18  the Haymon Defendants, posing as the nominal promoters of such events for a fixed

19  fee, while, in fact, the true promoters are the Haymon Defendants.  By such use of

20  such "sham" promoters, the Haymon Defendants not only take a "direct or indirect

21  financial interest in the promotion of a boxer" in violation of federal and state law,

22  they are, in every sense, the true entrepreneurs and promoters of the bout, taking the

23  profits, making the decisions and paying a fixed fee to the sham "promoters."  The

24  sham promoters do not make the key promotional decisions and do not even have

25  promotional contracts with the boxers they purport to promote.

26         Just as they act to "lock up" network air time in order to lock out their

27  competitors, the Haymon Defendants have acted to "lock up" all desirable dates for

28  bouts in major arenas, doing so, here again, to render Golden Boy and other

legitimate promoters unable to arrange attractive and profitable bouts for their Championship-Caliber Boxers at such arenas.  And the Haymon Defendants have attempted, by other unlawful means, to prevent legitimate promoters from arranging desirable boxing matches, so that, by such schemes, defendants can induce boxers to sever their relationship with other promoters and such legitimate promoters will be driven from the business.  Plaintiffs are informed and believe and, on that ground, allege that the Haymon Defendants have also illegally enhanced their ability to promote successful boxing matches by engaging in other conduct unavailable to law abiding promoters, such as illegally "scalping" tickets to matches featuring Championship-Caliber Boxers, in order to increase their revenue, and by failing to pay the taxes properly due in respect of such sales and other income from such matches.

The Haymon Defendants exploit another unfair and illegal advantage over legitimate boxing promoters.  As described above, legitimate boxing promoters must comply with extensive regulatory requirements at both the federal and state levels that place rigorous limits and duties on legitimate promoters.  Under the Ali Act, for example, a promoter must not function as a manager or have any financial interest in a manager; and, before receiving any proceeds of a bout, promoters must make detailed financial disclosures to boxers, as well as to state boxing commissions.  In California, promoters must be licensed, and all promotion contracts must be submitted to, and approved by, the State Athletic Commission, must be in writing and on a required form designated by the Commission and must conform to terms and restrictions specified by regulation.  In addition, the Haymon Defendants also appear to be violating 15 U.S.C. § 6308(c) in that they are acting as a "sanctioning organization," intending to have their own in-house "champion," and even preparing championship belts, while, at the same time, they are receiving vast economic benefits from boxers and their bouts, while acting as a manager and promoter.  The Haymon Defendants do not comply with any of these laws and

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

17896-00617/2339405.1

15

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

1   regulations – to their unfair advantage and to the detriment of boxers, legitimate

2   promoters, and ultimately the public.

3                              **RELEVANT MARKET AND MARKET POWER**

4           26.     The Defendants' conduct described hereinabove significantly impacts

5   two relevant markets – the market for managing "Championship-Caliber Boxers,"

6   and the market for promoting bouts by such boxers.

7                        **The Market for Managing Championship-Caliber Boxers**

8           27.     In the United States boxing industry, there is a distinct and defined

9   market for managing Championship-Caliber Boxers.  The Supreme Court has

10  recognized, for purposes of the Sherman Act, that, within the professional boxing

11  business, there are distinct tiers of boxers, and those separate tiers correlate with

12  separate and distinct markets.  In *International Boxing Club of New York, Inc., v.*

13  *United States*, for example, the Court affirmed that the relevant market in that case

14  had properly been defined as "the promotion of *championship* boxing contests in

15  contrast to *all* professional boxing events."  358 U.S. 242, 249 (1959) (emphasis in

16  original).  The Court recognized that "the 'cream' of the boxing business . . . is a

17  sufficiently separate part of the trade or commerce to constitute the relevant market

18  for Sherman Act purposes."  *Id*. at 252.

