# EXHIBIT 2

Redacted Version of Document Proposed to be filed Under Seal

# Redacted Version of Document
# Proposed to be Filed Under Seal

QUINN EMANUEL URQUHART
& SULLIVAN, LLP
John B. Quinn (SBN 90378)
johnquinn@quinnemanuel.com
Michael E. Williams (SBN 108542)
michaelwilliams@quinnemanuel.com
Adam B. Wolfson (SBN 262125)
adamwolfson@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000
Facsimile:  213.443.3100

Attorneys for Defendants Haymon Boxing
LLC, Haymon Sports LLC, Haymon Boxing
Management, and Haymon Holdings LLC,
Alan Haymon, and Alan Haymon
Development, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN BOY PROMOTIONS, LLC, GOLDEN BOY PROMOTIONS, INC., and BERNARD HOPKINS,<br><br>    Plaintiffs,<br><br>    v.<br><br>ALAN HAYMON *et al.*,<br><br>    Defendants. | Case No.  2:15-cv-03378 JFW (MRWx)<br><br>*Assigned to Hon. John F. Walter*<br>*Magistrate Judge:  Hon. Michael R.*<br>*Wilner*<br><br>**DEFENDANTS' INITIAL DISCLOSURES OF EXPERT WITNESSES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)**<br><br>Action Filing Date: May 5, 2015 |

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Defendants Haymon Boxing LLC, Haymon Sports LLC ("Haymon Sports"), Haymon Holdings LLC, Haymon Boxing Management, Alan Haymon Development, Inc. (collectively, the "Haymon Entities") and Alan Haymon (together, with the Haymon Entities, the "Haymon Defendants") hereby designate the following persons as expert witnesses whose testimony Defendants intend to introduce at the trial of this matter:

1.    Duncan J. Cameron, Ph.D.  A copy of Dr. Cameron's expert report is attached hereto as Exhibit 1.

2.    Kery Davis, Esq.  A copy of Mr. Davis's expert report is attached hereto as Exhibit 2.

3.    Steve Farhood.  A copy of Mr. Farhood's expert report is attached hereto as Exhibit 3.

4.    Michael P. Smith, Ph.D.  A copy of Dr. Smith's expert report is attached hereto as Exhibit 4.

The Haymon Defendants have not completed their investigation of all facts and circumstances relating to this action.  Continuing investigation and discovery may require the Haymon Defendants to supplement these disclosures of expert witnesses and/or identify other potential expert witnesses.  The Haymon Defendants reserve the right to correct, modify and/or supplement the attached reports at later stages of this litigation with whatever pertinent information they may subsequently discover and/or with facts or information omitted as a result of mistake, oversight, inadvertence or changed circumstances.

**EXHIBIT 2**

**4**

1   DATED:  September 27, 2016          QUINN EMANUEL URQUHART &
2                                       SULLIVAN LLP

3                                       By: */s/ Michael E. Williams*
4                                               John B. Quinn
                                                Michael E. Williams
5                                               Adam Wolfson
6                                       Attorneys for Defendants Haymon Sports LLC,
                                        Haymon Boxing LLC, Haymon Boxing
7                                       Management and Haymon Holdings LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' INITIAL DISCLOSURES OF EXPERT WITNESSES
**EXHIBIT 2**                                                    **5**

# Exhibit 1

EXHIBIT 2                                                    6

*CONFIDENTIAL*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

GOLDEN BOY PROMOTIONS, LLC,
GOLDEN BOY PROMOTIONS, INC.,
AND BERNARD HOPKINS,

        Plaintiffs,

    v.

ALAN HAYMON, ALAN HAYMON
DEVELOPMENT, INC., HAYMON
HOLDINGS, LLC, HAYMON SPORTS,
LLC, HAYMON BOXING
MANAGEMENT, HAYMON BOXING
LLC, and RYAN CALDWELL,

        Defendants.

**Expert Report of Dr. Duncan J. Cameron**

**EXHIBIT 2**        **7**

# Exhibit 2

EXHIBIT 2                                        96

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

GOLDEN BOY PROMOTIONS, LLC, et al.

        Plaintiffs,

  v.

ALAN HAYMON, et al.

        Defendants.

**EXPERT REPORT OF KERY DAVIS, ESQ.**

**EXHIBIT 2**                                                97

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..........................................................................................1

    A.   Background and Qualifications ...........................................................1

    B.   Prior Association with Parties and Witnesses to this Lawsuit................2

    C.   Prior Retentions as an Expert Witness; Prior Publications...................3

    D.   Retention in This Matter ....................................................................3

II.   SUMMARY OF OPINIONS ........................................................................4

III.   MANY BOXING PROMOTERS DO NOT TAKE SIGNIFICANT FINANCIAL RISK ........................................................................................5

IV.   "CHAMPIONSHIP CALIBER BOXER" IS NOT A RECOGNIZED TERM IN THE BOXING INDUSTRY........................................................6

V.   BOXING MANAGERS HAVE FREQUENTLY NEGOTIATED DIRECTLY WITH TELEVISION NETWORKS; HAYMON SPORTS IS NOT UNUSUAL IN THIS RESPECT ...............................................................................6

VI.   IF SUCCESSFUL, THE PBC SERIES IS LIKELY TO BENEFIT, NOT HARM, THE BOXING INDUSTRY........................................................................8

VII.   CONCLUSION............................................................................................10

i

**EXHIBIT 2**                    98

**Expert Report of Kery Davis, Esq.**

## I. INTRODUCTION

### A. Background and Qualifications

1. I am presently the Director of Athletics at Howard University, a position I assumed in September 2015. Founded in 1867, Howard University is a private, research university in Washington, D.C. with 19 NCAA Division I athletic programs.

2. I hold a B.A. from Dartmouth College, and I also hold a J.D. from Cornell University.

3. From 1997 to 2013, I worked as an executive at HBO Sports with a particular focus on boxing programming. I began my HBO career as a Director of Programming and Business Affairs. I was later promoted to Vice President, and ultimately to Senior Vice President, a position I held for more than a decade.

4. As Senior Vice President at HBO Sports, I was the primary negotiator for the major fights the network aired across its several boxing platforms, including "HBO Championship Boxing," the bouts for which featured prominent champions and contenders; "HBO Boxing After Dark," which matched rising prospects and contenders in competitive bouts; and HBO PPV, which aired some of the largest events in the sport during that period, including: Lennox Lewis vs. Mike Tyson in June 2002, which did almost two million PPV buys; Oscar De La Hoya vs. Shane Mosley II in September 2003, which did 950,000 PPV buys; and Oscar De La Hoya vs. Floyd Mayweather in May 2007, which did 2.4 million PPV buys.

5. In putting together deals for HBO, I dealt with stakeholders from every corner of the boxing business, from boxers to promoters to managers to the print and digital media. My duties included buying boxing programming for the network; selecting the fights that would appear on the HBO PPV platform; negotiating relevant contracts with content providers; developing boxing-related "shoulder programming" for HBO and HBO's digital platforms, including the highly-regarded "24/7" series, which received 7 Sports Emmy nominations in 2014 alone; and negotiating the sales of international rights for HBO's boxing programming.

6.      In addition to negotiating contracts for individual HBO Boxing events, I was deeply involved in the decision-making process about the overall direction of the HBO boxing franchise.  As Senior Vice President, I reported directly to the head of HBO Sports, which was initially Ross Greenburg, and later Ken Hirschman.  During this time, HBO was regarded throughout the industry as the leader in boxing television, though we also faced spirited competition from Showtime.  HBO Boxing was repeatedly recognized at the Sports Emmy Awards and elsewhere for its outstanding boxing programming and the technical innovations we brought to the sport.

7.      My current resume is Exhibit A to this report.

**B.      Prior Association with Parties and Witnesses to this Lawsuit**

8.      During my time at HBO, I worked closely with many people in the boxing industry, including a number of individuals and entities involved in this matter.  For example, I worked closely with executives of Golden Boy Promotions, including Oscar De La Hoya, Richard Schaefer, Eric Gomez, and others.  When Golden Boy was a relatively new promotional company, HBO entered into a development agreement with Golden Boy under which Golden Boy was initially the exclusive supplier for fights on HBO Latino; one series produced under this agreement was called "Oscar De La Hoya Presents Boxeo de Oro."  This initial development opportunity with HBO was widely credited with helping nurture Golden Boy's growth into an established promoter.

9.      HBO later entered into an output agreement with Golden Boy that gave Golden Boy the right to present 3-4 shows annually on HBO Boxing After Dark and HBO Championship Boxing.  This deal lasted from 2007-2011.  Many of the shows presented under the HBO/Golden Boy output deal were very successful for both companies.  Some other boxing promoters complained to me that this output agreement gave Golden Boy an unfair advantage in the promotional market.  HBO's relationship with Golden Boy lasted until March 2013, when

HBO Sports president Ken Hirschman decided to sever ties between the two companies.[1]  I was not involved in that decision.

10.      During my time at HBO, we presented several PPV events featuring Bernard Hopkins, one of the elite boxers of his era and, I understand, a plaintiff in this case.  On many occasions I dealt directly with Mr. Hopkins and his representatives.  Also, my deposition was taken in a defamation lawsuit brought by promoter Lou DiBella against Mr. Hopkins in 2002.  I was called to testify at trial by Mr. DiBella's attorneys.

11.      While at HBO, I also worked with Al Haymon.  Haymon Sports had managerial or advisory relationships with a number of boxers that were attractive to HBO Sports, and I made deals with Haymon Sports clients that I believed were in the best interests of HBO.  Many of the shows HBO presented featuring Haymon Sports clients, some of which were promoted by Golden Boy, were very successful for everyone involved.

12.      Gary Shaw Productions also did business with HBO during my time there.  I also worked with Mr. Shaw while he was COO of Main Events, Inc., another promoter that presented shows on HBO.

**C.      Prior Retentions as an Expert Witness; Prior Publications**

13.      I have never been retained as an expert witness.

14.      I have not authored any publications in the last 10 years.

**D.      Retention in This Matter**

15.      I have been retained by the law firm Quinn Emanuel Urquhart & Sullivan, LLP to offer expert opinions on behalf of Alan Haymon, Alan Haymon Development, Inc., Haymon Holdings, LLC, Haymon Sports, LLC, Haymon Boxing Management, and Haymon Boxing LLC (the "Haymon Defendants").  I am being compensated for my time at the rate of $500 per hour.

---

[1]   Dan Rafael, "HBO Severs Ties With Golden Boy," *ESPN.com*, Mar. 20, 2013, *available at http://www.espn.com/boxing/story/_/id/9067117/hbo-puts-end-partnership-golden-boy*.

16.     The documents I reviewed in connection with my work in this matter are listed at Exhibit B.

## II.     SUMMARY OF OPINIONS

17.     I have been asked to respond to the Expert Report of Gary Shaw.  While some of what Mr. Shaw states in his report is consistent with my experience working in boxing programming at HBO, I disagree with his opinions in certain key respects.

18.     First, Mr. Shaw is incorrect in broadly asserting that boxing promoters take significant financial risk.  While some promoters are willing and able to take financial risks, the business model pursued by many promoters is to first secure television license fees and sometimes site fees that cover most or all of their expenses in promoting a fight card.  In this respect, many of these companies operate more as "packagers" than as actual promoters.

19.     Second, Mr. Shaw is incorrect in suggesting that "boxing stars are sometimes called championship caliber boxers."  In my 16 years in boxing, I do not recall ever hearing or using this term in the course of my business dealings.  There are champions, there are PPV stars, there are contenders, there are prospects, and there are opponents—but I am not familiar with the term "championship caliber boxers" outside the context of Mr. Shaw's report and this litigation.

