# EXHIBIT 3

Redacted Version of Document Proposed to be filed Under Seal

Redacted Version of Document
Proposed to be Filed Under Seal

BERTRAM FIELDS (SBN 024199)
BFields@ggfirm.com
RICARDO P. CESTERO (SBN 203230)
RCestero@GreenbergGlusker.com
JAMES R. MOLEN (SBN 260269)
JMolen@GreenbergGlusker.com
GREENBERG GLUSKER FIELDS
  CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590
Telephone:  310.553.3610
Fax:  310.553.0687

Attorneys for Plaintiffs
Golden Boy Promotions, LLC, Golden Boy
Promotions, Inc. and Bernard Hopkins

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GOLDEN BOY PROMOTIONS, LLC,
GOLDEN BOY PROMOTIONS, INC.
and BERNARD HOPKINS,

Plaintiffs,

v.

ALAN HAYMON, ALAN HAYMON
DEVELOPMENT, INC., HAYMON
HOLDINGS, LLC, HAYMON
SPORTS, LLC, HAYMON BOXING
MANAGEMENT, HAYMON
BOXING LLC, and RYAN
CALDWELL,

Defendants.

Case No. 2:15-cv-03378 JFW (MRWx)

*Assigned to Hon. John F. Walter*
*Magistrate Judge: Hon. Michael R.*
*Wilner*

**PLAINTIFFS' INITIAL
DISCLOSURE OF EXPERT
WITNESSES**

Action Filing Date:  May 5, 2015

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California  90067-4590

1        Pursuant to Federal Rule of Civil Procedure 26(a)(2), Plaintiffs Golden Boy

2  Promotions, LLC, Golden Boy Promotions, Inc., and Bernard Hopkins

3  ("Plaintiffs") hereby designate the following persons as expert witnesses whose

4  testimony Plaintiffs intend to introduce at the trial of this matter:

5

6       1.     Robert Kneuper, Ph.D.  A copy of Mr. Kneuper's expert report is

7  attached hereto as Exhibit "A."

8

9       2.     Gene Deetz, CPA/ABV, ASA, CFF.  A copy of Mr. Deetz's expert

10  report is attached hereto as Exhibit "B."

11

12      3.     Gary Shaw.  A copy of Mr. Shaw's expert report is attached hereto as

13  Exhibit "C."

14

15       Plaintiffs have not yet completed their investigation of the facts relating to

16  this action, have not yet completed discovery in this action, and have not yet

17  completed preparation for trial.  Consequently, the attached expert reports are based

18  on information currently available and are issued without prejudice to the right to

19  alter, amend or modify the reports based on the discovery of additional documents

20  or information.

21       The foregoing designation does not include any expert whose testimony may

22  be offered solely for purposes of impeachment or rebuttal.  Plaintiffs reserve the

23  right to amend and/or modify their expert witness designation in accordance with

24  the Federal Rules of Civil Procedure and Local Rules of this Court.

25

26

27

28

GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1

2
DATED:  September 6, 2016          GREENBERG GLUSKER FIELDS
                                   CLAMAN & MACHTINGER LLP

3

4
                                   By: */s/ Bertram Fields*
5                                       BERTRAM FIELDS (SBN 024199)
                                        Attorneys for Plaintiffs Golden Boy
6                                       Promotions, LLC, Golden Boy
                                        Promotions, Inc. and Bernard Hopkins

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP**
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

**EXHIBIT 3**                                                           **184**

# EXHIBIT A

EXHIBIT 3                    185

HIGHLY CONFIDENTIAL Subject to Protective Order

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN BOY PROMOTIONS, LLC, GOLDEN BOY PROMOTIONS, INC., and BERNARD HOPKINS, <br><br> Plaintiffs, <br><br> v. <br><br> ALAN HAYMON, ALAN HAYMON DEVELOPMENT, INC., HAYMON HOLDINGS, LLC, HAYMON SPORTS, LLC, HAYMON BOXING MANAGEMENT, HAYMON BOXING, LLC, and RYAN CALDWELL, <br><br> Defendants. | Case No. 2:15-cv-03378 JFW (MRWx) <br><br> *Assigned to Hon. John F. Walter* |