19          28.     Thus, management services provided to Championship-Caliber Boxers

20  – "the 'cream' of the boxing business" – are fundamentally different from, and

21  therefore not interchangeable with, management services provided to boxers in the

22  lower tiers of the boxing business.  The business affairs of a Championship-Caliber

23  Boxer are inherently more complex than those of other professional boxers.  The

24  manager charged with handling the business affairs of a Championship-Caliber

25  Boxer must be skilled and experienced in many areas of business and even some

26  areas of law.  Managing a Championship-Caliber Boxer who participates in pay-

27  per-view televised and richly sponsored bouts held in venues like the MGM Grand

28  in Las Vegas or Madison Square Garden, where the purse may range in the tens or

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  even hundreds of millions of dollars, does not compare with managing a boxer in

2  untelevised bouts at minor venues, where the purse may only be in the thousands or

3  even hundreds. The necessary business and legal acumen also makes it difficult, if

4  not impossible, for a Championship-Caliber Boxer to serve effectively as his own

5  manager.

6        29.    Moreover, because of the unique nature of the professional boxing

7  industry, people and firms that represent other types of professional athletes, like

8  baseball players or football players, cannot be – and, as a matter of practice, are not

9  – a substitute for the manager of Championship-Caliber Boxers.  Unlike other

10  professional sports, there are no professional leagues; rather, promoters and

11  "matchmakers" arrange bouts on an individualized basis.  In order for the boxers to

12  get paid, boxing managers have to negotiate with boxing promoters – a role for

13  which there are no clear analogies in other professional sports.  Moreover, boxing is

14  closely regulated by state and federal laws and regulations that reflect and respond

15  to the extraordinary nature of boxing.  Simply put, boxing managers operate in a

16  wholly different market from agents who represent other professional athletes.

17        30.    There are also barriers to entry in the market for managing for

18  Championship-Caliber Boxers.  As previously noted, boxing managers must be

19  professionally licensed in many states, including California and Nevada.  In

20  California, licensure requires that the applicant take and pass a written exam.  In

21  order to effectively represent Championship-Caliber Boxers, a manager must

22  possess deep knowledge and experience in both the boxing industry and many areas

23  of business and even law.  Moreover, the use of long-term exclusive contracts by

24  established managers of Championship-Caliber Boxers makes it extremely difficult,

25  if not impossible, for new entrants to obtain Championship-Caliber Boxers as

26  clients.

27        31.    The relevant geographic market for managers of Championship-

28  Caliber Boxers is the United States.  Although there are some foreign-based

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

1    managers, none have gained a significant number of such boxers to serve as a close

2    substitute for the U.S.-based managers.

3         32.    Because of these market characteristics, a small but significant non-

4    transitory increase in a manager's compensation by a hypothetical monopolist

5    would not induce significant substitution by customers (in this case, boxers) to

6    managers from outside the market.

7         **The Market for Promoting the Bouts of Championship-Caliber Boxers**

8         33.    In the United States boxing business, there is also a distinct market for

9    promoting the bouts of Championship-Caliber Boxers.  As indicated above, the

10   Supreme Court has already acknowledged that the promotion of top tier boxers is a

11   separate and distinct market from that of promoting "all boxers."  *International*

12   *Boxing Club of New York, Inc. v. United States*, *supra*, 358 U.S. at 249.

13        34.    Promoting a boxing match involving a Championship-Caliber Boxer,

14   is fundamentally different from promoting matches in the lower strata of boxing.  In

15   order to effectively promote a large-scale, highly visible boxing match involving

16   Championship-Caliber Boxers, a promoter must have sufficient financial resources

17   to shoulder essential expenditures and obligations, including those required to

18   acquire an appropriate venue, attract major sponsors and advertisers, contract with

19   innumerable outside vendors, and guarantee a sizeable "purse" to the boxers and

20   their managers – which may be in the tens of millions of dollars.  Planning and

21   negotiating each of these highly complex arrangements and, perhaps most

22   importantly, the television broadcast of the bouts,  whether "free" or pay-per-view,

23   requires extensive, often arcane knowledge of multiple businesses, not to mention

24   possessing useful connections in each business area.  A promoter who operates in a

25   lower strata of the industry simply cannot accomplish what the promoter of a

26   Championship-Caliber Boxer can.  For this reason, promoters for lower-tier boxers

27   are not interchangeable with promoters of Championship-Caliber Boxers.