20.     Third, Mr. Shaw is incorrect in asserting that it is the exclusive province of the boxing promoter to deal with television networks in connection with televised boxing events.  While I was at HBO, several prominent managers dealt directly with HBO on behalf of their star fighters.  Mr. Haymon, who also dealt directly with HBO, was not at all unusual.  Negotiating with a television network on behalf of a boxer does not make one a promoter.

21.     Fourth, Mr. Shaw is incorrect in asserting that the PBC series and its creators somehow have an unfair advantage over existing industry stakeholders like HBO, Showtime, Top Rank, and Golden Boy, or that the PBC series' business model is somehow bad for the boxing industry.  The PBC series certainly has made the boxing business more competitive, which may be uncomfortable for those who were content with existing arrangements.  But if Haymon Sports succeeds in growing the audience for professional boxing by broadcasting fights on network television, broadly speaking that should help, not hurt, other industry players.

4

**EXHIBIT 2**

102

Indeed, there is no reason why a star boxer cannot successfully appear on all three television platforms in the course of his career: network television; premium cable; and PPV. And, in fact, a person who is exposed to boxing on network television and who becomes a boxing fan is more likely—not less likely—to also consume boxing on premium cable and even PPV platforms. A rising tide in boxing would lift all boats, and it is my opinion that this is exactly what the PBC series is doing for the sport and for the boxers that risk their well-being by stepping into the ring.

## III.   MANY BOXING PROMOTERS DO NOT TAKE SIGNIFICANT FINANCIAL RISK

22.   Mr. Shaw suggests in his report that boxing promoters take significant financial risk, require significant capital to operate successfully, and that "[s]uccessfully promoting boxing events is a complicated business."[2] None of those things is true in all instances.[3] Some promoters act as packagers, assembling the fighters and the venue, and then securing a television rights fee that in many instances covers most or all of their projected expenses. By the time all the contracts are signed, a promoter has generally already locked in a profit.[4]

23.   In this sense, Mr. Shaw's analogy between boxing promoters and Ringling Brothers is not apt. Indeed, Mr. Shaw himself acknowledges that "the availability of television rights fees is essential to a promoter's ability to profitably promote boxing events"[5]; in other words, Mr. Shaw's business model does not work without television. That much we agree upon.

24.   I also agree with Mr. Shaw's observation that "boxing has traditionally been led by a handful of successful promoters at any given time."[6] Where Mr. Shaw and I appear to part

---

[2]   Shaw Report at 2.

[3]   Both Golden Boy President Eric Gomez said that while PPV shows present some financial risk because the number of buys cannot be known in advance, with other events there is no such risk because the promoter is aware in advance of the revenues it can expect to receive. Gomez Depo. at 201:3 – 202:10.

[4]   Golden Boy President Eric Gomez testified that Golden Boy generally would not do an event that financial projections did not show would be profitable. Gomez Depo. at 203:3-19.

[5]   Shaw Report at 5.

[6]   Shaw Report at 3.

**EXHIBIT 2**

company is that he seems to regard this as a healthy and inevitable state of affairs, a view with which I cannot concur. An oligopoly market in which just a few promoters have the power to get boxers on television is one that is rife with potential for abuse of the boxers themselves. As Oscar De La Hoya himself has observed, "the Don Kings and Bob Arums have had a chokehold on this sport for the last 40 years."[7]

## IV.   "CHAMPIONSHIP CALIBER BOXER" IS NOT A RECOGNIZED TERM IN THE BOXING INDUSTRY

25.     Mr. Shaw says that "[b]oxing stars are sometimes called championship caliber boxers."[8] In my 18 years in boxing, I do not recall hearing or using this term in the course of my business dealings. There are champions, there are PPV stars, there are contenders, there are prospects, and there are opponents—but I am not familiar with the term "championship caliber boxers" outside the context of Mr. Shaw's report, nor am I familiar with any generally accepted or recognized definition of the term, which strikes me as highly subjective.

26.     In addition, Mr. Shaw's definition of a championship caliber boxer unwittingly reveals the fluid nature of the categories I listed immediately above. There are constantly new stars being made, either by virtue of a relatively unknown fighter achieving an upset victory over an established star, or a talented contender's maturation into a champion and then, ultimately, into a star through greater experience and media exposure.

## V.   BOXING MANAGERS HAVE FREQUENTLY NEGOTIATED DIRECTLY WITH TELEVISION NETWORKS; HAYMON SPORTS IS NOT UNUSUAL IN THIS RESPECT

27.     Mr. Shaw states that "[i]n the planning stages for a boxing event, a boxing promoter negotiates with the television broadcaster for the rights to broadcast the event. This, of course, includes negotiation of the rights fees to be paid, but also includes negotiation of the

---

[7]   *See* Ben Grossman, "Oscar De La Hoya's New Fight," broadcastingcable.com, Sept. 27, 2010, *available at http://www.broadcastingcable.com/news/news-articles/oscar-de-la-hoya-s-new-fight/126187.*

[8]   Shaw Report at 5.

manner of producing the television broadcast and other essential items."[9]  In my experience working at HBO, the division between promoters and managers in terms of dealing with television was not nearly as stark as Mr. Shaw suggests.  Indeed, I dealt directly with a number of managers in my role as the negotiator for the fights HBO bought and broadcast across its platforms.

28.     Former prominent manager, Shelly Finkel, whose International Boxing Hall of Fame career included managing fighters such as include Mike Tyson, Manny Pacquiao, Evander Holyfield, Pernell Whitaker, Meldrick Taylor, the Klitschko brothers, and Mike McCallum, often negotiated the basic terms of HBO multi-bout agreements and bout agreements for his boxers directly with me.  Indeed, Mr. Finkel insisted on having a standing monthly lunch date with me at which he could pitch me various proposals for his fighters.  HBO did do a number of deals with Mr. Finkel's clients while I was at the network, and Mr. Finkel always retained a licensed promoter to handle the advertisement and promotion of the fight.  In the case of the Klitschko brothers, who had their own promotional company, K2 promotions, Mr. Finkel handled the negotiations for the network agreements, while the role of the promoter was limited to matters such as logistics, ticket sales and merchandise sales.

29.     Mr. Finkel was not alone among managers in this respect.  I often dealt directly with Evander Holyfield's lawyer, Jim Thomas, in arranging the PPV events that HBO did featuring Mr. Holyfield.  Likewise, Naseem Hamed's older brother and manager, Riath Hamed, negotiated directly with me for Naseem Hamed's multi-bout HBO agreement, and for various bouts held pursuant to that agreement.  For Naseem Hamed's bouts in the United States, Riath Hamed's practice generally was to hire a different local promoter for each bout.

30.     In this respect, Al Haymon's negotiating directly with broadcasters is not unprecedented or unusual.  There was no practice at HBO concerning which representative of the boxer we dealt with.  Sometimes that was a manager, sometimes it was a promoter, and sometimes it was an attorney or family member.  Frequently, we took our guidance from the

---

[9]  Shaw Report at 7.

fighter.  In terms of negotiating the HBO deal, we did not draw a distinction among the various kinds of advisors that fighters often employ.

31.    Mr. Shaw also states that "In my experience, a television network would not agree to broadcast a boxing event unless it was confident that the promoter responsible for making that show happen has the necessary experience and ability to put on a quality event and to comply with all state athletic commission requirements.  Because of this, the television contracts confirm that the networks view Haymon as the promoter and are comfortable that he will be responsible for all aspects of making the shows happen."[10]  I do not understand the basis for this statement. *First*, my understanding is that the PBC series always uses promoters duly licensed in the states where the events take place, and I am not aware of any claim the PBC series events do not "comply with all state athletic commission requirements."  *Second*, as I stated above, while I was at HBO, we frequently negotiated key terms with certain managers, who then hired promoters to handle advertising and promotional aspects of staging the event.  I did not, and my colleagues at HBO did not regard those managers as promoters.

## VI.    IF SUCCESSFUL, THE PBC SERIES IS LIKELY TO BENEFIT, NOT HARM, THE BOXING INDUSTRY

32.    Mr. Shaw contends that the PBC series business model "has had negative impacts on the sport as a whole."[11]  I find this claim extremely puzzling.  My understanding is that the PBC series has brought boxing back to networks, including NBC and CBS, who had all but abandoned the sport after long prior histories of showing boxing.  The PBC series has also brought boxing to distribution outlets with no prior history of televising boxing, including Spike TV and Bounce.  Introducing boxing to new audiences through free network television can only be good for the game, especially if the programming is compelling.

33.    Mr. Shaw's claim that "Haymon's model has diluted the overall quality of boxing on television" is simply inaccurate.[12]  The PBC series fights that have appeared on ESPN are far

---

[10]    Shaw Report at 9.

[11]    Shaw Report at 12.

[12]    *Id.*

superior in quality to the fights ESPN2 was previously showing as part of its "Friday Night Fights" series.  And several PBC series fights have been candidates for fight of the year, including the Glowacki-Huck fight at the Prudential Center in Newark, New Jersey in August 2015, broadcast on Spike[13], and the Thurman-Porter fight at the Barclays Center in Brooklyn in June 2016.[14]  Meanwhile, HBO and Showtime continue to present strong offerings, both on their regular platforms and as PPV events.  There is no question that there is more good boxing on television now than there was prior to the PBC series.  This is not to suggest that every televised bout is thrilling; but such is the nature of the game.

34.     Mr. Shaw's claim that because the PBC series has taken up "so many time slots on the broadcasters who carry boxing" that "there is realistically no available time on those networks for additional boxing programming"[15] strikes me as wrong as a matter of common sense.  *First*, Mr. Shaw ignores that many of the "broadcasters who carry boxing" were not doing so before they were approached by Haymon Sports[16]; *second*, Top Rank, Inc., Golden Boy, and Main Events work regularly with premium cable networks (like HBO), traditionally the most important television force in the sport, as well as with PPV distributors (like HBO PPV); and *third*, since the PBC series started in March 2015, both Top Rank (TruTV) and Golden Boy (Estrella TV) have signed substantial new deals to present boxing on television networks that had not previously aired boxing programming, while Roc Nation signed a deal to present boxing on BET, which had not aired boxing since the early 1990's.

---

[13]   *See* Dan Rafael, "Scorecard: Krzysztof Glowacki's win over Marco Huck is one to remember," *ESPN.com*, Aug. 17, 2015, *avaialable at http://www.espn.com/boxing/story/_/id/13454023/krzysztof-glowacki-win-marco-huck-one-remember* ("How good was this ferocious fight? It is a very strong candidate for fight of the year, round of the year (the sixth), knockout of the year and upset of the year.").

[14]   *See* Dan Rafael, "Scorecard: Thurman, Porter deliver more than expected," *ESPN.com*, June 27, 2016, *available at http://www.espn.com/boxing/story/_/id/16558568/keith-thurman-shawn-porter-stage-epic-welterweight-title-bout* ("Thurman and Porter--both elite fighters with exciting styles, good personalities and a willingness to fight each other—gave us all something to be proud of as boxing fans.").

[15]   Shaw Report as 12.

[16]   Golden Boy CEO Oscar De La Hoya has confirmed that prior to the PBC series, Golden Boy was not promoting events on any of the networks now airing PBC series shows.  De La Hoya Depo. at 214:11 – 216:17.