**EXPERT REPORT OF ROBERT KNEUPER, Ph.D.**

**September 6, 2016**

**PRIVILEGED AND CONFIDENTIAL**

**PREPARED FOR COUNSEL**

EXHIBIT 3                    186

# EXHIBIT B

EXHIBIT 3                                    269

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN BOY PROMOTIONS, LLC, GOLDEN BOY PROMOTIONS, INC. And BERNARD HOPKINS, | Case 2:15-cv-03378 JFW (MRWx) |
| Plaintiffs, | |
| v. | |
| ALAN HAYMON, ALAN HAYMON DEVELOPMENT, INC., HAYMON HOLDINGS, LLC, HAYMON SPORTS, LLC, HAYMON BOXING MANAGEMENT, HAYMON BOXING LLC, and RYAN CALDWELL, | |
| Defendants. | |

**Expert Report of**
**Gene Deetz, CPA/ABV, ASA, CFF**
September 6, 2016

EXHIBIT 3                                                           270

# EXHIBIT C

EXHIBIT 3                    316

# Expert Report of Gary Shaw

## I.      INTRODUCTION

I have been retained by Greenberg Glusker Fields Claman & Machtinger, LLP and Golden Boy Promotions to act as an expert witnesses in connection with the case of *Golden Boy Promotions, LLC, et al. v. Alan Haymon Development, Inc. et al.*, California Central District case no. 15-cv-03378 JFW (MRWx).  I have been asked to render opinions regarding customs and practices in the boxing industry and specifically in connection with promotion of championship caliber boxers. The opinions expressed in this report are based on my experience and my review of the documents identified.

## II.      STATEMENT OF QUALIFICATIONS

I have worked in the boxing industry for more than 46 years.  I began as a boxing regulator, serving as Inspector for the New Jersey State Athletic Control Board, became Chief Inspector in the late 1990's and a member of the Board, Appointed by three Governors and confirmed by the NJ Senate in early 2000.

In 2008, I began acting as a boxing promoter, working as the COO of Main Events, one of the biggest boxing promotional companies in its time, run by the famous Duva family.  I formed Gary Shaw Productions in 2002 and worked as a boxing promoter under that company for 13 years.  In total, I have promoted more than 100 boxing events, of all sizes and nature, around the world

## III.      DOCUMENTS REVIEWED

In connection with preparing this report, I have reviewed the following documents:

1.      The Second Amended Complaint filed by the Golden Boy Parties on or about January 21, 2016.

2.      TV contracts

3.      Management/Advisory Contracts

1

**EXHIBIT 3**                                                         317

## IV.   **OPINIONS AND ANALYSIS**

I have been asked to provide opinions on four major topics.  Those topics are:

1.      The typical economic models for boxing promotions.

2.      The relative importance of top level boxing talent for boxing promotions.

3.      The typical duties of boxing promoters vs. boxing managers and the distinctions between them.

4.      The impact of the current boxing promotion model employed by the Haymon defendants.

I will address each of these topics in turn below.

### A.   Economic Models for Boxing Promotion

The business of boxing promoters is to plan and produce boxing events.  I liken it to Ringling Brothers – the boxing promoter comes to town, pitches the tent, sells the souvenirs, puts on the acts, collects the ticket sales, and at the end of the night, breaks everything down and moves on to the next show in the next town.

Boxing events normally consist of a main event, between two very competitive fighters, and several undercard matches.  For televised boxing events, the main event match is typically a 12 round bout between two recognized championship caliber boxers.  The undercard matches can be fights of any length involving some combination of championship caliber boxers, up and coming fighters and young fighters just getting their start.