28

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

35.     In the world of professional sports, nothing remotely compares to the unique business of professional boxing promotion.  A professional baseball or tennis player, for example, does not directly contract with a third party to organize, sell tickets for, televise, and otherwise promote his or her games or matches.  Rather, these activities are handled by an overarching league or governing organization, such as Major League Baseball or the Association of Tennis Professionals.  Unlike the situation in other sports, there are no close substitutes for licensed promoters of Championship-Caliber Boxers.

36.     Due in large part to the factors described above, there are significant barriers to entry in the market for promoting Championship-Caliber Boxers.  While all promoters must be professionally licensed and comply with extensive laws and regulations, only those with significant financial resources, deep industry knowledge, and far-reaching business contacts and acumen can orchestrate a high-profile boxing match for Championship-Caliber Boxers – and shoulder the sizeable financial risk associated with each such promotion.  Moreover, the statutory "firewall" separating managers from promoters prevents many industry insiders – at least the law-abiding ones – from engaging in promotion.  These inherent barriers to entry are exacerbated by the Haymon Defendants' long-term "tie out" contracts, which effectively prevent numerous Championship-Caliber Boxers from contracting with legitimate promoters of their choice, whether the promoters are new entrants or incumbents.

37.     Because of these market characteristics, a small but significant non-transitory increase in price by a hypothetical monopolist would not induce significant substitution by customers to promoters from outside the market.

38.     The relevant geographic market for promoters of Championship-Caliber Boxers is the United States.

39.     The market for promotion of Championship-Caliber Boxers is distinct from the market for management of Championship-Caliber Boxers.  As alleged

1   hereinabove, applicable state and federal laws, create a "firewall" between these
2   two separate markets, and no single person may lawfully participate in both markets
3   at the same time.  As a practical matter, most market participants do in fact respect
4   the boundary between these markets – with the notable exception of the Haymon
5   Defendants who, as alleged hereinabove, simply ignore that statutory, policy based
6   boundary.

7   **The Defendants' Market Power**

8   40.   The Haymon Defendants already possess monopoly power in the
9   primary relevant market – the market for management of Championship-Caliber
10  Boxers.  They have achieved unprecedented dominance in that market.  Plaintiffs
11  are informed and believe and, on that ground, allege that they manage at least 100
12  Championship-Caliber Boxers.  No other boxing manager represents more than a
13  handful of such boxers and none obtains the sweeping rights demanded by the
14  Haymon Defendants.  While Plaintiffs do not have access to precise figures,
15  Plaintiffs are informed and believe and, on that ground, allege that the Haymon
16  Defendants' share of this relevant market is significantly greater than 50%.

17  41.   By engaging in the illegal, tortious, and anticompetitive conduct
18  alleged herein, the Haymon Defendants are leveraging their monopoly position in
19  the primary relevant market for management of Championship-Caliber Boxers to
20  undermine and eliminate competition in and monopolize the secondary relevant
21  market for promotion of such boxers.

22  42.   The ability of the Haymon Defendants to foreclose competition in that
23  secondary relevant market is enhanced by a "lock in" effect.  Due to
24  (i) asymmetrical sophistication and bargaining power between the Haymon
25  Defendants and their boxers, (ii) the impracticality (if not impossibility) of
26  assessing the long-term costs and effects of the Haymon Defendants' promoter "tie
27  out" clauses, (iii) the high costs of switching from one manager to another, (iv) the
28  lengthy terms of the Haymon Defendants' management contracts, and (v) the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

relative lack of adequate substitutes for their management services, boxers, including Championship-Caliber Boxers, are highly susceptible to being "locked in" to the Haymon Defendants' exclusionary contracts. Once "locked in," the Haymon Defendants' boxers are contractually precluded from entering into agreements with legitimate promoters. Therefore, the "lock out" effect not only strengthens the Haymon Defendants' dominance in the primary market for management of Championship-Caliber Boxers, it enhances their ability to monopolize the secondary market for promotion of such boxers.

## ANTICOMPETITIVE EFFECTS AND DAMAGES

43.     The Haymon Defendants, financed, advised, aided and abetted by their co-conspirators, engage in the business of professional boxing management and the business of professional boxing promotion throughout the United States, including California. In connection with this business, monies, contracts, bills, and other forms of business communication and transactions are transmitted in a continuous and uninterrupted flow across state lines. Defendants use various devices to carry out the illegal acts alleged herein, including the United States mail, interstate travel, and interstate telephone commerce. Defendants' activities are within the flow of, and have substantially affected, interstate commerce.