35. Finally, Mr. Shaw's claim that "Haymon's willingness to pay television broadcasters, rather than the other way around, has eroded the value of television rights fees," seems to me grossly overstated. HBO and Showtime continue to pay substantial license fees, just as they did before the PBC series. Spike TV pays license fees for the PBC series. And the platform for boxing's most lucrative bouts, PPV, is entirely unaffected by the Haymon Sports time buys, as evidenced by the May 2015 PPV bout between Floyd Mayweather and Manny Pacquiao, which was by far the most lucrative boxing event ever presented.[17]

## VII. CONCLUSION

36. Some of the observations in Mr. Shaw's report simply are not consistent with my 16 years' experience working in the business of boxing, during which I dealt with a broad variety of stakeholders. The boxing business is, in certain respects, more complex than he makes it seem. At the same time boxing, like any other business, is subject to market forces. Perhaps my most basic disagreement with Mr. Shaw is over whether the increased competition brought by the PBC series is likely to be good or bad for the sport.

Dated: _____9/27/16_____      _____
                                          Kery Davis, Esq.

---

[17] *See* Kevin Iole, "Showtime's Stephen Espinoza: Mayweather Deal A Resounding Success," *Yahoo.com*, Sept. 10, 2015, *available at http://sports.yahoo.com/blogs/boxing/showtime-s-stephen-espinoza-000634474.html* ("The Mayweather-Pacquiao fight broke every financial record that exists in boxing, including largest paid gate ($72 million), pay-per-view revenue (more than $400 million) and pay-per-view sales (4.6 million).").

**EXHIBIT 2**                                                                 **108**

# Exhibit A

EXHIBIT 2                                    109

# KERY D. DAVIS

1 SUNFLOWER DRIVE
UPPER SADDLE RIVER, NJ 07458
917-291-0498
KERYDDAVIS@GMAIL.COM

---

**SUMMARY OF QUALIFICATIONS**

Highly respected senior network executive with over 25 years of experience and well-documented success at the highest level of sports, television and entertainment. A veteran of complex negotiations and dealings involving domestic and international television outlets, sports leagues (including the *NFL, NHL* and *NBA*), players' unions and world-class athletes.  Recognized amongst *Sports Illustrated's "most powerful minorities in sports"* and *Black Enterprises' "most powerful African Americans in sports."*

**RELEVANT EXPERIENCE**

**Howard University**                                                                                    Washington, DC
***Director of Intercollegiate Athletics***
*2015-Present*

Responsible for the direction and supervision of Howard University's 19 Division I sports programs and 350 student athletes.

Accomplishments include two conference championships and NCAA appearances for Women's Soccer and Women's Volleyball. Howard's first appearance in the NCAA Tournament since 2005.

Negotiated an exclusive multi-year apparel agreement with Under Armour, the first such deal for an Historically Black College and University.

Oversaw the Academic Improvement Plan of the department resulting in 134 athletes named to the Conference All-Academic team with an overall department GPA of 3.1

**HBO (HOME BOX OFFICE, INC.)**                                                      New York, NY
***Senior Vice President, HBO Sports***
*November 1997–2014*

Responsible for defining and implementing the strategic direction of HBO's Boxing programming division and for international sales of HBO's Sports programming throughout the World, reaching approximately 30 million U.S. subscribers and as many as 80 million households worldwide.

Identified and help build many of the networks top sports stars including Floyd Mayweather, Manny Pacquiao, Roy Jones, Jr. and Oscar De La Hoya through brand marketing, strategic partnerships and innovative programming ideas.

Negotiated complex multi-year rights agreements with leagues and athletes, including the production and licensing deal with the *National Football League* for the longest running cable television series in history, *Inside the NFL* and the Emmy award winning series *Hard Knocks*. Also successfully negotiated numerous multi-year fight deals with HBO's biggest boxing stars such as Oscar De La Hoya, Roy Jones, Jr., Lennox Lewis, Shane Mosley, Manny Pacquiao and Floyd Mayweather, Jr. A member of the team that brokered the complex, groundbreaking, dual-network pay-per-view bout between Mike Tyson and Lennox Lewis.

Helped create groundbreaking programming for both television and digital formats including the award winning *24/7 Series*, *Ringlife* and *Face-Off*.

Managed sizable premium network budgets, meeting long and short-term financial mandates while driving viewership growth and maintaining the HBO brand worldwide.

Provided leadership, oversight and both strategic and creative direction to internal departments including HBO production, marketing, legal/business affairs, finance, scheduling, international sales, HBO.com, HBO-on-demand and media/public relations, on all sports related programming.

Served as HBO spokesperson on programming matters to the sports community and media.  Maintained respected and productive working relationships with sports rights holders, marketing and promotional partners, press, talent and talent representatives.

**EXHIBIT 2**                                                                                              110

RELEVANT
EXPERIENCE
(CONT.)

**REACH ENTERTAINMENT AND SPORTS**                                   New York, NY
*Vice President and General Council*
*1986-1997*
Served as chief negotiator for all company agreements, including theatrical and arena agreements for various concerts and musical performances.

Executive produced and co-produced groundbreaking theatrical projects, including the longest running off-Broadway musical in theatre history, a Tony Award winning Broadway play, an Olivier Award nominated musical on London's West End, and other domestic and international theatre productions, tours and musical concerts.

Executive produced several Award-Winning Pop and R&B albums recorded on the Capitol and EMI Record labels, as well as award-winning cast albums.

**GOLENBOCK AND BARELL, LLP**                                   New York, NY
*Entertainment Attorney*
*1984-1986*
Television/Theater Syndication and Rights Acquisitions, Mergers, and General Entertainment.

**CHADBOURNE AND PARKE, LLP**                                   New York, NY
*Attorney*
*1982-1984*
Corporate, Antitrust Litigation

EDUCATION

**CORNELL UNIVERSITY LAW SCHOOL**                                   Ithaca, NY
Juris Doctor Degree (1982)

**DARTMOUTH COLLEGE**                                   Hanover, NH
Bachelor of Arts Degree in Political Science (1979)
Varsity Basketball

MEMBERSHIPS

Bar of the State of New York, Admitted 1983 (inactive)
Chairman – Board of Directors, Mama Foundation
Trustee – Board of Directors, Council for Unity
Member, National Association for Multi-Ethnicity in Communications
Member, Archbishop's Leadership Project

**EXHIBIT 2**                                                                 **111**

# EXHIBIT B

EXHIBIT 2                                                    112

<u>Sources Relied Upon</u>

<u>Case Materials</u>

Second Amended Complaint, *Golden Boy Promotions, LLC v. Alan Haymon, et al.*, January 20, 2016

Deposition Testimony of Eric Gomez, Sept. 22, 2016.

Deposition Testimony of Oscar De La Hoya, Sept. 23, 2016.

<u>Sample Haymon Advisory/Management Agreements</u>

Haymon Agreement with Luis Collazo (HAYMON_00002375-83)

Haymon Agreement with Alejandro Gonzalez, Jr. (HAYMON_00002468-76)

Haymon Agreement with Carl Frampton (HAYMON_00002558-65)

Haymon Agreement with John Magda (HAYMON_00002807-14)

Haymon Agreement with Marvin Sonsona (HAYMON_00003019-26)

Haymon Agreement with Alejandro Luna (HAYMON_00003344-52)

Haymon Agreement with Jose Lopez (HAYMON_00004210-16)

Haymon Agreement with Raushee Warren (HAYMON_00004308-14)

Haymon Agreement with Mario Arano (HAYMON_00004574-77)

Haymon Agreement with Lee Selby (HAYMON_00004686-94

<u>Haymon Television Broadcaster Agreements</u>

Haymon Agreement with CBS Sports (DEF000610-34)

Haymon Agreement with ESPN (DEF000635-65)

Haymon Agreement with Fox Sports (DEF000666-674)

Haymon Agreement with Showtime Networks (DEF000686)

Haymon Agreement with NBC Universal (DEF000687-740)

Haymon Second Amended and Restated Agreement with NBC Universal (DEF000741-57)

Haymon Agreement with SPIKE TV (DEF000758-63)

Haymon Agreement with NBC Universal (HAYMON_00090806-23)

**EXHIBIT 2**                                                                 **113**

<u>News Articles</u>

Ben Grossman, "Oscar De La Hoya's New Fight," broadcastingcable.com, Sept. 27, 2010.

Dan Rafael, "HBO Severs Ties With Golden Boy," *ESPN.com*, Mar. 20, 2013.

Dan Rafael, "Scorecard: Krzysztof Glowacki's win over Marco Huck is one to remember," *ESPN.com*, Aug. 17, 2015.

Kevin Iole, "Showtime's Stephen Espinoza: Mayweather Deal A Resounding Success," *Yahoo.com*, Sept. 10, 2015.

Dan Rafael, "Scorecard: Thurman, Porter deliver more than expected," *ESPN.com*, June 27, 2016.

**EXHIBIT 2**                                           **114**

# Exhibit 3

EXHIBIT 2                    115

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

GOLDEN BOY PROMOTIONS, LLC, et al.

       Plaintiffs,

   v.

ALAN HAYMON, et al.

       Defendants.

**EXPERT REPORT OF STEVE FARHOOD**

**EXHIBIT 2**

## TABLE OF CONTENTS

Page

UNITED STATES DISTRICT COURT .......................................................................................1

I.    INTRODUCTION ...........................................................................................................1

    A.    Background and Work History ..............................................................................1

    B.    Prior Association with Parties to this Lawsuit........................................................3

    C.    Prior Retentions as an Expert Witness....................................................................4

    D.    Retention in This Matter ........................................................................................4

II.   SUMMARY OF OPINIONS ...........................................................................................5

III.  THE ARC OF MODERN BOXING AND THE IMPORTANCE OF TELEVISION TO THE BOXING INDUSTRY ................................................................6

IV.   SCANDAL AND PROMOTERS...................................................................................12

V.    THE PBC SERIES.........................................................................................................19

VI.   CONCLUSION..............................................................................................................24

**EXHIBIT 2**                                                                                                   **117**

**Expert Report of Steve Farhood**

## I.    INTRODUCTION

### A.    Background and Work History

1.    My name is Steve Farhood.  I have been a print and broadcast journalist for 38 years, principally covering the sport of boxing.  I have done so in a variety of roles, including editor, writer, broadcaster, editorial consultant, and book author.  My biography is attached to this report as Exhibit A.

2.    As a result, I have become widely known and respected as a boxing analyst and historian.  In almost four decades in the business, I believe that I have established an international reputation for honesty, integrity and professionalism.  This is reflected by the fact that I am the only journalist in the history of the Boxing Writers Association of America (BWAA) to receive all four of the following awards:

- 2002: Winner of the Sam Taub Award for Excellence in Broadcast Journalism[1]

- 2008: Winner of the James J. Walker Award for Long and Meritorious Service[2]

- 2010: Winner of the Nat Fleischer Award for Excellence in Boxing Journalism[3]

- 2012: Winner of the Marvin Kohn Good Guy Award[4]

3.    I graduated from New York University in 1978 with a B.A. in journalism.

---

[1]  International Boxing Hall of Fame, Boxing Writers Association of America Awards, *available at http://www.ibhof.com/pages/archives/bwaa.html.*

[2]  Id.

[3]  "Steve Farhood Snags BWAA Nat Fleischer Award," *The Sweet Science*, Dec. 26, 2010, *available at http://www.thesweetscience.com/articles-of-2010/11817-steve-farhood-snags-bwaa-fleischer-award.*

[4]  "Boxing luminaries to attend BWAA awards dinner on Thursday," *The Ring*, Apr. 9, 2013, *available at http://ringtv.craveonline.com/news/178193-boxing-luminaries-to-attend-bwaa-awards-dinner-on-thursday,*

4.     From 1978 to 1997, I was first Managing Editor, later Editor in Chief and then Executive Editor at London Publishing, where I oversaw the publication of as many as three boxing publications a month.  In 1980, I spearheaded the launch of *KO* magazine, which during my tenure grew quickly to rival *The Ring* as the world's leading boxing magazine.