The main job of a boxing promoter is to generate sufficient revenue to cover the purses paid to the boxers plus all the other expenses incurred in putting on the event.  Successfully promoting boxing events is a complicated business and only a few promoters are truly successful at it.  Promoting boxing events requires knowledge of several different industries – television, advertising and sponsorships, ticket sales, event venues, and of course, boxing.  The knowledge of the boxing business is the hardest to come by.  To begin with, successful promoters must understand how to pick the best opponents for their fighters.  This includes selecting opponents in order to maximize their fighter's career potential.  It also includes understanding how different styles of boxers will match up in order to

2

**EXHIBIT 3**                                                      **318**

create exciting fights that the fans will enjoy.  Many promoters have failed because of their inability to understand these key aspects of the sport of boxing.

Promoters must also understand how to deal with sanctioning bodies and state licensing commissions.  The sanctioning bodies are essential to the development of boxers.  The four main sanctioning bodies, WBC, WBA, WBF and IBF all publish rankings by weight class.  Those rankings are used in determining when a boxer will get the chance to fight for a world title.  The rankings are also used to help generate interest in boxers from television broadcasters.  Because of the importance of these rankings, promoters need to successfully market their fighters to the sanctioning bodies to get them ranked and to move them up the rankings.  They also need to understand the rules regarding mandatory opponents, purse bids and other regulations that govern the sport.

Promoters must also ensure compliance with the state regulations governing boxing.  This includes financial disclosures, medical disclosures, required filings with the state commissions and other technical aspects of promoting a boxing event.

Promoting boxing events also requires significant capital.  The promoter must pay numerous expenses before receiving any significant revenue from the event.  The promoter must also be in a position to cover all of the boxers' purses, regardless of the financial results of the event.  That is because boxer purses are guaranteed and must be paid, regardless of the profitability of the event.

For this reason, boxing has traditionally been led by a handful of successful promoters at any given time.  Those companies have several top fighters on their roster and have the wherewithal to stage these complicated events.

The primary sources of revenue for boxing promoters are: (1) rights fees paid by domestic television broadcasters; (2) rights fees paid by foreign television broadcasters; (3) ticket sales and/or site fees; (4) sponsorships; (5) delayed broadcast rights fees; and (6) in some cases, the sale of food and beverage, parking etc., as constructed by the promoter in his deal.  Each event is constructed based on its unique characteristics and the distribution of revenue from each of these sources will vary from fight to fight.  However, there are certain principles which normally hold true.

First, for pay per view events, the majority of revenue is derived from pay per view sales.  Historically, the broadcasters of pay per view events have paid promoters a minimum guarantee and then a percentage of pay per view revenue

3

**EXHIBIT 3**                    **319**

above a set number of buys, also allowing the networks to collect a marketing fee. Pay per view events have historically been the most lucrative in boxing, although they do involve a high degree of risk because the expenses are generally higher. However, when successful, pay per view events normally produce the largest profits for the promoter.

Second, for non-pay per view broadcasts on television, the television network has traditionally paid a license fee for the right to broadcast the boxing match. This license fee generally dictates the size of the purses offered to the main event fighters. This is because a boxing promoter will want to know that it can cover the single largest expense of the fight – the purse paid to the main event fighters – with a guaranteed source of revenue like a television license fee.

Third, the boxing promoter negotiates the size of the boxers' purses with the boxers' management. The size of the purses that the promoter pays to the boxers will be based on a combination of the terms of the contract between the boxer and the promoter and the expected revenue from the fight. For example, a boxing promoter who signs a fighter to a multi-fight contract normally includes certain required purses for the boxer's fights over the life of the contract, and the fighter's purse will be set based on that contract. However, often times the promoter will offer the boxer a percentage of the promoter's net revenue. In those circumstances, the promoter will provide the boxer with a minimum guarantee based on the expected revenue from the fight and then pay any additional sums after the fight has concluded.

As discussed above, the guaranteed purses for the main event fighters will usually be dictated by the amount of the television license fee. By contrast, the size of the purses for undercard bouts will be determined based on numerous criteria such as the length of the fight, the level of the fighters, contractual terms between the promoter and the fighter, whether there is a championship belt on the line, and whether the fight is to be billed as a co-feature or is otherwise important to marketing the fight. As a general rule, however, it is the main event that carries the undercard fights.