44.     As a direct and proximate result of the Defendants' unlawful actions, competition has been substantially foreclosed in the relevant markets. Defendants' conduct harms competition by reducing the ability of existing managers and promoters to compete "on the merits" with the Haymon Defendants. Defendants' conduct also deters entry into the relevant markets, and thereby reduces the likelihood that rivals to the Haymon Defendants will emerge in the future. By undermining competition in these markets, Defendants have affected a substantial volume of commerce – and proximately injured boxers, legitimate promoters, and consumers alike. If Defendants' conduct is not enjoined, and the Haymon Defendants obtain the monopoly they seek in the market for promoting

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  Championship-Caliber Boxers, those injuries will only continue and become far

2  more egregious.

3       45.    By ignoring the "firewall" between managers and promoters

4  established by the Ali Act, the Haymon Defendants are essentially sitting on both

5  sides of the bargaining table.  While purporting to act in their boxers' best interests

6  as managers, the Haymon Defendants have functioned, at the same time, as

7  promoters of their boxers' fights – thereby creating the very conflict of interest the

8  Ali Act sought to remedy.  As a result, the numerous Championship-Caliber Boxers

9  managed by the Haymon Defendants – who comprise a significant part of the

10  Championship-Caliber boxing business – will, in the long run, earn less money and

11  a lower share of the profits from their bouts, with defendants pocketing the

12  difference.

13       46.    The Haymon Defendants are exploiting their dominance in the market

14  for managing Championship-Caliber Boxers to exclude all legitimate promoters

15  from the market for promoting such boxers.  If this conduct continues unabated, and

16  the Haymon Defendants become the de facto sole promoter of Championship-

17  Caliber Boxers, it will become increasingly difficult for any such boxers who are

18  not controlled by the Haymon Defendants to obtain the quality opponents, major

19  arenas or network television exposure necessary to their careers.  In order to

20  salvage their careers, Championship-Caliber Boxers will have no choice but to sign

21  with the Haymon Defendants – as both managers and promoters.  As the power and

22  influence of the Haymon Defendants in both relevant markets grow, they will be

23  able to exert ever more control over the entire boxing business, to pay boxers less

24  and retain more.

25       And boxers are hurt in still another way.  Given the Haymon Defendants'

26  dominance as managers of numerous Championship-Caliber Boxers and their

27  growing dominance as promoters of such boxers, they are able to follow a policy of

28  calculated discrimination among the boxers they manage and promote, deliberately

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

favoring some over the others, making it clear that any boxer who may not strictly and happily conform to the dictates of Al Haymon will receive less favorable terms and assigned bouts by the Haymon Defendants that are less desirable or even damaging to their careers.  This is why Haymon has been called  "the Terminator."  If the competition is gone and the Haymon Defendants become essentially the sole promoters of Championship-Caliber Boxers, this discriminatory policy will make the careers and finances of every such boxer wholly dependent on the interests and dictates of Al Haymon.

47.    The Haymon Defendants' scheme harms consumers as well.  The more power the Haymon Defendants have in the relevant markets, the less variety consumers will enjoy.  Their scheme will ensure that consumers see only Haymon fights and Haymon boxers.  Moreover, once the predatory Haymon tactics pay off, consumers will have to pay more to see such bouts.  The Waddell Defendants are not financing the schemes of the Haymon Defendants for the good of the sport.  They fully expect not only to recoup their predatory outlays currently being used to finance and monopolize the boxing business, but also to reap a massive profit on their investment.

48.    Distributors of boxing content, including arenas and broadcasters, also stand to lose.  As the Haymon Defendants exclude more competitors from the market for promoting Championship-Caliber Boxers, arenas will be forced to deal exclusively with the Haymon Defendants – giving those defendants disproportionate bargaining power.  And once the Haymon Defendants are the only show in town, there is no reason to believe that they will pay broadcasters to air their content.  Not only will broadcasters be forced to pay the Haymon Defendants, rather than vice versa, they will be paying more than they ever would in a competitive promotion market.