5.     In 1989, I was named Editor in Chief of *The Ring*, which was founded in 1922 and for decades had been known as "The Bible of Boxing."  *The Ring* had suffered a decline in readership and reputation in the late 1970s and 1980s; during my tenure, I reestablished *The Ring* as the sport's leading publication.  I also worked as a columnist, feature writer, and associate editor for the British magazine "Boxing Monthly" from 1997 to 2015.

6.     In 1997, I resigned my position at London Publishing to pursue a career in boxing broadcasting.  I became a boxing correspondent for CNN, a regular contributor to HBO's boxing website, and ultimately, the analyst for Showtime's unique and innovative "ShoBox" series, which features bouts pitting top prospects against tough opposition.  In July 2016, "ShoBox" celebrated its 15th anniversary.  I have been the lead analyst throughout, having worked all 219 live broadcasts.  I also work in a variety of roles, including analyst, unofficial ringside judge, ringside reporter, and editorial consultant, for Showtime's flagship boxing series, "Showtime Championship Boxing," as well as boxing broadcasts on Showtime Pay-Per-View.  I also serve as analyst for boxing matches aired on Showtime Extreme (2012-present).

7.     In addition to my broadcast work for Showtime, I have served as an on-air analyst for ESPN, SportsChannel, Top Rank Boxing, and the "Star Boxing" and "Heavyweight Explosion" series.  I have also been an analyst on the New York-based "Broadway Boxing" since that series' inception in the mid-1990s.

8.     In August 1992, while editor in chief of *The Ring*, I was invited to testify before the United States Senate Committee on Governmental Affairs, which was investigating

corruption in professional boxing.  My testimony was on the subject of boxing ratings, in particular the manipulation of those rankings by promoters.[5]

9.      In 1993, BDD Illustrated Books published my book, "Boxing: The 20th Century," a history of the sport told through its most significant bouts, which was released in both the United States and the United Kingdom.[6]

10.     From 1993 to 2008, I served as First Vice President of the Boxing Writers Association of America (BWAA), a professional association that seeks to create better working conditions for boxing journalists and to promote excellence and integrity in the profession.

11.     In 1999, I served as an advisor to the National Association of Attorneys General Boxing Task Force, chaired by then-New York Attorney General Spitzer.  The Task Force was charged with examining the boxing industry, identifying existing problems and proposing recommendations to reform the industry.[7]

12.     On November 7, 2001, I organized and ran "Counterpunch!," a post-9/11 benefit held at Gleason's Gym in Brooklyn, New York, that raised $50,000 for the Twin Towers Fund.

**B.      Prior Association with Parties to this Lawsuit**

13.     At various times, I have had business relationships with several of the parties in this case.  For example, during my 15-year association with Showtime, I have broadcast many fight cards that were promoted by Golden Boy Promotions.  I have never worked directly for, or been paid by, Golden Boy.

---

[5]  Testimony of Steve Farhood before United States Senate Committee on Governmental Affairs, hearing on "Corruption in Professional Boxing," 103 S. Rpt. 408, Aug. 11, 1992.

[6]  Stanley Weston & Steve Farhood, "The Ring: Boxing The 20th Century," BDD Illustrated Books (New York, August 1993).

[7]  May 2000 press release, "National Association of Attorneys General Boxing Task Force," *available at http://www.ag.ny.gov/sites/default/files/press-releases/archived/report.pdf.*

3

**EXHIBIT 2**                                                                    **120**

14.    Over the years, I have covered several Bernard Hopkins fights as both a print journalist and a television broadcaster. I have interviewed Mr. Hopkins a number of times in those capacities.

15.    I have known Gary Shaw, who has filed an expert report on behalf of Golden Boy in this matter, for a number of years in his capacity as a boxing regulator and a boxing promoter. In my work as an announcer for Showtime, I have done many events promoted by Gary Shaw Productions.

16.    From March 2015 through January 2016, I worked as a researcher and unofficial judge for live boxing broadcasts presented by Premier Boxing Champions (PBC), for which I was paid as a freelancer by Haymon Sports. I worked twenty-one shows in that period. Since January 2016, I have broadcast five PBC series shows for Spike, but I am paid directly by Spike.

### C.    Prior Retentions as an Expert Witness

17.    I have been retained as an expert witness twice before. In March and April 2000, I worked extensively with the FBI and U.S. Attorney's Office in the criminal RICO case brought against the International Boxing Federation and its president, Bob Lee.[8]  I testified in federal court in Newark, New Jersey, for a total of 13 hours. In 2006, I was retained by the defendant in heavyweight boxer Henry Akinwande's suit against the Cleveland Clinic. The suit was settled before trial. In neither of these cases did I prepare an expert report.

### D.    Retention in This Matter

18.    I was initially contacted about working as an expert in this suit by attorneys who represented the Haymon defendants, Alan Haymon, Alan Haymon Development, Inc., Haymon Holdings, LLC, Haymon Sports, LLC, Haymon Boxing Management, and Haymon Boxing LLC (the "Haymon Defendants"). I was later retained by the law firm of Quinn, Emanuel, Urquhart & Sullivan LLP on behalf of the same defendants. I am being compensated for my time at the rate of $300 per hour. If I am called upon to testify at a deposition or at trial, my rate for that

---

[8]    *United States v. Lee*, 359 F.3d 194 (3d Cir. 2004).

4

**EXHIBIT 2**                                                                 121

time will be $400 per hour.  The documents I relied upon in forming my opinions in this matter
are listed at Exhibit B.

## II.   SUMMARY OF OPINIONS

19.    Even in the absence of a professional league or national governing body, boxing
has been a popular spectator sport in the United States at least since the 1920s.  It has, however,
suffered from periodic corruption scandals that have created doubt about the competitive
integrity of the sport and disgust at the inequitable treatment of boxers at the hands of managers[9]
and especially promoters.

20.    Boxing has always been a sport open to all comers.  You don't need an advanced
degree to become a promoter, a manager, or a trainer, and the licensing standards of the state
athletic commissions are generally easily satisfied.[10]  New participants are constantly entering
from other fields[11], and their success depends on their business savvy and the relationships they
build.

21.    Boxing and network television had a mutually beneficial relationship from the
1950s into the 1980s.  In the 1980s, however, after the ring death of Duk Koo Kim and a brutal,
lopsided ABC fight between Larry Holmes and Randall "Tex" Cobb—the latter of which caused
Howard Cosell to announce publicly that he would never broadcast another match—the networks
grew nervous about their association with a violent and possibly corrupt sport that countenanced
the exploitation of athletes from impoverished backgrounds.

---

[9]   As discussed elsewhere in this report, historically some managers have become
compromised by their relationships with promoters.  Such managers typically do not serve their
fighters well.

[10]   *See, e.g.*, 2016 Nevada State Athletic Commission Application for a Manager's
License, *available at*
*http://boxing.nv.gov/uploadedFiles/boxingnvgov/content/Licensing/Renewal/Manager_App_201
6.pdf*.  The application is two pages long, and the second page concerns whether the applicant is
in arrears on any child support obligations.

[11]   In my time in boxing, major promoters have come and gone with regularity.
Recently, Roc Nation (led by music producer Jay-Z) has established what appears to be
relatively solid footing in business, promoting champions Andre Ward, Guillermo Rigondeaux,
and Miguel Cotto.

22.     When the networks walked away from boxing, a dominant new distribution model emerged for the most important bouts: premium cable channels like HBO and Showtime, and for the biggest fights, pay-per-view (PPV) broadcast. This model has made a few stars very rich indeed. Over time, however, it has been bad for fans, because it has made it very expensive to follow the sport. Partially as a result, boxing has had difficulty attracting younger fans, and the average age of the boxing audience has grown much older, making the sport less attractive to advertisers. Without network television, boxing became an increasingly marginal sport, watched only by aficionados.

23.     Under the premium cable/PPV distribution model, a handful of stars like Floyd Mayweather and Manny Pacquiao have become known to the general sports fan. But a boxer's career is short, and to maintain fan interest, boxing must constantly be developing new stars. The absence of a "middle market" has made that very difficult. A promoter with a young, exciting prospect has limited means by which build a fan base for that boxer.

24.     With the PBC series, Haymon Sports has reversed this long-term trend by putting boxing back in front of the public through network TV. It is unclear whether this effort will succeed; so far, ratings for PBC series events have been mixed. However, the PBC series clearly has increased the exposure of the fighters involved, not all of whom have contractual relationships with Haymon Sports. Boxers appearing on the PBC series have made more money in purses, and received broader television exposure, than otherwise might have been the case. Boxing fans, both hard-core and casual, have enjoyed a good deal of freely-available boxing, some of it of the very highest quality. As someone who has spent his career covering boxing, I regard the PBC series as an exciting development for the sport.

### III.    THE ARC OF MODERN BOXING AND THE IMPORTANCE OF TELEVISION TO THE BOXING INDUSTRY

25.     Boxing's absence, until recently, from network television has been one reason why boxing has been the only sport that showed its biggest events to the smallest audiences. The competitive disadvantage in which this has placed boxing by comparison with sports like the NFL, MLB, and the NBA cannot be overstated. This is an unfortunate state of affairs,

particularly because boxing had a long and successful run as a television sport before a variety of factors conspired to drive it to the broadcast margins.

26. The 1950s was a fascinating time in boxing, sometimes referred to as the sport's Golden Age.[12] Certainly it was a good time for boxing on television; there were as many as six different boxing promotions aired per week, all in prime time, including Wednesday night fights on CBS and Friday night fights on NBC. The 1960s saw the emergence of Muhammad Ali as one of the most recognizable sports figures in world history. But Ali's enormous fame masked what was actually a somewhat moribund period for boxing on television.

27. Two developments changed the momentum and directly led to the brief boxing boom of the early 1980s. First, in 1976, the United States unexpectedly won five boxing gold medals at the Olympic Games in Montreal. In time, several of these boxers would develop into champions and television attractions. Among the champions was Sugar Ray Leonard, who thanks largely to extensive pre- and post-Olympics coverage on ABC, would follow Ali as the sport's biggest star. Second, the small-budget movie "Rocky" opened. It turned out to be the largest-grossing film of the year and won the Academy Award for Best Motion Picture. "Rocky" served as a timely reminder of boxing's unique connection to the American Dream of rising from humble beginnings to great success, and it spurred a transient revival of interest in the sport.

28. Cable television also contributed to the resurgence of boxing programming. "ESPN Top Rank Boxing," on the new 24-hour sports network ESPN, served to introduce many young fighters, some of whom would advance to the more demanding level of network TV. Another long-running and popular cable television live boxing series, "USA Tuesday Night Fights," began on the USA network and ran from 1982 to 1998.

29. In terms of boxing on network television, then, there was never a better time than the early 1980s. On Saturday and Sunday afternoons, CBS, NBC, and ABC frequently televised

---

[12] The story is actually somewhat more complex; while boxing was popular, the Mafia, in the form of the International Boxing Club of New York, which had close ties to the Lucchese crime family, controlled the sport and we now know that a number of major fights during the period were fixed. *See* Barney Nagler, "James Norris And The Decline Of Boxing," The Bobbs-Merrill Company (Indianapolis, IN 1964).