Fourth, the non-television sources of revenue are generally used to cover the purses paid to undercard fighters, the various expenses related to the production of the event and then to generate profits for the promoter.

The final economic driver of boxing promotion is the value of fight footage. Promoters usually retain the right to exploit the footage of their televised fights after a certain holdback period negotiated with the television network. Successful

promoters are thereby able to build a library of fight footage that can be licensed in the future for significant value.

Given these economic realities of boxing promotion, it is my opinion that the availability of television rights fees is essential to a promoter's ability to profitably promote boxing events. Without these fees, a promoter cannot profitably promote a boxing event without significantly reducing the purses paid to the boxers, which makes it impossible to attract the necessary talent to create a successful event. Without the product and the platform, all you can ever be is a very small time promoter, doing very small local club shows.

B.    Importance of Top Level Boxing Talent

Boxing promotion is built around star power. Being a successful boxing promoter is about creating stars and maintaining stars.

Boxing stars are sometimes called championship caliber boxers. These are the boxers who have established themselves as being able to command license fees from television broadcasters such as HBO and Showtime and to carry pay per view events. Championship caliber boxers include those true superstars such as Floyd Mayweather, Manny Pacquiao and Canelo Alvarez, as well as the opponents they face. There are many factors that go into determine who qualifies as a championship caliber boxer, but generally, you consider factors such as record, ranking, television appearances on major broadcasters such as ESPN, Fox, HBO and Showtime, prior performances against quality opponents and the like.

In my experience it is easier to create a star than it is to maintain a star. There are several reasons for this.

First, every young fighter just turning pro is the same – he just wants to sign with a promoter. He is willing to accept any terms just to get his career started. However, those original promotional contracts generally cannot exceed five years. As a general matter it takes a number of years to build a young boxer into a star, so that right around the time they become a star, their original contract will expire and they will have the ability to move to another promoter.

During this development period, the promoter will invest significantly in the young fighter. The promoter will generally pay advances and expenses for the fighter, and will often take losses on the promotion of their fights. In my experience a good promoter will invest somewhere between $100,000 and $200,000 developing a fighter into a championship caliber boxer.

5

EXHIBIT 3                                321

Second, once a fighter becomes a star, every promoter and manager in the business wants to try to take that fighter.  Therefore, once a promoter has developed a young fighter into a star, the promoter is under severe pressure to keep that fighter happy in order to maintain that star fighter in the promoter's stable.  It is at this time that access to television broadcasters is most critical.  The promoter needs to be able to promise the up and coming young fighter that he will be on the best television networks and get the maximum exposure so that he can become the next great star.  If a promoter cannot get access to the main television stations such as HBO, Showtime, ESPN and Fox, that promoter will be much less likely to sign and retain talented fighters.

Third, if a promoter is able to develop and maintain a true boxing star, the promoter has a great deal of power.  Traditionally, television networks have engaged in competitive bidding to get the rights to broadcast the fights of star boxers, which gives the promoter of that star boxer great leverage in negotiating license fees and pay per view guarantees.

In addition, the star power of a boxer helps drive additional revenue from the other sources.  Obviously, ticket sale revenue increases if a star boxer can draw a large audience and command top level ticket prices.  Similarly, sponsors will pay more to sponsor the fight of true boxing star because they know that a large number of people will be watching the fight.  Accordingly, promoters are much more likely to generate profits from star fighters.

Finally, star power is important because it helps build interest in undercard fighters.  This helps the boxing promoter build future star boxers and grow its business.

C.    Duties of Promoters and Managers and the Differences Between Them

I start with the fundamental proposition that managers and promoters have different roles and serve different purposes.  Generally speaking, a manager is there to represent the interests of the boxer in negotiations with the promoter whereas the promoter is there to do the work of producing and promoting the boxing matches.  Not only is this distinction required by the Muhammad Ali Act, in my opinion as a former regulator and long-time boxing promoter, it is necessary to protect the sport. The manager has a fiduciary responsibility to the fighter, whereas the promoter does not.