49.    Golden Boy and other promoters are already being severely injured as a direct and proximate result of the Defendants' illegal, tortious, and

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1 anticompetitive conduct.  But for the conduct of defendants alleged herein, the

2 Championship-Caliber Boxers managed by the Haymon Defendants would be free

3 to contract with legitimate boxing promoters, including Golden Boy; and the

4 legitimate promoters would be able to compete on the merits, to sign

5 Championship-Caliber Boxers, and to obtain network air time for their bouts as

6 well as major arenas on desirable dates.

7 50.    The Defendants' anticompetitive schemes have already substantially

8 harmed competition in the primary and secondary relevant markets.  The

9 cumulative anticompetitive effects of this scheme lack any redeeming value and far

10 outweigh any ostensible procompetitive benefits that Defendants may allege.

11 51.    The Haymon Defendants and their co-conspirators have engaged in the

12 illegal, tortious, and anticompetitive conduct alleged herein with the specific intent

13 to maintain the Haymon Defendants' monopoly in the primary relevant market for

14 management of Championship-Caliber Boxers, and to obtain a monopoly in the

15 secondary relevant market for promotion of such boxers.  If left unchecked, the

16 Haymon Defendants have a dangerous probability of achieving monopoly power in

17 the latter market and will continue to maintain it in the former.

18 52.    As a direct and proximate result of Defendants' conduct, Plaintiffs

19 have suffered significant harm.  The full extent of Plaintiffs' damages cannot yet be

20 fully measured, but on information and belief, Plaintiffs allege that its damages

21 exceed $100 million.  Such damages should be trebled pursuant to 15 U.S.C. § 15.

## CLAIMS FOR RELIEF

## FIRST CLAIM

**(Unlawful "Tie Out" in Violation of 15 U.S.C. § 1 – Against the Haymon Defendants and DOES 1 through 10)**

27 53.    Plaintiffs incorporate each preceding and succeeding paragraph as

28 though fully set forth herein.

54.     Defendants have knowingly and intentionally engaged in an unlawful contract, combination, or conspiracy constituting a per se violation of Section 1 of the Sherman Act.  15 U.S.C. § 1.

55.     With the advice, aid, financial backing and express agreement of the Waddell Defendants and CVC, the Haymon Defendants have entered into agreements to restrain trade in a substantial portion of the market for promotion of Championship-Caliber Boxers.  As alleged hereinabove, while the Haymon Defendants insist that they are not promoters, their contracts to manage Championship-Caliber Boxers contain exclusionary provisions that condition their professional services on the boxers' agreement not to contract with legitimate boxing promoters.  These agreements constitute unlawful "tying" or "tie out" arrangements (sometimes known as "negative tying"), and as such, constitute *per se* violations of the Sherman Act.

56.     The Haymon Defendants' illegal agreements create a "tying" relationship between services sold in separately defined relevant markets:  the market for management of Championship-Caliber Boxers (i.e., the "tying" market), and the market for promotion of Championship-Caliber Boxers (i.e., the "tied" market).

57.     The Haymon Defendants exercise monopoly power in the market for management of Championship-Caliber Boxers (i.e., the "tying" market).  Their dominance in the "tying" market is sufficient to substantially affect competition in the market for promotion of Championship-Caliber Boxers (i.e., the "tied" market).  The Haymon Defendants' ability to use their power in the "tying" market to foreclose competition in the "tied" market is enhanced by the susceptibility of Championship-Caliber Boxers to become "locked in."

58.     The Haymon Defendants' imposition of unlawful "tying" or "tie out" provisions in their contracts with Championship-Caliber Boxers has in fact had a

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

significant adverse effect on a substantial volume of commerce to the extent of many millions of dollars.

59.     As a direct and proximate result of Defendants' unlawful and anticompetitive conduct, Plaintiffs have been injured and damaged in its business and property.