7

**EXHIBIT 2** 124

major matches.  Superfights that were offered on closed-circuit television (the technological predecessor to PPV) received front page newspaper coverage.  And when the USA boxing team won nine gold medals at the 1984 Olympic Games in Los Angeles, a new set of stars was in place.

30.    But by the end of the decade, the networks began to again shy away from boxing, for several reasons.  Corruption scandals certainly contributed to the networks' declining interest.  As discussed further below, the financial exploitation of fighters by their promoters, and the involvement of promoters in corrupting the sanctioning body rankings, made the sport less appealing to advertisers and therefore to the networks.

31.    Finally, premium cable channels HBO and Showtime entered the business, and with larger, subscription-driven budgets, were able to outbid network television, with its advertising revenue model, for many of the most compelling fights.

32.    At first, the entry of HBO and Showtime into boxing seemed like a boon for the sport.  HBO and Showtime elevated the production values of boxing broadcasts, and they helped develop a number of new stars.

33.    In time, however, boxing's move away from network television would prove to be a negative for the sport's popularity.  The lack of network television exposure made it difficult for boxing to market itself to younger fans.  The recent success of the UFC and other MMA platforms, which draw a much younger demographic that seeks instant gratification, has been a reminder of the fact that boxing's fan base is graying—indeed, the hair coloring "Just For Men" was a main sponsor of ESPN's long-running "Friday Night Fights" series.

34.    Boxing has also been hurt by the lack of a league or other unifying structure to protect the sport as a whole.  Over time, four sanctioning bodies, the WBA, the WBC, the IBF, and the WBO, emerged to purportedly fill this vacuum.  The sanctioning bodies issue monthly rankings of the boxers in each of the 17 weight divisions, which in turn determine the eligibility of boxers to fight for titles.  Broadly speaking, only ranked boxers can challenge a reigning champion.

8

**EXHIBIT 2**                                                                                      125

35.     Various proposals have been made to create a national or federal boxing commission or league.[13]  The influence of the sanctioning bodies persists, however, in part because they serve the economic interests of many of boxing's stakeholders.  A title fight for one of the four sanctioning body belts continues to be an event (which can be marketed effectively to the public, and therefore sold to television), even if the fighters themselves do not have substantial followings.

36.     The corruption and violence associated with boxing, and the public protest they engendered, were among the reasons network television all but dropped out of the game by the mid-1990s.  With time, the television roster was reduced to cable networks like ESPN and USA, premium cable channels HBO and Showtime, and for the really big fights, PPV.  There were plenty of big fights in the 1990s, and some tremendously successful PPV offerings, but the absence of the networks began to undermine the long-term health of the sport.  "It could be argued whether the television networks abandoned boxing or boxing abandoned the television networks, but where [Sugar Ray] Leonard, [Marvin] Hagler, [Thomas] Hearns, and [Roberto] Duran had established their early reputations with weekend appearances on ABC, CBS, and NBC, by the mid-1990s all three networks had forsaken the sport.  Boxing aficionados could still find weekly shows on ESPN and USA, and big fights on HBO and Showtime, but the absence of weekend afternoon programming rendered boxing a virtual stranger to armchair America[.]"[14]

37.     The import of this trend was clear to everyone in boxing.  As Top Rank promoter Bob Arum said in 2003: "For the next Sugar Ray Leonard or Mike Tyson to surface ... there has to be wider exposure when these fighters are coming up ... The public grew up with Hagler, Leonard, and Hearns on network TV."[15]

---

[13]   *See, e.g.*, Daniel Strauss, "McCain and Reid introduce legislation creating national boxing commission," *The Hill*, June 18, 2012, *available at http://thehill.com/blogs/floor-action/senate/233327-mccain-and-reid-introduce-legislation-creating-national-boxing-commission* (discussing the Professional Boxing Amendments Act of 2012).

[14]   George Kimball, "Four Kings: Leonard, Hagler, Hearns, Duran and the Last Great Era of Boxing," at 298 (McBooks Press 2008).

[15]   Steve Farhood, "Is It Because They're Black?," *Boxing Monthly*, February 2003.

**EXHIBIT 2**                                                    **126**

38.     Spanish-language television networks like UniMas (formerly Telefutura) and Estrella have remained committed to boxing, in part because Hispanic Americans constitute an intensely passionate—and growing—fan base.  The weekly program, "Solo Boxeo Tecate," has been running (with brief interruptions) since 2000 and has featured a number of young fighters who have gone on to become champions, including Miguel Cotto, Antonio Margarito, Juan Manuel Marquez, Rafael Marquez, Juan Diaz and Kermit Cintron.[16]

39.     Finally, on March 7, 2015, came the PBC.  With a main event from Las Vegas (unbeaten WBA welterweight titlist Keith Thurman defending his crown against former two-division titlist Robert Guerrero), the PBC series debuted in prime time on NBC.  The show averaged 3.4 million viewers and peaked at 4.2 million viewers.[17]  Of perhaps greater significance, it did strongly with the 18-49 year-old demographic.  It was the most watched boxing telecast in 17 years.[18]

40.     In the 16 months since that premiere, 20 other PBC series shows have aired on network television (CBS, Fox, and NBC).  As of and including September 3, 2016, the PBC series has aired a total of 83 shows, including fights on NBCSN, Bounce, Spike, ESPN, and Fox Sports 1.

41.     On July 16, 2016, heavyweight champion Deontay Wilder defended his title against Chris Arreola in prime time on Fox.  During the main event, the rating averaged 2.54 million viewers.  Overall, the show averaged a rating of 1.45 million viewers.  While not rivaling

---

[16]   Dan Rafael, "'Solo Boxeo' to return in April," *ESPN.com*, Mar. 15, 2010, *available at* http://www.espn.com/sports/boxing/news/story?id=4998272.

[17]   NBC press release, "Debut of 'Premier Boxing Champions on NBC' is Most-Watched Boxing Broadcast Since 1998," Mar. 9, 2015, *available at http://tvbythenumbers.zap2it.com/2015/03/09/debut-of-premier-boxing-champions-on-nbc-is-most-watched-boxing-broadcast-since-1998/372852/.*

[18]   Id.

10

**EXHIBIT 2**                                                                 **127**

the draws for major sports, these ratings dwarf the average rating for the pre-PBC "Friday Night Fights" series on ESPN2.[19]

42.     On August 22, 2016, a PBC series event featuring rising star Errol Spence Jr. appeared in the prime NBC-televised slot immediately following the United States' victory over Serbia in the men's basketball gold-medal game at the Rio de Janeiro Olympics.  With this strong lead-in, the bout drew an average of 4.8 million viewers, peaking at 6.34 million viewers.  Even ESPN boxing writer Dan Rafael, a noted PBC series skeptic, called the event "good for boxing."[20]

43.     Said Stephen Espinoza, Showtime network's sports executive vice president and general manager, after the PBC series plan was announced, "Anything which has the potential to expand boxing's fan base and to bring in a wider range of fans is a good thing for the sport of boxing and is a good thing for every network that carries boxing... Floyd [Mayweather] and Manny [Pacquiao] are the notable exceptions and there are reasons for those.  But in order to really build true stars, you have to market those boxers not just to the 25 percent of television households that have premium television but to the entire hundred million homes that have television. That's the only way that you're going to build mainstream stars."[21]

44.     While I am not an economist, and I have no basis for an opinion as to the relevant antitrust markets in this matter, I do have two observations as a close observer of the boxing industry. *First*, I must dissent from the claim, made in the Expert Report of Gary Shaw, that "Boxing stars are sometimes called championship caliber boxers."[22]  In my 38 years in boxing,

---

[19]  For example, "Friday Night Fights" averaged only 409,000 viewers during its 2012 season.  Austin Karp, "ESPN's 'Friday Night Fights' Sees Lowest Season Audience Since Inception In '98," *Sports Business Daily*, Aug. 30, 2012, *available at http://www.sportsbusinessdaily.com/Daily/Issues/2012/08/30/Research-and-Ratings/FNF.aspx.*

[20]  Dan Rafael, "Enormous Audience for Spence-Bundu Good for Boxing," *ESPN.com*, Aug. 23, 2016,  *available at http://espn.gns.go.com/blog/dan-rafael/post/_/id/16571/enormous-audience-for-spence-bundu-good-for-boxing.*

[21]  Lem Satterfield, "Stephen Espinoza Calls Al Haymon's NBC Deal 'A Great Move For The Sport'," *The Ring*, Jan. 16, 2015.

[22]  Shaw Expert Report at 5.

**EXHIBIT 2**                                                                                    **128**

interacting on almost a daily basis with people at all levels and all functions of the sport, I have never heard anyone refer to a fighter as "championship caliber." There are many different categories of boxers—including champions, former champions, contenders, prospects, and less flatteringly, opponents and has-beens—but "championship caliber" is not one of them.

45.      *Second*, even accepting the idea "championship caliber" is a recognized category of boxers (which it is not), a market that excludes many of the sport's biggest PPV and television stars does not seem to me to reflect the economic realities of the industry. I understand, for example, that Dr. Kneuper excludes from his manager market the manager of Canelo Alvarez, on the grounds that Alvarez's manager does not reside within the United States. This distinction ignores the reality that boxing is increasingly a global sport, and that the most important bouts bring together constituencies from around the world. For example, staging the Alvarez-Khan bout required the cooperation of a Mexican manager (Eddy Reynoso), an English manager of Pakistani birth (Shah Khan), a U.S. advisor (Haymon Sports), a U.S. promoter (Golden Boy), and boxers who trained for the fight in San Diego (Alvarez) and Oakland (Khan), respectively. The fight was viewed around the world by close to 600,000 PPV subscribers.[23]

## IV.    SCANDAL AND PROMOTERS

46.      Dating back to Tex Rickard at the turn of the 20th century, promoters have been among the most powerful people in professional boxing. Since boxing is first a business, power and influence have always belonged to promoters first—and in the modern era, to the television networks—and then everybody else.

47.      The saying "absolute power corrupts absolutely" has always applied to boxing promoters. And as a result, boxing's image, and boxing as a whole, has suffered. Most of boxing's biggest and most damaging scandals have directly involved promoters.

---

[23]   Dan Rafael, "Canelo-Khan Fight Draws 'Around' 600K PPV Buys, Golden Boy Says," *ESPN.com*, May 14, 2016, *available at* http://www.espn.com/boxing/story/_/id/15523779/canelo-alvarez-amir-khan-fight-sells-close-600000-pay-per-view-buys-golden-boy-promotions-says.

**EXHIBIT 2**                                                                              **129**

48.    As discussed above, during the 1950s, boxing was dominated by the Mafia-controlled IBC, which was associated with the mobsters Frankie Carbo and Blinky Palermo, both of whom would end up in jail.[24]  So powerful was the IBC that from 1949 to 1955, it promoted 47 of the 51 world title fights contested in the United States.  Some of those title fights produced curious results, leading to speculation about the integrity of the matches.

49.    In 1966, Bob Arum started at the top of the boxing world when he promoted his first bout, the 1966 world heavyweight title fight between Muhammad Ali and George Chuvalo in Toronto.  Fifty years later, Arum's company, Top Rank, remains a major force in the sport.  In fact, Top Rank is widely viewed as the industry standard for promotion.