6

EXHIBIT 3                                    322

1.    Promoter Duties

A promoter's job is to produce and promote the boxing event and to maximize the revenues from the boxing event.  In the planning stages for a boxing event, a boxing promoter negotiates with the television broadcaster for the rights to broadcast the event.  This, of course, includes negotiation of the rights fees to be paid, but also includes negotiation of the manner of producing the television broadcast and other essential terms.  The promoter also negotiates with the venue that will host the event.  This negotiation involves potential site fees paid to the promoter, who will control ticket sales, and the details of how the event will be staged.  The promoter negotiates sponsorship deals.  The promoter negotiates both the sponsorship fees paid and where the sponsor will be displayed (e.g., on the ring, on ring posts, on the lighting rig).  The promoter also negotiates foreign television contracts and the contracts for ancillary broadcast rights, such as internet or streaming broadcasts.  Basically, it is the promoter's job to negotiate all of the agreements that are necessary to generate revenue from the fight and make the fight happen.  These are the promoter's responsibilities because a promoter only makes money if its event is a success.

The promoter is also responsible for advertising and promoting the fight.  Therefore, the promoter is responsible for press conferences, advertising, co-promotional opportunities and other activities designed to drive viewers to the see the fight.

The promoter is then responsible for coordinating all of the different parts of the actual event.  These include:  the weigh in, press conferences and press room, the ring announcer, getting approvals from the relevant sanctioning bodies, filing the required documents with the state boxing commissions, coordinating medical support, providing locker rooms for the fighters and the like.

Finally, the promoter is responsible for collecting all the revenue from the fight and paying all the expenses.  Primarily, this includes paying the boxer's purses.  It is the promoter's responsibility to pay each boxer his purse after the fight, and in some districts, paying the fighters by check through the commission prior to the fight. Promoters also pay for drug testing, sanctioning fees, all travel, rooms and food, if not included in site deal.

2.    Manager's Duties

As I have mentioned, a boxing manager is responsible for negotiating on behalf of his or client with the boxing promoter.  The manager is responsible for

trying to get the largest possible purse for the boxer.  Boxing managers are incentivized to get the largest purse possible because they share in the purse received by the boxer.  Managers do not share in the profits of the fight earned by a promoter, and therefore, are not supposed to be involved in the negotiations conducted by the promoter.  That is why there is an Ali Act, and one can NOT be both a manager, advisor and Promoter in the United States, unlike other foreign Countries.

Traditionally, boxing managers do not negotiate with television networks, sponsors, venues or the like.  They simply represent their boxers in negotiations with the promoters who promote their fights.

D.   The Boxing Promotion Model Currently Employed By the Haymon Defendants

I have known Al Haymon for years.  In fact, I was one of the first promoters to promote a fighter Mr. Haymon managed – Vernon Forrest.  From that personal experience, I am familiar with Mr. Haymon's preferred method of operating.  I have also reviewed copies of some of his current management/advisory contracts with boxers and the television network agreements he has entered into with respect to Premier Boxing Champions ("PBC").  In my opinion, Mr. Haymon continues to operate in the same manner he did when I first worked with him.

1.   Haymon's Boxing Promotion Model

Mr. Haymon is a boxing manager.  He signs boxers to either management or advisory contracts which provide that Mr. Haymon has exclusive control over the boxer's professional career.  Based on my review of a number of these contracts, it is my opinion that these agreements give Mr. Haymon control over not only the management of the boxers, but also the promotion of their fights.

Although he calls himself a boxing manager, it is my opinion that Mr. Haymon acts as a boxing promoter.  Based on my personal experience with Mr. Haymon, and my review of the television contracts he has signed for his PBC Series, I can state that Mr. Haymon regularly negotiates with television networks, sponsors, venues and all other providers of revenue for boxing events.  Mr. Haymon sets the budgets for the events that his fighters are involved in, he negotiates the purses for those fighters and he controls all aspects of the promotion of the fights.  In my opinion, in his model, Mr. Haymon fulfills all the traditional duties of a boxing promoter.