## **SECOND CLAIM**

### **(Conspiracy in Restraint of Trade in Violation of 15 U.S.C. § 1 – Against All Defendants)**

60.     Plaintiffs incorporate each preceding and succeeding paragraph as though fully set forth herein.

61.     Defendants have knowingly and intentionally engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade in violation of Section 1 of the Sherman Act.  15 U.S.C. § 1.  These unlawful agreements include, but are not limited to:

A.     agreements between the Waddell Defendants and the Haymon Defendants and between CVC and the Haymon Defendants, whereby the Waddell Defendants and CVC have financed,  participated in, and gained a direct or indirect financial interest in the Haymon Defendants' anticompetitive scheme;

B.     agreements between the Haymon Defendants and Championship-Caliber Boxers;

C.     agreements between the Haymon Defendants and boxing venues;

D.     agreements between the Haymon Defendants and television networks;

E.     agreements between the Haymon Defendants and advertisers;

F.     agreements between the Haymon Defendants and sponsors;

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

G.      agreements between the Haymon Defendants and "sham" promoters who act as "fronts" for the Haymon Defendants; and

H.      agreements between the Haymon Defendants and key employees "poached" from legitimate promoters.

62.      As alleged hereinabove, Defendants have engaged in a multi-faceted and far-reaching scheme to unreasonably restrain trade in the primary and secondary relevant markets.  This scheme includes, but is not limited to, the following actions:

A.      violating the prohibition, under state and federal law, against acting as both manager and promoter, so as to gain an unfair advantage over legitimate promoters;

B.      violating numerous state and federal laws and regulations governing promoters with which legitimate promoters must comply;

C.      entering into unlawful "tie out" agreements to prevent Championship-Caliber Boxers from contracting with legitimate promoters of their choice;

D.      surreptitiously operating in the promotion business through "sham" promoters;

E.      locking up boxing talent, venues, and television networks in exclusive dealing arrangements;

F.      paying broadcast companies for exclusive rights to television air time on most U.S. networks, so as to illegally present and promote televised boxing matches and to exclude legitimate promoters from promoting such matches on network television and to enhance the Haymon Defendants' unlawful presence in the promotion business and ability to monopolize that business;

G.      misappropriating trade secrets from legitimate promoters; and

H.      other unlawful, anticompetitive, and tortious conduct.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

63.     As a direct and proximate result of this illegal, tortious, and anticompetitive conduct, Defendants have undermined and foreclosed competition in a substantial share of the affected commerce.  Specifically, Defendants have maintained and expanded the Haymon Defendants' monopoly in the primary relevant market for management of Championship-Caliber Boxers, and caused a significant adverse effect on a substantial volume of commerce in the secondary relevant market for promotion of such boxers.

64.     The anticompetitive effect of the Defendants' unlawful and anticompetitive conduct outweighs any ostensible procompetitive benefits.

65.     As a direct and proximate result of Defendants' unlawful and anticompetitive conduct, Plaintiffs have been injured and damaged in its business and property.

## THIRD CLAIM

### (Attempted Monopolization in Violation of 15 U.S.C. § 2 –
### Against All Defendants)

66.     Plaintiffs incorporate each preceding and succeeding paragraph as though fully set forth herein.

67.     Defendants have engaged in the predatory and anticompetitive conduct alleged hereinabove to leverage the Haymon Defendants' monopoly power in the market for management of Championship-Caliber Boxers, in an attempt to obtain a monopoly in the market for promotion of Championship-Caliber Boxers, in violation of Section 2 of the Sherman Act.  15 U.S.C. § 2.  This scheme includes, but is not limited to, the following actions:

A.      violating the prohibition, under state and federal law, against acting as both manager and promoter, so as to gain an unfair advantage over legitimate promoters;

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

B.      violating numerous federal and state laws and regulations governing promoters with which legitimate promoters must comply;

C.      entering into unlawful "tie out" agreements to prevent Championship-Caliber Boxers from contracting with legitimate promoters of their choice;

D.      surreptitiously operating in the promotion business through "sham" promoters;

E.      locking up boxing talent, venues, and television networks in exclusive dealing arrangements;

F.      paying broadcast companies for exclusive rights to television air time on most U.S. networks, so as to illegally produce and promote television boxing matches and to exclude legitimate promoters from promoting such matches on network television and to enhance the Haymon Defendants' unlawful presence in the promotion business and ability to monopolize that business;

G.      misappropriating trade secrets from legitimate promoters and others; and

H.      other unlawful, anticompetitive, and tortious conduct.

68.     The Haymon Defendants' dominance in the primary relevant market of managing Championship-Caliber Boxers is sufficient to substantially affect competition in the secondary relevant market of promoting such boxers.  Their ability to use this power in the primary relevant market to foreclose competition in the secondary relevant market is enhanced by the susceptibility of boxers to become "locked in."