50.    Despite his considerable accomplishments in the sport, Arum has been involved in two highly-publicized bribery scandals.  Arum has acknowledged that he paid the WBA's Pepe Cordero a $250,000 bribe to secure Ray Mancini a second opportunity at a world lightweight title.  "There's one bagman in the WBA and that's Pepe Cordero," Arum told an interviewer from *The Ring*.  "And anytime you want a fix in the WBA you 'bribe' Cordero and he takes care of it ... It's bullshit that I control the WBA. When I want something done I have to pay off Cordero also."[25]  Mancini took advantage of his second title shot in seven months and won the WBA title in 1982.[26]

51.    Some 18 years later, testifying at the RICO trial of the IBF and its president, Bob Lee, Arum said that in 1995, he had paid Lee a bribe of $100,000 for the IBF to approve a title defense by heavyweight champion George Foreman against Germany's Axel Schulz.  Lee ultimately was convicted of money laundering and tax evasion and sentenced to 22 months in federal prison.  It is arguably the case that the sanctioning bodies are more transparent organizations now than they were then, but the Lee scandal unquestionably damaged the sport.

---

[24]  Barney Nagler, "James Norris And The Decline Of Boxing," The Bobbs-Merrill Company (Indianapolis, IN 1964), at 245.

[25]  Mark Kriegel, "The Good Son: The Life of Ray 'Boom Boom' Mancini," (Simon & Schuster 2013), at 104-105.

[26]  Id. at 110.

**EXHIBIT 2**                                                                    130

52.     For most of Arum's run at the top, he was joined by his chief promotional rival, Don King.  A former numbers boss from Cleveland, King spent almost four years in prison for manslaughter.[27]  Like Arum, King started at the top of the boxing world, promoting the iconic Ali-Foreman "Rumble In The Jungle" in Zaire in 1974.  He also promoted legendary champions Julio Cesar Chavez, Roberto Duran, Felix Trinidad, Mike Tyson, Larry Holmes, and many others.

53.     King has not always dealt fairly with fighters.  As one example among many, after the Larry Holmes-Muhammad Ali heavyweight title fight in 1980, King paid Ali $1,170,000 less than the signed contract stipulated.  In June 1982, Ali sued King, and in late July of that year, ended up accepting $50,000 cash in a suitcase as a settlement after King had a Nation of Islam intermediary approach Ali at the UCLA Medical Center, where the former heavyweight champion was receiving treatment, and coerce Ali into signing a release.[28]

54.     In 1986, HBO paid King $1.7 million for the rights to televise the heavyweight championship fight between Frank Bruno and Tim Witherspoon.  Witherspoon's purse was $500,000.  After King's deductions, the Philadelphia heavyweight was paid $90,094.  Carl King, Don's stepson and Witherspoon's manager of record, received $275,000, or more than half Witherspoon's purse.  In 1987, Witherspoon sued King for fraud.  The fighter ultimately settled out of court for $1 million.[29]

55.     King frequently forced fighters who wished to signed promotional contracts with him to use Carl King as their manager, paying Carl King one-third or more of their purse. Because promoters have been such powerful actors in the boxing business, they have frequently been able to compromise the independence of the managers who are supposed to protect the fighter and negotiate at arm's length with the promoter.

---

[27]   Jack Newfield, "Only in America: The Life and Crimes of Don King," William Morrow & Co. (New York 1995), at 1-19.

[28]   Id. at 166.

[29]   Id.

56.     In 2000, Oscar De La Hoya sued his promoter, Top Rank, alleging that his promotional agreement was void and unenforceable because, among other reasons, it purported to bind the young boxer for longer than the maximum seven years permissible under California law for personal services contracts.[30]  In a motion for partial summary judgment, De La Hoya, through his counsel, had this to say: "Boxing has a long and sordid history of promoters and managers using their superior bargaining position to take advantage of young and unsophisticated fighters. As a result, over the years, boxing has come under considerable scrutiny and regulation by state athletic commissions and, most recently, by the federal government."[31] The court ultimately ruled that Top Rank's contract was indeed unenforceable.[32]

57.     In 2002, when Oscar De La Hoya launched his own promotional firm, Golden Boy Promotions, he said, "We believe in transparency and honesty. We lay everything on the table ... I guarantee you that 99.9 percent of the people who run boxing are petrified."  But even Golden Boy has not been immune from scandal: "Oscar De La Hoya and his chief executive of Golden Boy Promotions helped lure boxer Manny Pacquiao into signing a multi-fight contract by delivering to him a suitcase stuffed with $250,000 in cash as a signing bonus at a Beverly Hills steakhouse in September [2006], Pacquiao's trainer Freddie Roach said Wednesday... The cash transfer became public Wednesday when the *Las Vegas Review-Journal* reported details of Roach's deposition on February 13 as part of civil lawsuits between Golden Boy and rival promoter Bob Arum's Top Rank Inc.  The rival firms are suing over Pacquiao's promotional rights."[33]

---

[30]  *De La Hoya, et al. v. Top Rank, Inc.*, 2:00-cv-09230-WMB-RNB (C.D. Cal.), First Amended Complaint, Sept. 15, 2000, at 4.

[31]  *De La Hoya, et al. v. Top Rank, Inc.*, 2:00-cv-09230-WMB-RNB (C.D. Cal.), Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment, Oct. 16, 2000, at 1.

[32]  *De La Hoya, et al. v. Top Rank, Inc.*, 2:00-cv-09230-WMB-RNB (C.D. Cal.), Judgment & Order, Feb. 6, 2001, at 2.

[33]  Lance Pugmire, "Oscar De La Hoya Delivered Cash to Lure Pacquiao," *Los Angeles Times*, Mar. 1, 2007, *available at http://articles.latimes.com/2007/mar/01/sports/sp-boxing1.*

58.     Promoters sometimes justify their practices by referring to the purportedly large financial investments they make in their boxers and the large capital outlays necessary to put on a boxing event. Both of these claims are misleading. While it is often the case that a promoter will stage money-losing events early in a boxer's career in order to get that boxer exposure, the promoter does so with the expectation of recouping that investment if the boxer becomes successful. In cases where the boxer's living expenses are paid or supplemented, often in the form of a monthly stipend, that is typically done by the manager rather than the promoter.

59.     While putting on a large-scale boxing event can be a complex endeavor, the amount of financial risk incurred by the promoter is typically limited. For significant fights, the promoter usually negotiates a television license fee up front that will cover most or all of his expenses, including the purses. HBO and Showtime typically pay license fees in the low seven figures, though that amount obviously varies depending on the match being presented. In addition, if the event is staged at a gaming casino, the promoter typically receives a site fee, because the casinos experience a substantial increase in gaming revenue in the days around the fight, and also benefit from the publicity associated with hosting a nationally televised event.

60.     Not all promoters rip off fighters. But over the years, boxers have been financially abused more than any other athletes. Boxers fight. Promoters do business. It's a mismatch.

61.     Indeed, Congress cited promoter abuses as one of its chief concerns in passing the Muhammad Ali Boxing Reform Act of 2000 ("Ali Act"), which seeks to protect fighters financially from corrupt business practices in boxing.[34]

62.     Above, I discussed Don King's practice of coercing the boxers he promoted into agreeing to have Carl King serve as their manager. Oscar De La Hoya's father and brother have managed a number of Golden Boy Promotions boxers over the years, including Diego De La

---

[34] *See* Muhammad Ali Boxing Reform Act, 114 Stat. 321(3)(2000).

16

**EXHIBIT 2**                    133

Hoya, Francisco Vargas, Julian Ramirez and Hugo Centeno.[35] I have no basis for an opinion as to whether those boxers have been well-served by this arrangement; but the apparent conflict of interest is troubling.

63.     Sometimes promoters exert influence over managers in less obvious ways. Many managers, including some prominent ones, have consistently steered their fighters to a single promoter. This arguably helps the manager, but it is not best for the fighter, whose interests would be better served if multiple promoters were forced to bid against each other for his services. For example, prominent manager Shelly Finkel steered almost all of his fighters to a single promoter, Main Events. There are simply instances where a manager's ongoing relationship with a particular promoter is more important to him than his relationship with his own fighter.

64.     Boxing managers are sometimes accomplished professionals in other fields, and sometimes not, but the business has always been wide open to newcomers. The story of Cameron Dunkin is illustrative. Dunkin was an automotive finance manager in Phoenix when, in 1991, he entered boxing management by signing a single fighter, Danny Romero.[36] Romero went on to become one of the great "little men" of his era, winning titles in four different weight divisions, and Dunkin's career as a manager was launched. Dunkin went on to manage a number of champions, including Steve Forbes, Johnny Tapia, Diego Corrales, Kelly Pavlik, and most recently, Timothy Bradley. Bradley ultimately left Dunkin when his management contract expired in 2013, replacing him as manager with his wife, Monica Bradley, previously a homemaker, who had picked up a knowledge of how the boxing business works during the

---

[35]    Dan Rafael, "Diego De La Hoya turning pro," *ESPN.com*, Aug. 29, 2013, *available at http://www.espn.com/boxing/story/_/id/9614061/oscar-de-la-hoya-cousin-diego-set-pro-debut-sept-12.*

[36]    Dean Juipe, "Duncan: A New Breed of Boxing Manager," *Las Vegas Sun*, Aug. 8, 2002, *available at http://lasvegassun.com/news/2002/aug/08/dunkin-a-new-breed-of-boxing-manager/.*

course of her husband's career.[37]  Monica Bradley was one of four nominees by the Boxing
Writers Association of America for 2015 manager of the year.[38]

65.     Like Shelly Finkel, Al Haymon entered boxing from the music business.  Haymon
has undergraduate and MBA degrees from Harvard.[39]  To my knowledge Haymon Sports has
never been sued by a boxer with whom it has had a manager or advisor agreement, or by any
non-Haymon Sports fighter who appeared in a PBC series event.

66.     Haymon has been named Manager of the Year five times, including the last four
years running, by the BWAA.  Indeed, a number of boxers associated with Haymon Sports
and/or the PBC series have spoken publicly about how their careers have benefited.  Said light
heavyweight champion Adonis Stevenson, "You never hear a fighter say Al Haymon is not good.
He takes care of his fighters, he makes sure the money is right for the fighter[.]"[40]  Robert
Guerrero, whose wife has battled leukemia, has said that working with Haymon has made his life
easier—"inside and outside the ring."[41]

67.     The PBC series frequently features fighters not managed or advised by Haymon
Sports.  For example, on Saturday, August 27, 2016, I broadcast a PBC series event on Spike.
Of the 6 boxers who appeared on Spike that night, only 3, Robert Guerrero, Alfredo Angulo, and
Terrell Gausha, have manager or advisor agreements with Haymon Sports.

---

[37]  Bill Dwyer, "Monica Bradley: Managing the Family Business," *TopRank.com*, Feb.
29, 2016, *available at* http://www.toprank.com/news/boxing-promotions-monica-bradley-
managing-the-family-business.

[38]  Dan Rafael, "BWAA awards ballot features wide-open race for fighter of the year,"
*ESPN.com*, Dec. 8, 2015, *available at http://www.espn.com/boxing/story/_/id/14317337/boxing-
writers-association-america-sets-2015-awards-ballot.*

[39]  Tim Struby, "Who is Al Haymon, and What Has He Done to Boxing?," *Playboy.com*,
Oct. 23, 2015, *available at http://www.playboy.com/articles/who-is-al-haymon-and-what-has-he-
done-to-boxing.*

[40]  Bob Velin, "Stevenson Takes Aim At Fonfara, With Help From A Friend," *USA
Today*, May 23, 2014.