8

**EXHIBIT 3**                    324

I am aware that Mr. Haymon has arranged to have licensed boxing promoters involved in his PBC events. However, based on my personal experience with Mr. Haymon and my experience in the boxing industry, it is my opinion that those promoters are not acting as true boxing promoters. Mr. Haymon is performing all of the traditional functions of a boxing promoter. The licensed promoter is simply putting its name on contracts that have been already negotiated and decided by Mr. Haymon. In this way, the promoters are, in effect, "renting" their license to Mr. Haymon.

Indeed, my review of the television contracts Haymon has entered into confirms this. Those television contracts provide that Haymon will arrange for a promoter to be involved in the PBC events, without any disclosure of who that promoter will be, that promoter's experience or qualifications or the history of that promoter's activities. In my experience, a television network would not agree to broadcast a boxing event unless it was confident that the promoter responsible for making that show happen has the necessary experience and ability to put on quality event and to comply with all state athletic commission requirements. Because of this, the television contracts confirm that the networks view Haymon as the promoter and are comfortable that he will be responsible for all aspects of making the shows happen.

By calling himself a manager, while acting as a promoter, Haymon is not constrained by the state and federal regulations governing boxing. When he acts as a promoter and negotiates the essential contracts for the promotion of an event, Haymon does not worry about compliance with the regulations regarding financial disclosures that are required of promoters. Further, when Haymon tells his fighters what they are going to get paid for a particular fight, he does not need to comply with state regulations regarding how and when that money will be paid. Payments made by Haymon to boxers are not reported to state athletic commissions or otherwise disclosed.

Moreover, from my personal experience with Mr. Haymon, I can testify that Mr. Haymon will not allow his fighters to sign long term or multi-fight contracts with boxing promoters. In my opinion this is because Mr. Haymon wants to control and direct all aspects of any boxing promotion in which a fighter he manages is involved.

Based on media reports I have reviewed, I believe Mr. Haymon obtained well in excess of $500 million in venture capital funding to pursue his PBC series. Mr. Haymon then used that money to do two things.

First, Mr. Haymon agreed to buy air time from numerous television broadcasters. Based on my review of the contracts provided to me in connection with this assignment, it appears that Mr. Haymon agreed to buy time on the following networks: NBC, SpikeTV, Fox, ABC/ESPN, CBS/Showtime and Bounce TV. Most of these agreements require that the networks carry only Mr. Haymon's boxing programs, thereby precluding other boxing promoters from having their events broadcast on those networks.

Second, Mr. Haymon began overpaying fighters. Based on my experience in the industry, it is my opinion that, since the beginning of 2015, Mr. Haymon has offered fighters more than double the purse that would have normally been paid for a comparable fight. Mr. Haymon has also paid for expensive perks for his fighters, such as flights on private jets and the like. Mr. Haymon has used these excessive purses and flashy perks to attract many fighters to his stable, along with the promise to put the fighters on Television.

2.      Impact of Haymon's Model on Boxing.

In order to be a successful boxing promoter, you need a platform and you need a product. Traditionally, the platforms for boxing are television networks such as HBO, Showtime, NBC, CBS, ABC, Fox, ESPN and Spike TV. The product is, of course, boxing matches between quality opponents. As a boxing promoter, if you are missing one of these two components, you are going to have great difficulty conducting a profitable and successful business, of any magnitude.

Haymon's PBC model has impacted both the availability of platforms and product. Let me begin with platforms.

When Haymon entered into exclusive agreements with NBC, Fox, Spike TV, ABC/ESPN, and CBS/Showtime, he eliminated access to almost all of the platforms for televising boxing matches. Because each of these broadcasters agreed to carry only Haymon-promoted boxing matches, no other boxing promoters, such as my company or Golden Boy, could obtain dates or license fees for their events. This lack of platforms has drastically limited the ability of other promoters to compete.