69.     Defendants have engaged in predatory and anticompetitive conduct as alleged hereinabove with the specific intent to allow the Haymon Defendants to monopolize the market for promotion of Championship-Caliber Boxers.  If left unchecked, the Haymon Defendants have a dangerous probability of obtaining monopoly in that market.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

70.     As a direct and proximate result of Defendants' unlawful and anticompetitive conduct, Plaintiffs have been injured and damaged in its business and property.

## FOURTH CLAIM

### (Injunctive Relief Under 15 U.S.C. § 26 -- Against All Defendants)

71.     Plaintiffs incorporate each preceding and succeeding paragraph as though fully set forth herein.

72.     As previously alleged, Defendants' illegal, tortious, and anticompetitive scheme violates Sections 1 and 2 of the Sherman Act.

73.     As a direct and proximate result of Defendants' unlawful and anticompetitive conduct, Plaintiffs have been injured and damaged in their business and property.

74.     Unless enjoined, Defendants' unlawful and anticompetitive conduct will continue and cause further injury to competition, and Plaintiffs will continue to suffer irreparable injury for which there is no adequate remedy at law.

75.     Plaintiffs therefore seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to correct for the anticompetitive effects caused by Defendants' unlawful and anticompetitive conduct, and other relief so as to assure that such conduct does not continue or reoccur in the future.

## FIFTH CLAIM

### (Unfair Competition – Against All Defendants)

76.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

77.     California Business and Professions Code § 17,200 et seq. defines as "unfair competition" any unlawful business practice.  As alleged hereinabove, the

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1  business practices of the Haymon Defendants violate numerous regulations and

2  laws, are patently "unlawful" and thus "unfair competition."

3  **The Laws Violated**

4  78.  The laws violated by the Haymon Defendants include the following:

5  A.  The Muhammad Ali Boxing Reform Act 15 U.S.C. § 1631 et

6  seq. (the "Ali Act") explicitly creates a "Firewall between promoters and

7  managers" and provides, inter alia, that it is unlawful for "a manager" to have "a

8  direct or indirect financial interest in the promotion of a boxer" or "to receive

9  compensation or other benefits from a promoter."  15 U.S.C. § 6308(b)(1)(B).  In

10  addition, Sections 6307e(a) and (b) require promoters to make financial disclosures

11  with respect to each bout to the applicable State Athletic Commissions and to the

12  boxers they promote, and preclude a promoter from receiving the proceeds of a

13  bout without having complied with these requirements.  15 U.S.C. § 6309 makes it

14  a federal crime to violate these requirements.

15  B.  The California Code of Regulations, CCR Title 4 contains

16  similar provisions.  For example, CCR 396 provides it is unlawful for "any

17  member, stockholder, director or officer [of a promoter]" to "act directly or

18  indirectly as manager of a boxer."  The CCRs contain other provisions regulating

19  the conduct of boxing promoters and managers, by requiring promoters to be

20  licensed as such and requiring that their contracts be in writing on prescribed and

21  approved forms and meet specified standards.

22  C.  Nevada law makes it illegal to act as a promoter without a

23  license to so act.  Nevada Revised Statute §§ 467.080, 467.104.  The Nevada

24  Administrative Code also prohibits a promoter from acting directly or indirectly as

25  a manager or holding any financial interest in a boxer's management or earnings

26  from boxing matches.

27  D.  The Sherman Act, 15 U.S.C. §§ 1 and 2 make the conduct of the

28  Haymon Defendants illegal, in the respects alleged hereinabove.

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

## The Defendants' Conduct Violates The Applicable Laws

79.     The conduct of the Haymon Defendants alleged hereinabove violates the Ali Act, and particularly 15 U.S.C. § 6308(b)(1)(A) and (B) and § 6307(e)(a) and (b), in that the Haymon Defendants are managers and not only have "a direct or indirect financial interest in the promotion of a boxer," but have actually functioned and are actually functioning as both managers and unlicensed promoters, have failed to provide the boxers they promote or state boxing commissions with the financial disclosures required by the Ali Act and have unlawfully received the proceeds of numerous bouts without such compliance.