[41]  Olly Campbell, "Robert Guerrero: Life Is Easier Under Al Haymon," *boxing247.com*,
June 1, 2015, *available at https://www.boxing247.com/boxing-news/robert-guerrero-life-is-
easier-under-al-haymon/42057.*

18

**EXHIBIT 2**                                                                    135

## V. THE PBC SERIES

68.     I've always been told that if you walked into a bar in the 1940s or 1950s, the talk was sports, and the sport was either baseball or boxing. Obviously, that has changed, at least in America. As boxing has grown globally, it has become domestically marginalized for a number of reasons: lack of centralized leadership; the presence of four major[42] sanctioning organizations (rather than one, as in the NFL, NBA, or MLB); an aging fan base; and the inherent risk of brain damage and fatalities.

69.     Central to boxing's problems is the short-term thinking and greed of power promoters. Most of the scandals that have undermined the image of the sport have centered on promoters. Nonetheless, boxing is a star-driven sport, and when the sport is headed by a transcendental and iconic superstar, boxing can still command a significant audience.

70.     For literally decades, I have bemoaned the fact that boxing had all but disappeared from network TV. This has also been a concern of many of my colleagues, as well as many other industry insiders.

- In 2009, Dan Pieroni of *Bleacher Report* cited the lack of network coverage as the number one reason for the sport's decline: "[B]oxing's lack of coverage on free television hurts it's [sic] popularity because few people know or care who the big name fighters are in all the weight classes because there is no free showcase on network television for their talent… In order for boxing to regain its popularity, there should be at the very least a weekly afternoon or evening boxing series on network television."[43]

---

[42]     The term "major" is used here to distinguish these sanctioning bodies from minor or regional sanctioning bodies like the IBC and the NABO, whose championships are not recognized as significant by fans or television broadcasters.

[43]     Dan Pieroni, "Technical Knockouts: Three Reasons Why Boxing Has Waned In Popularity," *Bleacher Report*, July 22, 2009, *available at http://bleacherreport.com/articles/222485-technical-knockouts-three-reasons-why-boxing-has-waned-in-popularity.*

19

**EXHIBIT 2**                                                                                     **136**

- In 2013, Jonathan Mahler of *BloombergView* put it even more bluntly: "The force most responsible for boxing's decline is the same one that causes all sports to live or die: television."[44]

- Promoter Bob Arum tried for years to build a partnership with CBS that would bring his fights to that network. "If this works to bring boxing back to network television this will be one of the crowning achievements of my career, because it will help all of boxing," Arum said in 2011.[45] Top Rank sold shoulder programming for Manny Pacquaio fights to CBS, but Top Rank and CBS never built the kind of partnership that Arum envisioned.

- In 2011, years before the PBC series debuted, Oscar De La Hoya predicted that *Golden Boy* would soon return boxing to the networks. "Boxing will be back on network television, I can feel very confident in saying that. Sooner than later, it will be back on network television. When you put good fighters together, people want to watch. And when you have any type of network behind boxing, you will create ratings. And it's a matter of when, and we're working that—with Golden Boy Promotions, we're working on taking those next steps."[46] Golden Boy has not returned boxing to network television since 2011.

- When the PBC series was announced, Kathy Duva of Main Events predicted that it would not be successful, but acknowledged that she had also hoped to strike a network deal. "Experience tells us that there is, in my view, a level at which this

---

[44]   Jonathan Mahler, "Why Football Won't Go The Way of Boxing (Yet)," *Bloomberg View*, Feb. 14, 2013, *available at https://www.bloomberg.com/view/articles/2013-02-14/why-football-won-t-go-the-way-of-boxing-yet-.*

[45]   Tim Smith, "Promoter Bob Arum is Trying to Bring Boxing—and Stars Like Manny Pacquaio—Back to Network TV," *New York Daily News*, Feb. 4, 2011, *available at http://www.nydailynews.com/sports/more-sports/promoter-bob-arum-fighting-bring-boxing-stars-manny-pacquiao-back-network-tv-article-1.132929.*

[46]   Chris Palmquist, "Oscar De La Hoya: UFC on Fox is Amazing, and Good for Boxing," mixedmartialarts.com, Sept. 21, 2011, *available at http://www.mixedmartialarts.com/news/Oscar-De-La-Hoya-UFC-on-FOX-is-amazing-and-good-for-boxing.*

**EXHIBIT 2**

could work beautifully.  I was trying very hard to get us there. I got us one step of the way by getting NBC to accept boxing, period.  My whole life the last 20 years has been trying to figure out how to make that work. I'm not saying that just because I couldn't do it it's impossible."[47]

71.     Today more than ever before, fighters need social and traditional media to grow into legitimate stars.

- In the 1920s and 1930s, radio helped launch Jack Dempsey and Joe Louis.

- In the 1950s, the relatively new and fast-growing medium of television popularized Rocky Marciano, who became a symbol of the decade almost as much as Elvis Presley and Dwight Eisenhower.

- In the 1960s, Muhammad Ali's worldwide fame was at least initially boosted by his convenient and mutually beneficial relationship with ABC-TV's Howard Cosell.

- In 1977, Olympic gold medalist and media darling Sugar Ray Leonard turned pro on national network television.  If, as philosopher Marshall McLuhan famously wrote, "the medium is the message," both medium and message were clear: The medium was television, and the message was the luminous and brilliantly packaged Sugar Ray, who become the richest boxer in history and one of the most famous celebrities of his time.

- The shift from networks to premium cable and PPV brought Mike Tyson in the 1980s and 1990s, followed by Oscar De La Hoya, Floyd Mayweather, and Manny Pacquiao.  Tyson, De La Hoya, Mayweather, and Pacquiao became international stars who made millions in purses, but since they had never been exposed to the

---

[47]  Tim Starks, "Kathy Duva: 'Premier Boxing Champions' Is Doomed From The Start," *The Queensberry Rules*, Mar. 14, 2015, *available at http://thecomeback.com/queensberryrules/2015-articles/kathy-duva-premier-boxing-champions-is-doomed-from-the-start.html.*

average sports fan on network TV, boxing as a whole continued to decline.
Hence, the slow but steady marginalization of a sport that was once as popular as
any other.

72.     With Mayweather retired and Pacquiao extending the end of his career by one
fight at a time, it is not clear who, if anyone, will replace them.  Exposing boxing's best fighters
on network television may not only increase their chance of crossover stardom, but just as
importantly, increase the sport's dwindling fan base.

73.     Enter Haymon Sports and the PBC series.  In the United States, from March 7,
2014, until the end of that year, there were 82 boxing shows aired on English-language networks,
excluding pay-per-view cards. Over the same period in 2015, the total was 103, with many of
those shows airing on network television.  From April 2015 to April 2016. PBC delivered the
three biggest non-pay-per-view boxing audiences, as well as seven of the top ten and ten of the
top fifteen.[48]

74.     Several recent PBC series events have provided for compelling viewing.  The
August 14, 2015 cruiserweight title fight between Marco Huck and Krzysztof Glowacki, held at
the Prudential Center in Newark, New Jersey, and broadcast on Spike, was widely heralded as a
candidate for fight of the year.  The June 25, 2016 bout between welterweight champions Keith
Thurman and Shawn Porter at the Barclays Center in Brooklyn was equally thrilling, and the
audience for the fight on CBS was impressive: according to Nielsen, the broadcast drew an
average of 3.1 million viewers and a high of 3.94 million.

75.     It is not the case, as some have alleged, that the quality of the fights shown as part
of the PBC series is substandard.  Indeed, as discussed above, the PBC series has aired some
truly memorable bouts.  Of course, some of the PBC series fights have turned out to be dull or
one-sided, but that is the nature of the game; not all boxing matches are thrillers, any more than
all NBA or MLB games are riveting.  As an apples to apples comparison, consider this: ESPN2

---

[48]   Bill King, "Networks Take Hard Look at PBC Fight Cards,"
*SportsBusinessDaily.com*, Apr. 25, 2016, *available at*
*http://www.sportsbusinessdaily.com/Journal/Issues/2016/04/25/In-Depth/PBC.aspx.*

22

**EXHIBIT 2**                                                                    **139**

ended its 17-year "Friday Night Fights" series when Haymon Sports made a time buy on ESPN. There is simply no comparison in the level of the fights broadcast; the Haymon product is far superior.

76.     It is clear that the availability of free boxing on the networks has not compromised the offerings of the premium cable networks; indeed, it seems likely that rising overall interest in boxing generated by the PBC series will ultimately help HBO and Showtime. The idea that Haymon Sports' time buys will erode the value of boxing licence fees is inconsistent with my observations as someone working in boxing television. HBO World Championship Boxing continues to be strong draw. Showtime continues to purchase boxing programming at roughly the same rate as before. TruTV jumped into the boxing game for the first time in 2015, announcing a multi-year deal with Top Rank.[49] And Golden Boy announced a deal with Estrella TV, the first time boxing has come to that network.

77.     How boxing benefits from exposure on network television is illustrated by the emergence of heavyweight titlist Deontay Wilder. The heavyweight division is resurgent, and Wilder has the intangibles of a transcendental star; he's handsome, well-spoken, full of personality, physically imposing (he stands 6'7"), and powerful (36 knockouts in 37 pro bouts). Moreover, he has a compelling backstory. Wilder's PBC series fights on NBC and Fox have been seen by millions of viewers, many of whom would not have had the opportunity to watch him had he fought on premium cable. Whether Wilder becomes the face of boxing remains to be seen; his biggest bouts are ahead of him. But scoring emphatic knockouts on network television gives him a fighting chance.

78.     Conversely, there is the case of former light heavyweight champion Andre Ward. Ward is undefeated as a professional and is regarded as one of the top pound-for-pound fighters in the world by most observers. But Ward, who is promoted by Roc Nation, has been on HBO, Showtime, and BET but never on free network television. This, combined with a long period of

---

[49]   Dan Rafael, "TruTV to Broadcast Boxing Series," *ESPN.com*, Mar. 30, 2015, *available at http://www.espn.com/boxing/story/_/id/12588467/top-rank-trutv-partner-live-boxing-series.* The series was cancelled in 2016.

23

**EXHIBIT 2**                                                                 **140**

relative inactivity because of protracted litigation with promoter Dan Goossen[50], arguably has prevented Ward from becoming a crossover star. Ward will fight fellow light heavyweight Sergey Kovalev on November 19 in a heavily-anticipated fight—but on PPV.

79.     Haymon Sports understands a simple truth: pro boxers have a limited period of maximum earnings potential. Moreover, the physical risk they face is considerable. The long-term promotional contracts other fighters sign—often three to five years in length—often work against them. It has become a running joke at the fighter meetings my colleagues and I attend; when I ask a fighter why he's had a lengthy layoff from boxing, the answer is almost always the same: "Promotional problems." Fighters managed and advised by Haymon Sports generally do not sign lengthy promotional contracts, because it is generally not in their interest to do so.

80.     Haymon Sports' vision for the PBC series is long-term and has been implemented at a critical time. While it is too early to determine PBC series' long-range effects, one thing is already clear: what's good for the fighters and the fans is good for the sport of boxing.

## VI.   CONCLUSION

81.     Boxing, the sport to which I have devoted my professional career, has declined from one of America's most popular spectator sports to a marginal sport, crowded out by juggernauts like the NFL and the NBA and now challenged on its own turf by the UFC. . Boxing's fan base has aged, which makes it less attractive to advertisers. And the lack of a unified governing body has meant that individual stakeholders have been free to pursue their short-term self-interests at the expense of what is best for the sport as a whole. This situation makes me and many of my colleagues in boxing broadcasting and journalism sad, because what happens inside the ring is so frequently compelling. There's still nothing quite like a great fight.

82.     Over my 38-year career covering boxing, I have observed as certain promoters have repeatedly taken advantage of some of the boxers they represent, signing them to long-term promotional contracts that are not necessarily in their interest, controlling the very managers with

---

[50]   I have no basis for an opinion as to the merits of Ward's suit against Goossen. The suit was settled in 2015, with Ward signing a promotional agreement with Roc Nation shortly thereafter.