The lack of a platform impacts a promoter economically in two primary ways. First, if you cannot find a television network to broadcast the fight, there will be no rights fee paid to the promoter. The entire economic model of the sport is based on around the payment of these license fees. Second, if there is no television broadcast, it is difficult to attract sponsors and to convince sponsors to

EXHIBIT 3                                      326

pay any significant amount of money to sponsor the event.  Therefore, by preventing the promoter from getting a television license fee, you are effectively preventing the promoter from staging a profitable and successful event.

The lack of a television platform also impacts a promoter's ability to create and maintain star boxers.  Without television, the promoter cannot attract or keep the top boxing talent who want to further their careers by appearing on television and building a name for themselves.  This is the single biggest reason why Haymon has been able to attract and retain so many top young boxers.  He promises them television exposure and the large purses that go along with that.

In my experience it is very difficult to create interest in boxing at cable networks that do not have a history of televising boxing matches.  To make this happen you have to convince the executives involved in setting programming for that network that they should move away from their typical programming and carry something different.  This, in and of itself, is difficult.  You then have to convince the network that they should move away from their typical programming to carry boxing.  Normally, you can only do this if you can show the broadcaster that championship-caliber boxing matches will draw higher ratings than their typical programming.

This has always been an exceedingly difficult task, and Haymon has made it more difficult.  Because Haymon's arrangement with the television networks require him to pay the television network to carry the fight (a so-called "time buy" arrangement), there is little incentive for televisions networks who have not traditionally carried boxing to pay a license fee.  After all, if ESPN, the leader in sports television, is not paying a license fee, why should a non-sports network with no history of televising boxing?

Haymon's model has also affected the ability of other promoters to create product to be televised.  Because of the nature of Haymon's contracts with his boxers, other promoters are unable to contract with Haymon's fighters.  This precludes other promoters from putting together fights involving Haymon fighters.

In addition, in my experience, Haymon will not give a competing promoter an option for a future fight with one of his boxers.  Options on future fights are a critical aspect of successful boxing promotions.  Traditionally, when a promoter contracts with a fighter with whom it does not have a long term agreement, the promoter will take one or more options on that fighter's future fights.  These options normally take effect if the fighter beats the promoter's fighter.  The idea is that the promoter wants the right to promote a future fight of the winner of the

11

**EXHIBIT 3**                                                                  **327**

bout, regardless of who wins.  Haymon refuses this arrangement which makes it increasingly difficult to make deals for Haymon's fighters.

Given the number of boxers that Haymon controls in many of the key weight classes, such as the welterweight and middleweight categories, Haymon's refusal to allow his fighters to sign with other promoters makes it increasingly difficult to find opponents for boxers promoted by companies like Golden Boy.  Accordingly, Haymon's model restricts access to the product as well as the platforms.

In my opinion, Haymon's model has had negative impacts on the sport as a whole.  Because Haymon's model depends on purchasing significant amounts of air time from many different television broadcasters, Haymon is forced to fill those time slots with fights which would normally not be considered main event type fights.  In this way, Haymon's model has diluted the overall quality of boxing on television.  By diluting the quality of boxing on television, Haymon is hurting boxing's fan base and reducing the likelihood that television broadcasters who are not tied to Haymon will pay license fees for other events. Television ratings have borne this out.

Moreover, by taking up so many time slots on the broadcasters who carry boxing, there is realistically no available time on those networks for additional boxing programming.  Therefore, promoters such as Golden Boy are unable to find network availability for their product.

Finally, Haymon's willingness to pay television broadcasters, rather than the other way around, has eroded the value of television rights fees.  Television broadcasters now expect all promoters to pay for the privilege of having their boxing events televised.  By eroding the value of the television rights, and indeed making television broadcasts an expense, rather than a revenue producing number, boxing promoters now cannot generate the same revenue for a boxing event as they once could.  As a result, fewer quality boxing matches will be broadcast on television as a result of Haymon's model.

## V.   <u>CONCLUSION</u>

Al Haymon and his companies have been acting as both a boxing manager and a boxing promoter.  By entering into exclusive agreements with fighters that prevent those fighters from fighting for other promoters and by locking up television broadcasters with exclusive arrangements, Haymon has effectively reduced the opportunities for other promoters to be able to put together successful

and profitable boxing events. Accordingly, boxing promoters are deprived of both the product and the platforms they need to compete in the boxing business.