80.     The conduct of the Haymon Defendants alleged hereinabove also violates Title 4, Sections 211(3), 213, 220, 221, 222, 230, 243 263 and 396 of the California Code of Regulations, as well as Nevada Revised Statute Sections 467.080 and 467.104 as well as the Nevada Administrative Code, in that the Haymon Defendants regularly and repeatedly function as both managers and promoters, and do so without being licensed as promoters and without the promotional contracts required by law, and in that the Haymon Defendants prevent the boxers they manage from signing contracts with any legitimate promoters, as the law requires.

81.     By reason of the facts alleged hereinabove, the Haymon Defendants have also violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

82.     The unlawful conduct of the Haymon Defendants alleged hereinabove was devised in and is managed in and emanates from California and has a significant impact in and on California and California consumers.

83.     The acts of the Haymon Defendants alleged hereinabove constitute unlawful business practices under federal and state law and are thus unfair competition as defined in California Business and Professions Code Section 17,200 et seq.  If not enjoined, the Haymon Defendants will continue their unlawful acts of unfair competition.

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION

## **The Need For Equitable Relief**

84.    As a direct and proximate result of the illegal conduct and unfair competition of the Haymon Defendants, plaintiffs are entitled to restitution from defendants in a substantial sum.  The full amount of that sum is difficult, if not impossible to compute or measure accurately, so that, if the Haymon Defendants are allowed to continue their illegal acts of unfair competition, plaintiffs will suffer severe and irreparable harm for which they have no adequate remedy at law.

WHEREFORE, plaintiffs pray judgment against defendants jointly and severally as follows:

1.    For an injunction, permanently and pending final judgment in this case, precluding defendants and each of them, and the agents, employees and representatives of each of them, from having any direct or indirect financial interest in the promotion of bouts featuring boxers they manage, from acting as both boxing managers and boxing promoters, from presenting, or participating in the presentation of, boxing matches on television featuring such boxers, or from arranging the arenas, sponsors and/or television broadcasts of boxing matches featuring boxers defendants manage, from directing or otherwise causing or inducing boxers not to sign contracts with Golden Boy or other promoters, from attempting, in any way, to prevent plaintiffs from obtaining venues or other essential facilities for the boxing matches plaintiffs promote, from raiding Golden Boy's employees, from using Golden Boy's trade secrets to lure business from it, and from attempting, in any other way, to monopolize the business of promoting Championship-Caliber Boxers in the United States, and from financing or otherwise aiding or abetting commission of any of the acts so enjoined;

2.    For damages in the sum of $100 million or such other sum as shall be found;

3.    That such damages be trebled pursuant to 15 U.S.C. § 15;

4.    For restitution in such amount as shall be found;

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1       5.      For interest at the highest lawful; rate on all monetary awards;

2       6.      For plaintiffs' reasonable attorneys' fees; and

3       7.      For costs of suit and such other or further relief as the Court shall

4 deem just.

5

6 DATED:  May 5, 2015          GREENBERG GLUSKER FIELDS
                         CLAMAN & MACHTINGER LLP

7

8

9                        By: /s/ Bertram Fields
                         BERTRAM FIELDS (SBN 024199)

10                      Attorneys for Plaintiffs Golden Boy
                       Promotions LLC and Bernard Hopkins

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1

## **DEMAND FOR JURY TRIAL**

2          Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by

3    jury on all issues so triable.

4

5    DATED:  May 5, 2015                    GREENBERG GLUSKER FIELDS
                                             CLAMAN & MACHTINGER LLP
6

7

8                                            By: /s/ Bertram Fields
                                                 BERTRAM FIELDS (SBN 024199)
9                                                Attorneys for Plaintiffs Golden Boy
                                                 Promotions LLC and Bernard Hopkins

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590

COMPLAINT FOR SHERMAN ACT VIOLATION
AND UNFAIR COMPETITION