**EXHIBIT 2**                                                                              **141**

whom they are supposed to negotiate, and often failing to honor the terms of the bout contracts they sign with their boxers. That is not to say that all promoters behave dishonorably, or that there is not plenty of blame to go around for the bad reputation boxing has with the general public. Fighters can sometimes be their own worst enemies, as in the case of Mike Tyson and others whose legal problems cost them some of their prime earning years in the ring.

83.     Exposure on network television has always been crucial to the success of boxing as a business. The distribution model that boxing fell into after the networks backed away from the sport has made a small number of boxers and promoters enormously rich, but at the expense of the overall growth of the sport. It seems likely that only by returning to network television can boxing reverse its long decline, grow in popularity, and appeal to the younger demographic that advertisers covet.

84.     The PBC series is an innovative and refreshing attempt to do just that. While it is too soon to tell whether it will ultimately be successful, the concept has brought new energy and renewed optimism to the game. Most importantly, many fighters in the series have made larger purses and been exposed to larger audiences than they otherwise might have dreamed.

Dated: 9-29-16

Steve Farhood

**EXHIBIT 2**

# EXHIBIT A

EXHIBIT 2                143

# STEVE FARHOOD BIOGRAPHY

Steve Farhood has been around the sport of boxing for 38 years, much of which was spent as Editor-in-Chief of *The Ring* and *KO* magazines.

Farhood works as an on-air analyst for Showtime's "ShoBox" series, "Showtime Championship Boxing," and the syndicated "Broadway Boxing" series. He also serves as an editorial consultant and unofficial scorer for Spike's boxing broadcasts. From 2015-2016, he worked as an unofficial scorer and researcher for various PBC series boxing broadcasts.

Farhood assumed command of *The Ring* in 1989, when London Publishing bought the title. *The Ring* subsequently regained much of the luster that was lost during the magazine's financial struggle in the '80s. Farhood resigned the position in September 1997 to pursue other interests, specifically in the broadcasting industry.

In 1980, Farhood launched *KO* magazine. During his tenure, *KO* grew quickly to rival *The Ring* as the world's leading boxing magazine.

A ringside fixture at big fights, Farhood has served as an on-air analyst for ESPN, SportsChannel, Top Rank Boxing, and "Heavyweight Explosion," and regularly contributed to the USA Network's long-running series, "Tuesday Night Fights." He also worked for five years as CNN's boxing correspondent, and has contributed to boxing broadcasts on Fox, Bounce, NBC, and CBS.

In 1992, Farhood testified before Congress regarding boxing ratings.

In 1993, Farhood authored "Boxing: The 20th Century" (BDD Illustrated Books), which was released in both England and the USA.

Farhood served as First Vice President of the Boxing Writers Association of America (BWAA) from 1993 to 2008. In 2002, he won the BWAA award for Broadcaster of the

**EXHIBIT 2**                                                                **144**

Year; in 2008, he won the James J. Walker Award for Long and Meritorious Service; in 2010, he won the Nat Fleischer Award for Excellence in Boxing Journalism; and in 2012, he won the BWAA's Good Guy Award.

In 2008, Farhood served as a consultant for an episode of "Law And Order: Criminal Intent." In 2010, he appeared as an actor in episodes of "Law And Order" and "Lights Out."

In 2001, Farhood organized and ran "Counterpunch!," a post-9-11 benefit that raised $50,000 for the Twin Towers Fund. In a career filled with highlights, he considers that benefit, which was held at the legendary Gleason's Gym in Brooklyn, his most noteworthy achievement.

The 59-year-old Farhood, a lifelong resident of New York City, lives in Manhattan with his wife, Marcia McCaffrey. Among his hobbies, he lists going to fights, watching fights on TV, taping fights, analyzing fights, reading about fights, and only occasionally, missing fights.

Farhood is also a former columnist for "All In," a poker magazine, and worked for 18 years as a columnist and associate editor for "Boxing Monthly," a British-based magazine.

**EXHIBIT 2** 145

# EXHIBIT B

EXHIBIT 2                                              146

## Sources Relied Upon

<u>Case Materials</u>

Second Amended Complaint, *Golden Boy Promotions, Inc. v. Alan Haymon, et al.*, January 20, 2016.

*De La Hoya, et al. v. Top Rank, Inc.*, 2:00-cv-09230-WMB-RNB (C.D. Cal.), First Amended Complaint, Sept. 15, 2000, at 4.

*De La Hoya, et al. v. Top Rank, Inc.*, 2:00-cv-09230-WMB-RNB (C.D. Cal.), Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment, October 16, 2000, at 1.

*De La Hoya, et al. v. Top Rank, Inc.*, 2:00-cv-09230-WMB-RNB (C.D. Cal.), Declaration of Dean Lohuis and Oscar De La Hoya in Support of Motion for Partial Summary Judgment re: Declaratory Relief, Nov. 6. 2000.

*De La Hoya, et al. v. Top Rank, Inc.*, 2:00-cv-09230-WMB-RNB (C.D. Cal.), Judgment & Order, Feb. 6, 2001, at 2.

<u>Secondary Sources</u>

<u>Books</u>

Barney Nagler, <u>James Norris and the Decline of Boxing</u>, The Bobbs-Merrill Co, 1964.

Stanley Weston & Steve Farhood, <u>The Ring: Boxing The 20th Century</u>, BDD Illustrated Books, 1993.

Jack Newfield, <u>Only In America: The Life And Crimes Of Don King</u>, William Morrow And Company, 1995.

George Kimball, <u>Four Kings: Leonard, Hagler, Hearns, Duran and the Last Great Era of Boxing</u>, McBooks Press, 2008.

Wil Haygood, <u>Sweet Thunder: The Life And Times Of Sugar Ray Robinson</u>, Alfred A. Knopf, 2009.

Mark Kriegel, <u>The Good Son: The Life Of Ray 'Boom Boom' Mancini</u>, Simon & Schuster Paperbacks, 2012.

<u>News Articles</u>

Dean Juipe, "Duncan: A New Breed of Boxing Manager," *Las Vegas Sun*, Aug. 8, 2002.

Lance Pugmire, "Oscar De La Hoya Delivered Cash to Lure Pacquiao," *Los Angeles Times*, Mar. 1, 2007.

**EXHIBIT 2**                                    **147**

Dan Pieroni, "Technical Knockouts: Three Reasons Why Boxing Has Waned In Popularity," *Bleacher Report*, July 22, 2009.

Dan Rafael, "'Solo Boxeo' to return in April," *ESPN.com*, Mar. 15, 2010.

Tim Smith, "Promoter Bob Arum is Trying to Bring Boxing—and Stars Like Manny Pacquaio—Back to Network TV," *New York Daily News*, February 4, 2011.

Chris Palmquist, "Oscar De La Hoya: UFC on Fox is Amazing, and Good for Boxing," mixedmartialarts.com, September 21, 2011.

Daniel Strauss, "McCain and Reid introduce legislation creating national boxing commission," *The Hill*, June 18, 2012.

Jonathan Mahler, "Why Football Won't Go The Way of Boxing (Yet)," *Bloomberg View*, Feb. 14, 2013.

Austin Karp, "ESPN's 'Friday Night Fights' Sees Lowest Season Audience Since Inception In '98," *Sports Business Daily*, August 30, 2012.

Dan Rafael, "Diego De La Hoya turning pro," *ESPN.com*, Aug. 29, 2013.

Bob Velin, "Stevenson Takes Aim At Fonfara, With Help From A Friend," *USA Today*, May 23, 2014.

Lem Satterfield, "Stephen Espinoza Calls Al Haymon's NBC Deal 'A Great Move For The Sport'," *The Ring*, Jan. 16, 2015.

NBC press release, "Debut of 'Premier Boxing Champions on NBC' is Most-Watched Boxing Broadcast Since 1998," March 9, 2015.

Tim Starks, "Kathy Duva: 'Premier Boxing Champions' Is Doomed From The Start," *The Queensberry Rules*, March 14, 2015.

Olly Campbell, "Robert Guerrero: Life Is Easier Under Al Haymon," *boxing247.com*, June 1, 2015.

Dan Rafael, "BWAA awards ballot features wide-open race for fighter of the year," *ESPN.com*, Dec. 8, 2015.

Dan Rafael, "TruTV to Broadcast Boxing Series," *ESPN.com*, March 30, 2015.

Tim Struby, "Who is Al Haymon, and What Has He Done to Boxing?," *Playboy.com*, Oct. 23, 2015.

**EXHIBIT 2**                                                       **148**

Dan Rafael, "BWAA awards ballot features wide-open race for fighter of the year," *ESPN.com*, Dec. 8, 2015.

Bill Dwyer, "Monica Bradley: Managing the Family Business," *TopRank.com*, Feb. 29, 2016.

Bill King, "Networks Take Hard Look at PBC Fight Cards," *SportsBusinessDaily.com*, April 25, 2016.

Dan Rafael, "Canelo-Khan Fight Draws 'Around' 600K PPV Buys, Golden Boy Says,"` *ESPN.com*, May 14, 2016.

Dan Rafael, "Enormous Audience for Spence-Bundu Good for Boxing," *ESPN.com*, Aug. 23, 2016.

Federal Legislation

H.R. 1832, Muhammad Ali Boxing Reform Act of 2000, 114 Stat. 321.

**EXHIBIT 2** **149**

# Exhibit 4

EXHIBIT 2                                150

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN BOY PROMOTIONS, LLC, GOLDEN BOY PROMOTIONS, INC. and BERNARD HOPKINS, <br><br> Plaintiffs, <br><br> v. <br><br> ALAN HAYMON, ALAN HAYMON DEVELOPMENT, INC., HAYMON HOLDINGS, LLC, HAYMON SPORTS, LLC, HAYMON BOXING MANAGEMENT, HAYMON BOXING LLC and RYAN CALDWELL, <br><br> Defendants. | Case 2:15-cv-03378 JFW (MRWx) |

## EXPERT REBUTTAL REPORT OF MICHAEL P. SMITH, PH.D.

**September 27, 2016**

HIGHLY CONFIDENTIAL

**EXHIBIT 2**                                                    **151**

## PROOF OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 865 South Figueroa Street, 10th Floor, Los Angeles, CA 90017-2543.

On September 27, 2016, I served true copies of the following documents described as **DEFENDANTS' INITIAL DISCLOSURES OF EXPERT WITNESSES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)** on the interested parties in this action as follows:

> Ricardo P. Cestero, Esq.
> rcestero@greenbergglusker.com
> James Molen, Esq.
> jmolen@greenbergglusker.com
> Elizabeth M. Sbardellati, Esq.
> esbardellati@greenbergglusker.com
> Greenberg Glusker Fields
>   Claman & Machtinger LLP
> 1900 Avenue of the Stars, 21st Floor,
> Los Angeles, CA 90067
> D: 310.553.3610
> F: 310.201.1784
>
> Attorneys for Plaintiffs

**BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of Quinn Emanuel Urquhart & Sullivan, LLP for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope was placed in the mail at Los Angeles, California.

**BY ELECTRONIC MAIL TRANSMISSION**: By electronic mail transmission from nithinkumar@quinnemanuel.com on September 27, 2016, by transmitting a PDF format copy of such document(s) to each such person at the e mail address listed below their address(es).  The document(s) were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 27, 2016, at Los Angeles, California.

_____
Nithin Kumar

**EXHIBIT 2**                                    **181**