## VI. PUBLICATIONS AND PRIOR EXPERT TESTIMONY

I have not authored any publications in the last 10 years. I have not served as an expert witness in any matter in the last 4 years.

## VII. COMPENSATION

I am being compensated on a flat fee basis for my services in this matter. I am receiving $20,000 for consulting with counsel and preparing this report. I will receive an additional $20,000 fee if I am called to testify in deposition. If I am called to testify at trial, I will receive an additional $25,000. No part of my fees in this matter have been conditioned on the nature of my opinions, nor is any part of my fee conditioned on the outcome of the case.

I reserve the right to amend or supplement this report with further opinions in the event additional information is provided to me, or if additional questions are asked of me to opine on.

Dated: _Sept 6, 2016_        _____
                                           Gary Shaw

13

**EXHIBIT 3**        **329**

1

## PROOF OF SERVICE

2

3     I am a resident of the State of California, over the age of eighteen years, and
4 not a party to the within action.  My business address is Greenberg Glusker Fields
Claman & Machtinger LLP, 1900 Avenue of the Stars, 21st Floor, Los Angeles,
5 California 90067.

6     On **September 6, 2016**, I served the following documents: **PLAINTIFFS'
INITIAL DISCLOSURE OF EXPERT WITNESSES** on the interested parties in
7 this action by placing a copy thereof enclosed in a sealed envelope addressed as
8 follows:

9     Howard Weitzman                     *Attorneys for Alan Haymon, Alan*
10    Kinsella Weitzman Iser Kump         *Haymon Development, Inc., Haymon*
      and Aldisert LLP                    *Sports, LLC, Haymon Boxing*
11    808 Wilshire Boulevard              *Management, Haymon Boxing LLC,*
      3rd Floor                           *Haymon Boxing: Media Group*
12    Santa Monica, CA 90401              *Holdings, LLC*
                                          T: 310-566-9800
13                                        F: 310-566-9850
                                          E: hweitzman@kwikalaw.com
14                                            JReynolds@kwikalaw.com

15    Barry H. Berke                      *Attorneys for Alan Haymon, Alan*
      Kramer Levin Naftalis and           *Haymon Development, Inc., Haymon*
16    Frankel LLP                         *Sports, LLC, Haymon Boxing*
      1177 Avenue of the Americas         *Management, Haymon Boxing LLC,*
17    New York, NY 10036-2714             *Haymon Boxing: Media Group*
                                          *Holdings, LLC*
18                                        T: 212-715-7560
                                          F: 212-715-7660
19                                        E: bberke@kramerlevin.com

20    Michael E. Williams                 *Attorneys for Haymon Sports, LLC,*
      Quinn Emanuel Urquhart and          *Haymon Boxing Management, Haymon*
21    Sullivan LLP                        *Boxing LLC, Haymon Holdings, LLC*
      865 South Figueroa Street           T: 213-443-3000
22    10th Floor                          F: 213-433-3100
      Los Angeles, CA 90017-2543          E: michaelwilliams@quinnemanuel.com
23                                           HaymonCase@quinnemanuel.com

24

25    ☒     **(BY E-MAIL)**  I caused a true copy of the foregoing document to be
            served by e-mail at the e-mail address set forth above.  Each e-mail was
26          complete and no reports of error were received.

27

28

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

17896-00617/2679147.1

PLAINTIFFS' INITIAL DISCLOSURE OF
EXPERT WITNESSES

**EXHIBIT 3**                                               **330**

1     I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

3     Executed on **September 6, 2016**, at Los Angeles, California.

    Jannette G. Gore                              Signature

GREENBERG GLUSKER FIELDS CLAMAN
& MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067-4590

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

17896-00617/2679147.1

PLAINTIFFS' INITIAL DISCLOSURE OF
EXPERT WITNESSES

**EXHIBIT 3**                                                                 **331**