**HIGHLY CONFIDENTIAL Subject to Protective Order**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN BOY PROMOTIONS, LLC, GOLDEN BOY PROMOTIONS, INC., and BERNARD HOPKINS, <br><br> Plaintiffs, <br><br> v. <br><br> ALAN HAYMON, ALAN HAYMON DEVELOPMENT, INC., HAYMON HOLDINGS, LLC, HAYMON SPORTS, LLC, HAYMON BOXING MANAGEMENT, HAYMON BOXING, LLC, and RYAN CALDWELL, <br><br> Defendants. | Case No. 2:15-cv-03378 JFW (MRWx) <br><br> *Assigned to Hon. John F. Walter* |

**EXPERT REPORT OF ROBERT KNEUPER, Ph.D.**

**September 6, 2016**

**PRIVILEGED AND CONFIDENTIAL**

**PREPARED FOR COUNSEL**

**HIGHLY CONFIDENTIAL Subject to Protective Order**

# Table of Contents

I.    Qualifications ................................................................................ 3

II.   The Parties and the Allegations ................................................... 4

III.  Assignment and Summary of Conclusions .................................. 5

IV.   Background ................................................................................... 9

      *The Economics of the Boxing Industry* ..................................... 9

      *Championship-Caliber Boxers* ................................................. 12

      *The Economic Functions of Boxing Managers and Boxing Promoters* ...................... 15

      *Conflicts of Interest from Combining Management with Promotion in Boxing* ........... 17

V.    Market Definition ...................................................................... 19

      *Economic Background* .............................................................. 19

      *The Relevant Antitrust Markets for Managing and Promoting Championship-Caliber Boxers* .................................................... 21

VI.   Market Shares and Market Concentration ................................. 24

VII.  Market Power and Competitive Effects ..................................... 30

      *Economic Background* .............................................................. 30

      *Actions of Haymon* .................................................................. 33

      *Haymon Locks In Most of the Key Boxers* ............................... 34

      *Haymon Refuses Access to Golden Boy and Other Key Promoters* ............................ 35

      *Haymon Ties Management to Promotion* ................................. 36

      *Haymon Locks Up the Networks* ............................................. 36

      *The Effects of Haymon's Exclusionary Actions* ...................... 37

VIII. Entry ........................................................................................... 46

## Exhibits

**Exhibit 1:**      **Curriculum Vitae**

**Exhibit 2:**      **Materials Considered**

**Exhibits 3-7:**  **Empirical Appendices**

Case 2:15-cv-03378-JFW-MRW Document 159-1 Filed 10/31/16 Page 3 of 83 Page ID #:4438

HIGHLY CONFIDENTIAL Subject to Protective Order

**EXPERT REPORT OF ROBERT KNEUPER, Ph.D.**

## I.      Qualifications

1.      My name is Robert Kneuper. I am a Director and Principal at Navigant Economics, an economic consulting firm specializing in applied microeconomics, antitrust, health care, intellectual property, labor, and financial analysis. I am an Adjunct Professor at Loyola University School of Law where I teach a course in antitrust economics. I am also an Adjunct Professor at Charleston Southern University where I teach MBA courses in Managerial Economics and in Corporate Finance.

2.      I have worked as an antitrust, regulatory, and financial economist for over 20 years, both in the federal government and in private consulting. Among other things, my consulting practice focuses on analysis of the competitive effects of a variety of business practices such as mergers and acquisitions, horizontal and vertical restraints, and alleged monopolization. I also have various publications in the field of antitrust economics.

3.      I have consulted with both private clients and government regulators as part of my antitrust practice, applying economic theory and data analyses to a wide variety of business practices that raise antitrust issues. My antitrust work has spanned a wide variety of industries including health care, pharmaceuticals, insurance, energy, media, entertainment, transportation, internet, sports, gaming, aerospace, defense, waste collection, retail and consumer products.

4.      I previously worked for more than 10 years analyzing antitrust matters at the Federal Trade Commission. While at the FTC, I analyzed antitrust issues in various industries including the sports industry. In my work at the FTC, I employed a wide variety of economic techniques in order to evaluate the competitive effects associated with a wide variety of antitrust cases including those involving horizontal and vertical restraints.

5.      I received my Ph.D. in Applied Economics from Clemson University in 1990 and my B.S. in Economics from George Mason University in 1986. During my graduate studies, I was an H.W. Close Fellow and an R.C. Edwards Fellow. I am also a member of the American Bar Association and the American Economic Association.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

6.      A copy of my curriculum vitae is attached as Exhibit 1 to this report. This contains a list of all publications I have authored in the last 10 years. It also includes all of my expert reports and testimony (deposition or trial) in the last 10 years. For my time, Navigant Economics is being compensated at the rate of $625 per hour. Neither Navigant Economics' compensation nor my compensation is contingent upon the conclusions I reach in this Report or upon the outcome of this litigation.

7.      A list of the materials I have considered is attached as Exhibit 2. This Report contains the results of my research and analysis to date. As additional information becomes available, it is my intention to review that material and, if appropriate, to amend or supplement this Report.

## II.    The Parties and the Allegations

8.      Plaintiffs Golden Boy Promotions, LLC and Golden Boy Promotions, Inc. (collectively, "Golden Boy") are, respectively, a California limited liability company and a California corporation,[1] established in 2002 by Oscar De La Hoya, a ten-time boxing world champion and U.S. Olympic Gold Medalist.[2] Golden Boy describes itself on its website as "one of boxing's most active and respected promoters" and currently promotes boxing matches held in "packed venues around the United States on networks such as HBO, SHOWTIME, FOX Sports 1, and FOX Deportes."[3] Plaintiff Bernard Hopkins is also a renowned boxer.[4]

9.      Defendants are Alan Haymon; Alan Haymon Development, Inc.; Haymon Holdings, LLC; Haymon Sports, LLC; Haymon Boxing Management; Haymon Boxing LLC; and Ryan Caldwell. (I will herein refer to the Defendants collectively as "Haymon.") Al Haymon, a resident of California, along with his affiliated entities with principal places of business in either California or Nevada, are alleged to function as both boxing promoters

---

[1]      Second Amended Complaint for Sherman Act Violations, Unfair Practices Act Violations and Unfair Competition, filed January 20, 2016, (hereinafter "Complaint"), ¶¶ 1, 5.

[2]      "About Us," http://www.goldenboypromotions.com/en/about-us; Complaint, ¶ 1.

[3]      "About Us," http://www.goldenboypromotions.com/en/about-us.

[4]      Complaint, ¶ 1.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

and boxing managers.[5] Haymon created the Premier Boxing Champions ("PBC") series in January 2015.[6] Haymon describes PBC on its website as a boxing series that features "today's best and brightest stars in their toughest, most anticipated bouts" and states that PBC is broadcast "live and free to air on NBC, NBC Sports Network, ESPN and ESPN Deportes, CBS, FOX Sports 1, FOX Deportes, Spike TV and Bounce TV."[7]

10.    Plaintiffs allege that Defendants are "attempting to monopolize the business of promoting professional boxing matches in the United States" through "illegal, predatory and anticompetitive conduct, such as forcing boxers to refuse to deal with Plaintiffs and acting to deny Plaintiffs access to elements essential to their business success."[8]  Plaintiffs further allege that Defendants are "violating the prohibition, under state and federal law, against acting as both manager and promoter of Championship-Caliber Boxers," by "entering into unlawful 'tie out' agreements to limit competition," and by other means.[9] Plaintiffs allege that because of Haymon's "illegal, predatory and anti-competitive acts,"[10] Plaintiffs have "suffered significant harm."[11] As a remedy to this alleged harm, Plaintiffs seek monetary damages and injunctive relief.[12]


### III.    Assignment and Summary of Conclusions

11.    I have been asked by counsel for Plaintiffs in this matter to evaluate the economic aspects of their antitrust claims. In particular, I have been asked to evaluate whether Defendants have market power in a relevant U.S. market for managing Championship-Caliber Boxers and in a relevant U.S. market for promoting Championship-Caliber Boxers. I have been also asked to evaluate the past and likely future competitive effects of

---

[5]     Complaint, ¶ 6.

[6]     Premier Boxing Champions, "About," http://www.premierboxingchampions.com/about.

[7]     Premier Boxing Champions, "About," http://www.premierboxingchampions.com/about.

[8]     Complaint, ¶ 2.

[9]     Complaint, ¶ 103.

[10]    Complaint, ¶ 58.

[11]    Complaint, ¶ 106.

[12]    Complaint, pp. 50-51.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

Haymon's actions on boxers, boxing managers, and boxing promoters. Based on these evaluations, I have arrived at the following conclusions.

12.    First, Haymon has engaged in a series of anticompetitive actions that have enabled it to reach a position of market power in two relevant antitrust markets:

- the U.S. market for managing Championship-Caliber Boxers; and
- the U.S. market for promoting Championship-Caliber Boxers.

The key elements of Haymon's anticompetitive strategy include:

- "locking up" the majority of Championship-Caliber Boxers via long-term exclusive management contracts that give Haymon control of the boxer's choice of fights including the opponent (and associated promoter) that he will face;
- "tying" the management of Haymon boxers to the promotion of Haymon boxers, which clearly violates the spirit (if not the letter) of federal law (the Ali Act) meant to protect boxers from the recognized economic harm associated with such tying;
- generally refusing to allow Haymon-controlled Championship-Caliber Boxers to participate in fights against boxers represented by key competing promoters including Golden Boy Promotions, Top Rank, and others;
- "locking up" the key networks and cable stations that broadcast boxing via multi-year exclusive contracts.

13.    Second, Haymon's anticompetitive actions have allowed it to lock up key inputs which are essential to effectively compete as a promoter of televised boxing events in the U.S. – namely, Championship-Caliber Boxers. Haymon's anticompetitive actions have also allowed it to gain substantial control of U.S. televised boxing events. Haymon's current market share in the U.S. markets for managing and promoting Championship-Caliber Boxers, and with respect to 2016 U.S. televised bouts on key boxing channels (the Network channels, ESPN, HBO and Showtime) is shown in Figure 1 below:

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-11 Filed 10/31/16 Page 7 of 83 Page ID #:4442

**HIGHLY CONFIDENTIAL Subject to Protective Order**

### Figure 1



Source: See workpapers "Boxers Final.xlsx," "Events Final.xlsx" and "Rankings Final.xlsx."

14.     Third, Haymon's anticompetitive actions have had a substantial impact on commerce in the market for the promotion of Championship-Caliber Boxers in the U.S. and have injured key competing boxing promoters targeted by Haymon, including Golden Boy, by substantially foreclosing those promoters from attracting Championship-Caliber Boxers and from offering competing high-quality U.S. televised boxing events for their existing roster of boxers. As a result, Golden Boy and other promoters competing against Haymon have experienced substantially reduced revenues and profits.

15.     Fourth, Haymon's anticompetitive actions have also harmed, and are likely to harm, numerous boxers, who are also victims of Haymon's tying actions in the two relevant antitrust markets.[13] The nature of this harm is twofold:

---

[13]     Haymon's actions also have the potential to harm other consumers of U.S. televised boxing events including networks, cable stations, venues, advertisers and viewers. Given Haymon's control over the management and promotion of most Championship-Caliber Boxers, these downstream viewers are at risk of anticompetitive harm.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

- Non-Haymon Championship-Caliber Boxers have been harmed and are likely to continue to be harmed through a reduction in the number, quality, and economic value of the boxing events in which they participate;

- Many Haymon Championship-Caliber Boxers may be harmed in the future as Haymon reduces key elements of their compensation (e.g., purse size) in part because Haymon must recoup the enormous financial losses that it has accumulated in the process of gaining control of Championship-Caliber Boxers and U.S. televised boxing events.

16.     Haymon claims that his strategy is fundamentally procompetitive because he has expanded the number of U.S. televised events, including events on "free tv," in an attempt to increase the popularity of boxing. This argument is based on two unsupported premises. The first premise is that Haymon's various exclusionary actions were necessary in order to achieve the hoped-for output expansion and, therefore, could not have been achieved through competitively less restrictive means.   For example, why did Haymon have to engage in "tying" in order to expand output?  Rather than tying, Haymon could have offered competing promoters the chance to assemble a series of quality televised boxing events using Haymon's Championship-Caliber Boxers. In effect, Haymon could potentially have achieved output expansion without "tying" management to promotion.   Indeed, insofar as the "Ali Act" recognizes that tying management and promotion of boxers substantially harms boxers, boxers would have economically been better off under a market growth strategy that did not involve tying management to promotion.

17.     A second premise of the output expansion argument is that there are no offsetting future reductions in output that occur once Haymon has achieved a position of market power.   However, while there has been a growth in U.S. televised boxing events during 2015 and 2016, it is unclear whether this expansion will continue in the future. Indeed, the available evidence indicates Haymon's "free tv" growth strategy has not achieved the success that Haymon had hoped for and that Haymon has lost substantially more money than the hundreds of millions of dollars he anticipated when forming this risky business venture.   Haymon will likely be forced to significantly reduce televised boxing events and engage in actions enabling it to recoup the substantial losses it has incurred.   Thus, much, if not all, of the expansion in output of U.S. televised events in 2015 and 2016 is likely to be lost going forward and there is a substantial risk that boxing returns to output levels that

**HIGHLY CONFIDENTIAL Subject to Protective Order**

are below levels that existed in 2014 but with one difference from before – Haymon now controls management and promotion of most of the Championship-Caliber Boxers.

18. These expert opinions are based on the evidence currently available in this case. I understand that discovery is continuing and I plan to refine and supplement my opinions as necessary.

## IV. Background

*The Economics of the Boxing Industry*

19. The sport of professional boxing "is a multi-billion dollar industry that conducts a significant portion of its business within the United States."[14] In 2005, professional boxing events in the U.S. drew attendance of nearly 2 million people, and an estimated television audience of nearly 20 million people.[15] In 2015, boxing promoters in the U.S. generated revenues of approximately $225 million.[16]

20.  And the key driver of revenues in sports tends to be television revenues, since television can potentially reach

---

[14]   Baglio, Scott, "The Muhammad Ali Boxing Reform Act: The First Jab at Establishing Credibility in Professional Boxing," *Fordham Law Review*, 68(6), 2000, pp. 2257-2298 ("Baglio 2000") at 2260.

[15]   Humphreys, Brad, "The Size and Scope of the Sports Industry in the United States," IASE/NAASE Working Paper Series, No. 08-11, August 2008, at 12 and 17.

[16]   IBISWorld, "Boxing Promoters in the US: Market Research Report," December 2015, http://www.ibisworld.com/industry/boxing-promoters.html.

▮▮▮▮ Expert Report of Gary Shaw, September 6, 2016, pp. 5-6. The "market value of a fight" in boxing depends upon "total willingness to pay from the 'fight buyers,' that is, the viewers, advertisers, and other interested parties," which, in turn, depends on "expected utility from viewing the match. This utility is a function of the boxers' expected performances, and each agent forms his expectations based on his information and an idiosyncratic or 'opinion' factor." Tenorio, Rafael, "The Economics of Professional Boxing Contracts," *Journal of Sports Economics*, 1(4), November 2000, pp. 363–384, at 366-367. For example, a bout in 2015 between two champion boxers, Floyd Mayweather and Manny Pacquiao, generated 4.4 million pay per view buys, $400 million in TV revenue, and attendance of 16,219. It is widely regarded as the richest fight in boxing history. ESPN, "Mayweather-Pacquiao eclipses 4.4 million PPV buys, $72M gate," May 12, 2015, http://www.espn.com/boxing/story/_/id/12872711/floyd-mayweather-manny-pacquiao-fight-shatters-all-live-gate-record.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

many thousands or millions of viewers.[18] From this perspective, it is the elite athletes who tend to drive substantial revenues and a single entity controlling all or a large share of these athletes could have substantial power over key financial terms associated with the events, including the amount that the elite athletes get paid and the prices charged to sports venues, broadcasters, and advertisers.[19]

21.    The economic relevance of the elite athletes in different sports depends in part on the way competitive sporting events are organized and sold.[20] The fundamental organization problem in sports is one of bringing together the recognized "stars" with other elite athletes in order to create an attractive sports product for consumers.[21] Moreover, it is important to have a system in place that fosters and grows those athletes so that they can potentially reach the elite ranks.[22] Some organizations of elite athletes, such as Major League Baseball, have a minor league system which in turn fosters the development of up-and-coming baseball players on their path to the Major League.[23]

---

[18]    See Baglio, Scott, cited above, at 2262.

[19]    "[O]f the approximately 8,000 licensed professional boxers in the United States, very few earn a significant amount of money." Baglio, Scott, cited above, at 2260. "Mayweather-Pacquiao eclipses 4.4 million PPV buys, $72M gate," May 12, 2015, http://www.espn.com/boxing/story/_/id/12872711/floyd-mayweather-manny-pacquiao-fight-shatters-all-live-gate-record. "Total revenue in many sports is highly concentrated among the top contestants." Rosen and Sanderson, "Labour Markets in Professional Sports," *The Economic Journal*, 111(469), Features, February 2001), pp. F47-F68, at F50.

[20]    "Certain sports hold more weight/leveragability in terms of television exposure, visibility of athletes' faces, interaction with the media, and global reach. For example, successful athletes in individual, global sports can potentially earn more endorsement money than those in team sports. These athletes receive more exposure and camera-time than do athletes in team sports…Basketball showcases its athletes better than most other team sports, as there are only two teams of five players on a court, and no helmets to obstruct viewers seeing the emotions of players during the game." Foster, O'Reilly, Davila, "Sports Business Management: Decision Making Around the Globe," Routledge, 2016, Section 12.3.1.

[21]    Said differently, "The contest aspects of sports imply that the value of one player depends on the services rendered by others. Two kinds of interactions must be distinguished. Within team complementarities are easy, between-team complementarities are harder to deal with." Rosen and Sanderson, cited above, at F49.

[22]    Noll, Roger, "The Organization of Sports Leagues," SIEPR Discussion Paper No. 02-43, August 2003, at 8.

[23]    Rosen and Sanderson, cited above, at F60.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

22.     From an economic perspective, this basic organizational structure generates what is commonly referred to as a "network effect."[24] Elite athletes (including the "stars" of a sport) generally benefit from competing against other elite athletes and also benefit from a healthy system for developing new elite athletes. For example, Frascatore (1999) finds that in a sport with leagues that compete for a fixed number of stars of discrete talent levels, one league will be expected to attract all of the stars, while the other leagues will attract no stars.[25] This organizational problem shapes the organizational structure of different sports in different ways. In some sports, it is feasible and common for teams to play each other regularly. In such circumstances, it can be inefficient for the teams to agree on the rules, logistics, marketing, etc. for each game individually, and the creation of leagues is incentivized to circumvent the need for a series of bilateral agreements.[26]

23.     This same effect occurs in boxing. While the most recognized champions, such as Oscar De La Hoya and Floyd Mayweather, drive the greatest fan interest, other elite boxers are needed to fight against them or to potentially reach their level. There is also a general benefit from having a system in place that fosters the development of elite boxers. Said differently, the fan interest driven by recognized champions must be fed by a supply of championship contenders. However, a difference from league-based sports is that boxers generally do not face each other regularly (e.g., on a weekly or monthly basis) or within short time intervals.

24.     Historically, boxing has solved this organizational problem through competition amongst managers and separate and distinct competition amongst promoters. Unlike other sports, such as football, baseball, and golf, boxing has not naturally evolved towards having a single entity controlling most or all of the professionally televised events in the sport.

---

[24]     In general, a network effect exists when "desired behavior of an individual depends on some average of the actions of others." Acemoglu and Ozdaglar, "6.207/14.15: Networks Lectures 17 and 18: Network Effects," MIT, November 2009, http://economics.mit.edu/files/4831, at 3. Network effects are discussed at length in ABA Section of Antitrust Law, *Market Power Handbook*, 2005, Chapter VI.

[25]     Frascatore, Mark, "The Grouping of Stars: An Application to Professional Sports," *International Journal of Industrial Organization*, 17, 1999, pp. 1009-1027. See also Noll, Roger, "The Organization of Sports Leagues," SIEPR Discussion Paper No. 02-43, August 2003, at 6.

[26]     Noll, Roger, "The Organization of Sports Leagues," SIEPR Discussion Paper No. 02-43, August 2003, at 1 and 3.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

This is not surprising since televised boxing events can be sold individually or as a series, such as Friday Night Fights, which ended in 2015 after 17 years, or Premier Boxing Champions (created by Haymon Boxing), which replaced it.[27]



*Championship-Caliber Boxers*

26.    A term that is sometimes used to describe those elite boxers who command substantial economic value is "Championship-Caliber Boxer."[31]    While the specific definition of what constitutes a Championship-Caliber Boxer may differ somewhat within the boxing industry, the key notion is that certain boxers are economically valuable and,

---

[27]    Hines, Patrick, "ESPN Joins Premier Boxing Champions' Corner, Knocking Out 'Friday Night Fights,'" *Deadline*, March 18, 2015, http://deadline.com/2015/03/espn-premier-boxing-champions-friday-night-fights-ending-1201394575/.



[31]    Expert Report of Gary Shaw, September 6, 2016, pp. 5-6.  See also, e.g., "Mayweather Promotions Signs Exciting Lightweight Contender Sharif The Lion Bogere," Press Release, March 10, 2016, http://mayweatherpromotions.com/mayweather-promotions-signs-exciting-lightweight-contender-sharif-the-lion-bogere/; and Holmes, William, "HBO Boxing Results: Miguel Cotto Obliterates Geale in Four," *Boxing Insider*, http://www.boxinginsider.com/headlines/hbo-boxing-results-miguel-cotto-obliterates-geale-in-four/.)

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW  Document 150-1  Filed 10/31/16  Page 13 of 83  Page ID
#:4448

**HIGHLY CONFIDENTIAL Subject to Protective Order**

therefore, sought after by promoters.[32]  Therefore, as I am applying the term in this case, I am focusing on industry-recognized objective measures that are associated with boxers that have relatively high economic value including that they are highly ranked (e.g., in the top 5 or 10 in a weight class),[33] that they are former champions, that they command a high purse size and that they have value to the television networks.[34]  From an economic perspective, these are useful objective measures recognized in the industry as indicating that a boxer has substantial economic value to a manager and/or promoter.

27.  Championship-Caliber Boxers are naturally correlated with the highly-ranked fighters who, by definition, are those closest to the number 1 rank, that is, closest to the actual champion.  Achieving a high rank is associated with higher financial rewards.[35] Rankings of, typically, the 10 to 15 top fighters are developed periodically by a number of sanctioning organizations and media outlets, which include the WBA, WBC, IBF, WBO, TBRB, FightNews, Ring Magazine, and ESPN.[36]  The criteria used to develop the rankings may include such factors as record, quality of performance, level of competition, significance of bouts, and experience in championship or elimination bouts.[37]  The WBC reports the purpose of the rankings "is to determine eligible contenders to participate in elimination bouts and to challenge for WBC championships."[38]  The sanctioning

[32]  Expert Report of Gary Shaw, September 6, 2016, pp. 5-6.

[33]  One factor that has been used to compare the best fighters over time is their record against contemporaneous "champion-caliber" / Top 10 opponents.  See, e.g., Bad Left Hook, "Floyd Mayweather and the 10 greatest unbeaten fighters of all time," http://www.badlefthook.com/2013/9/19/4747960/floyd-mayweather-and-the-10-greatest-unbeaten-fighters-of-all-time.

[34]  Expert Report of Gary Shaw, September 6, 2016, pp. 2-6.

[35]  Baglio 2000, p. 2275.

[36]  See Fightnews.com, "World Boxing Rankings," http://www.fightnews.com/rankings-2; Ring Magazine, "Ring Ratings," http://ringtv.craveonline.com/ratings/welterweight; ESPN, "Divisional rankings: Heavyweight," http://www.espn.com/boxing/story/_/id/12494121/division-division-rankings-index.

[37]  Rules & Regulations of the World Boxing Council ("WBC"), Updated November 2015, §6.6, p. 36, http://wbcboxing.com/downloads/WBC_Rules_&_Regulations_amended_as_of_November_2015.pdf.

[38]  Id, §6.4, p. 35.

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 150-31 Filed 10/31/16 Page 14 of 83 Page ID #:4449

**HIGHLY CONFIDENTIAL Subject to Protective Order**

organizations generally require that a champion in a given weight class can only defend his title against top 15 contenders.[39]

28.     In addition, participation in televised bouts also tends to characterize top, Championship-Caliber Boxers, particularly on major boxing broadcasters such as Fox, ESPN, HBO and Showtime.[40]  As television advertising represents the largest source of boxing revenues, greater participation in televised fights signifies that a fighter possesses higher economic value.



29.     The ability of promoters to tout the former world championships of such fighters, along with the likelihood of greater name recognition, would be expected to bestow greater economic value on them.[43]

30.     Another indicator of Championship-Caliber Boxers is the purse size they have been able to command in their bouts.  Higher purses reflect a fighter's economic value, which would be expected to correlate with boxing ability, and therefore, with championship potential.

---

[39]     S. Baglio 2000, p. 2263.

[40]     Boxing websites prominently display schedules of upcoming televised fights.  See, e.g., Bad Left Hook, "Upcoming Boxing Schedule," http://www.badlefthook.com/pages/boxing-television-schedule.



[43]     For an example of promotion based on being a former champion, see Esco, Will, "PBC on Spike – Guerrero vs. Peralta," *Bad Left Hook*, August 27, 2016, http://www.badlefthook.com/2016/8/27/12660926/pbc-on-spike-guerrero-vs-peralta-live-streaming-results-and-round-by.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

*The Economic Functions of Boxing Managers and Boxing Promoters*

31.     A manager is "a person who receives compensation for service as an agent or representative of a boxer."[44] Several business transactions must take place before a boxer participates in an event. The role of the boxing manager is to represent the boxer in all business transactions and affairs. Such activities include, "the selection of a promoter, the negotiating of contractual terms with that promoter, the selection of a trainer, and approving the opponents for the fighter."[45] In addition, "[e]arly in a boxer's career, the manager is also usually responsible for paying the training expenses and providing a stipend on which the boxer lives."[46]

32.     Managers are typically compensated by receiving a percentage of the boxer's "purse" for each bout.[47] The purse is "contractually guaranteed prior to each bout and is not altered by the outcome of the match."[48] This compensation arrangement incentivizes the manager to "negotiate the best terms possible from the promoter for the benefit of the boxer and himself."[49]

33.     To those unfamiliar with the business of boxing promotion, the term "promoter" may be somewhat misleading, in that the activities of the promoter extend far beyond just advertising and other marketing activities usually associated with "promotion." The role of the boxing promoter is somewhat analogous to that of a movie producer. Promoters contract with boxers, arrange for a venue, contract with the television networks, and promote the event.[50] Thus, promoters assume the financial risk of a match by guaranteeing

---

[44]     15 USC § 6301(5).

[45]     Baglio 2000, pp. 2260-2261.

[46]     Baglio 2000, pp. 2260-2261.

[47]     Baglio 2000, pp. 2260.

[48]     Baglio 2000, p. 2261.

[49]     Complaint, ¶16. See also Baglio 2000, p. 2261.

[50]     Expert Report of Gary Shaw, September 6, 2016, p. 7.

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 150-31 Filed 10/31/16 Page 16 of 83 Page ID #:4451

**HIGHLY CONFIDENTIAL Subject to Protective Order**

payment of the purse and by paying all of the expenses of promotion. The promoter's profit depends on fight revenues exceeding their expenditures.[51]

34.  Promoters also sometimes put together a series of boxing events to sell to broadcasters and local venues. In order to promote economically attractive events to broadcasters, advertisers, venues and boxing fans, it is vital that promoters be able to access a sufficient combination of Championship-Caliber Boxers and be able to access attractive broadcasters.[53] In some cases, promoters can draw largely from their own set of boxers in order to accomplish this goal, but in other cases promoters must work together to put forth attractive events.[54]

35.  Some of the key broadcasting brands that have shown an interest in televising boxing include ESPN, HBO, Showtime, Fox and NBC.[56] While there are numerous other potential broadcasters that might in theory be available to televise a boxing match, in practice it can be very difficult to find both the interest and available attractive time slots to be able to effectively televise boxing through these broadcasters.[57]

---

[51]    Complaint, ¶21.

[53]    Expert Report of Gary Shaw, September 6, 2016, pp. 10-12.

[54]    For example, the boxers in the richest fight in boxing history, Floyd Mayweather and Manny Pacquiao, had different promoters—Top Rank for Pacquiao and Mayweather Promotions for Mayweather. Poole, Gary, "The Fight to Organize the 'Fight of the Century,'" *The Atlantic*, May 2, 2015,                http://www.theatlantic.com/entertainment/archive/2015/05/mayweather-versus-pacquiao/392036/; "Muhammad Ali Boxing Reform Act: Report of the Committee on Commerce, Science, and Transportation on S. 305." Report 106-83, USGPO June 21, 1999, page 2272.

[56]    For example, see Exhibit 6 to this report.

[57]    Said one promoter at Top Rank, "Then, if you can provide a show each week, you'll get the viewers. But it's so complicated. I've lived this my whole life. You have to deal with selling a show to

**HIGHLY CONFIDENTIAL Subject to Protective Order**

36.     Using economic jargon, boxing promoters need to access certain "essential inputs" in order to be able to market and sell boxing events, particularly televised events involving Championship-Caliber Boxers. This includes having sufficient and attractive access to Championship-Caliber Boxers, broadcasters and venues. When that access becomes substantially limited (e.g., through exclusive contracts or market behavior that is exclusionary), not only can promoters be hurt but also the boxers, broadcasters, venues and fans can be hurt because potentially attractive boxing events do not occur.

*Conflicts of Interest from Combining Management with Promotion in Boxing*

37.     As boxers develop and become recognized, they often (though not always) sign contracts with managers who are agents representing their economic and legal interests. In economic terms, the relationship is referred to as that between the principal (the boxer) and the agent (the manager).[58] In legal terms, the agent has a "fiduciary" responsibility to the principal.[59]

38.     In the sport of boxing, this fiduciary relationship between the principal and the agent, the boxer and the manager, has been further codified by federal legislation in the form of the Muhammad Ali Boxing Reform Act (the "Ali Act"). On the necessity for the separation of managers and promotors, the Ali Act states:

> [I]t remains essential that managers, if a boxer does hire a manager, that the manager serve and protect the interests of the boxer. They should not be serving the financial interests of the promoter, while simultaneously taking a 33% earnings cut from the boxer for biased representation as manager. It is not plausible for a boxer to receive proper representation and counsel from a manager if the manager is also on the payroll of a promoter. This is an obvious conflict of interest which works to the detriment of the boxer

---

a network guy whose boss hasn't heard of these guys. Some promoters and managers want to protect their guys and won't put them in with anyone. It makes it so difficult." Iole, Kevin, "Roadblocks to boxing getting more exposure on non-premium TV," *Yahoo Sports*, January 7, 2015, http://sports.yahoo.com/news/roadblocks-to-boxing-getting-more-exposure-on-non-premium-tv-031733524.html.

[58]     The economic analysis of principal-agent relationships encompasses a vast literature, especially as it relates to business managers as agents of shareholders. See, for example, Tirole, Jean, *The Theory of Corporate Finance*, Princeton University Press, 2009, Chapter 1.

[59]     A fiduciary is "a person having a legal duty to act primarily for the benefit of another in matters connected with his undertaking." Gifis, Steven, *Law Dictionary*, 3rd Edition, Barron's Educational Series, 1991, page 189.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

and the advantage of the promoter. The Committee received testimony about instances wherein boxers had suffered significant career and economic injury due to their manager's clear conflicting interests. A manager must be a determined advocate for the boxer's interests and not be influenced by financial inducements from a promoter.[60] …

Firewall between Promoters and Managers. (1) In general: It is unlawful for (A) a boxer's promoter (or a promoter who is required to be licensed under State law) to have a direct or indirect financial interest in that boxer's licensed manager or management company; or (B) a licensed manager or management company (or a manager or management company that, under State law, is required to be licensed) (i) to have a direct or indirect financial interest in the promotion of a boxer; or (ii) to be employed by or receive compensation or other benefits from a promoter, except for amounts received as consideration under the manager's contract with the boxer.[61]

39.   Plaintiffs in this case are boxing promotors. According to the Ali Act, the promotor is "the person primarily responsible for organizing, promoting, and producing a professional boxing match."[62] Plaintiffs allege, among other things, that Defendants in this case are acting both as managers and as promotors, in violation of the Ali Act. I offer no opinion on the legal aspects of that allegation. From an economic perspective, however, a pertinent question is whether Defendants have a financial interest in both the compensation paid to the boxer (in their role as managers) and the profitability of the boxing match (in their role as promotors), which would give rise to a conflict of interest.

40.   It certainly appears that the Defendants have such (conflicting) financial interests in their roles as both managers and promoters and, for purposes of the analysis here, I will assume that to be the case.[63] As discussed at length below, the conflict of interest that arises

---

[60]   "Muhammad Ali Boxing Reform Act: Report of the Committee on Commerce, Science, and Transportation on S. 305." Report 106-83, USGPO June 21, 1999, p. 11.

[61]   "Muhammad Ali Boxing Reform Act: Report of the Committee on Commerce, Science, and Transportation on S. 305." Report 106-83, USGPO June 21, 1999, p. 18.

[62]   15 USC § 6301(9).

[63]   Haymon's Premier Boxing Champions series certainly appears to be acting as a promoter of televised boxing matches. The web site for Premier Boxing Champions states that "Premier Boxing Champions (PBC), was created for television by Haymon Sports, LLC, in January 2015." See: www.premierboxingchampions.com/.

See also the five-part article by Thomas Hauser in "The Ring" available at:

> http://ringtv.craveonline.com/news/415547-what-we-know-about-al-haymon-part-i;
> http://ringtv.craveonline.com/news/415577-what-we-know-about-al-haymon-part-ii;
> http://ringtv.craveonline.com/news/415853-what-we-know-about-al-haymon-part-iii;

HIGHLY CONFIDENTIAL Subject to Protective Order

from Defendants' integration of managing and promoting is directly relevant to the antitrust issues in this matter.

## V.  Market Definition

*Economic Background*

41.  The basic principles of antitrust market definition are derived from standard economic concepts.[64] One common approach used to analyzing market definition is described in the *Horizontal Merger Guidelines*.[65] The *Guidelines* set forth a useful and now standard and widely-accepted method for defining markets: the "hypothetical monopolist test."

> Specifically, the test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist") likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market …[66]

The question of interest for market definition is whether the elasticity of demand (that is the sensitivity of the quantity demanded to changes in price) for the product or service in question is low enough such that a hypothetical monopolist would be able to profitably increase price.[67] Market definition, therefore, focuses on demand substitution, that is, on

---

http://ringtv.craveonline.com/news/416065-what-we-know-about-al-haymon-part-iv;
http://ringtv.craveonline.com/news/416173-what-we-know-about-al-haymon-part-v.

[64]  Antitrust market definition is a topic covered in the field of economics known as "industrial organization." See, for examples, Davis, Peter and Garcés, Eliana, *Quantitative Techniques for Competition and Antitrust Analysis*, 2010, Chapter 4; Carlton, Dennis and Perloff, Jeffrey, *Modern Industrial Organization*, Fourth Edition, 2005, Chapter 19.

[65]  U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* (2010) [hereinafter "*Guidelines*"].

[66]  *Guidelines*, § 4.1.1.

[67]  The elasticity of demand is the percentage change in quantity divided by the percentage change in price along a given demand curve. The elasticity of demand is sometimes referred to as the "own" or "direct" price elasticity to distinguish it from the "cross" elasticity, which measures the change in demand for a good in response to the change in the price of another good. See Carlton and Perloff, cited above, at 647-648 (italics in original):

> The direct price elasticity – *not* the cross-elasticity of demand – determines market power. … There is a relationship between cross-elasticity and direct elasticity,

19

**HIGHLY CONFIDENTIAL Subject to Protective Order**

the extent to which customers would substitute away from one product in response to a price increase.

42.     The same general framework that is used to define product markets can also be used to define geographic markets. As the *Guidelines* state:

> The hypothetical monopolist test requires that a hypothetical profit-maximizing firm that was the only present or future producer of the relevant product(s) located in the region would impose at least a SSNIP from at least one location, including at least one location of one of the merging firms. In this exercise the terms of sale for all products produced elsewhere are held constant. A single firm may operate in a number of different geographic markets, even for a single product.[68]

43.     For both product and geographic markets, there are a number of practical indicators of the lack of easy interchangeability that would indicate a relevant antitrust market. These include industry, public or governmental recognition, peculiar characteristics and uses, unique production facilities, distinct prices, distinct customers or sellers, and sensitivity to price changes.[69]

44.     In many antitrust cases, economists analyze direct evidence of market behavior, and the potential competitive effects of that behavior, in forming an opinion as to the relevant antitrust market.  Thus, there is an economically logical relationship between competitive effects and market definition.  As stated in the Horizontal Merger Guidelines, "Evidence of competitive effects can inform market definition, just as market definition can be informative regarding competitive effects.[70]

45.     It is well established as a matter of antitrust economics that antitrust harm can occur in upstream markets (the management and promotion of Championship-Caliber Boxers), even if the ultimate "downstream" product at issue (televised boxing matches sold to

---

however. All else the same, the larger a cross-elasticity of demand, the larger in absolute value is the direct elasticity of demand.

[68]     *Guidelines*, § 4.2.1.

[69]     See, e.g., *Brown Shoe Co., Inc. v. U.S.* 370 U.S. 294 (1962), p. 370.

[70]     *Guidelines*, § 4.

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-1 Filed 10/31/16 Page 21 of 83 Page ID #:4456

HIGHLY CONFIDENTIAL Subject to Protective Order

networks and advertisers) is not a relevant antitrust market.[71] In this case, the markets of interest are a) the management of Championship-Caliber Boxers and b) the promotion of televised boxing matches involving Championship-Caliber Boxers.

*The Relevant Antitrust Markets for Managing and Promoting Championship-Caliber Boxers*

46.     As an initial matter, it is important to recognize that Haymon has achieved market power in the management and promotion of Championship-Caliber Boxers through his various exclusionary activities including both his contracting practices and his market behavior.  It is also these various actions that create the barriers to competitors that allow Haymon to possess market power in the relevant markets in this case.  I analyze this in more detail in the competitive effects section of this report.  As an economic matter, this means that even if one assumes that a monopoly manager of Championship-Caliber Boxers in the U.S. would have difficulty exercising market power, a monopoly manager that also substantially controlled the promotion of Championship-Caliber Boxers could possess market power.  And such market power would no doubt be enhanced even further if that monopolist locked up the key boxing broadcasters under long-term contracts (or otherwise gained substantial volume commitments from such networks). The two economically logical and relevant antitrust markets that flow from Haymon's anticompetitive actions are:

- the U.S. market for managing Championship-Caliber Boxers; and
- the U.S. market for promoting Championship-Caliber Boxers.

47.     The analysis here can also be viewed in the context of what economists call a "dominant firm" framework.[72] A dominant manager who is also a dominant promoter can exclude from televised events those boxers who are not under his management. The message to boxers would be: only boxers under my management have access to televised

---

[71]     For example, this applies to aftermarket cases such as *Eastman Kodak Co.* v. *Image Technical Services, Inc.*, 112 S. Ct. 2072 (1992). For a discussion of some of the key economic issues in aftermarket cases like Kodak, see Joseph Kattan, Joseph, "Market Power in the Presence of an Installed Base," *Antitrust Law Journal*, 62(1), (Summer 1993), pp. 1-21.

[72]     A dominant firm is "a price-setting firm that faces smaller, price-taking firms." Carlton, Dennis, and Perloff, Jeffrey, *Modern Industrial Organization*, Fourth Edition, 2005, page 781.

events that I promote. Once the management and promotion functions are tied together, the integrated manager / promoter can exert even further pressure on Championship-Caliber Boxers (as well as on television networks) for exclusive agreements.

48.   This appears to be the path that Haymon has taken. The tie between managing and promoting creates a barrier to competition (at both the management level and the promotion level) and allows for the exercise of market power in both the tied and tying markets. As discussed in detail in the competitive effects section of this report, this is the classic example of a tie that allows for the creation and extension of market power.

49.   Furthermore, a manager / promoter who controls a substantial portion of Championship-Caliber Boxers can arrange higher quality matches than any other promoter with a smaller market share. This is especially the case if the competing managers and promoters are fragmented and cannot legally (or will not ethically) tie management to promotion.  This competitive advantage to the dominant manager / promoter is enhanced by the "network effect" I discussed in the background section of this report.  The more Championship-Caliber Boxers in a promoter's "network," (through direct control or through access to other promoters) the greater the advantage over its competitors.

50.   From the perspective of the hypothetical monopoly test mentioned in the Merger Guidelines, Haymon's exclusionary practices have placed him in a position to be able to profitably charge a higher than competitive price as a boxing manager (e.g., taking a higher cut of the purse) and as a boxing promoter (e.g., paying a lower purse).  Competitors like Golden Boy and Top Rank have an inherent disadvantage in responding given that they are fragmented, are not engaged in tying management to promotion, and have experienced foreclosed access to key boxing broadcasters.  Boxers, on the other hand, are incentivized to stay with Haymon or switch to Haymon (even at a somewhat lower compensation level) because of his competitive advantages.

51.   As a more general matter, there are various supply-side impediments that limit the ability of other competitors to enter and compete as U.S.-based promoters of Championship-Caliber Boxers. First, because Championship-Caliber Boxers are financially valuable, promotion of these boxers involves substantial financial exposure and risk.  Moreover, there are large capital requirements that must be met in order to promote

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW  Document 155-6  Filed 10/31/16  Page 23 of 83  Page ID
#:4458

**HIGHLY CONFIDENTIAL Subject to Protective Order**

a bout featuring a championship.  As I understand it, promoters must have the capital to procure an appropriate venue, attract major sponsors and advertisers, contract with outside vendors, and guarantee a sizeable "purse" to the boxers and their managers.[73]  Furthermore, investing the capital needed to promote a championship-caliber bout comes with considerable financial risk, as a promoter must cover the large expenses related to promotion before realizing the return from this investment.



 Further, promoters must be professionally licensed and comply with extensive laws and regulations.[75]

53.    Third, given this, it is economically sensible that promoters with a proven track record at effectively promoting Championship-Caliber Boxers have a distinct advantage over those that are yet unproven at protecting the interests of Championship-Caliber Boxers. Given the substantial financial risks faced by Championship-Caliber Boxers and the industry-specific knowledge necessary to provide Championship-Caliber Boxers with attractive promotional opportunities, promoters with a track record and a good reputation have a distinct advantage over other promoters.  The history of Golden Boy (discussed earlier in this report) clearly illustrates this point.

54.    These various impediments to promoting Championship-Caliber Boxers in the U.S. apply to foreign promoters, who lack experience in the U.S. It goes without saying that competitive access to U.S. television events is crucial to the ability of U.S.-based Championship-Caliber Boxers to earn competitive pay for their skills and efforts. Thus, the lack of localized knowledge, relationships and experience substantially impedes the ability of foreign promoters from easily entering and competing against U.S.-based promoters. Finally, the various exclusionary activities by Haymon in and of themselves substantially limit the ability of foreign-based promoters (and managers) to compete in the U.S. and

---

[73]    Expert Report of Gary Shaw, September 6, 2016, pp. 3, 7.

[75]    Expert Report of Gary Shaw, September 6, 2016, p. 3.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

have allowed Haymon to achieve market power in the promotion (and management) of Championship-Caliber Boxers in the U.S.

## VI.   Market Shares and Market Concentration

55.    Market shares and market concentration play an important role in economic analysis of antitrust cases.[76]  This is because firms with high market shares are more likely to be able to exercise market power unilaterally.   Additionally, markets with a small number of competing firms will also tend to be highly concentrated and can be prone to collusion.

56.    From an economic perspective, market shares are but one indicator of the potential ability of a firm, or group of firms, to exercise market power.[77]   From this perspective, market shares must be considered along with analysis of various other evidence relating to the competitive effects of market activities that may raise anticompetitive effects.

57.     The current Merger Guidelines measure market concentration using the Hirschman-Herfindahl Index or the "HHI."   The HHI is used in a variety of antitrust contexts, is a well-accepted measure of market concentration by antitrust practitioners and the courts, and is also the primary measure of concentration used by federal antitrust regulators.[78] The HHI is calculated by summing the squared market shares of each of the competitors in a relevant product and geographic market.   In this way, the HHI gives relatively greater weight to firms with high market shares.   For example, a market with five equally-sized competitors has an HHI of 2,000.[79] But a market with two equally sized competitors has an HHI of 5,000.   The highest possible HHI is 10,000, which is associated with a pure monopoly.

---

[76]        See *Guidelines*, Section 2.1.3 and Section 5.

[77]        See *Guidelines*, Sections 5-12.

[78]        See *Guidelines*, Section 5.3.

[79]        This calculation is based on the sum of the squared market shares of the firms in the market. For example, a firm with a 20% share contributes 400 points (i.e., 20 X 20) towards the total HHI.  And 5 firms equally size firms thus lead to a total HHI of 2000 (i.e., 5 X 400).

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW   Document 151-2   Filed 10/31/16   Page 25 of 83   Page ID
#:4460

HIGHLY CONFIDENTIAL Subject to Protective Order

58.     Under the Merger Guidelines, markets with HHIs above 2,500 are considered highly concentrated.[80]  Markets with HHIs of between 1,500 and 2,500 are considered moderately concentrated.  And markets with HHIs below 1,500 are unconcentrated.  Under the Merger Guidelines, HHIs above 1,500 potentially raise significant anticompetitive concerns while HHIs above 2,500 are presumed likely to enhance market power.[81]

59.     In cases involving allegations of unilateral anticompetitive conduct, particularly one facing a small set of smaller competitors, the Guidelines' concentration thresholds can be applied as follows.  An industry characterized by a single firm with a market share of 40% and facing a large number of smaller competitors, would have an HHI of around 1,600 and, therefore would be considered moderately concentrated.  And an industry characterized by a single firm with a market share of 50% and facing a large number of smaller competitors, would have an HHI of around 2,500 and therefore would be considered highly concentrated.  These market share levels (40% to 50% or more) are consistent with the general economic notion that a single firm controlling around half or more of the market can potentially possess market power, particularly one that has substantial competitive advantages over its competitors.

60.     Whether such power can in fact be exercised depends on other economic factors. In this case, there are various other factors that I discuss in more detail in the competitive effects section of this memo which indicate that if Haymon has a market share that is in the 40-50% range, or above that range, in both the relevant markets in this case, then Haymon likely possesses market power.

61.     In this case, I calculate market shares using a variety of economically reasonable alternative calculations of the group of boxers that are of championship-caliber.  Based on various objective criteria characterizing a Championship-Caliber Boxer that I discussed in the background section of this memo, I start with a base case that is as follows:[82]

---

[80]     See *Guidelines*, Section 5.3.

[81]     See *Guidelines*, Section 5.3.  This is only the cases for mergers in moderately concentrated markets in which the change in HHI from the merger is over 100 and highly concentrated markets in which the change in HHI from the merger is over 200.

[82]     I do not at this point have a sufficiently complete and reliable set of data with which to factor purse size into the analysis as a separate indicator.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

- I include any boxer: (1) who has been ranked in the top 10 in any of the 14 weight classes by any of the four sanctioning bodies (WBA, WBC, WBF and IBF) during 2016; and (2) who has appeared on U.S. television at least one time since January 2015;

- I additionally add any boxer: (1) who has been classified as a worldwide champion (a number one ranking) in any of the 14 weight classes by any of the sanctioning bodies since January 2014; and (2) who have appeared on U.S. television since January 2015.[83]

62.     In addition, I include only Championship-Caliber Boxers who are U.S. managed in measuring market shares since foreign managers are not in the U.S. market for managing Championship-Caliber Boxers.   Likewise, I include only the Championship-Caliber Boxers who are U.S. promoted in measuring market shares since foreign promoters are not in this market.

63.     I also make an important adjustment that is conservative insofar as it understates Haymon's market share.  In the cases where the manager or the promoter of the U.S.-based Championship-Caliber Boxer is unknown, I assume those boxers are non-Haymon and include them as being in the market.[84]  To the extent that any of these boxers have foreign managers or are self-managed, then they are not directly competing against U.S. managers of boxers and therefore would not be included in the market.  I make the same adjustment in the promotion market share analysis.  Thus, by including all of these "unknown" boxers and assigning them as being non-Haymon competitors, I am being conservative because this treatment tends to understating Haymon's market share.

64.     Exhibit 3 shows the list of current Championship-Caliber Boxers managed in the U.S.  Exhibit 4 shows a list of the current Championship-Caliber Boxers promoted in the U.S.

65.     The resulting market share calculations for Haymon and other U.S. managers of Championship-Caliber Boxers is shown in Table 1 below. As shown in the table, Haymon has a market share of 49.1% while the other competing managers each of market have shares that are under 5%.

---

[83]     I also remove any boxers where there is information that they are currently retired.

[84]     As shown in Tables 1 and 2, the manager is unknown for 38 Championship-Caliber Boxers that are U.S.-managed and for 19 of the Championship-Caliber Boxers that are U.S.-promoted.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

### Table 1

**Competitors in the U.S. Market for Managing
Championship-Caliber Boxers**

| Manager | Count of Boxers | Share of Boxers |
|---|---|---|
| Haymon | 85 | 49.1% |
| Cameron Dunkin | 7 | 4.0% |
| Egis Klimas | 6 | 3.5% |
| Frank Espinoza | 5 | 2.9% |
| Vadim Kornilov | 2 | 1.2% |
| James Prince | 2 | 1.2% |
| Ricky Marquez | 2 | 1.2% |
| Steven Feder | 2 | 1.2% |
| Other | 24 | 13.9% |
| Total [1] | 173 | |

**Note:**
[1] Total of 173 includes 38 boxers for whom the
boxer's manager is unknown. They are assumed to
have non-Haymon managers.

**Source:**
See workpaper files "Boxers Final.xlsx," "Rankings
Final.xls," and "Events Final.xlsx."

66. The resulting market share calculation for Haymon and other U.S. promoters of Championship-Caliber Boxers is shown in Table 2 below. As shown in the table, Haymon has a market share of 44.2% while the group of alleged Haymon-sham promoters have a market share of 6.1%. A combined Haymon and Haymon-sham market share is 50.3%. By contrast, the two next leading promoters are Top Rank at 13.7% and Golden Boy at 10.7%.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

**Table 2**

**Competitors in the U.S. Market for Promoting the
Bouts of Championship-Caliber Boxers**

| Promoter | Count of Boxers | Share of Boxers |
|---|---|---|
| Haymon | 87 | 44.2% |
| Haymon Sham | 12 | 6.1% |
| Top Rank | 27 | 13.7% |
| Golden Boy | 21 | 10.7% |
| Main Events | 7 | 3.6% |
| Banner Promotions | 3 | 1.5% |
| Other | 21 | 10.7% |
| Total | 197 | |

**Note:**
Total of 197 includes 19 boxers for whom the boxer's
promoter is unknown. They are assumed to have non-
Haymon promoters.

**Source:**
See workpaper files "Boxers Final.xlsx," "Rankings
Final.xls," and "Events Final.xlsx."

67.      In order to test the robustness of these results, I applied a wide variety of alternative economically reasonable criteria including the following:

- Modifying the analysis to only include boxers ranked in the top 5 in 2016.

- Expanding the analysis to include boxers ranked in the top 15 in 2016.

- Expanding the analysis to include boxers who appeared on U.S. television since 2014, while also expanding the criteria to include former champions dating back to 2014.

- Modifying the analysis to only include boxers who appeared on "Key" TV networks (defined as: CBS, ESPN, FOX SPORTS 1, FOX, HBO, NBC, NBCSN, and SHOWTIME) since 2015.

- Modifying the analysis to only include boxers who appeared on "Key" TV networks since 2014, while also expanding the criteria to include former champions dating back to 2014.

The above criteria were applied in a variety of combinations, totaling eleven additional sensitivity tests to the data.

68.      As shown in Table 3, all of these criteria show a Haymon share in the two relevant antitrust markets of at least 40% and often exceeding 50%. In the manager market, the

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 139-1 Filed 10/31/16 Page 29 of 83 Page ID #:4464

**HIGHLY CONFIDENTIAL Subject to Protective Order**

average Haymon share is 50%, with the lowest calculated share being 47% and the highest being 54%. In the promoter market, the Haymon share (including Haymon Sham) ranges from 47% to 54%, with an average of 50%. If the Haymon Sham promoters are removed, Haymon's share decreases but still remains above 40%, and can be as high as 49%. Importantly, Haymon's shares always increase when considering only "Key" broadcast networks, suggesting his market dominance is even stronger than the baseline scenario suggests.

**Table 3**

Haymon Share of U.S. Managed Championship Caliber Boxing

| | Best Ranking in Weighted Class During 2016 | | |
|---|---|---|---|
| | Top 5 | Top 10 | Top 15 |
| Fighters Appearing on US Television, or Champion, Since 2015 | 49.6 % | 49.1 % | 49.2 % |
| Fighters Appearing on US Television, or Champion, Since 2014 | 49.7 % | 47.3 % | 47.0 % |
| Fighters Appearing on Key TV Networks on US Television, or Champion, Since 2015 | 53.0 % | 53.5 % | 53.8 % |
| Fighters Appearing on Key TV Networks on US Television, or Champion, Since 2014 | 51.1 % | 49.4 % | 49.0 % |

Haymon Share of U.S. Promoted Championship Caliber Boxing

| | | Best Ranking in Weighted Class During 2016 | | |
|---|---|---|---|---|
| | | Top 5 | Top 10 | Top 15 |
| Fighters Appearing on US Television, or Champion, Since 2015 | Haymon | 43.2 % | 44.2 % | 43.6 % |
| | Haymon Sham | 4.8 % | 6.1 % | 6.2 % |
| | Total Haymon | 47.9 % | 50.3 % | 49.8 % |
| Fighters Appearing on US Television, or Champion, Since 2014 | Haymon | 42.6 % | 41.6 % | 40.7 % |
| | Haymon Sham | 4.7 % | 6.4 % | 6.3 % |
| | Total Haymon | 47.3 % | 47.9 % | 47.0 % |
| Fighters Appearing on Key TV Networks on US Television, or Champion, Since 2015 | Haymon | 46.3 % | 48.6 % | 47.7 % |
| | Haymon Sham | 3.7 % | 5.7 % | 6.0 % |
| | Total Haymon | 50.0 % | 54.3 % | 53.8 % |
| Fighters Appearing on Key TV Networks on US Television, or Champion, Since 2014 | Haymon | 43.8 % | 43.7 % | 42.7 % |
| | Haymon Sham | 4.9 % | 6.8 % | 6.7 % |
| | Total Haymon | 48.8 % | 50.5 % | 49.4 % |

Source:  See workpapers "Boxers Final.xlsx," "Rankings Final.xlsx" and "Events Final.xlsx."
Note:
[1] Key TV Networks are CBS, ESPN, FOX SPORTS 1, FOX, HBO, NBC, NBCSN, and SHOWTIME.

69.     Taken together, these various measures make it clear that Haymon controls approximately half or more of the Championship-Caliber Boxers in both the management and promotion markets for Championship-Caliber Boxers.  From this perspective, Haymon

**HIGHLY CONFIDENTIAL Subject to Protective Order**

has gained control of roughly half, or more, of the key inputs that are essential to effectively compete as either a boxing manager or boxing promoter – particularly competition with respect to the high-revenue televised boxing events.

## VII.    Market Power and Competitive Effects

*Economic Background*

70.    Within the general category of activities that economists call "Raising Rivals' Costs," certain types of behavior raise competitive concerns because they are designed to competitively disadvantage rivals and thereby allow a firm to possess or enhance market power.[85]   In this case, Haymon has engaged in various practices that have competitively disadvantaged his rivals and allowed Haymon to possess market power in the U.S. markets for managing and promoting Championship-Caliber Boxers.   These practices include exclusive contracting and tying.

71.    Exclusive contracts can be used to create barriers limiting the ability of competitors to access key market inputs. For example, exclusive dealing occurs when a supplier prohibits a retailer or distributor from carrying its product.[86]   As noted by Carlton & Perloff, "Exclusive dealing can harm society if it prevents or impedes rivals from obtaining distribution of their product."[87]

72.    Exclusive contracting can create a vertical foreclosure effect that can substantially impede the ability of rivals to compete.  As noted by Krattenmaker and Salop, "Foreclosure also can raise rivals' costs when the purchaser acquires an exclusionary right over a representative portion of the supply, withholding that portion from rivals and thereby driving up the market price for the remainder of the input still available to rivals."[88]   In this case, Haymon has used exclusive contracting and exclusive dealing to lock up the two key

---

[85]    Salop, Steven, and Scheffman, David, "Raising Rivals' Costs," *American Economic Review* 73(2), (May 1983), pp. 267-271.

[86]    Monopolization and Dominance Handbook, American Bar Association, 2011, p. 40.

[87]    Carlton and Perloff, cited above, at 668.

[88]    Krattenmaker, Thomas, and Salop, Steven, "Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price," *The Yale Law Journal*, Vol. 96, No. 2 (Dec., 1986), pp. 209-293, p. 236.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

inputs necessary to successfully and effectively promote televised boxing matches in the U.S.: Championship-Caliber Boxers and key broadcasters.

73.    Haymon's tying of boxing "management" and boxing "promotion" also raises anticompetitive concerns – concerns that go even beyond the conflict of interest issues raised by the Ali Act. From an economic perspective, tying occurs when the purchase of one good or service is conditional upon, is "tied" to, the purchase of another good or service. In other words, "a consumer can buy one good only by purchasing another good as well."[89]

74.    A key anticompetitive concern of tying is that it is used to competitively disadvantage rivals and enables the firm engaging in the tying to create or extend its market power. As described by Carlton and Waldman, in referencing a separate paper by Tirole:

> We agree with Tirole that, concerning the circumstances where tying can reduce welfare, the main set of circumstances are those where rivals in either the tied or tying good are harmed and, as a result, either exit the market or incur higher costs, consequently increasing prices compared to the no-tying situation. …[90]

In other words, tying is economically harmful if it forecloses competition and thereby results in the creation, extension or preservation of market power, to the detriment of consumers. Baker discusses this exact issue.

> A dominant firm that sells complementary products can take customers away from an unintegrated rival, thereby reducing the rival's scale of operations and so raising its costs. *The dominant firm can also accomplish the same end by tying complementary products together*, offering discounts to buyers purchasing a package of products, or offering discounts to buyers

---

[89]    Carlton and Perloff, cited above, at 319.

[90]    Carlton, Dennis, and Waldman, Michael, "How Economics Can Improve Antitrust Doctrine towards Tie-In Sales: Comment on Jean Tirole's 'The Analysis of Tying Cases: A Primer,'" *Competition Policy International*, 1(1), Spring 2005, pp. 27-40, at 28-30. "Tirole" is the Nobel Prize winning economist Jean Tirole. The article they are referring to is Tirole, Jean, "The Analysis of Tying Cases: A Primer," *Competition Policy International*, 1(1), Spring 2005, pp. 1-25. The concept of raising rivals' costs, through tying or other strategies, is well established. See, for example, Salop, Steven, and Scheffman, David, "Raising Rivals' Costs," *American Economic Review* 73(2), (May 1983), pp. 267-271; Krattenmaker, Thomas, Lande, Robert, and Salop, Steven, "Monopoly Power and Market Power in Antitrust Law, 76 *Georgetown Law Journal*, 241 (December, 1987); Baker, Jonathan, "Exclusion as a Core Competitive Concern," *Antitrust Law Journal*, 3, 2013, 527-589.

HIGHLY CONFIDENTIAL Subject to Protective Order

based on the share of the buyer's total input purchases accounted for by the excluding seller.[91]

*The complementary inputs that are being tied together here are the management and promotion of Championship-Caliber Boxers.*[92]

75. In evaluating the overall competitive impact of Haymon's various exclusionary actions, it is important to consider Haymon's alternatives. An important economic principle involved in evaluating the competitive impact of practices that exclude or disadvantage competitive rivals involves the concept of less restrictive alternatives. In the context of exclusionary practices or other vertical restraints that limit competition, a guiding economic principle is whether "less restrictive vertical restraints may exist that provide equivalent efficiency benefits without increasing rivals' costs or entry barriers."[93] As I discuss at the end of this section the report, Haymon has not supported the premise that the alleged procompetitive effects of his actions could not been have achieved through competitively less restrictive means.

---

[91]    Jonathan Baker, cited above, pp. 540-541, italics added.

[92]    It might be suggested that boxers would not enter into the exclusive agreements with Haymon, at both the management and promotion levels, if it were not in their individual self-interest to do so; and, since it was presumptively in the boxers' interest to enter into these agreements, the agreements cannot be harmful to the boxers. But this is not the case. For one thing, Haymon has a distinct information advantage over the boxers in terms of more fully understanding the short-term and long-term effect his strategy will have on individual boxers. In economics, this is referred to an asymmetric information problem. See Carlton & Perloff, cited above, at 443-450. In antitrust, the phenomenon of informational asymmetries leading to consumer harm has been applied in a variety of contexts including in the aftermarket context where consumers initially get "locked-in" via their original equipment purchases yet can ultimately be harmed in the aftermarket. See Kattan, cited above, at pp. 17-20. In addition, even if the boxers understood the ultimate anticompetitive implications of the agreements, boxers individually may still be better off signing with Haymon. The alternative of being left out of the Haymon roster of Championship-Caliber Boxers given the large number of others signing with Haymon is a worse outcome even with an anticompetitive result. This outcome is known as the "prisoner's dilemma." For a discussion of prisoner's dilemma issues such as this in the context of exclusive dealing, see Besanko, David and Perry, Martin K., *The RAND Journal of Economics*, Vol. 24, No. 4 (Winter, 1993), pp. 646-667.

[93]    Krattenmaker, Thomas, Lande, Robert, and Salop, Steven, "Monopoly Power and Market Power in Antitrust Law, 76 *Georgetown Law Journal*, 241 (December, 1987), p. 258; Ross, Steven, "The Misunderstood Alliance between Sports Fans, Players, and the Antitrust Laws," 1997 U. Ill. L. Rev. 519 (1997).

*Actions of Haymon*

76.     In 2015, backed by hundreds of millions of dollars in venture capital, Haymon embarked on a risky business venture based on the stated premise that boxing viewership and revenue could be increased significantly by expanding television coverage of boxing from the pay-per-view and premium cable outlets (e.g., HBO, Showtime) to also include the mainstream "free TV" networks (NBC, FOX, CBS, etc.).[94] This venture involved a new series of televised boxing events under Haymon's control called "The Premium Boxing Championship Series" or PBC.[95] In pursuing this plan, Haymon proposed to reverse the basic economics of the cash flows in the industry, at least during the initial phase of his plan – he would pay the broadcasters, and sell the advertising, rather than being paid by the broadcasters.[96] In that process, and as discussed in more detail below, Haymon signed exclusive contracts with various broadcasters, including most of the key broadcasters who had historically televised boxing.

77.     Haymon's plan entailed incurring very substantial financial losses during the first two years of this venture, which he planned to recoup with profits he expected to generate in future years. For example, in May 2015, shortly after the project was launched, Haymon projected that it would incur approximately $350 million in financial losses during 2015 and 2016.[97] After these two years, Haymon projected a substantial turnaround towards significant positive profits, driven largely by an assumed reversal back to the conventional business model under which the broadcasters would then revert to paying him substantial TV license fees to broadcast PBC fights.[98]

---

[94]     See, e.g., King, Bill, "Boxing's Grand New Stage," *Sports Business Journal*, April 20, 2015 ("King 2015"), http://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/In-Depth/Main.aspx; Pugmire, Lance, "Al Haymon is Spending to Put Boxing on TV, But do the Numbers Add Up?" Los Angeles Times, February 2, 2016 ("Pugmire 2016"), http://www.latimes.com/sports/la-sp-al-haymon-boxing-20160203-story.html; Maese, Rick, and DePaolo, Joe, "The Man Behind the Man:  Al Haymon Pulls the Strings to Floyd Mayweather's Bouts," *The Washington Post*, April 28, 2015, "Maese and DePaolo 2015," https://www.washingtonpost.com/sports/boxing-mma-wrestling/boxings-man-of-mystery/2015/04/28/2a2f5570-edf8-11e4-8abc-d6aa3bad79dd_story.html.

[95]     Ibid.  See also, http://www.premierboxingchampions.com/.

[96]     See, e.g., King 2015, Pugmire 2016.

[97]     $204 million in 2015 and $145 million in 2016 (HAYMON-00005906).

[98]     HAYMON-00005906.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

78.    As part of this strategy, Haymon implemented various exclusionary practices that would substantially weaken his key promoter competitors, allowing Haymon to control the majority (or near majority) of the Championship-Caliber Boxers and televised boxing events in the U.S. The key exclusionary elements of Haymon's strategy included:

- "locking up" the majority of Championship-Caliber Boxers via long-term exclusive contracts which give Haymon the power to dictate the boxer's opponent (and opponent's promoter);

- refusing (with few exceptions) to allow Haymon-controlled Championship-Caliber Boxers to participate in fights against Championship-Caliber Boxers represented by key competing promoters including Golden Boy Promotions, Top Rank, and others;

- "tying" the management of Haymon boxers to the promotion of Haymon boxers, which clearly violates the spirit (if not the letter) of Congressionally passed law (the Ali Act) meant to protect boxers from economic harm;

- "locking up" the key networks and cable stations that have historically broadcast boxing via multi-year exclusive contracts.

I discuss each of these elements of Haymon's business strategy in more detail below.

*Haymon Locks In Most of the Key Boxers*

79.    Prior to announcing the PBC in 2015, Haymon began aggressively signing up key boxers to long-term (five year) contracts that gave Haymon exclusive control over the events in which the boxers would participate and the opponents they would face.[99]  Lured in part by large financial payments, key boxers signed up with Haymon and agreed to cede virtually total control of their boxing opportunities to Haymon for five years or more.[100]

80.    In Exhibit 5, I summarize various key terms of the Haymon boxer contracts that were provided in this litigation. As shown in the Exhibit, Haymon signed up 107 boxers in 2014 (50% of total Haymon contracts) and 53 boxers in 2015 (25% of total Haymon contracts). All of these contracts appear to include relatively strong exclusivity provisions,

---

[99]    See, e.g., King 2015; Maese and DePaolo 2015; Pugmire 2016.

[100]    Expert Report of Gary Shaw, September 6, 2016, p. 10.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

which I understand to give Haymon exclusive control of each of these boxer's fight
opportunities.[101]


*Haymon Refuses Access to Golden Boy and Other Key Promoters*

81.     In addition to signing up the majority (or near majority) of the key boxers, Haymon
also refused (with very few exceptions), to allow Haymon-controlled Championship-
Caliber Boxers to fight in U.S. televised matches against boxers from other key promoters,
such as Golden Boy, Top Rank and others.[102]

82.     In order to analyze the degree to which Haymon-promoted boxers participated in
fights against Golden Boy-promoted boxers, I started with the list of current Haymon and
Haymon-sham promoted fighters. Next, I analyzed their fighting history since January 1,
2015 (when Haymon started PBC) to assess the degree to which these fighters participated
in U.S.-televised fights against fighters who were Golden Boy-promoted at the time of the
fight. I found that only 1 of 237[103] fights involving Haymon and Haymon-sham-promoted
boxers were against a Golden Boy-promoted boxer – 0.4% of the total Haymon fights. This
is a very small percentage of fights particularly given that Golden Boy promotes about 11%
of the Championship-Caliber-Boxers (see Table 2).

---

[101]     I have no legal opinion regarding the exact limitations of these contracts.  However, there are
various provisions which appear on their face to effectively cede all promotional rights to Haymon,
consistent with Plaintiffs' allegations in this case.  In addition, I have reviewed the May 15, 2016
Settlement Agreement and Release of Claims in the case of Top Rank v. Haymon.  This agreement
includes provisions that appear to relate to Haymon's exclusivity provisions with boxers, among other
things.  I render no opinion regarding the proper legal interpretation of the settlement agreement.  For
the purposes of this report, I assume that Haymon has controlled and will continue to control the
promotional activities of the boxers he manages. The data that I describe in this report is consistent with
these claims.

[102]     Discovery is still ongoing regarding the extent to which Haymon refused to allow Haymon-
controlled boxers to participate in boxing matches with boxers from key promoters such as Golden Boy,
Top Rank, and others.  In the meantime, I assume that Haymon had a general policy forbidding the
boxers under his control from participating in fights against Golden Boy, Top Rank and other key
promoters.  The data that I describe in this report is consistent with these claims.

[103]     Of the 237 fights, 214 were promoted by Haymon and 23 were promoted by Haymon-sham
promoters.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

83.     I also analyzed the reverse.  I started with the current roster of Golden Boy-promoted boxers and analyzed their fight history. I only found 1 of 128 fights involving Haymon and Haymon-sham-promoted and Golden Boy-promoted fighters – 0.8% of total Golden Boy fights. This is a very small percentage of fights particularly given that Haymon (and Haymon sham) promotes about half of the Championship-Caliber Boxers (see Table 2).

84.     These data are consistent with Plaintiff's allegation that Haymon, with very few exceptions, did not allow Haymon-promoted boxers to fight against Golden Boy-promoted boxers.


*Haymon Ties Management to Promotion*

85.     According to the Golden Boy Complaint, Haymon acted in conjunction with various "sham" promoters effectively to "tie" management with promotion.[104] In other words, Haymon effectively controlled, and profited from, the promotional activities of its Haymon-managed boxers.[105] Such actions directly violate the spirit (if not the letter) of the Congressionally passed law (the Ali Act) meant to protect boxers from the economic harm associated with the conflicts of interest inherent in such "tying."[106]


*Haymon Locks Up the Networks*

86.     In addition to locking up a majority (or near majority) of the key Championship-Caliber Boxers, and refusing to allow those boxers to fight with Championship-Caliber

---

[104]     Complaint at ¶¶64, 80-81.

[105]     I understand that Haymon disagrees with Golden Boy's contention that a Championship-Caliber boxer who wants the management services of the Haymon Defendants (the "tying" service) is forced to accept and rely on the exclusive promotional services of the Haymon Defendants (the "tied" service) and thereby reject promotional services of Golden Boy and many other legitimate promoters (the "tied out" service).  For the purposes of this report, I assume that Haymon is effectively conditioning the sale of Haymon-management services on the purchase of Haymon-promotion services.  The data that I discuss in this report is consistent with that claim.

[106]     As discussed earlier, the Ali Act has codified the necessity for the separation of managers and promotors.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

Boxers associated with other key promoters, Haymon also locked up the key boxing broadcasters.  This included virtually every broadcaster (with the exception of HBO) that had been broadcasting televised boxing prior to the start of the PBC.  Exhibit 6 summarizes the key terms of the contracts that Haymon signed with the network and cable stations.  Haymon signed exclusive contracts with CBS, ESPN, ABC, Fox, NBC, and Spike TV and signed a non-exclusive contract with Showtime.[107]  In addition, Haymon in many cases received commitments for a minimum number of televised events from many of the broadcasters.

*The Effects of Haymon's Exclusionary Actions*

87.     Haymon's exclusionary actions have allowed it to lock up a substantial portion of the key inputs that are essential to be able to effectively compete as a promoter of televised boxing events in the U.S. – namely, Championship-Caliber Boxers and key TV broadcasters.  Haymon's anticompetitive actions have also allowed it to achieve substantial control of U.S. televised boxing events on the key boxing channels.  Figure 1 below shows Haymon's share in these key areas.

---

[107]     I have reviewed the May 15, 2016 Settlement Agreement and Release of Claims in the case of Top Rank v. Haymon.  This agreement includes provisions that appear to relate to Haymon's exclusivity provisions with broadcasters, among other things.  I render no opinion regarding the proper legal interpretation of the settlement agreement.  It is unclear at this point as to the degree to which the Top Rank settlement may "effectively" free up the broadcasters with Haymon exclusives to offer televised events to non-Haymon promoters such as Golden Boy, Top Rank and others.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

## Figure 1

### Haymon Market Share



Source: See workpapers "Boxers Final.xlsx," "Events Final.xlsx" and "Rankings Final.xlsx."

88.    These share figures demonstrate Haymon's current dominant position in controlling the key assets necessary to televise boxing – Championship-Caliber Boxers and key broadcast channels.   Through a combination of contracting practices and market practices (e.g., tying management to promotion, excluding key competitors from access to key inputs, etc.) Haymon has achieved a position of market power in two relevant antitrust markets:

- the U.S. market for managing Championship-Caliber Boxers; and
- the U.S. market for promoting Championship-Caliber Boxers.

89.    Haymon's increasing control of televised boxing is shown in Exhibit 7.  When considering all of the fights on U.S. television, Haymon's PBC has quickly increased its share from 0% in 2014 to 33% in 2015 to 42% in 2016.  At the same time, Non-PBC televised fights, such as those involving Golden Boy and Top Rank promoted boxers, fell from 267 in 2014 to 225 in 2015 – a 16% drop.

90.    More importantly, Haymon's share of U.S.-televised boxing matches on the key boxing channels increased even more dramatically.  Figure 2 shows Haymon's share over time of U.S.-televised boxing fights on the key TV boxing channels between 2014 and 2016.  The key channels include those that revealed a strong interest in broadcasting boxing

**HIGHLY CONFIDENTIAL Subject to Protective Order**

matches prior to the entry of PBC – NBC, Fox, CBS, ESPN, HBO and Showtime.[108] As shown in the Figure, PBC's share of U.S. televised boxing matches on key boxing channels grew from 0% in 2014 to 31% in 2015 to 61% in 2016.  Haymon clearly dominates U.S. televised boxing.

**Figure 2**



PBC Share of US-Televised Fights on Key Boxing Stations 2014-2016

Notes: A single fight aired on multiple stations is counted among each station's fight totals.
Source: See workpaper "Events_with_Promoter.xls."

91.     In addition, the number of televised boxing matches involving the key promoters that Haymon has allegedly targeted has fallen substantially. In Table 4 below I show the number of non-PBC fights during January-July during 2014, 2015 and 2016 on the key boxing channels.[109] As shown in the table, non-PBC fights on key boxing channels have fallen from 170 to 45, a 74% fall. This is consistent with the foreclosure effect that I would have expected to result from Haymon's exclusionary actions.

---

[108]     See Exhibit 6.
[109]     I use January – July so that I can compare equivalent time periods and avoid any seasonality effects distorting this comparison.

HIGHLY CONFIDENTIAL Subject to Protective Order

**Table 4**

**Non-PBC US-Televised Fights by Year
Shown on Key Boxing Stations**

*Jan-July 2014, 2015, 2016*

| Key Boxing Stations | 2014 Jan-July | 2015 Jan-July | 2016 Jan-July |
|---|---|---|---|
| CBS | 0 | 8 | 16 |
| ESPN | 51 | 38 | 0 |
| FOX SPORTS 1 | 38 | 42 | 1 |
| FOX | 4 | 6 | 0 |
| HBO | 30 | 23 | 26 |
| NBC | 10 | 1 | 0 |
| NBCSN | 0 | 0 | 0 |
| SHOWTIME | 37 | 19 | 2 |
| **TOTAL** | 170 | 137 | 45 |

Notes:
A single fight aired on multiple stations is counted among each station's fight totals.

Sources:
See workpaper "Events_with_Promoter.xls."

92. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████ In Figure 3 below I show the percentage of televised non-PBC boxing fights on the key TV boxing channels versus the other channels. As of 2014, 100% of non-PBC televised fights were on the key boxing channels. As of 2016, that percentage had fallen to 40%. Indeed, the majority of the non-PBC fights televised in 2016 have been on various channels that have historically not broadcasted boxing, including Spanish-language channels such as Estrella, Telemundo, and Unimas. Haymon's foreclosure strategy effectively forced key competitors like Golden Boy and Top Rank to stage many of their events on these less preferred channels in lieu of the preferred historical alternatives.

---

█ ████████████████████████████████████████████████
████████████████

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 150-31 Filed 10/31/16 Page 41 of 83 Page ID #:4476

**HIGHLY CONFIDENTIAL Subject to Protective Order**

**Figure 3**

**Percentage of Non-PBC Fights on Key Boxing TV Channels
Versus Other Boxing TV Channels
Jan-July 2014, 2015, 2016**



Notes: A single fight aired on multiple stations is counted among each station's fight totals.
Source: See workpaper "Events_with_Promoter.xls."

93.     I separately look at the trend in televised events for Golden Boy.  I focus this analysis on the current set of Golden Boy promoted fighters and analyze the history of their televised fights between 2014 and 2016.  I focus on the time period January – July of each year in order to get a common period comparison.  As shown in Table 5 below, the televised fights for these Golden Boy boxers on key boxing channels went from 49 in January – July 2014 to 9 in January – July 2016 – a fall of 82%.

PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
HIGHLY CONFIDENTIAL Subject to Protective Order

**Table 5**
### US-Televised Fights by Year
### Among Fights Shown on Key Boxing Stations and
### Featuring at Least One Fighter Currently Promoted by Golden Boy
*Jan-July 2014, 2015, 2016*

| Key Boxing Stations | 2014 Jan-July | 2015 Jan-July | 2016 Jan-July |
|---|---|---|---|
| CBS | 0 | 0 | 0 |
| ESPN | 2 | 1 | 0 |
| FOX SPORTS 1 | 24 | 35 | 0 |
| FOX | 1 | 5 | 0 |
| HBO | 1 | 9 | 9 |
| NBC | 1 | 0 | 0 |
| NBCSN | 0 | 0 | 0 |
| SHOWTIME | 20 | 1 | 0 |
| **TOTAL** | 49 | 51 | 9 |

Notes:
A single fight aired on multiple stations is counted among each station's fight totals.

Sources:
See workpaper "Events_with_Promoter.xls."

94.     Golden Boy was also forced to shift most of its boxing content onto less preferred channels, particularly Estrella.  Again, I focus this analysis on the current set of Golden Boy promoted fighters and analyze the history of their televised fights between 2014 and 2016, and I focus on the time period January – July of each year in order to get a common period comparison.  As shown in Figure 4, 100% of Golden Boy's U.S.-televised events were on key boxing channels in 2014 but that percentage fell to 22% as of 2016.  As a result of Haymon's foreclosure strategy, Golden Boy now has 78% of its televised events on Estrella.

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-31 Filed 10/31/16 Page 43 of 83 Page ID #:4478

**HIGHLY CONFIDENTIAL Subject to Protective Order**

### Figure 4

Percentage of Fights on Key Boxing TV Channels
Versus Other Boxing TV Channels
Among Fights Featuring at Least One Fighter
Currently Promoted by Golden Boy
Jan-July 2014, 2015, 2016



■ Percentage of US-Televised Fights Featuring at Least One Fighter Currently Promoted by Golden Boy on Key Channels
■ Percentage of US-Televised Fights Featuring at Least One Fighter Currently Promoted by Golden Boy on Non-Key Channels

Notes: A single fight aired on multiple stations is counted among each station's fight totals.
Source: See workpaper "Events_with_Promoter.xls."

95.     As these various data show, Haymon's anticompetitive actions have had a substantial impact on commerce in the tied market for promotion of boxers in the U.S. More particularly, Haymon's anticompetitive actions have economically injured competing boxing promoters, including Golden Boy, by substantially foreclosing those promoters from attracting Championship-Caliber Boxers and from offering competing high-quality boxing events for their existing stable of boxers, particularly U.S. televised boxing events. As a result, Golden Boy and other promoters competing against Haymon, have experienced substantially reduced revenues and profits. These key boxing promotion competitors are also at risk of even further financial decline (and potential exit) going forward given Haymon's distinct competitive advantages that result from his tying and other exclusionary actions.

96.     Haymon's anticompetitive actions have also harmed, and are likely to harm, numerous boxers, who are the consumers of the services in the relevant markets, and are

HIGHLY CONFIDENTIAL Subject to Protective Order

victims of Haymon's tying actions in the two relevant antitrust markets. The nature of this harm is twofold:

- Non-Haymon Championship-Caliber Boxers have been harmed and are likely to continue to be harmed through reduction in the quality and economic value of the boxing matches in which they participate;

- Many Haymon Championship-Caliber Boxers may be harmed in the future as Haymon reduces key elements of their compensation (e.g., purse size) in part because Haymon must recoup the enormous financial losses that he has experienced in the process of gaining control of Championship-Caliber Boxers and U.S. televised boxing events.

97. Haymon's actions also have the potential to harm other consumers of U.S. televised boxing events including networks, cable stations, venues, advertisers and viewers. Given that Haymon controls the majority (or near majority) of Championship-Caliber Boxers and the majority of televised air time on key boxing channels, these downstream consumers may ultimately be the victims of Haymon's actions.

98. Haymon claims that his strategy is fundamentally procompetitive because he has expanded output of U.S. televised events, including events on "free tv," in an attempt to increase the popularity of boxing.[111] This argument is based on two unsupported premises. The first premise is that this alleged output expansion strategy could not have been achieved through competitively less restrictive means.[112] Haymon has failed to provide any sound economic reason for this premise, specifically why Haymon's exclusionary actions were necessary for Haymon to achieve his alleged growth strategy.

99. For example, a potentially greater output of high quality boxing events could have occurred if Haymon allowed Haymon-managed and Haymon-promoted Championship-Caliber Boxers to fight against Championship-Caliber Boxers promoted by Golden Boy, Top Rank, and the other key promoters that Haymon appears to have targeted. Under such a scenario, Haymon, PBC and boxing viewers would have benefited from Haymon

---

[111]     Complaint at ¶¶53, 100, and 113.

[112]     Ross, Steven, "The Misunderstood Alliance between Sports Fans, Players, and the Antitrust Laws," 1997 *U. Ill. L. Rev.* 519 (1997), discusses promoting competitive balance through means that are not restrictive.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

allowing more matches that include Haymon-promoted boxers and boxers from Golden Boy, Top Rank, and other promoters.

100.    It is also not clear why Haymon could not have achieved his growth strategy without engaging in tying. For example, Haymon could have offered competing promoters the chance to assemble a series of high quality televised boxing events using Haymon's Championship-Caliber Boxers. In effect, Haymon could potentially have achieved output expansion without "tying" management to promotion.[113] Indeed, insofar as the "Ali Act" recognizes that tying management and promotion of boxers has been shown to substantially harm boxers, boxers would have been better off under a market growth strategy that did not involve tying management to promotion.

101.    A second premise of the output expansion argument is that there are no offsetting future reductions in output that occur once Haymon has achieved a position of market power.  However, while there has been a growth in U.S. televised boxing events during 2015 and 2016, it is unclear whether this expansion will continue in the future. Indeed, the available evidence indicates Haymon's alleged "free tv" growth strategy has not achieved the success that Haymon had hoped for and that Haymon will be forced to significantly reduce televised boxing events.[114] In particular, PBC fights have generated disappointing viewership that has been declining over time.[115]  Likewise, Haymon's actual operating losses appear to have been substantially greater than anticipated.  For example, in May 2015, Haymon projected it would lose $204 for all of 2015 but Haymon's financial statements show that its actual cash operating losses just through November 2015 were already $257 million.[116]

102.    Reflecting the economic significance of PBC's disappointing performance, shareholders in business trusts Waddell & Reed Management Co. and Ivy Investment Management Co., which provided the funding for Haymon's demonstration project, have

---

[113]      Haymon could also have alternatively avoided "tying" by exiting the management business and going into the business of promoting boxers.

[114]      Hauser, Thomas, "What we know about Al Haymon: Part V," The Ring, March 25, 2016, http://ringtv.craveonline.com/news/416173-what-we-know-about-al-haymon-part-v.

[115]      See, e.g., Pugmire 2016.

[116]      See HAYMON_00005906 and HAYMON_00002252.

**HIGHLY CONFIDENTIAL Subject to Protective Order**

sued these trusts to recover all the funds they invested in Haymon and PBC.[117] Among the shareholders' allegations is that the investment constituted "as high-risk a venture as one could imagine," in violation of the funds' prospectuses.[118]

103.    PBC's most likely strategy at this point is to attempt to recoup as much as possible of the hundreds of millions of dollars in accumulated losses it has built up during the demonstration project. This recoupment would be effected first by significantly scaling back the number of PBC fights to eliminate unprofitable fights and increase the value of each remaining fight relative to its cost, while also charging high license fees to the conventional pay-per-view/premium channel outlets that are more compatible with the economics of boxing. Thus, much, if not all, of the expansion in output of U.S. televised events in 2015 and 2016 is likely to be lost in the future and there is a risk that boxing returns to output levels that are below levels that existed in 2014 but with one difference from before – Haymon now controls management and promotion of the majority (or near majority) of the Championship-Caliber Boxers.

## VIII.   Entry

104.    In assessing entry barriers, the economic question is whether the threat of entry is likely to prevent the anticompetitive harm at issue in a case.[119]  The Merger Guidelines focus on whether entry is "timely, likely and sufficient in its magnitude, character and scope to deter or counteract competitive effects of concern."[120]

105.    In this case, entry is unlikely to prevent anticompetitive harm in either the U.S. market for managing Championship-Caliber Boxers or in the U.S. market for promoting

---

[117]    See, e.g., Gift, Paul, "$925 million Lawsuit Filed Over Investments with PBC's 'Shady Entrepreneur' Al Haymon," *Bloody Elbow (SB Nation),* May 2, 2016, http://www.bloodyelbow.com/2016/5/2/11553662/investors-sue-waddell-reed-over-al-haymon-premier-boxing-champions-boxing-news.

[118]    Harris, Joe, Investors Furious at Money Put Into Boxing," *Court House News Service,* April 28, 2016, http://www.courthousenews.com/2016/04/28/investors-furious-at-money-put-into-boxing.htm.

[119]    See *Guidelines*, Section 9; ABA Section of Antitrust Law, *Market Power Handbook*, 2005, Chapter VII.

[120]    See *Guidelines*, Section 9.

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW   Document 150-31   Filed 11/04/16   Page 47 of 83   Page ID
#:4482

**HIGHLY CONFIDENTIAL Subject to Protective Order**

the bouts of Championship-Caliber Boxers. The reasons for this are described in the competitive effects section above. In summary, Haymon's contracting practices and market behavior substantially limited and continue to limit the ability of new entrants to access Championship-Caliber Boxers, and certainly prevented, and will prevent, new entrants from undercutting Haymon's market power or otherwise prevent Haymon from acting anticompetitively.

_____

Robert Kneuper

September 6, 2016

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 150-31 Filed 10/31/16 Page 48 of 83 Page ID
#:4483
HIGHLY CONFIDENTIAL
Subject to Protective Order

<span style="text-align:center; font-weight:bold;">Exhibit 1</span>



# Robert Kneuper, PhD
**Director & Principal**

1200 19th Street, NW, Suite 700
Washington, DC 20036

Direct:  202.481-7318
Main:   202.973.2400
Email:   robert.kneuper@navigant.com

## PROFESSIONAL SUMMARY

Dr. Robert Kneuper is *Director and Principal* at Navigant Economics and has a Ph.D. in Applied Economics from Clemson University.  Dr. Kneuper also serves as an adjunct professor at both Loyola University Chicago School of Law and at Charleston Southern University, where he teaches courses in antitrust economics, managerial economies and corporate finance.

Dr. Kneuper consults on a wide variety of applied economic and applied finance topics such as antitrust, damages, class certification, intellectual property, and regulation.  Dr. Kneuper provides testimony both for private sector clients and for government regulators. His work spans a wide variety of industries including health care, pharmaceuticals, insurance, energy, media, entertainment, transportation, real estate, internet, sports, gaming, aerospace, defense, waste collection, retail and consumer products.

As part of his antitrust practice, Dr. Kneuper has provided economic analyses of the competitive impact of a wide variety of business practices that raise antitrust issues such as mergers, joint ventures, monopolization, IP licensing, price fixing, predatory pricing, price discrimination, tying, MFN clauses, monopsony, vertical restraints and more.  As part his antitrust work, Dr. Kneuper applies both economic theory and data analyses to evaluate key antitrust issues such as market definition, market power, entry barriers, competitive effects, power buyers, failing firms and efficiencies.

Dr. Kneuper has estimated damages in a variety of contexts including in antitrust cases, intellectual property cases, breach of contract cases and class certification cases.  In his damages work, Dr. Kneuper uses a combination of microeconomic modeling and data analyses to estimate the market impact on prices and/or profits of various types of alleged illegal acts.

Dr. Kneuper has also provided economic analyses of issues pertaining to class certification, including determining whether economic theory and data supports that there is a common impact to the class resulting from alleged illegal acts.  In addition, Dr. Kneuper has evaluated the economic impact of a variety of business practices in conjunction with regulatory proceedings and regulatory oversight.

Dr. Kneuper's professional experience includes more than 10 years analyzing antitrust matters at the Federal Trade Commission. At the FTC, Dr. Kneuper's work focused on mergers, horizontal and vertical restraints, damages, and intellectual property. Dr. Kneuper had a leadership role in developing the FTC's antitrust policy for cases involving patent settlements between branded and generic pharmaceutical companies. In addition, Dr. Kneuper participated extensively in the FTC's technical antitrust assistance program, advising various countries in development such as Poland, Lithuania, Latvia, Estonia and Venezuela.

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 150-31 Filed 10/31/16 Page 49 of 83 Page ID
#:4484

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 1**



# Robert Kneuper, PhD
**Director & Principal**

<div style="background:#8dc63f;">**REPRESENTATIVE CASES**</div>

- Provided economic analysis of liability in an antitrust cases involving allegation of monopolization by a retailer.

- Provided economic analysis of liability and damages for a large manufacturer in a case involving allegations of anticompetitive tying.

- Analyzed antitrust issues for a large energy company in a multi-billion merger involving midstream gas gathering assets.

- Estimated damages for a large pharmaceutical company as part of a breach of contract lawsuit.

- Provided economic analysis of class certification issues for a major manufacturer in a product liability case.

- Analyzed antitrust issues and estimated damages for a large health care insurer in the context of an antitrust case involving allegedly anticompetitive market practices by a large health care provider.

- Provided economic analyses of antitrust issues for a large hospital system in conjunction with a potential merger with another hospital system.

- Analyzed the competitive impact of a merger involving two major aerospace and defense companies.

- Analyzed economic issues relating to class certification and damages for counsel to a class of plaintiffs in an antitrust case involving a multi-billion dollar merger.

- Evaluated economic issues involving whether the patented invention associated with a blockbuster pharmaceutical product is a "commercial success."

- Analyzed economic issues involving liability and damages in a private antitrust suit involving allegations of illegal tying.

- Analyzed the economic and financial impact of various private equity acquisitions on gaming in the state of Nevada for the Nevada Gaming Commission.

- Provided economic analyses for the Pennsylvania Insurance Department of the competitive effects associated with a proposed consolidation of two major Pennsylvania health insurers.

- Analyzed the competitive impact of a merger of two liability insurers for a major liability insurer as part of a filing with the New Jersey Department of Banking and Insurance.

- Presented analyses to federal antitrust regulators involving the potential price impact of a contemplated merger involving a major manufacturer of consumer products.

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 1



# Robert Kneuper, PhD
**Director & Principal**

## EDUCATION

1990    Ph.D., Applied Economics, Clemson University

1987    M.S., Economics, Clemson University

1986    B.S., Economics, George Mason University

## PROFESSIONAL POSITIONS

2010 - Present   Director and Principal, Navigant Economics, LLC

2015 - Present   Adjunct Faculty, Loyola University Chicago Law School

2014 - Present   Adjunct Faculty, Charleston Southern University

1999 - 2013      Adjunct Faculty, Johns Hopkins University

2007 - 2010      Senior Managing Economist, LECG, LLC

2005 - 2007      Senior Economist, Economists, Incorporated.

1998 - 2005      Staff Economist, Federal Trade Commission

1996 - 1998      Senior Economist, National Economic Research Associates

1990 - 1996      Staff Economist, Federal Trade Commission

## PUBLICATIONS

"The Role of the Economic Expert in Damages Analyses," *The Expert Witnesses Newsletter*, ABA Section of Litigation, Fall 2014.

"Chapter VII: Barriers to Entry," (with Michael Salinger), *Market Power Handbook: Competition Law and Economic Foundations*, ABA Section of Antitrust Law, Second Edition, 2012.

"The Potential Role of Civil Antitrust Damage Analysis in Determining Financial Penalties in Criminal Antitrust Cases," with James Langenfeld, *George Mason Law Review*, Summer 2011, Vol. 18, No. 4, pp. 953-986.

"Geographic Market Definition in Markets with Imports," with Phil Nelson and Laura Malowane, *The Threshold*, the American Bar Association, Spring 2007.

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 150-31 Filed 10/31/16 Page 51 of 83 Page ID
#:4486

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 1

NAVIGANT

## Robert Kneuper, PhD
**Director & Principal**

"Four Economic Principles Underlying the FTC's Position Against Reverse Payments in Patent Settlement Agreements," *The Antitrust Source*, January 2006.

"Auto Insurers and the Airbag:  Reply," with Bruce Yandle, *Journal of Risk and Insurance*, September 1996, Volume 63, Number 3, pp. 524-525.

"The Air Bag/Seat Belt Controversy:  How the States Voted," with Bruce Yandle, *Eastern Economic Journal*, Spring 1996, Volume 22, Number 1, pp. 147-160.

"Auto Insurers and the Air Bag" with Bruce Yandle, *Journal of Risk and Insurance*, March 1994, Volume 61, Number 1, pp. 107-116.

"Insurers, Auto Makers, and the Political Debate Over Air Bags," in *Economics Consequences of Liability Rules*, edited by Bruce Yandle and Roger Meiners, Quorum Books, 1991.

## EXPERT REPORTS AND TESTIMONY

May 11, 2016 – Trial Testimony in U.S. District Court for the Western District of Michigan, Southern Division, Encana Oil & Gas (USA) Inc., v. Zaremba Family Farms, Inc., Case No. 1:12-cv-00369-PLM.

May 19-21, 2015 – Trial Testimony in U.S. District Court for the Northern District of Illinois, Eastern Division, Hannah's Boutique v. Barbara Ann Surdej, Roy Surdej and Jeffrey Surdej d/b/a Peaches Boutique, Case No. 13-cv-02564.

March 19, 2015 – Supplemental Declaration of Dr. Robert Kneuper, U.S. District Court for the Northern District of Illinois, Eastern Division, Hannah's Boutique v. Barbara Ann Surdej, Roy Surdej and Jeffrey Surdej d/b/a Peaches Boutique, Case No. 13-cv-02564.

December 3, 2014 – Deposition Testimony in U.S. District Court for the Northern District of Illinois, Eastern Division, Hannah's Boutique v. Barbara Ann Surdej, Roy Surdej and Jeffrey Surdej d/b/a Peaches Boutique, Case No. 13-cv-02564.

November 3, 2014 – Expert Report of Dr. Robert Kneuper, U.S. District Court for the District of New Jersey, Orologio of Short Hills, Inc., and Orologio International Ltd., Inc. v. The Swatch Group (U.S.) Inc., Civil Action No. 11-6854 (SDW).

October 8, 2014 – Declaration of Dr. Robert Kneuper, U.S. District Court for the Northern District of Illinois, Eastern Division, Hannah's Boutique v. Barbara Ann Surdej, Roy Surdej and Jeffrey Surdej d/b/a Peaches Boutique, Case No. 13-cv-02564.

August 20, 2014 – Deposition Testimony in U.S. District Court for the Western District of Michigan, Southern Division, Encana Oil & Gas (USA) Inc., v. Zaremba Family Farms, Inc., Case No. 1:12-cv-00369-PLM.



HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 1**

# Robert Kneuper, PhD
**Director & Principal**

June 20, 2014 – Expert Report of Dr. Robert Kneuper, U.S. District Court for the Western District of Michigan, Southern Division, Encana Oil & Gas (USA) Inc., v. Zaremba Family Farms, Inc., Case No. 1:12-cv-00369-PLM.

November 23, 2011 – "Economic Analyses of the Competitive Impacts from the Proposed Acquisition of Princeton Insurance Company by Medical Protective Corporation," with James Langenfeld and Michaelyn Corbett, Expert Report Filed with the New Jersey Department of Banking and Insurance in Support of Form A Application of Medical Protective Corporation and Berkshire Hathaway Inc.

October 4, 2011 – Deposition Testimony in U.S. District Court for the District of New Jersey, Mylan Inc. et al vs. Smithkline Beecham Corporation et al., Civil Action No. 10-4809

September 9, 2011 – Expert Report of Robert Kneuper, Ph.D., U.S. District Court for the District of New Jersey, Mylan Inc. et al vs. Smithkline Beecham Corporation et al., Civil Action No. 10-4809

January 30, 2009 - "Supplemental LECG Report Regarding Proposed Highmark/IBC Consolidation," with James Langenfeld, Expert Report Assisting the Pennsylvania Insurance Department.

September 10, 2008 - "LECG Report to the Pennsylvania Insurance Department Regarding Proposed Highmark/IBC Consolidation," with James Langenfeld, Expert Report Assisting the Pennsylvania Insurance Department.

November 18, 2007 – Presentation to the Nevada Gaming Commission Regarding Private Equity Gaming Acquisitions, with David Scheffman, Presentation Assisting the Nevada Gaming Commission.

November 15, 2007 – Report Analyzing the Economic Impact of Various Proposed Private Equity Acquisitions of Gaming Companies, with David Scheffman, Expert Report Assisting the Nevada Gaming Commission.

## FELLOWSHIPS AND AWARDS

Outstanding Team Effort Award, FTC, 1991 and 1993

Hugh Macauley Award (Best Masters Thesis in Economics)
Clemson Univ., 1988

R. C. Edwards Fellow, Clemson Univ., 1988-89

H. W. Close Fellow, Clemson Univ., 1986-88

Weber H. Peterson Award, (Best Economics Student)
George Mason Univ., 1985-86

Subject to Protective Order

# Exhibit 2
## Documents Considered

| |
|---|
| **Case Filings** |
| Expert Report of Gary Shaw, September 6, 2016 |
| Second Amended Complaint for Sherman Act Violations, Unfair Practices Act Violations and Unfair Competition, filed January 20, 2016 |
| May 15, 2016 Settlement Agreement and Release of Claims in the case of Top Rank v. Haymon |
| The Haymon Defendants' Answer to the Second Amended Complaint 1/20/2016 |
| Plaintiffs' Response to Defendants' Motion to Stay Action and Compel Plaintiffs to Arbitrate the Issue of Arbitrability and Jurisdiction Before the Arbitrator 5/5/2015 |
| Declaration of Bernard Hopkins In Support of Plaintiffs' Response to Defendants' Motion to StayAction and Compel Plaintiffs to Arbitrate the Issue of Arbitrability and Jurisdiction Before the Arbitrator 9/28/2015 |
| Notice of Filing Unredacted Documents Pursuante to Court's August 18, 2015 Order (Docket No.64) 9/28/2015 |
| First Amended Complaint for Sherman Act Violations, Unfair Practices Act Violations fnd Unfair Competition 8/10/2015 |
| Joint Rule 26(f) Report 8/3/2015 |
| Defendants' Reply in Support of Motion to Stay Action Pending Arbitrator's Decision on Arbitrability and Release of Claims 8/10/2015 |
| Plaintiffs' Points and Authorities in Opposition to Defendants' Motion to Stay 8/10/2015 |
| Defendants' Notice of Motion and Motion to Stay Action Pending Arbitrator's Decision on Arbitrability and Release of Claims 8/10/2015 |
| Complaint for Sherman Act Violation and Unfair Competition 5/5/2015 |
| Order Denying the Haymon Defendants' Motion to Dismiss the Second Amended Complaint Pursuant FRCP 12(b)(6) 1/6/2016 |
| The Haymon Defendants' Notice of Motion and Motion to Dismiss the Second Amended Complaint Pursuant to FRCP 12(b)(6); Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint 12/14/2015 |
| Order Granting in Part the Haymon Defendants' Motion to Dismiss Pursuant to FRCP 12(b)(6) 10/16/2015 |
| The Haymon Defendants' Notice of Motion and Motion to Dismiss Pursuant to FRCP 12(b)(6); Memorandum of Law in Support of their Motion to Dismiss the First Amended Complaint. 10/5/2015 |
| **Bates Stamped Documents** |
| Haymon Management Contract HAYMON_00002336 to HAYMON_00002343 |
| Haymon Management Contract HAYMON_00002351 to HAYMON_00002358 |
| Haymon Management Contract HAYMON_00002359 to HAYMON_00002366 |
| Haymon Management Contract HAYMON_00002393 to HAYMON_00002401 |
| Haymon Management Contract HAYMON_00002402 to HAYMON_00002410 |
| Haymon Management Contract HAYMON_00002411 to HAYMON_00002419 |
| Haymon Management Contract HAYMON_00002429 to HAYMON_00002437 |
| Haymon Management Contract HAYMON_00002438 to HAYMON_00002445 |
| Haymon Management Contract HAYMON_00002336 to HAYMON_00002343 |
| Haymon Management Contract HAYMON_00002456 to HAYMON_00002467 |
| Haymon Management Contract HAYMON_00002468 to HAYMON_00002476 |
| Haymon Management Contract HAYMON_00002477 to HAYMON_00002485 |
| Haymon Management Contract HAYMON_00002486 to HAYMON_00002493 |
| Haymon Management Contract HAYMON_00002510 to HAYMON_00002517 |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-09375-JFW-MRW Document 159-3 Filed 10/31/16 Page 54 of 88 Page ID
#:4489

Filed Under Seal
Subject to Protective Order

# Exhibit 2
## Documents Considered

| |
|---|
| Haymon Management Contract HAYMON_00002518 to HAYMON_00002525 |
| Haymon Management Contract HAYMON_00002542 to HAYMON_00002549 |
| Haymon Management Contract HAYMON_00002550 to HAYMON_00002557 |
| Haymon Management Contract HAYMON_00002574 to HAYMON_00002581 |
| Haymon Management Contract HAYMON_00002582 to HAYMON_00002589 |
| Haymon Management Contract HAYMON_00002590 to HAYMON_00002597 |
| Haymon Management Contract HAYMON_00002606 to HAYMON_00002613 |
| Haymon Management Contract HAYMON_00002630 to HAYMON_00002637 |
| Haymon Management Contract HAYMON_00002638 to HAYMON_00002645 |
| Haymon Management Contract HAYMON_00002646 to HAYMON_00002654 |
| Haymon Management Contract HAYMON_00002655 to HAYMON_0002662 |
| Haymon Management Contract HAYMON_00002663 to HAYMON_00002670 |
| Haymon Management Contract HAYMON_00002679 to HAYMON_00002686 |
| Haymon Management Contract HAYMON_00002687 to HAYMON_00002694 |
| Haymon Management Contract HAYMON_00002759 to HAYMON_00002766 |
| Haymon Management Contract HAYMON_00002775 to HAYMON_00002782 |
| Haymon Management Contract HAYMON_00002783 to HAYMON_00002790 |
| Haymon Management Contract HAYMON_00002831 to HAYMON_00002838 |
| Haymon Management Contract HAYMON_00002839 to HAYMON_00002846 |
| Haymon Management Contract HAYMON_00002847 to HAYMON_00002854 |
| Haymon Management Contract HAYMON_00002872 to HAYMON_00002879 |
| Haymon Management Contract HAYMON_00002888 to HAYMON_00002895 |
| Haymon Management Contract HAYMON_00002896 to HAYMON_00002903 |
| Haymon Management Contract HAYMON_00002912 to HAYMON_00002919 |
| Haymon Management Contract HAYMON_00002986 to HAYMON_00002994 |
| Haymon Management Contract HAYMON_00002995 to HAYMON_00003002 |
| Haymon Management Contract HAYMON_00003011 to HAYMON_00003018 |
| Haymon Management Contract HAYMON_00003027 to HAYMON_00003035 |
| Haymon Management Contract HAYMON_00003036 to HAYMON_00003043 |
| Haymon Management Contract HAYMON_00003076 to HAYMON_00003083 |
| Haymon Management Contract HAYMON_00003108 to HAYMON_00003115 |
| Haymon Management Contract HAYMON_00003138 to HAYMON_00003145 |
| Haymon Management Contract HAYMON_00003154 to HAYMON_00003161 |
| Haymon Management Contract HAYMON_00003171 to HAYMON_00003178 |
| Haymon Management Contract HAYMON_00003179 to HAYMON_00003186 |
| Haymon Management Contract HAYMON_00003203 to HAYMON_00003210 |
| Haymon Management Contract HAYMON_00003219 to HAYMON_00003227 |
| Haymon Management Contract HAYMON_00003237 to HAYMON_00003244 |
| Haymon Management Contract HAYMON_00003245 to HAYMON_00003252 |
| Haymon Management Contract HAYMON_00003277 to HAYMON_00003284 |
| Haymon Management Contract HAYMON_00003311 to HAYMON_00003318 |
| Haymon Management Contract HAYMON_00003327 to HAYMON_00003334 |
| Haymon Management Contract HAYMON_00003335 to HAYMON_00003343 |

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 2

## Documents Considered

| |
|---|
| Haymon Management Contract HAYMON_00003344 to HAYMON_00003352 |
| Haymon Management Contract HAYMON_00003353 to HAYMON_00003362 |
| Haymon Management Contract HAYMON_00003372 to HAYMON_00003380 |
| Haymon Management Contract HAYMON_00003381 to HAYMON_00003389 |
| Haymon Management Contract HAYMON_00003390 to HAYMON_00003399 |
| Haymon Management Contract HAYMON_00003409 to HAYMON_00003417 |
| Haymon Management Contract HAYMON_00003418 to HAYMON_00003426 |
| Haymon Management Contract HAYMON_00003455 to HAYMON_00003463 |
| Haymon Management Contract HAYMON_00003473 to HAYMON_00003481 |
| Haymon Management Contract HAYMON_00003500 to HAYMON_00003508 |
| Haymon Management Contract HAYMON_00003509 to HAYMON_00003517 |
| Haymon Management Contract HAYMON_00003536 to HAYMON_00003544 |
| Haymon Management Contract HAYMON_00003545 to HAYMON_00003554 |
| Haymon Management Contract HAYMON_00003582 to HAYMON_00003590 |
| Haymon Management Contract HAYMON_00003591 to HAYMON_00003601 |
| Haymon Management Contract HAYMON_00003602 to HAYMON_00003610 |
| Haymon Management Contract HAYMON_00003638 to HAYMON_00003646 |
| Haymon Management Contract HAYMON_00003647 to HAYMON_00003655 |
| Haymon Management Contract HAYMON_00003665 to HAYMON_00003673 |
| Haymon Management Contract HAYMON_00003701 to HAYMON_00003709 |
| Haymon Management Contract HAYMON_00003719 to HAYMON_00003727 |
| Haymon Management Contract HAYMON_00003728 to HAYMON_00003736 |
| Haymon Management Contract HAYMON_00003746 to HAYMON_00003754 |
| Haymon Management Contract HAYMON_00003782 to HAYMON_00003790 |
| Haymon Management Contract HAYMON_00003800 to HAYMON_00003808 |
| Haymon Management Contract HAYMON_00003809 to HAYMON_00003817 |
| Haymon Management Contract HAYMON_00003836 to HAYMON_00003844 |
| Haymon Management Contract HAYMON_00003863 to HAYMON_00003872 |
| Haymon Management Contract HAYMON_00003873 to HAYMON_00003881 |
| Haymon Management Contract HAYMON_00003891 to HAYMON_00003899 |
| Haymon Management Contract HAYMON_00003909 to HAYMON_00003917 |
| Haymon Management Contract HAYMON_00003927 to HAYMON_00003935 |
| Haymon Management Contract HAYMON_00003945 to HAYMON_00003953 |
| Haymon Management Contract HAYMON_00003963 to HAYMON_00003971 |
| Haymon Management Contract HAYMON_00004014 to HAYMON_00004018 |
| Haymon Management Contract HAYMON_00004024 to HAYMON_00004030 |
| Haymon Management Contract HAYMON_00004031 to HAYMON_00004036 |
| Haymon Management Contract HAYMON_00004037 to HAYMON_00004044 |
| Haymon Management Contract HAYMON_00004053 to HAYMON_00004061 |
| Haymon Management Contract HAYMON_00004062 to HAYMON_00004068 |
| Haymon Management Contract HAYMON_00004075 to HAYMON_00004081 |
| Haymon Management Contract HAYMON_00004082 to HAYMON_00004088 |
| Haymon Management Contract HAYMON_00004103 to HAYMON_00004109 |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-RFW-MRW Document 159-3 Filed 10/31/16 Page 56 of 83 Page ID
#:4491

Held Under Seal
Subject to Protective Order

# Exhibit 2
## Documents Considered

| |
|---|
| Haymon Management Contract HAYMON_00004110 to HAYMON_00004116 |
| Haymon Management Contract HAYMON_00004131 to HAYMON_00004137 |
| Haymon Management Contract HAYMON_00004145 to HAYMON_00004151 |
| Haymon Management Contract HAYMON_00004159 to HAYMON_00004166 |
| Haymon Management Contract HAYMON_00004175 to HAYMON_00004181 |
| Haymon Management Contract HAYMON_00004189 to HAYMON_00004195 |
| Haymon Management Contract HAYMON_00004196 to HAYMON_00004202 |
| Haymon Management Contract HAYMON_00004203 to HAYMON_00004209 |
| Haymon Management Contract HAYMON_00004210 to HAYMON_00004216 |
| Haymon Management Contract HAYMON_00004217 to HAYMON_00004223 |
| Haymon Management Contract HAYMON_00004224 to HAYMON_00004230 |
| Haymon Management Contract HAYMON_00004231 to HAYMON_00004237 |
| Haymon Management Contract HAYMON_00004238 to HAYMON_00004244 |
| Haymon Management Contract HAYMON_00004245 to HAYMON_00004251 |
| Haymon Management Contract HAYMON_00004252 to HAYMON_00004258 |
| Haymon Management Contract HAYMON_00004259 to HAYMON_00004265 |
| Haymon Management Contract HAYMON_00004273 to HAYMON_00004279 |
| Haymon Management Contract HAYMON_00004301 to HAYMON_00004307 |
| Haymon Management Contract HAYMON_00004315 to HAYMON_00004321 |
| Haymon Management Contract HAYMON_00004336 to HAYMON_00004342 |
| Haymon Management Contract HAYMON_00004350 to HAYMON_00004356 |
| Haymon Management Contract HAYMON_00004378 to HAYMON_00004384 |
| Haymon Management Contract HAYMON_00004385 to HAYMON_00004390 |
| Haymon Management Contract HAYMON_00004391 to HAYMON_00004397 |
| Haymon Management Contract HAYMON_00004405 to HAYMON_00004411 |
| Haymon Management Contract HAYMON_00004412 to HAYMON_00004418 |
| Haymon Management Contract HAYMON_00004434 to HAYMON_00004442 |
| Haymon Management Contract HAYMON_00004452 to HAYMON_00004460 |
| Haymon Management Contract HAYMON_00004470 to HAYMON_00004478 |
| Haymon Management Contract HAYMON_00004501 to HAYMON_00004509 |
| Haymon Management Contract HAYMON_00004510 to HAYMON_00004518 |
| Haymon Management Contract HAYMON_00004530 to HAYMON_00004335 |
| Haymon Management Contract HAYMON_00004550 to HAYMON_00004557 |
| Haymon Management Contract HAYMON_00004582 to HAYMON_00004590 |
| Haymon Management Contract HAYMON_00004704 to HAYMON_00004711 |
| Haymon Management Contract HAYMON_00004720 to HAYMON_00004727 |
| Haymon Advisory Agreement HAYMON_00002344 to HAYMON_00002350 |
| Haymon Advisory Agreement HAYMON_00002375 to HAYMON_00002383 |
| Haymon Advisory Agreement HAYMON_00002446 to HAYMON_00002452 |
| Haymon Advisory Agreement HAYMON_00002494 to HAYMON_00002501 |
| Haymon Advisory Agreement HAYMON_00002502 to HAYMON_00002509 |
| Haymon Advisory Agreement HAYMON_00002526 to HAYMON_00002533 |
| Haymon Advisory Agreement HAYMON_00002534 to HAYMON_00003541 |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-3 Filed 10/31/16 Page 57 of 88 Page ID #:4492

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 2
## Documents Considered

| |
|---|
| Haymon Advisory Agreement HAYMON_00002558 to HAYMON_00002565 |
| Haymon Advisory Agreement HAYMON_00002566 to HAYMON_00002573 |
| Haymon Advisory Agreement HAYMON_00002598 to HAYMON_00002605 |
| Haymon Advisory Agreement HAYMON_00002614 to HAYMON_00002621 |
| Haymon Advisory Agreement HAYMON_00002671 to HAYMON_00002678 |
| Haymon Advisory Agreement HAYMON_00002695 to HAYMON_00002702 |
| Haymon Advisory Agreement HAYMON_00002703 to HAYMON_00002710 |
| Haymon Advisory Agreement HAYMON_00002711 to HAYMON_00002718 |
| Haymon Advisory Agreement HAYMON_00002719 to HAYMON_00002726 |
| Haymon Advisory Agreement HAYMON_00002727 to HAYMON_00002734 |
| Haymon Advisory Agreement HAYMON_00002734 to HAYMON_00002742 |
| Haymon Advisory Agreement HAYMON_00002743 to HAYMON_00002750 |
| Haymon Advisory Agreement HAYMON_00002751 to HAYMON_00002758 |
| Haymon Advisory Agreement HAYMON_00002767 to HAYMON_00002774 |
| Haymon Advisory Agreement HAYMON_00002791 to HAYMON_00002798 |
| Haymon Advisory Agreement HAYMON_00002799 to HAYMON_00002806 |
| Haymon Advisory Agreement HAYMON_00002815 to HAYMON_00002822 |
| Haymon Advisory Agreement HAYMON_00002855 to HAYMON_00002863 |
| Haymon Advisory Agreement HAYMON_00002864 to HAYMON_00002871 |
| Haymon Advisory Agreement HAYMON_00002904 to HAYMON_00002911 |
| Haymon Advisory Agreement HAYMON_00002920 to HAYMON_00002927 |
| Haymon Advisory Agreement HAYMON_00002936 to HAYMON_00002944 |
| Haymon Advisory Agreement HAYMON_00002954 to HAYMON_00002961 |
| Haymon Advisory Agreement HAYMON_00002962 to HAYMON_00002969 |
| Haymon Advisory Agreement HAYMON_00002970 to HAYMON_00002977 |
| Haymon Advisory Agreement HAYMON_00003019 to HAYMON_00003026 |
| Haymon Advisory Agreement HAYMON_00003044 to HAYMON_00003051 |
| Haymon Advisory Agreement HAYMON_00003060 to HAYMON_00003067 |
| Haymon Advisory Agreement HAYMON_00003084 to HAYMON_00003091 |
| Haymon Advisory Agreement HAYMON_00003100 to HAYMON_00003107 |
| Haymon Advisory Agreement HAYMON_00003146 to HAYMON_00003153 |
| Haymon Advisory Agreement HAYMON_00003162 to HAYMON_00003170 |
| Haymon Advisory Agreement HAYMON_00003187 to HAYMON_00003194 |
| Haymon Advisory Agreement HAYMON_00003195 to HAYMON_00003202 |
| Haymon Advisory Agreement HAYMON_00003261 to HAYMON_00003268 |
| Haymon Advisory Agreement HAYMON_00003285 to HAYMON_00003292 |
| Haymon Advisory Agreement HAYMON_00003293 to HAYMON_00003301 |
| Haymon Advisory Agreement HAYMON_00003363 to HAYMON_00003371 |
| Haymon Advisory Agreement HAYMON_00003400 to HAYMON_00003408 |
| Haymon Advisory Agreement HAYMON_00003436 to HAYMON_00003444 |
| Haymon Advisory Agreement HAYMON_00003445 to HAYMON_00003454 |
| Haymon Advisory Agreement HAYMON_00003491 to HAYMON_00003499 |
| Haymon Advisory Agreement HAYMON_00003527 to HAYMON_00003535 |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-1 Filed 10/31/16 Page 58 of 83 Page ID #:4493

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 2
## Documents Considered

| |
|---|
| Haymon Advisory Agreement HAYMON_00003555 to HAYMON_00003563 |
| Haymon Advisory Agreement HAYMON_00003564 to HAYMON_00003572 |
| Haymon Advisory Agreement HAYMON_00003573 to HAYMON_00003581 |
| Haymon Advisory Agreement HAYMON_00003611 to HAYMON_00003619 |
| Haymon Advisory Agreement HAYMON_00003620 to HAYMON_00003628 |
| Haymon Advisory Agreement HAYMON_00003629 to HAYMON_00003637 |
| Haymon Advisory Agreement HAYMON_00003683 to HAYMON_00003691 |
| Haymon Advisory Agreement HAYMON_00003764 to HAYMON_00003772 |
| Haymon Advisory Agreement HAYMON_00003791 to HAYMON_00003799 |
| Haymon Advisory Agreement HAYMON_00003818 to HAYMON_00003826 |
| Haymon Advisory Agreement HAYMON_00003827 to HAYMON_00003835 |
| Haymon Advisory Agreement HAYMON_00003845 to HAYMON_00003853 |
| Haymon Advisory Agreement HAYMON_00003882 to HAYMON_00003890 |
| Haymon Advisory Agreement HAYMON_00003981 to HAYMON_00003989 |
| Haymon Advisory Agreement HAYMON_00003990 to HAYMON_00004001 |
| Haymon Advisory Agreement HAYMON_00004069 to HAYMON_00004074 |
| Haymon Advisory Agreement HAYMON_00004089 to HAYMON_00004095 |
| Haymon Advisory Agreement HAYMON_00004117 to HAYMON_00004123 |
| Haymon Advisory Agreement HAYMON_00004124 to HAYMON_00004130 |
| Haymon Advisory Agreement HAYMON_00004138 to HAYMON_00004144 |
| Haymon Advisory Agreement HAYMON_00004152 to HAYMON_00004158 |
| Haymon Advisory Agreement HAYMON_00004266 to HAYMON_00004272 |
| Haymon Advisory Agreement HAYMON_00004280 to HAYMON_00004286 |
| Haymon Advisory Agreement HAYMON_00004294 to HAYMON_00004300 |
| Haymon Advisory Agreement HAYMON_00004322 to HAYMON_00004328 |
| Haymon Advisory Agreement HAYMON_00004357 to HAYMON_00004363 |
| Haymon Advisory Agreement HAYMON_00004371 to HAYMON_00004377 |
| Haymon Advisory Agreement HAYMON_00004426 to HAYMON_00004433 |
| Haymon Advisory Agreement HAYMON_00004488 to HAYMON_00004492 |
| Haymon Advisory Agreement HAYMON_00004519 to HAYMON_00004529 |
| Haymon Advisory Agreement HAYMON_00004542 to HAYMON_00004549 |
| Haymon Advisory Agreement HAYMON_00004591 to HAYMON_00004598 |
| Haymon Advisory Agreement HAYMON_00004607 to HAYMON_00004614 |
| Haymon Advisory Agreement HAYMON_00004623 to HAYMON_00004629 |
| Haymon Advisory Agreement HAYMON_00004654 to HAYMON_00004661 |
| Haymon Advisory Agreement HAYMON_00004678 to HAYMON_00004685 |
| Haymon Advisory Agreement HAYMON_00004686 to HAYMON_00004694 |
| Haymon Advisory Agreement HAYMON_00004728 to HAYMON_00004735 |
| ███████████████████████████████ |
| Haymon Fight Cards, Additional Management Agreements, and Financial Documents HAYMON_00000764 to HAYMON_00002336 |
| Haymon Network Contracts DEF000609 to DEF000758 |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

FILED UNDER SEAL
Subject to Protective Order

# Exhibit 2
## Documents Considered

| |
|---|
| Additional Haymon Network Contracts NBCU_0001120 to NBCU_0001239 |
| Haymon Business Document HAYMON_00004793 |
| Haymon Business Document HAYMON_00004811 to Haymon_00004812 |
| Haymon Business Document HAYMON_00005527 |
| Haymon Business Document HAYMON_00005915 |
| Haymon Business Document HAYMON_00006636 to HAYMON_00006647 |
| Haymon Business Document HAYMON_00007635 to HAYMON_00007637 |
| Haymon Business Document HAYMON_00007641 to HAYMON_00007652 |
| Haymon Business Document HAYMON_00007668 |
| Haymon Business Document HAYMON_00008464 to HAYMON_00008468 |
| Haymon Business Document HAYMON_00008482 to HAYMON_00008486 |
| Haymon Business Document HAYMON_00008825 to HAYMON_00008828 |
| **PDF Documents** |
| Golden Boy Event Cards (2014 Fight Cards.pdf, 2015 Fight Cards.pdf, 2016 Fight Cards.pdf) |
| Golden Boy TV Contracts (Fox amendment 3-28-2013 (Partially executed).pdf; Fox Sports Espanol 6_23_15 two month Ext..pdf; Fox Term Termination Letter - 3-17-15.pdf; Golden Boy Fox Program Purchase Agreement FULLY EXECUTED.PDF; Memorandum of Understanding - LBI-Golden Boy (FINAL EXECUTION COPY - 07-....pdf; Scan0007 CaneloHBO.PDF) |
| **Websites** |
| "About Us," http://www.goldenboypromotions.com/en/about-us |
| Premier Boxing Champions, "About," http://www.premierboxingchampions.com/about |
| Fightnews.com, "World Boxing Rankings," http://www.fightnews.com/rankings-2 |
| Ring Magazine, "Ring Ratings," http://ringtv.craveonline.com/ratings/welterweight |
| ESPN, "Divisional rankings: Heavyweight," http://www.espn.com/boxing/story/_/id/12494121/division-division-rankings-index |
| Bad Left Hook, "Upcoming Boxing Schedule," http://www.badlefthook.com/pages/boxing-television-schedule |
| www.premierboxingchampions.com/ |
| Rankings from http://www.ibfusbaregistration.com/ |
| Rankings from http://www.wbaboxing.com/ |
| Rankings from http://wbcboxing.com/ |
| Rankings from http://www.wboboxing.com/ |
| Rankings from http://www.fightnews.com/ |
| For boxer manager info: http://boxrec.com/media/index.php/Al_Haymon |
| For boxer manager info: http://www.boxingscene.com/krzysztof-glowacki-surgery-on-elbow-wrist--95315 |
| For boxer manager info: http://www.boxingscene.com/sergey-lipinets-comes-on-board-with-al-haymon--97968 |
| PBC Roster: http://presscenter.premierboxingchampions.com/fighters |
| DiBella Entertainment Roster: http://dbe1.com/athletes/ |
| Mayweather Promotions Roster: http://mayweatherpromotions.com/fighters/ |
| Warriors Boxing Promotions Roster: http://www.warriorsboxing.com/fighters.html |
| Golden Boy Promotions Roster: http://www.goldenboypromotions.com/en/fighters |
| Top Rank Roster: http://www.toprank.com/fighters/ |
| General Boxer Info: Boxrec.com |
| http://checkhookboxing.com/index.php?threads/hassan-ndam-signs-with-gary-hyde.25503/ |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-RFW-MRW Document 159 Filed 10/31/16 Page 60 of 83 Page ID
#:4495

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 2
## Documents Considered

| |
|---|
| http://goldenboypromotions.com/en/news-article/david-lemieux-take-glen-tapia-co-main-event-canelo-vs-khan |
| http://hiphopdx.com/news/id.32396/title.boxer-bryant-jennings-leaves-roc-nation-sports |
| K2 Roster: HTTP://K2PROMOS.COM/FIGHTERS/ |
| Starboxing roster: http://www.starboxing.com/boxers/ |
| http://leaveitintheringradio.com/look-for-a-new-lightweight-in-town-denis-shafikov/ |
| http://ressports.com/news/?article_id=823&content_type=printable&plugin_id=news.front.system&block_id=5001 |
| http://ringtv.craveonline.com/news/320113-sullivan-barrera-signs-with-main-events |
| http://ringtv.craveonline.com/news/372143-orlando-salido-rocky-martinez-in-the-works |
| http://ringtv.craveonline.com/news/403211-eduard-troyanovsky-grabs-ibf-title-with-bizarre-tko-of-cesar-cuenca |
| http://sampsonboxing.com/perez_uchiyama.html |
| http://teiken.com/profile/ao.html |
| http://theboxingtribune.com/tag/edgar-sosa/ |
| http://throneboxing.com/fighters-2/ |
| http://www.alaboxing.com/fighter/donnie-ahas-nietes/ |
| http://www.alaboxing.com/fighter/king-arthur-villanueva/ |
| http://www.allstarboxinginc.com/fighters.html |
| http://www.badlefthook.com/2015/11/2/9657804/gary-hyde-guillermo-rigondeaux-complicit-in-destroying-his-own-career |
| http://www.boxen.com/boxer/uebersicht.html |
| http://www.boxing.com/what_keeps_tony_thompson_ticking.html |
| http://www.boxingbase.com/al-haymons-bursting-boxer-stable-the-big-list/ |
| http://www.boxingnewsonline.net/bernd-boente-david-haye-could-secure-wladimir-klitschko-rematch/ |
| http://www.boxingscene.com/bryant-jennings-inks-managerial-pact-with-james-prince--63645 |
| http://www.boxingscene.com/clarence-booth-inks-managerial-pact-with-pat-lynch--83200 |
| http://www.boxingscene.com/deguardia-on-algieris-future-working-with-haymon--99152 |
| http://www.boxingscene.com/denis-lebedev-murat-gassiev-late-november-early-december--107814 |
| http://www.boxingscene.com/geales-promoter-miguel-cotto-rematch-clause--91239 |
| http://www.boxingscene.com/juan-hernandez-chocolatito-sights-latest-win--101167 |
| http://www.boxingscene.com/krzysztof-glowacki-surgery-on-elbow-wrist--95315 |
| http://www.boxingscene.com/oosthuizen-latest-join-haymon-pbc-ranks--89444 |
| http://www.boxingscene.com/photos-jose-uzcategui-carlos-ocampo-on-weight-fights--107892 |
| http://www.boxingscene.com/rigondeaux-signed-caribe-looking-co-promoter--80227 |
| http://www.boxingscene.com/zepedes-promoter-confident-he-capture-wbo-crown--93095 |
| http://www.cesboxing.com/boxers |
| http://www.chrisalgieri.com/news_stories/kohei-kono-rex-tso-showdown-in-the-works-for-march-25291949?showrepost=true# |
| http://www.dailymail.co.uk/sport/boxing/article-2960757/martin-murray-backed-manager-overcome-gennady-golovkin-despite-huge-underdog-status.html |
| http://www.eottm.com/ |
| http://www.espinozaboxingclub.com/boxers/ |
| http://www.espn.com/boxing/story/_/id/12425320/middleweight-champion-miguel-cotto-signs-roc-nation-sports |
| http://www.espn.com/boxing/story/_/id/15213106/vasyl-lomachenko-move-challenge-rocky-martinez-junior-lightweight-title |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-RFW-MRW Document 159-1 Filed 03/03/16 Page 61 of 83 Page ID #:4496

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 2
## Documents Considered

| |
|---|
| http://www.expressnews.com/sports/columnists/john_whisler/article/s-a-fighter-s-deal-with-las-vegas-promoter-6806871.php |
| http://www.fightnews.com/boxing/weights-from-merida-3-111648 |
| http://www.goldengloves.co.za/boxers/ |
| http://www.interbox.ca/en/team |
| http://www.kingsportsworldwide.com/#!hassan-ndam/c11ef |
| http://www.mainevents.com/roster-home |
| http://www.matchroomboxing.com/boxers/ |
| http://www.matchroomboxing.com/boxers/nathan-cleverly/ |
| http://www.myjoyonline.com/sports/2015/november-9th/ghanaian-boxer-fredrick-lawson-to-have-surgery-on-broken-jaw.php |
| http://www.phoenixvillenews.com/article/pv/20141124/sports/141129995 |
| http://www.sampsonboxing.com/fighters.html |
| http://www.sauerlandpromotion.com/profiles/ |
| http://www.sowetanlive.co.za/sport/2015/10/28/vetyeka-still-in-the-game---promoter |
| http://www.sportsnews24.com/boxing-mma/bermane-stiverne-signing-with-al-haymon/ |
| http://www.teiken.com/profile/t_miura.html |
| http://www.thompsonboxing.com/fighters.php |
| http://www.wboboxing.com/carlos-takam/ |
| https://www.boxing247.com/boxing-news/lets-give-jesus-the-space-hes-earned/31093 |
| https://www.facebook.com/nowhere2hydeboxermanagement/videos/vb.181840421826452/831783833498771/?type=2&theater |
| https://www.frankwarren.com/fighters_cat/fighters/ |
| http://www.ringnews24.com/2016/01/15/greg-cohen-begins-2016-with-high-hopes-bolstered-roster/#.V8867TXomrN |
| http://ringtv.craveonline.com/news/402405-press-release-golden-boy-signs-jorge-melendez-bastie-samir |
| **Textbooks** |
| Foster, O'Reilly, Davila, "Sports Business Management: Decision Making Around the Globe," Routledge, 2016 |
| ABA Section of Antitrust Law, Market Power Handbook, 2005 |
| Tirole, Jean, *The Theory of Corporate Finance* , Princeton University Press, 2009 |
| Gifis, Steven, *Law Dictionary* , 3rd Edition, Barron's Educational Series, 1991 |
| Davis, Peter and Garcés, Eliana, *Quantitative Techniques for Competition and Antitrust Analysis* , 2010 |
| Carlton, Dennis and Perloff, Jeffrey, *Modern Industrial Organization* , Fourth Edition, 2005 |
| Monopolization and Dominance Handbook, American Bar Association, 2011 |
| **Journal Articles** |
| Baglio, Scott, "The Muhammad Ali Boxing Reform Act: The First Jab at Establishing Credibility in Professional Boxing," *Fordham Law Review* , 68(6), 2000 |
| Humphreys, Brad, "The Size and Scope of the Sports Industry in the United States," IASE/NAASE Working Paper Series, No. 08-11, August 2008 |
| Tenorio, Rafael, "The Economics of Professional Boxing Contracts," *Journal of Sports Economics* , 1(4), November 2000 |
| Rosen and Sanderson, "Labour Markets in Professional Sports," The Economic Journal, 111(469), Features, February 2001) |

# Exhibit 2
## Documents Considered

| |
|---|
| Noll, Roger, "The Organization of Sports Leagues," SIEPR Discussion Paper No. 02-43, August 2003 |
| Frascatore, Mark, "The Grouping of Stars: An Application to Professional Sports," International Journal of Industrial Organization, 17, 1999 |
| Seal, James, "Market Definition in Antitrust Litigation in the Sports and Entertainment Industries," *Antitrust Law Journal,* 61(3), Spring 1993 |
| Joseph Kattan, Joseph, "Market Power in the Presence of an Installed Base," *Antitrust Law Journal* , 62(1), (Summer 1993) |
| Salop, Steven, and Scheffman, David, "Raising Rivals' Costs," *American Economic Review* 73(2), (May 1983) |
| Krattenmaker, Thomas, and Salop, Steven, "Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price," *The Yale Law Journal* , Vol. 96, No. 2 (Dec., 1986) |
| Carlton, Dennis, and Waldman, Michael, "How Economics Can Improve Antitrust Doctrine towards Tie-In Sales: Comment on Jean Tirole's 'The Analysis of Tying Cases: A Primer,'" *Competition Policy International* , 1(1), Spring 2005 |
| Tirole, Jean, "The Analysis of Tying Cases: A Primer," *Competition Policy International* , 1(1), Spring 2005 |
| Krattenmaker, Thomas, Lande, Robert, and Salop, Steven, "Monopoly Power and Market Power in Antitrust Law, 76 Georgetown Law Journal, 241 (December, 1987); |
| Baker, Jonathan, "Exclusion as a Core Competitive Concern," *Antitrust Law Journal* , 3, 2013 |
| Besanko, David and Perry, Martin K., The RAND Journal of Economics, Vol. 24, No. 4 (Winter, 1993), pp. 646-667 |
| Ross, Steven, "The Misunderstood Alliance between Sports Fans, Players, and the Antitrust Laws," 1997 U. Ill. L. Rev. 519 (1997) |
| Carlton, Dennis W. and Michael Waldman., "The Strategic Use of Tying to Preserve and Create Market Power in Evolving Industries" RAND Journal of Economics Vol. 33, No. 2, Summer 2002 pp. 194-220. |
| **News Articles** |
| ESPN, "Mayweather-Pacquiao eclipses 4.4 million PPV buys, $72M gate," May 12, 2015,http://www.espn.com/boxing/story/_/id/12872711/floyd-mayweather-manny-pacquiao-fight-shatters-all-live-gate-record |
| Hines, Patrick, "ESPN Joins Premier Boxing Champions' Corner, Knocking Out 'Friday Night Fights,'" Deadline, March 18, 2015, http://deadline.com/2015/03/espn-premier-boxing-champions-friday-night-fights-ending-1201394575/ |
| "Mayweather Promotions Signs Exciting Lightweight Contender Sharif The Lion Bogere," Press Release, March 10, 2016, http://mayweatherpromotions.com/mayweather-promotions-signs-exciting-lightweight-contender-sharif-the-lion-bogere/ |
| Holmes, William, "HBO Boxing Results: Miguel Cotto Obliterates Geale in Four," Boxing Insider, http://www.boxinginsider.com/headlines/hbo-boxing-results-miguel-cotto-obliterates-geale-in-four/ |
| Bad Left Hook, "Floyd Mayweather and the 10 greatest unbeaten fighters of all time," http://www.badlefthook.com/2013/9/19/4747960/floyd-mayweather-and-the-10-greatest-unbeaten-fighters-of-all-time |
| Esco, Will, "PBC on Spike – Guerrero vs. Peralta," *Bad Left Hook* , August 27, 2016, http://www.badlefthook.com/2016/8/27/12660926/pbc-on-spike-guerrero-vs-peralta-live-streaming-results-and-round-by |
| Poole, Gary, "The Fight to Organize the 'Fight of the Century,'" The Atlantic, May 2, 2015, http://www.theatlantic.com/entertainment/archive/2015/05/mayweather-versus-pacquiao/392036/ |

Subject to Protective Order

# Exhibit 2
## Documents Considered

| |
|---|
| Iole, Kevin, "Roadblocks to boxing getting more exposure on non-premium TV," *Yahoo Sports* , January 7, 2015, http://sports.yahoo.com/news/roadblocks-to-boxing-getting-more-exposure-on-non-premium-tv-031733524.html |
| Thomas Hauser in "The Ring" available at: http://ringtv.craveonline.com/news/415547-what-we-know-about-al-haymon-part-i; http://ringtv.craveonline.com/news/415577-what-we-know-about-al-haymon-part-ii; http://ringtv.craveonline.com/news/415853-what-we-know-about-al-haymon-part-iii; http://ringtv.craveonline.com/news/416065-what-we-know-about-al-haymon-part-iv; http://ringtv.craveonline.com/news/416173-what-we-know-about-al-haymon-part-v |
| King, Bill, "Boxing's Grand New Stage," Sports Business Journal, April 20, 2015 ("King 2015"), http://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/In-Depth/Main.aspx |
| Pugmire, Lance, "Al Haymon is Spending to Put Boxing on TV, But do the Numbers Add Up?" Los Angeles Times, February 2, 2016 ("Pugmire 2016"), http://www.latimes.com/sports/la-sp-al-haymon-boxing-20160203-story.html |
| Maese, Rick,  and DePaolo, Joe, "The Man Behind the Man:  Al Haymon Pulls the Strings to Floyd Mayweather's Bouts," The Washington Post, April 28, 2015, "Maese and DePaolo 2015," https://www.washingtonpost.com/sports/boxing-mma-wrestling/boxings-man-of-mystery/2015/04/28/2a2f5570-edf8-11e4-8abc-d6aa3bad79dd_story.html |
| Gift, Paul, "$925 million Lawsuit Filed Over Investments with PBC's 'Shady Entrepreneur' Al Haymon," *Bloody Elbow (SB Nation),*  May 2, 2016, http://www.bloodyelbow.com/2016/5/2/11553662/investors-sue-waddell-reed-over-al-haymon-premier-boxing-champions-boxing-news |
| Harris, Joe, Investors Furious at Money Put Into Boxing," Court House News Service, April 28, 2016, http://www.courthousenews.com/2016/04/28/investors-furious-at-money-put-into-boxing.htm |
| **Miscellaneous** |
| Acemoglu and Ozdaglar, "6.207/14.15: Networks Lectures 17 and 18: Network Effects," MIT, November 2009, http://economics.mit.edu/files/4831 |
| Rules & Regulations of the World Boxing Council ("WBC"), Updated November 2015, http://wbcboxing.com/downloads/WBC_Rules_&_Regulations_amended_as_of_November_2015.pdf |
| 15 USC § 6301 |
| "Muhammad Ali Boxing Reform Act: Report of the Committee on Commerce, Science, and Transportation on S. 305." Report 106-83, USGPO June 21, 1999 |
| U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines*  (2010) |
| Brown Shoe Co., Inc. v. U.S. 370 U.S. 294 (1962) |
| *Eastman Kodak Co.*  v. *Image Technical Services, Inc.* , 112 S. Ct. 2072 (1992) |
| IBISWorld, "Boxing Promoters in the US: Market Research Report," December 2015, http://www.ibisworld.com/industry/boxing-promoters.html |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-1 Filed 10/31/16 Page 64 of 83 Page ID
#:4499

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 3**
**U.S. Managed Championship Caliber Boxers**

| Last Name | First Name | Country | Weight Class |
|---|---|---|---|
| ALGIERI | CHRIS | USA | WELTERWEIGHT |
| ALI | SADAM | USA | WELTERWEIGHT |
| ALVAREZ | ELEIDER | CANADA | LIGHT HEAVYWEIGHT |
| ARREOLA | CRISTOBAL | USA | HEAVYWEIGHT |
| ARROYO | MCJOE | PUERTO RICO | SUPER FLYWEIGHT |
| ARROYO | MCWILLIAMS | PUERTO RICO | FLYWEIGHT |
| AVANESYAN | DAVID | USA | WELTERWEIGHT |
| BARRERA | SULLIVAN | USA | LIGHT HEAVYWEIGHT |
| BARRIOS | MARIO | USA | SUPER BANTAMWEIGHT |
| BARTHELEMY | RANCES | USA | SUPER FEATHERWEIGHT |
| BENAVIDEZ | DAVID | USA | SUPER MIDDLEWEIGHT |
| BENAVIDEZ | JOSE | USA | SUPER WELTERWEIGHT |
| BERTO | ANDRE | USA | WELTERWEIGHT |
| BETERBIEV | ARTUR | CANADA | LIGHT HEAVYWEIGHT |
| BEY | MICKEY | USA | LIGHTWEIGHT |
| BIZIER | KEVIN | CANADA | WELTERWEIGHT |
| BRADLEY | TIMOTHY | USA | WELTERWEIGHT |
| BREAZEALE | DOMINIC | USA | HEAVYWEIGHT |
| BRONER | ADRIEN | USA | WELTERWEIGHT |
| BROWNE | MARCUS | USA | CRUISERWEIGHT |
| BUNDRAGE | CORNELIUS | USA | LIGHT MIDDLEWEIGHT |
| BUNDU | LEONARD | ITALY | WELTERWEIGHT |
| BUTE | LUCIAN | CANADA | LIGHT HEAVYWEIGHT |
| CABALLERO | RANDY | USA | BANTAMWEIGHT |
| CARTAGENA | MIGUEL | USA | FLYWEIGHT |
| CASTILLO | WALTER | NICARAGUA | SUPER LIGHTWEIGHT |
| CHARLO | JERMALL | USA | SUPER WELTERWEIGHT |
| CHARLO | JERMELL | USA | SUPER WELTERWEIGHT |
| CHAVEZ | JULIO | MEXICO | SUPER MIDDLEWEIGHT |
| CRAWFORD | TERENCE | USA | JUNIOR WELTERWEIGHT |
| CUNNINGHAM | STEVE | USA | HEAVYWEIGHT |
| DE LA TORRE | HARMONITO | USA | LIGHTWEIGHT |
| DEGALE | JAMES | UK | SUPER MIDDLEWEIGHT |
| DEREVYANCHENKO | SERGIY | USA | MIDDLEWEIGHT |
| DIAZ | CHRISTOPHER | PUERTO RICO | FEATHERWEIGHT |
| DIAZ | FELIX | DOMINICAN REPUBLIC | SUPER LIGHTWEIGHT |
| DIAZ | JOSEPH | USA | JUNIOR FEATHERWEIGHT |
| DIRRELL | ANDRE | USA | SUPER MIDDLEWEIGHT |
| DIRRELL | ANTHONY | USA | SUPER MIDDLEWEIGHT |
| DONAIRE | NONITO | PHILIPPINES | JUNIOR FEATHERWEIGHT |
| DOUGLAS | ANTOINE | USA | MIDDLEWEIGHT |
| DOUGLAS | OMAR | USA | SUPER FEATHERWEIGHT |
| EASTER | ROBERT | USA | LIGHTWEIGHT |
| ESCANDON | OSCAR | COLOMBIA | SUPER BANTAMWEIGHT |
| FARMER | TEVIN | USA | JUNIOR LIGHTWEIGHT |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-FMO-MRW   Document 150-1   Filed 10/31/16   Page 65 of 83   Page ID
#:4500

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 3**
**U.S. Managed Championship Caliber Boxers**

| Last Name | First Name | Country | Weight Class |
|---|---|---|---|
| FEDOSOV | ANDREY | RUSSIA | HEAVYWEIGHT |
| FELIX | JOSE | MEXICO | SUPER LIGHTWEIGHT |
| FIGUEROA | OMAR | USA | LIGHTWEIGHT |
| FLORES | BJ | USA | CRUISERWEIGHT |
| FLORES | MOISES | MEXICO | SUPER BANTAMWEIGHT |
| FONFARA | ANDRZEJ | USA | LIGHT HEAVYWEIGHT |
| FORTUNA | JAVIER | DOMINICAN REPUBLIC | SUPER FEATHERWEIGHT |
| FRAMPTON | CARL | UK | SUPER BANTAMWEIGHT |
| GARCIA | DANNY | USA | SUPER LIGHTWEIGHT |
| GARCIA | MIKEY | USA | FEATHERWEIGHT |
| GLAZKOV | VYACHESLAV | USA | HEAVYWEIGHT |
| GLOWACKI | KRZYSZTOF | POL | JR HEAVYWEIGHT |
| GOLOVKIN | GENNADY | KAZ | MIDDLEWEIGHT |
| GOMEZ | EDDIE | USA | JUNIOR MIDDLEWEIGHT |
| GOMEZ | FRANCISCO | USA | JUNIOR WELTERWEIGHT |
| GONZALEZ | JHONNY | MEXICO | SUPER FEATHERWEIGHT |
| GONZALEZ | ROMAN | NICARAGUA | FLYWEIGHT |
| GRADOVICH | EVGENY | RUSSIA | FEATHERWEIGHT |
| GRANADOS | ADRIAN | USA | SUPER LIGHTWEIGHT |
| GROVES | GEORGE | UK | SUPER MIDDLEWEIGHT |
| GUERRERO | ROBERT | USA | WELTERWEIGHT |
| GUZMAN | JONATHAN | DOMINICAN REPUBLIC | SUPER BANTAMWEIGHT |
| GVOZDYK | OLEKSANDR | UKRAINE | LIGHT HEAVYWEIGHT |
| HARRISON | TONY | USA | MIDDLEWEIGHT |
| HART | JESSE | USA | SUPER MIDDLEWEIGHT |
| HERNANDEZ | ANDREW | USA | SUPER MIDDLEWEIGHT |
| HERRERA | MAURICIO | USA | JUNIOR WELTERWEIGHT |
| HUNTER | ERIC | USA | LIGHTWEIGHT |
| HURD | JARRETT | USA | SUPER WELTERWEIGHT |
| IMAM | AMIR | USA | SUPER LIGHTWEIGHT |
| ISLAM | KANAT | USA | WELTERWEIGHT |
| JACK | BADOU | GAMBIA/SWEDEN | SUPER MIDDLEWEIGHT |
| JACKSON | JOHN | USA | SUPER WELTERWEIGHT |
| JACOBS | DANIEL | USA | MIDDLEWEIGHT |
| JENNINGS | BRYANT | USA | HEAVYWEIGHT |
| JOHNSON | TUREANO | USA | MIDDLEWEIGHT |
| KALAJDZIC | RADIVOJE | USA | LIGHT HEAVYWEIGHT |
| KAMEDA | TOMOKI | JAPAN | BANTAMWEIGHT |
| KAYODE | LATEEF | NIG | CRUISERWEIGHT |
| KHAN | AMIR | UK | WELTERWEIGHT |
| KHYTROV | IEVGEN | USA | MIDDLEWEIGHT |
| KIELCZEWSKI | RYAN | USA | SUPER FEATHERWEIGHT |
| KONO | KOHEI | JAPAN | SUPER FLYWEIGHT |
| KOROBOV | MATVEY | USA | MIDDLEWEIGHT |
| KOVALEV | SERGEY | USA | LIGHT HEAVYWEIGHT |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 150-1 Filed 10/31/16 Page 66 of 83 Page ID
#:4501

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 3**
**U.S. Managed Championship Caliber Boxers**

| Last Name | First Name | Country | Weight Class |
|---|---|---|---|
| LARA | ERISLANDY | USA | SUPER WELTERWEIGHT |
| LARA | JORGE | MEXICO | SUPER BANTAMWEIGHT |
| LEE | ANDY | IRE | MIDDLEWEIGHT |
| LIPINETS | SERGEY | USA | JUNIOR WELTERWEIGHT |
| LOMACHENKO | VASYL | UKRAINE | FEATHERWEIGHT |
| LOPEZ | ABRAHAM | USA | FEATHERWEIGHT |
| LUBIN | ERICKSON | USA | SUPER WELTERWEIGHT |
| LUNDY | HENRY | USA | SUPER LIGHTWEIGHT |
| MAGDALENO | JESSIE | USA | FEATHERWEIGHT |
| MARES | ABNER | USA | BANTAMWEIGHT |
| MARTIN | CHARLES | USA | HEAVYWEIGHT |
| MARTINEZ | KIKO | SPAIN | SUPER BANTAMWEIGHT |
| MARTINEZ | ROMAN | PUERTO RICO | SUPER FEATHERWEIGHT |
| MARTIROSYAN | VANES | USA | SUPER WELTERWEIGHT |
| MCCUMBY | TREVOR | USA | LIGHT HEAVYWEIGHT |
| MEDINA | ROGELIO | USA | SUPER MIDDLEWEIGHT |
| MENDEZ | ARGENIS | USA | SUPER FEATHERWEIGHT |
| MILLER | JARRELL | USA | HEAVYWEIGHT |
| MOLINA | CARLOS | USA | SUPER WELTERWEIGHT |
| MOLINA | ERIC | USA | CRUISERWEIGHT |
| MOLINA | JOHN | USA | WELTERWEIGHT |
| MOLINA | OSCAR | USA | WELTERWEIGHT |
| MONAGHAN | SEAN | USA | LIGHT HEAVYWEIGHT |
| MONTIEL | FERNANDO | MEXICO | JR FEATHERWEIGHT |
| MOSLEY | SHANE | USA | WELTERWEIGHT |
| NELSON | WILLIE | USA | SUPER MIDDLEWEIGHT |
| OROZCO | ANTONIO | USA | JUNIOR WELTERWEIGHT |
| ORTIZ | LUIS | USA | HEAVYWEIGHT |
| PASCAL | JEAN | CANADA | LIGHT HEAVYWEIGHT |
| PAYANO | JUAN | USA | BANTAMWEIGHT |
| PEDRAZA | JOSE | PUERTO RICO | SUPER FEATHERWEIGHT |
| PEREZ | DARLEYS | USA | LIGHTWEIGHT |
| PETERSON | LAMONT | USA | SUPER LIGHTWEIGHT |
| PORTER | SHAWN | USA | WELTERWEIGHT |
| POSTOL | VIKTOR | UKRAINE | SUPER LIGHTWEIGHT |
| QUILLIN | PETER | USA | MIDDLEWEIGHT |
| RABCHENKO | SERGEY | BELARUS | SUPER WELTERWEIGHT |
| RAMIREZ | JOSE | USA | LIGHT WELTERWEIGHT |
| REDKACH | IVAN | USA | LIGHTWEIGHT |
| RIOS | RONNY | USA | FEATHERWEIGHT |
| ROBINSON | RAY | USA | WELTERWEIGHT |
| RODRIGUEZ | EDWIN | USA | LIGHT HEAVYWEIGHT |
| RODRIGUEZ | EMMANUEL | PUERTO RICO | BANTAMWEIGHT |
| RODRIGUEZ | SAUL | USA | SUPER FEATHERWEIGHT |
| ROJAS | JESUS | PUR | SUPER BANTAMWEIGHT |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)
Case 2:15-cv-03378-JFW-MRW Document 150-1 Filed 10/31/16 Page 67 of 83 Page ID
#:4502
HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 3**
**U.S. Managed Championship Caliber Boxers**

| Last Name | First Name | Country | Weight Class |
|---|---|---|---|
| ROSA | LUIS | USA | JUNIOR FEATHERWEIGHT |
| RUIZ | ANDY | USA | HEAVYWEIGHT |
| RUIZ | HUGO | MEXICO | SUPER BANTAMWEIGHT |
| RUSSELL | GARY | USA | FEATHERWEIGHT |
| SANCHEZ | GILBERTO | MEXICO | SUPER MIDDLEWEIGHT |
| SANTA CRUZ | LEO | USA | SUPER BANTAMWEIGHT |
| SANTIAGO | ALEXIS | USA | BANTAMWEIGHT |
| SCOTT | MALIK | USA | HEAVYWEIGHT |
| SELBY | LEE | UK | FEATHERWEIGHT |
| SELDIN | CLETUS | USA | SUPER LIGHTWEIGHT |
| SHABRANSKYY | VYACHESLAV | USA | LIGHT HEAVYWEIGHT |
| SHIMMELL | JORDAN | USA | HEAVYWEIGHT |
| SHUMENOV | BEIBUT | USA | CRUISERWEIGHT |
| SMITH | ISHE | USA | JUNIOR MIDDLEWEIGHT |
| SMITH | JOE | USA | LIGHT HEAVYWEIGHT |
| SOLIMAN | SAM | AUSTRALIA | MIDDLEWEIGHT |
| SOSA | JASON | USA | JR LIGHTWEIGHT |
| SPENCE | ERROL | USA | WELTERWEIGHT |
| STEVENS | CURTIS | USA | MIDDLEWEIGHT |
| STEVENSON | ADONIS | CANADA | LIGHT HEAVYWEIGHT |
| STIVERNE | BERMANE | HAITI/CANADA | HEAVYWEIGHT |
| SZPILKA | ARTUR | POLAND | HEAVYWEIGHT |
| TARVER | ANTONIO | USA | HEAVYWEIGHT |
| THURMAN | KEITH | USA | WELTERWEIGHT |
| TROUT | AUSTIN | USA | SUPER WELTERWEIGHT |
| VALDEZ | OSCAR | MEXICO | FEATHERWEIGHT |
| VARGAS | FRANCISCO | MEXICO | JUNIOR LIGHTWEIGHT |
| VARGAS | JESSIE | USA | WELTERWEIGHT |
| VASQUEZ | MIGUEL | MEXICO | LIGHTWEIGHT |
| VASQUEZ | SAMMY | USA | WELTERWEIGHT |
| VERDEJO | FELIX | PUERTO RICO | LIGHTWEIGHT |
| VILORIA | BRIAN | USA | LIGHT FLYWEIGHT |
| WADE | DOMINIC | USA | MIDDLEWEIGHT |
| WARD | ANDRE | USA | SUPER MIDDLEWEIGHT |
| WARREN | RAUSHEE | USA | BANTAMWEIGHT |
| WILDER | DEONTAY | USA | HEAVYWEIGHT |
| WILLIAMS | JULIAN | USA | SUPER WELTERWEIGHT |
| WILLIAMS | THOMAS | USA | LIGHT HEAVYWEIGHT |

Source:  See workpapers "Boxers Final.xlsx," "Events Final.xlsx" and "Rankings Final.xlsx."

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016 (DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 150-1 Filed 10/31/16 Page 68 of 83 Page ID #:4503

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 4**
**U.S. Promoted Championship Caliber Boxers**

| Last Name | First Name | Country | Weight Class |
|---|---|---|---|
| ALGIERI | CHRIS | USA | WELTERWEIGHT |
| ALI | SADAM | USA | WELTERWEIGHT |
| ALVAREZ | ELEIDER | CANADA | LIGHT HEAVYWEIGHT |
| ALVAREZ | SAUL | MEXICO | JUNIOR MIDDLEWEIGHT |
| ARREOLA | CRISTOBAL | USA | HEAVYWEIGHT |
| ARROYO | MCJOE | PUERTO RICO | SUPER FLYWEIGHT |
| ARROYO | MCWILLIAMS | PUERTO RICO | FLYWEIGHT |
| AVANESYAN | DAVID | USA | WELTERWEIGHT |
| BARRERA | SULLIVAN | USA | LIGHT HEAVYWEIGHT |
| BARRIOS | MARIO | USA | SUPER BANTAMWEIGHT |
| BARTHELEMY | RANCES | USA | SUPER FEATHERWEIGHT |
| BENAVIDEZ | DAVID | USA | SUPER MIDDLEWEIGHT |
| BENAVIDEZ | JOSE | USA | SUPER WELTERWEIGHT |
| BERTO | ANDRE | USA | WELTERWEIGHT |
| BETERBIEV | ARTUR | CANADA | LIGHT HEAVYWEIGHT |
| BEY | MICKEY | USA | LIGHTWEIGHT |
| BIZIER | KEVIN | CANADA | WELTERWEIGHT |
| BRADLEY | TIMOTHY | USA | WELTERWEIGHT |
| BREAZEALE | DOMINIC | USA | HEAVYWEIGHT |
| BRONER | ADRIEN | USA | WELTERWEIGHT |
| BROWNE | MARCUS | USA | CRUISERWEIGHT |
| BUNDRAGE | CORNELIUS | USA | LIGHT MIDDLEWEIGHT |
| BUNDU | LEONARD | ITALY | WELTERWEIGHT |
| BUTE | LUCIAN | CANADA | LIGHT HEAVYWEIGHT |
| CABALLERO | RANDY | USA | BANTAMWEIGHT |
| CAPARELLO | BLAKE | AUSTRALIA | SUPER MIDDLEWEIGHT |
| CARTAGENA | MIGUEL | USA | FLYWEIGHT |
| CASTELLANOS | ROBINSON | USA | FEATHERWEIGHT |
| CASTILLO | WALTER | NICARAGUA | SUPER LIGHTWEIGHT |
| CHARLO | JERMALL | USA | SUPER WELTERWEIGHT |
| CHARLO | JERMELL | USA | SUPER WELTERWEIGHT |
| CHAVEZ | JULIO | MEXICO | SUPER MIDDLEWEIGHT |
| CHILEMBA | ISAAC | SOUTH AFRICA | LIGHT HEAVYWEIGHT |
| COTA | JORGE | MEXICO | SUPER WELTERWEIGHT |
| COTTO | MIGUEL | PUERTO RICO | MIDDLEWEIGHT |
| CRAWFORD | TERENCE | USA | JUNIOR WELTERWEIGHT |
| CUNNINGHAM | STEVE | USA | HEAVYWEIGHT |
| DE LA HOYA | DIEGO | MEXICO | JUNIOR FEATHERWEIGHT |
| DE LA TORRE | HARMONITO | USA | LIGHTWEIGHT |
| DEGALE | JAMES | UK | SUPER MIDDLEWEIGHT |
| DEL VALLE | LUIS | PUERTO RICO | SUPER BANTAMWEIGHT |
| DEREVYANCHENKO | SERGIY | USA | MIDDLEWEIGHT |
| DIAZ | CHRISTOPHER | PUERTO RICO | FEATHERWEIGHT |
| DIAZ | FELIX | DOMINICAN REPUBLIC | SUPER LIGHTWEIGHT |
| DIAZ | JOSEPH | USA | JUNIOR FEATHERWEIGHT |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-1 Filed 10/31/16 Page 69 of 83 Page ID
#:4504

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 4**
**U.S. Promoted Championship Caliber Boxers**

| Last Name | First Name | Country | Weight Class |
|-----------|-----------|---------|--------------|
| DIRRELL | ANDRE | USA | SUPER MIDDLEWEIGHT |
| DIRRELL | ANTHONY | USA | SUPER MIDDLEWEIGHT |
| DONAIRE | NONITO | PHILIPPINES | JUNIOR FEATHERWEIGHT |
| DOUGLAS | ANTOINE | USA | MIDDLEWEIGHT |
| DOUGLAS | OMAR | USA | SUPER FEATHERWEIGHT |
| EASTER | ROBERT | USA | LIGHTWEIGHT |
| ESCANDON | OSCAR | COLOMBIA | SUPER BANTAMWEIGHT |
| FARMER | TEVIN | USA | JUNIOR LIGHTWEIGHT |
| FEDOSOV | ANDREY | RUSSIA | HEAVYWEIGHT |
| FELIX | JOSE | MEXICO | SUPER LIGHTWEIGHT |
| FIGUEROA | OMAR | USA | LIGHTWEIGHT |
| FLORES | BJ | USA | CRUISERWEIGHT |
| FLORES | MOISES | MEXICO | SUPER BANTAMWEIGHT |
| FONFARA | ANDRZEJ | USA | LIGHT HEAVYWEIGHT |
| FORTUNA | JAVIER | DOMINICAN REPUBLIC | SUPER FEATHERWEIGHT |
| FRAMPTON | CARL | UK | SUPER BANTAMWEIGHT |
| GARCIA | DANNY | USA | SUPER LIGHTWEIGHT |
| GARCIA | MIKEY | USA | FEATHERWEIGHT |
| GASSIEV | MURAT | RUSSIA | CRUISERWEIGHT |
| GLAZKOV | VYACHESLAV | USA | HEAVYWEIGHT |
| GLOWACKI | KRZYSZTOF | POL | JR HEAVYWEIGHT |
| GOLOVKIN | GENNADY | KAZ | MIDDLEWEIGHT |
| GOMEZ | EDDIE | USA | JUNIOR MIDDLEWEIGHT |
| GOMEZ | FRANCISCO | USA | JUNIOR WELTERWEIGHT |
| GONZALEZ | JHONNY | MEXICO | SUPER FEATHERWEIGHT |
| GRADOVICH | EVGENY | RUSSIA | FEATHERWEIGHT |
| GRANADOS | ADRIAN | USA | SUPER LIGHTWEIGHT |
| GUERRERO | ROBERT | USA | WELTERWEIGHT |
| GUZMAN | JONATHAN | DOMINICAN REPUBLIC | SUPER BANTAMWEIGHT |
| GVOZDYK | OLEKSANDR | UKRAINE | LIGHT HEAVYWEIGHT |
| HARRISON | TONY | USA | MIDDLEWEIGHT |
| HART | JESSE | USA | SUPER MIDDLEWEIGHT |
| HERNANDEZ | ANDREW | USA | SUPER MIDDLEWEIGHT |
| HERNANDEZ | JUAN | MEXICO | LIGHT FLYWEIGHT |
| HERRERA | MAURICIO | USA | JUNIOR WELTERWEIGHT |
| HUCK | MARCO | GERMANY | CRUISERWEIGHT |
| HUNTER | ERIC | USA | LIGHTWEIGHT |
| HURD | JARRETT | USA | SUPER WELTERWEIGHT |
| IMAM | AMIR | USA | SUPER LIGHTWEIGHT |
| ISLAM | KANAT | USA | WELTERWEIGHT |
| JACK | BADOU | GAMBIA/SWEDEN | SUPER MIDDLEWEIGHT |
| JACKSON | JOHN | USA | SUPER WELTERWEIGHT |
| JACOBS | DANIEL | USA | MIDDLEWEIGHT |
| JENNINGS | BRYANT | USA | HEAVYWEIGHT |
| JOHNSON | TUREANO | USA | MIDDLEWEIGHT |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-2 Filed 10/31/16 Page 70 of 83 Page ID
#:4505

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 4**
**U.S. Promoted Championship Caliber Boxers**

| Last Name | First Name | Country | Weight Class |
|---|---|---|---|
| KALAJDZIC | RADIVOJE | USA | LIGHT HEAVYWEIGHT |
| KAMEDA | TOMOKI | JAPAN | BANTAMWEIGHT |
| KAYODE | LATEEF | NIG | CRUISERWEIGHT |
| KHAN | AMIR | UK | WELTERWEIGHT |
| KHYTROV | IEVGEN | USA | MIDDLEWEIGHT |
| KIELCZEWSKI | RYAN | USA | SUPER FEATHERWEIGHT |
| KLIMOV | ANDREY | RUSSIA | SUPER FEATHERWEIGHT |
| KLITSCHKO | WLADIMIR | UKRAINE | HEAVYWEIGHT |
| KONO | KOHEI | JAPAN | SUPER FLYWEIGHT |
| KOROBOV | MATVEY | USA | MIDDLEWEIGHT |
| KOVALEV | SERGEY | USA | LIGHT HEAVYWEIGHT |
| LARA | ERISLANDY | USA | SUPER WELTERWEIGHT |
| LARA | JORGE | MEXICO | SUPER BANTAMWEIGHT |
| LEE | ANDY | IRE | MIDDLEWEIGHT |
| LEMIEUX | DAVID | CANADA | MIDDLEWEIGHT |
| LINARES | JORGE | JAPAN | LIGHTWEIGHT |
| LIPINETS | SERGEY | USA | JUNIOR WELTERWEIGHT |
| LOMACHENKO | VASYL | UKRAINE | FEATHERWEIGHT |
| LOPEZ | ABRAHAM | USA | FEATHERWEIGHT |
| LUBIN | ERICKSON | USA | SUPER WELTERWEIGHT |
| LUNDY | HENRY | USA | SUPER LIGHTWEIGHT |
| MAGDALENO | JESSIE | USA | FEATHERWEIGHT |
| MAGOMEDOV | ARIF | RUSSIA | MIDDLEWEIGHT |
| MARES | ABNER | USA | BANTAMWEIGHT |
| MARTIN | CHARLES | USA | HEAVYWEIGHT |
| MARTINEZ | KIKO | SPAIN | SUPER BANTAMWEIGHT |
| MARTINEZ | ROMAN | PUERTO RICO | SUPER FEATHERWEIGHT |
| MARTIROSYAN | VANES | USA | SUPER WELTERWEIGHT |
| MATTHYSSE | LUCAS | ARGENTINA | JUNIOR WELTERWEIGHT |
| MCCUMBY | TREVOR | USA | LIGHT HEAVYWEIGHT |
| MENDEZ | ARGENIS | USA | SUPER FEATHERWEIGHT |
| MIKHAYLENKO | DMITRY | RUSSIA | WELTERWEIGHT |
| MILLER | JARRELL | USA | HEAVYWEIGHT |
| MOLINA | CARLOS | USA | SUPER WELTERWEIGHT |
| MOLINA | ERIC | USA | CRUISERWEIGHT |
| MOLINA | JOHN | USA | WELTERWEIGHT |
| MOLINA | OSCAR | USA | WELTERWEIGHT |
| MONAGHAN | SEAN | USA | LIGHT HEAVYWEIGHT |
| MOSLEY | SHANE | USA | WELTERWEIGHT |
| NELSON | WILLIE | USA | SUPER MIDDLEWEIGHT |
| NJIKAM | HASSAN | CMR | MIDDLEWEIGHT |
| OROZCO | ANTONIO | USA | JUNIOR WELTERWEIGHT |
| ORTIZ | LUIS | USA | HEAVYWEIGHT |
| PACQUIAO | MANNY | PHILIPPINES | WELTERWEIGHT |
| PAYANO | JUAN | USA | BANTAMWEIGHT |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
Case 2:15-cv-03378-JFW-MRW Document 150-1 Filed 10/31/16 Page 71 of 83 Page ID
#:4506
(DKT. NO. 141)
HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 4**
**U.S. Promoted Championship Caliber Boxers**

| Last Name | First Name | Country | Weight Class |
|---|---|---|---|
| PEDRAZA | JOSE | PUERTO RICO | SUPER FEATHERWEIGHT |
| PEREZ | DARLEYS | USA | LIGHTWEIGHT |
| PEREZ | MICHAEL | USA | JUNIOR WELTERWEIGHT |
| PETERSON | LAMONT | USA | SUPER LIGHTWEIGHT |
| PETROV | PETR | SPAIN | LIGHTWEIGHT |
| PORTER | SHAWN | USA | WELTERWEIGHT |
| POSTOL | VIKTOR | UKRAINE | SUPER LIGHTWEIGHT |
| PROVODNIKOV | RUSLAN | RUSSIA | LIGHT WELTERWEIGHT |
| QUILLIN | PETER | USA | MIDDLEWEIGHT |
| RABCHENKO | SERGEY | BELARUS | SUPER WELTERWEIGHT |
| RAMIREZ | JOSE | USA | LIGHT WELTERWEIGHT |
| REDKACH | IVAN | USA | LIGHTWEIGHT |
| RIGONDEAUX | GUILLERMO | CUB | SUPER BANTAMWEIGHT |
| RIOS | RONNY | USA | FEATHERWEIGHT |
| ROBINSON | RAY | USA | WELTERWEIGHT |
| RODRIGUEZ | EDWIN | USA | LIGHT HEAVYWEIGHT |
| RODRIGUEZ | EMMANUEL | PUERTO RICO | BANTAMWEIGHT |
| RODRIGUEZ | SAUL | USA | SUPER FEATHERWEIGHT |
| ROJAS | JESUS | PUR | SUPER BANTAMWEIGHT |
| ROSA | LUIS | USA | JUNIOR FEATHERWEIGHT |
| RUIZ | ANDY | USA | HEAVYWEIGHT |
| RUIZ | HUGO | MEXICO | SUPER BANTAMWEIGHT |
| RUSSELL | GARY | USA | FEATHERWEIGHT |
| SANCHEZ | GILBERTO | MEXICO | SUPER MIDDLEWEIGHT |
| SANTA CRUZ | LEO | USA | SUPER BANTAMWEIGHT |
| SANTIAGO | ALEXIS | USA | BANTAMWEIGHT |
| SCOTT | MALIK | USA | HEAVYWEIGHT |
| SELBY | LEE | UK | FEATHERWEIGHT |
| SELDIN | CLETUS | USA | SUPER LIGHTWEIGHT |
| SHABRANSKYY | VYACHESLAV | USA | LIGHT HEAVYWEIGHT |
| SHAFIKOV | DENIS | RUSSIA | LIGHTWEIGHT |
| SHELESTYUK | TARAS | UKRAINE | SUPER WELTERWEIGHT |
| SHIMING | ZOU | CHINA | FLYWEIGHT |
| SHIMMELL | JORDAN | USA | HEAVYWEIGHT |
| SHUMENOV | BEIBUT | USA | CRUISERWEIGHT |
| SMITH | ISHE | USA | JUNIOR MIDDLEWEIGHT |
| SMITH | JOE | USA | LIGHT HEAVYWEIGHT |
| SOSA | JASON | USA | JR LIGHTWEIGHT |
| SPENCE | ERROL | USA | WELTERWEIGHT |
| STEVENS | CURTIS | USA | MIDDLEWEIGHT |
| STEVENSON | ADONIS | CANADA | LIGHT HEAVYWEIGHT |
| STIVERNE | BERMANE | HAITI/CANADA | HEAVYWEIGHT |
| SZPILKA | ARTUR | POLAND | HEAVYWEIGHT |
| TARVER | ANTONIO | USA | HEAVYWEIGHT |
| TEIXEIRA | PATRICK | BRAZIL | JUNIOR MIDDLEWEIGHT |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 150-1 Filed 10/31/16 Page 72 of 83 Page ID
#:4507

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 4**
**U.S. Promoted Championship Caliber Boxers**

| Last Name | First Name | Country | Weight Class |
|---|---|---|---|
| THEOPHANE | ASHLEY | UK | JUNIOR WELTERWEIGHT |
| THURMAN | KEITH | USA | WELTERWEIGHT |
| TROUT | AUSTIN | USA | SUPER WELTERWEIGHT |
| VALDEZ | OSCAR | MEXICO | FEATHERWEIGHT |
| VARGAS | FRANCISCO | MEXICO | JUNIOR LIGHTWEIGHT |
| VARGAS | JESSIE | USA | WELTERWEIGHT |
| VASQUEZ | MIGUEL | MEXICO | LIGHTWEIGHT |
| VASQUEZ | SAMMY | USA | WELTERWEIGHT |
| VERDEJO | FELIX | PUERTO RICO | LIGHTWEIGHT |
| VILORIA | BRIAN | USA | LIGHT FLYWEIGHT |
| WADE | DOMINIC | USA | MIDDLEWEIGHT |
| WALTERS | NICHOLAS | JAMAICA | FEATHERWEIGHT |
| WARD | ANDRE | USA | SUPER MIDDLEWEIGHT |
| WARREN | RAUSHEE | USA | BANTAMWEIGHT |
| WILDER | DEONTAY | USA | HEAVYWEIGHT |
| WILLIAMS | JULIAN | USA | SUPER WELTERWEIGHT |
| WILLIAMS | THOMAS | USA | LIGHT HEAVYWEIGHT |

Source:  See workpapers "Boxers Final.xlsx," "Events Final.xlsx" and "Rankings Final.xlsx."

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 5

Summary of Haymon Manager/Advisor Agreements

| Boxer | Advisor or Manager Contract | Contract Effective Date | Original Term Length | Provisions for Early Termination by Fighter (Other Than Material Breach or Criminal Act by Manager/Advisor) | Haymon Approval Required for All Promotion and Bout Agreements |
|---|---|---|---|---|---|
| Kanat Islam | Manager Contract | Sep. 2015 | 5 years | none | yes |
| Jordan White | Manager Contract | Sep. 2015 | 5 years | none | yes |
| Emmanuel Rodriguez Vazquez | Advisor Contract | Aug. 2015 | 5 years | none | yes |
| Hugo Ruiz | Advisor Contract | Aug. 2015 | 5 years | none | yes |
| Frank Galarza | Manager Contract | Aug. 2015 | 5 years | none | yes |
| Fabian Andres Maidana | Advisor Contract | Aug. 2015 | 5 years | none | yes |
| Lee Selby | Advisor Contract | Jul. 2015 | 3 years | none | yes |
| Alejandro Gonzalez, Jr. | Manager Contract | Jul. 2015 | 5 years | none | yes |
| James DeGale | Manager Contract | Jul. 2015 | 3 years or 10 bouts | none [1] | yes |
| Charles Martin | Advisor Contract | Jun. 2015 | 5 years | none | yes |
| Carlos Brian Castano | Advisor Contract | Jun. 2015 | 5 years | none | yes |
| McJoe Arroyo | Advisor Contract | Jun. 2015 | 5 years | none | yes |
| Titus Williams | Manager Contract | Jun. 2015 | 5 years | none | yes |
| Roman Martinez | Manager Contract | Jun. 2015 | 5 years | none | yes |
| Antonio DuBose | Manager Contract | Jun. 2015 | 5 years | none | yes |
| Eddie Chambers | Manager Contract | Jun. 2015 | 5 years | none | yes |
| Javier Francisco Maciel | Advisor Contract | Jun. 2015 | 5 years | none | yes |
| Carl Frampton | Advisor Contract | May. 2015 | 3 years | none | yes [2] |
| Eddie Ramirez | Advisor Contract | Apr. 2015 | 5 years | none | yes |
| Steve Cunningham | Advisor Contract | Apr. 2015 | 5 years | none | yes |
| Farah Ennis | Advisor Contract | Mar. 2015 | 5 years | none | yes |
| Artur Beterbiev | Advisor Contract | Mar. 2015 | 3 years | none | yes |
| Keith Tapia | Manager Contract | Mar. 2015 | 5 years | none | yes |
| Michael Seals | Manager Contract | Mar. 2015 | 5 years | none | yes |
| Alejandro Luna | Manager Contract | Mar. 2015 | 5 years | none | yes |
| Carlos Gongora | Manager Contract | Mar. 2015 | 5 years | none | yes |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-11 Filed 10/31/16 Page 74 of 83 Page ID #:4509

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 5
## Summary of Haymon Manager/Advisor Agreements

| Boxer | Advisor or Manager Contract | Contract Effective Date | Original Term Length | Provisions for Early Termination by Fighter (Other Than Material Breach or Criminal Act by Manager/Advisor) | Haymon Approval Required for All Promotion and Bout Agreements |
|---|---|---|---|---|---|
| Christopher Colbert | Manager Contract | Mar. 2015 | 5 years | none | yes |
| Hugo Centeno, Jr. | Manager Contract | Mar. 2015 | 5 years | none [3] | yes |
| Dejan Zlatikanin | Manager Contract | Feb. 2015 | 5 years | none | yes |
| John Wesley Nofire | Advisor Contract | Feb. 2015 | 5 years | none | yes |
| Sergey Rabchenko | Advisor Contract | Feb. 2015 | 5 years | none | yes |
| Timothy Lee | Manager Contract | Feb. 2015 | 5 years | none | yes |
| Maciej Sulecki | Manager Contract | Feb. 2015 | 5 years | none | yes |
| Edner Cherry | Manager Contract | Feb. 2015 | 5 years | none | yes |
| Marvin Sonsona | Advisor Contract | Feb. 2015 | 5 years | none | yes |
| Edgardo Lopez Sasso | Manager Contract | Jan. 2015 | 5 years | none | yes |
| Luis Rosario | Manager Contract | Jan. 2015 | 5 years | none | yes |
| Miguel Alejandro Cruz | Manager Contract | Jan. 2015 | 5 years | none | yes |
| Gabriel Campillo | Advisor Contract | Jan. 2015 | 5 years | none | yes |
| Kiko Martinez | Advisor Contract | Jan. 2015 | 5 years | none | yes |
| Reynaldo Ojeda | Advisor Contract | Jan. 2015 | 5 years | none | yes |
| Tugstsogt Nyambayar | Manager Contract | Jan. 2015 | 5 years | none | yes |
| Terrel Shawn Williams | Manager Contract | Jan. 2015 | 5 years | none | yes |
| Rickey Edwards | Manager Contract | Jan. 2015 | 5 years | none | yes |
| Ryan Kielczweski | Manager Contract | Jan. 2015 | 5 years | none | yes |
| Danny O'Connor | Manager Contract | Jan. 2015 | 5 years | none | yes |
| Eleider Alvarez | Advisor Contract | Jan. 2015 | 5 years | none | yes |
| Oscar Rivas | Advisor Contract | Jan. 2015 | 5 years | none | yes |
| Sammy Vasquez Jr. | Advisor Contract | Jan. 2015 | 5 years | none | yes |
| Ramont Clay | Advisor Contract | Jan. 2015 | 5 years | none | yes |
| Lucian Bute | Advisor Contract | Jan. 2015 | 5 years | none | yes |
| Andrzej Wawrczyk | Manager Contract | Jan. 2015 | 5 years | none | yes |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-11 Filed 10/31/16 Page 75 of 83 Page ID
#:4510

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 5**

Summary of Haymon Manager/Advisor Agreements

| Boxer | Advisor or Manager Contract | Contract Effective Date | Original Term Length | Provisions for Early Termination by Fighter (Other Than Material Breach or Criminal Act by Manager/Advisor) | Haymon Approval Required for All Promotion and Bout Agreements |
|---|---|---|---|---|---|
| Ivan Golub | Advisor Contract | Jan. 2015 | 5 years | none | yes |
| Alex Isiah Thomas | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Ievgen Khytrov | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Jose Pedraza | Manager Contract | Dec. 2014 | 5 years | none | yes |
| Philip Lo Greco | Manager Contract | Dec. 2014 | 5 years | none | yes |
| Argenis Mendez | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Claudio Marrero | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Domonique Dolton | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Erickson Lubin | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Felix Diaz | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Juan Carlos Payano | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Leo Hall | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Samuel Figueroa | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Yudel Jhonson | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Dennis Galarza | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Humberto Savigne | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Moises Flores | Advisor Contract | Dec. 2014 | 5 years | none | yes |
| Dauren Yeleussinov | Manager Contract | Dec. 2014 | 5 years | none | yes |
| Artur Szpilka | Manager Contract | Dec. 2014 | 5 years | none | yes |
| Carlos Ivan Velasquez | Manager Contract | Nov. 2014 | 5 years | none | yes |
| Leduan Barthelemy | Advisor Contract | Nov. 2014 | 5 years | none | yes |
| Mark Deluca | Manager Contract | Nov. 2014 | 5 years | none | yes |
| Ivan Redkach | Manager Contract | Nov. 2014 | 5 years | none | yes |
| Yasmany Consuegra | Advisor Contract | Nov. 2014 | 5 years | none | yes |
| Darwin Price, Jr. | Manager Contract | Oct. 2014 | 5 years | none | yes |
| Jarrett Hurd | Manager Contract | Oct. 2014 | 5 years | none | yes |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-11  Filed 10/31/16  Page 76 of 83  Page ID
#:4511

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 5

## Summary of Haymon Manager/Advisor Agreements

| Boxer | Advisor or Manager Contract | Contract Effective Date | Original Term Length | Provisions for Early Termination by Fighter (Other Than Material Breach or Criminal Act by Manager/Advisor) | Haymon Approval Required for All Promotion and Bout Agreements |
|---|---|---|---|---|---|
| Malcolm Alexander McAllister | Manager Contract | Oct. 2014 | 5 years | none | yes |
| Sergiy Derevyanchenko | Manager Contract | Oct. 2014 | 5 years | none | yes |
| Kevin Bizier | Manager Contract | Oct. 2014 | 5 years | none | yes |
| John Jackson | Advisor Contract | Sep. 2014 | 5 years | none | yes |
| Julius Jackson | Advisor Contract | Sep. 2014 | 5 years | none | yes |
| Juan Dominguez | Manager Contract | Sep. 2014 | 5 years | none | yes |
| Kamil Laszczyk | Manager Contract | Sep. 2014 | 5 years | none | yes |
| Patryk Szymanski | Manager Contract | Sep. 2014 | 5 years | none | yes |
| Omar Douglas, Jr. | Manager Contract | Sep. 2014 | 5 years | none | yes |
| Leonard Bundu | Advisor Contract | Sep. 2014 | 5 years | none | yes |
| Jamal James | Manager Contract | Sep. 2014 | 5 years | none | yes |
| Sergio Mora | Manager Contract | Sep. 2014 | 5 years | none | yes |
| Ionut Dan Ion | Advisor Contract | Sep. 2014 | 5 years | none | yes |
| Jorge Lara | Manager Contract | Sep. 2014 | 5 years | none | yes |
| Jonathan Gonzalez | Advisor Contract | Sep. 2014 | 5 years | none | yes |
| Oscar Escandon | Advisor Contract | Aug. 2014 | 5 years | none | yes |
| Yonatan Guzman | Advisor Contract | Aug. 2014 | 5 years | none | yes |
| Javier Santiago Fortuna Francisco | Advisor Contract | Aug. 2014 | 5 years | none | yes |
| Adam Kownacki | Manager Contract | Aug. 2014 | 5 years | none | yes |
| Walter Castillo | Advisor Contract | Aug. 2014 | 5 years | none | yes |
| Andrzej Fonfara | Advisor Contract | Aug. 2014 | 5 years | none | yes |
| Earl Anthony Newman, Jr. | Manager Contract | Aug. 2014 | 5 years | none | yes |
| Stephen A. Fulton, Jr. | Manager Contract | Aug. 2014 | 5 years | none | yes |
| Haskell Lydell Rhodes | Manager Contract | Jul. 2014 | 5 years | none | yes |
| Tony Harrison | Manager Contract | Jul. 2014 | 5 years | none | yes |
| Thomas Hill, Jr. | Manager Contract | Jul. 2014 | 5 years | none | yes |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-11   Filed 10/31/16   Page 77 of 83   Page ID
#:4512

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 5**

Summary of Haymon Manager/Advisor Agreements

| Boxer | Advisor or Manager Contract | Contract Effective Date | Original Term Length | Provisions for Early Termination by Fighter (Other Than Material Breach or Criminal Act by Manager/Advisor) | Haymon Approval Required for All Promotion and Bout Agreements |
|---|---|---|---|---|---|
| Erick Bone | Manager Contract | Jul. 2014 | 5 years | none | yes |
| Daiki Kameda | Manager Contract | Jul. 2014 | 5 years | none | yes |
| Koki Kameda | Manager Contract | Jul. 2014 | 5 years | none | yes |
| Tomoki Kameda | Manager Contract | Jul. 2014 | 5 years | none | yes |
| Travis Kauffman | Manager Contract | Jul. 2014 | 5 years | none | yes |
| Danny Kelly | Manager Contract | Jul. 2014 | 5 years | none | yes |
| Javontae Starks | Manager Contract | Jul. 2014 | 5 years | none | yes |
| Miguel Vazquez | Advisor Contract | Jun. 2014 | 3 years | none | yes |
| Roberto Garcia | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Vanes Martirosyan | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Olusegun Ajose | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Joshua Conley | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Oyewale Omotoso | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Tommy Logan | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Luis Cruz | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Ahmed Ebiali | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Caleb Truax | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Joey Hernandez | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Wilky Campfort | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Jordan Shimmell | Advisor Contract | Jun. 2014 | 5 years | none | yes |
| Phillip Jackson-Benson | Manager Contract | Jun. 2014 | 5 years | none | yes |
| Abner Mares | Manager Contract | May. 2014 | 5 years | none | yes |
| Carlos Molina | Manager Contract | May. 2014 | 4 years | none | yes |
| Milton Santiago | Advisor Contract | Apr. 2014 | 5 years | none | yes |
| Marcos Forestal | Manager Contract | Apr. 2014 | 5 years | none | yes |
| Marcos Anthony Hernandez | Manager Contract | Apr. 2014 | 5 years | none | yes |
| John Magda | Advisor Contract | Apr. 2014 | 5 years | none | yes |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-11   Filed 10/31/16   Page 78 of 83   Page ID
#:4513
HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 5

Summary of Haymon Manager/Advisor Agreements

| Boxer | Advisor or Manager Contract | Contract Effective Date | Original Term Length | Provisions for Early Termination by Fighter (Other Than Material Breach or Criminal Act by Manager/Advisor) | Haymon Approval Required for All Promotion and Bout Agreements |
|---|---|---|---|---|---|
| Benjamin Flores | Manager Contract | Apr. 2014 | 5 years | none | yes |
| Kyrone Davis | Manager Contract | Apr. 2014 | 5 years | none | yes |
| Alex Martin | Manager Contract | Apr. 2014 | 5 years | none | yes |
| Caleb Plant | Manager Contract | Apr. 2014 | 5 years | none | yes |
| Mario Barrios | Manager Contract | Apr. 2014 | 5 years | none | yes |
| Miguel Flores | Manager Contract | Apr. 2014 | 5 years | none | yes |
| David Grayton IV | Advisor Contract | Apr. 2014 | 5 years | none | yes |
| Immanuel Aleem | Advisor Contract | Apr. 2014 | 5 years | none | yes |
| Moshea Aleem | Advisor Contract | Apr. 2014 | 5 years | none | yes |
| Robert Guerrero | Advisor Contract | Mar. 2014 | 3 years or 5 bouts | none | yes |
| Bryant Richard Perrella | Manager Contract | Mar. 2014 | 5 years | none | yes |
| Dennis Hasson | Manager Contract | Mar. 2014 | 5 years | none | yes |
| Chrisshawn Alexander | Advisor Contract | Mar. 2014 | 5 years | none | yes |
| Rances Barthelemy | Advisor Contract | Mar. 2014 | 5 years | none | yes |
| Amir Khan | Advisor Contract | Mar. 2014 | 3 years | none | yes |
| Anthony Peterson | Advisor Contract | Feb. 2014 | 4 years | none | yes |
| Lamont Peterson | Advisor Contract | Feb. 2014 | 4 years | none | yes |
| Adonis Stevenson | Manager Contract | Feb. 2014 | 3 years | none | yes |
| John Molina | Manager Contract | Feb. 2014 | 5 years | none | yes |
| Chadwick Dawson | Manager Contract | Feb. 2014 | 5 years | none | yes |
| Luis Collazo | Advisor Contract | Feb. 2014 | 5 years | none | yes |
| Ryan Karl | Manager Contract | Feb. 2014 | 5 years | none | yes |
| Prichard Colon Melendez | Manager Contract | Feb. 2014 | 5 years | none | yes |
| Steve Lovett | Manager Contract | Feb. 2014 | 5 years | none | yes |
| Jamontay Javon Clark | Manager Contract | Jan. 2014 | 5 years | none | yes |
| Semajay Thomas | Manager Contract | Jan. 2014 | 5 years | none | yes |

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 5
Summary of Haymon Manager/Advisor Agreements

| Boxer | Advisor or Manager Contract | Contract Effective Date | Original Term Length | Provisions for Early Termination by Fighter (Other Than Material Breach or Criminal Act by Manager/Advisor) | Haymon Approval Required for All Promotion and Bout Agreements |
|---|---|---|---|---|---|
| Gervonta Davis | Manager Contract | Jan. 2014 | 5 years | none | yes |
| Kareem Martin | Manager Contract | Jan. 2014 | 5 years | none | yes |
| Jermell Charlo | Manager Contract | Jan. 2014 | 5 years | none | yes |
| Paulie Malignaggi | Advisor Contract | Dec. 2013 | 5 years | none | yes |
| Beibut Shumenov | Manager Contract | Dec. 2013 | 5 years | none | yes |
| Michael Hunter | Manager Contract | Nov. 2013 | 5 years | none | yes |
| Thomas Williams | Advisor Contract | Oct. 2013 | 5 years | none | yes |
| Stephen Shaw | Manager Contract | Oct. 2013 | 5 years | none | yes |
| Julio Cesar Chavez, Jr. | Manager Contract | Oct. 2013 | 5 years | none | yes |
| Kevin Watts | Manager Contract | Aug. 2013 | 5 years | none | yes |
| Tevin Watts | Manager Contract | Aug. 2013 | 5 years | none | yes |
| Marcos Maidana | Advisor Contract | Aug. 2013 | 5 years | none | yes |
| Edwin Rodriguez | Manager Contract | Aug. 2013 | 5 years | unknown [3] | yes |
| Dominic Wade | Advisor Contract | Aug. 2013 | 5 years | none | yes |
| Deontay Wilder | Manager Contract | May. 2013 | 5 years | none | yes |
| Brandon Bennett | Manager Contract | Feb. 2013 | 5 years | none | yes |
| Victor Ortiz | Manager Contract | Feb. 2013 | 5 years | none | yes |
| Justin Lorenzo Deloach | Manager Contract | Jan. 2013 | 5 years | none | yes |
| Raynell Williams | Manager Contract | Jan. 2013 | 5 years | none | yes |
| Willie D. Jones | Manager Contract | Dec. 2012 | 5 years | none | yes |
| Jermall Charlo | Manager Contract | Dec. 2012 | 5 years | none | yes |
| Robert Easter, Jr. | Manager Contract | Nov. 2012 | 5 years | none | yes |
| Jamel Herring | Manager Contract | Sep. 2012 | 5 years | none | yes |
| Marcus Browne | Manager Contract | Sep. 2012 | 5 years | none | yes |
| Errol Spence, Jr. | Manager Contract | Sep. 2012 | 5 years | none | yes |
| Manuel Robles, Jr. | Manager Contract | Sep. 2012 | 5 years | none | yes |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW Document 159-11   Filed 10/31/16   Page 80 of 83   Page ID
#:4515

HIGHLY CONFIDENTIAL
Subject to Protective Order

# Exhibit 5
## Summary of Haymon Manager/Advisor Agreements

| Boxer | Advisor or Manager Contract | Contract Effective Date | Original Term Length | Provisions for Early Termination by Fighter (Other Than Material Breach or Criminal Act by Manager/Advisor) | Haymon Approval Required for All Promotion and Bout Agreements |
|---|---|---|---|---|---|
| Leo Santa Cruz | Manager Contract | Aug. 2012 | 5 years | none | yes |
| Julian Williams | Manager Contract | Aug. 2012 | 5 years | none | yes |
| Terrell Gausha | Manager Contract | Aug. 2012 | 5 years | none | yes |
| Raushee Warren | Manager Contract | Aug. 2012 | 5 years | none | yes |
| Dominic Breazeale | Manager Contract | Aug. 2012 | 5 years | none | yes |
| Gerald Washington | Manager Contract | Jul. 2012 | 5 years | none | yes |
| Jose Lopez | Manager Contract | Jun. 2012 | 5 years | none | yes |
| Erislandy Lara | Advisor Contract | Jun. 2012 | 5 years | none | yes |
| J'Leon Love | Manager Contract | Jun. 2012 | 5 years | none | yes |
| Omar Figueroa Jr. | Advisor Contract | Apr. 2012 | 5 years | none | yes |
| Cristobal Arreola | Manager Contract | Apr. 2012 | 5 years | none | yes |
| Austin Trout | Advisor Contract | Mar. 2012 | 5 years | none | yes |
| Devon Alexander | Advisor Contract | Mar. 2012 | 4 years | none | yes |
| Anthony Dirrell | Advisor Contract | Mar. 2012 | 2 years | none | yes |
| Peter Quillin | Advisor Contract | Mar. 2012 | 3 years | none | yes |
| Daquan Carlos Arnett | Manager Contract | Oct. 2011 | 5 years | none | yes |
| Christopher Pearson | Advisor Contract | Oct. 2011 | 5 years | none | yes |
| Seth Mitchell | Advisor Contract | Feb. 2011 | 5 years | none | yes |
| Danny Garcia | Manager Contract | Jan. 2011 | 5 years | none | yes |
| Joseph Elegele | Manager Contract | Dec. 2010 | 5 years | none | yes |
| Keith Thurman | Manager Contract | Nov. 2010 | 5 years | none | yes |
| Adrien Broner | Advisor Contract | Nov. 2010 | 5 years | none | yes |
| Fernando Guerrero | Advisor Contract | Feb. 2010 | 5 years | none [5] | yes |
| Sakio Bika | Advisor Contract | Dec. 2009 | 5 years | none | yes |
| Shawn Porter | Advisor Contract | Dec. 2009 | 5 years | none | yes |
| Gary Russell, Jr. | Manager Contract | Dec. 2008 | 5 years | none | yes |

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW  Document 159-11   Filed 10/31/16   Page 81 of 83   Page ID
#:4516

HIGHLY CONFIDENTIAL
Subject to Protective Order

## Exhibit 5

Summary of Haymon Manager/Advisor Agreements

| Boxer | Advisor or Manager Contract | Contract Effective Date | Original Term Length | Provisions for Early Termination by Fighter (Other Than Material Breach or Criminal Act by Manager/Advisor) | Haymon Approval Required for All Promotion and Bout Agreements |
|---|---|---|---|---|---|
| Rico Ramos | Advisor Contract | Apr. 2008 | 5 years | none | yes |
| Daniel Jacobs | Manager Contract | Nov. 2007 | 5 years | none | yes |
| Ronald Hearns | Manager Contract | Mar. 2007 | 4 years | none | yes |
| Andre Berto | Manager Contract | Oct. 2005 | 3 years | none | yes |
| Enrique Ornelas | Manager Contract | Sep. 2005 | 4 years | none | yes |
| Librado Andrade | Manager Contract | Sep. 2005 | 4 years | none | yes |
| Paul Williams | Advisor Contract | Dec. 2004 | until 12/31/2008 | none | yes |

**Notes:**
**[1]:** Fighter can terminate the contract if manager is unable to perform services as a result of a court or aribtrator ruling.
**[2]:** Advisor's consent to a possible bout cannot be unreasonably withheld.
**[3]:** Fighter can terminate the contract if manager loses license to manage in the state of California or if manager becomes insolvent.
**[4]:** Produced contract is missing page 6 containing early termination section.
**[5]:** Fighter can terminate the contract if manager cannot perform the required services.

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016
(DKT. NO. 141)

Case 2:15-cv-03378-JFW-MRW   Document 159-11   Filed 10/31/16   Page 82 of 83   Page ID
#:4517

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 6**
**Summary of Haymon Contracts**

| Contract | Networks | Agreement Date | Term Period | Haymon Exclusivity [A] | Early Termination Provisions for Network | # of Time Slots | Paid by Haymon (Except as Indicated) |
|---|---|---|---|---|---|---|---|
| DEF000610<br>CBS Agreement | CBS<br>CBSSN | 1/22/2015 | Main Term<br>2015, 2016<br>Extension Option<br>2017<br><br>[DEF000610-000611] | Yes, Professional boxing bouts alone [B]<br><br>[DEF000615] | None | Original Contract Term<br>16<br>Including Extension Option<br>24<br><br>[DEF000610-000611] | Original Contract Term<br>$4,225,000<br>Including Extension Option<br>$6,375,000<br><br>[DEF000612 - DEF000613] |
| DEF000635<br>ESPN Agreement | ESPN<br>ESPN 2<br>ABC | | Main Term<br>7/1/2015 to 6/30/2017<br>Extension Option<br>7/1/2017 to 12/31/2017<br><br>[DEF000635] | Yes, live boxing events excluding Boxcino tournament events on ABC<br><br>[DEF000645] | None | Original Contract Term<br>24<br>Including Extension Option<br>30<br><br>[DEF000635 & 000644] | Original Contract Term [C]<br>$16,000,000<br>Including Extension Option<br>$20,000,000<br><br>[DEF000636] |
| DEF000635<br>Fox Agreement | Fox<br>Fox Sports 1<br>Fox Sports 2<br>FX | | Main Term<br>3/31/2015 to 9/30/2018 or 3 years following Haymon's delivery of the first event.<br>[DEF000668] | Yes, live boxing events [D]<br><br>[DEF000667] | None | Contract Total<br>Minimum of 27 fights.<br><br>[DEF000666] | Contract Total<br>$18,750,000<br><br>[DEF000669] |
| DEF000686<br>Showtime Letter Agreement | Showtime [E] | 1/22/2015 | None | None | None | Annually<br>6<br><br>[DEF000686] | Payment to Haymon per Event<br>$2,750,000<br>[DEF000686] |
| DEF000687<br>NBC Agreement | NBC<br>NBCSN | 4/7/2014 | Main Term<br>1/1/2015 to 12/31/2016<br>Extension Option<br>1/1/2017 to 12/31/2017<br>[DEF000687] | Yes, live or delayed pro boxing<br><br>[DEF000688] | None | Original Contract Term<br>44<br>Including Extension Option<br>66<br>[DEF000688-000689] | Original Contract Term<br>$28,800,000<br>Including Extension Option<br>$43,200,000<br>[DEF000700] |
| DEF000705<br>NBC Amended Agreement | NBC Amendment 1<br>NBC<br>NBCSN<br>NBC Sports Live Extra | 4/30/2015 | Main Term<br>1/1/2015 to 12/31/2016<br>Extension Option<br>1/1/2017 to 12/31/2017<br>[DEF000705] | Yes, live or delayed pro boxing<br><br>[DEF000706] | None | Original Contract Term<br>Up to 40<br>Including Extension Option<br>Up to 62<br>[DEF000707] | Original Contract Term<br>$30,800,000<br>Including Extension Option<br>$45,200,000<br>[DEF000720] |
| DEF000741<br>NBC Second Amended Agreement | NBC Amendment 2<br>NBC<br>NBCSN<br>NBC Sports Live Extra | 1/4/2016 | Main Term<br>1/1/2015 to 12/31/2016<br>Extension Option<br>1/1/2017 to 12/31/2017<br><br>[DEF000741] | Yes, live or delayed pro boxing [E]<br><br>[DEF000742] | None | Original Contract Term<br>Up to 35<br>Including Extension Option<br>Up to 53<br>[DEF000743] | Original Contract Term<br>$29,700,000<br>Including Extension Option<br>43,400,000<br>[DEF000755] |
| DEF000758<br>Spike TV Deal Memorandum | Spike TV | 12/11/2014 | Main Term<br>1/1/2015 to 12/31/2016<br>Extension Option<br>1/1/2015 to 12/31/2017<br><br>[DEF000758] | Yes, live boxing<br><br>[DEF000760] | None | Original Contract Term<br>22<br>Including Extension Option<br>34<br>[DEF000758] | Payment to Haymon per Event<br>$350,000<br>(Possible increases based on Nielson Ratings)<br>[DEF000759] |

Notes:

[A]    A "Yes" indicates Haymon is the exclusive sole provider of the indicated broadcasted product.

[B]    Excluding preexisting boxing agreements with third parties or undercard events tied to a Showtime main card event.

[C]    Of Haymon's $8,000,000 annual payments, ESPN will invest $4,000,000 in productions, marketing, and ABC Network time buy fees for the Events and Programs. If the optional 6 month extension is taken then $2,000,000 of the $4,000,000 paid by Haymon will be invested in the aforementioned.

[D]    Excluding preexisting boxing agreements with third parties as well as any regional sports networks, FOX College Sports, FOX's Spanish language networks, Big Ten Network, and any channels not fully owned and operated by FOX.

[E]    Letter agreement accompanying the CBS agreement of the same date but regarding commitments between the CBS subsidiary "Showtime".

REDACTED VERSION OF DOCUMENT FILED PARTIALLY UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED OCTOBER 28, 2016 (DKT. NO. 141)

Case 2:15-cv-01045-RFB-PAL   Document 159-11   Filed 10/31/16   Page 83 of 83   PageID #:4518

HIGHLY CONFIDENTIAL
Subject to Protective Order

**Exhibit 7**
**US-Televised Fights by Year by Station**
**PBC vs. Non-PBC Status**

| Year: 2016 | | BET | BOUNCE | CBS | ESPN | ESTRELLA | FOX SPORTS 1 | FOX | HBO | NBC | NBCSN | SHOWTIME | SPIKE | TELEMUNDO | TRUTV | UNIMAS | OTHER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Station | | | | | | | | | | | | | | | | | |
| PBC Fights | | 0 | 6 | 1 | 12 | 1 | 19 | 7 | 0 | 10 | 2 | 20 | 8 | 0 | 0 | 0 | 0 | 86 |
| Non-PBC Fights | | 2 | 0 | 16 | 0 | 38 | 1 | 0 | 27 | 0 | 0 | 2 | 0 | 4 | 0 | 27 | 2 | 119 |
| Total Fights Aired | | 2 | 6 | 17 | 12 | 39 | 20 | 7 | 27 | 10 | 2 | 22 | 8 | 4 | 0 | 27 | 2 | 205 |
| PBC Percent of Fights | | 0% | 100% | 6% | 100% | 3% | 95% | 100% | 0% | 100% | 100% | 91% | 100% | 0% | N/A | 0% | 0% | 42% |

| Year: 2015 | | BET | BOUNCE | CBS | ESPN | ESTRELLA | FOX SPORTS 1 | FOX | HBO | NBC | NBCSN | SHOWTIME | SPIKE | TELEMUNDO | TRUTV | UNIMAS | OTHER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Station | | | | | | | | | | | | | | | | | |
| PBC Fights | | 0 | 7 | 10 | 11 | 0 | 17 | 0 | 0 | 37 | 4 | 3 | 20 | 0 | 0 | 0 | 0 | 109 |
| Non-PBC Fights | | 0 | 0 | 8 | 39 | 15 | 45 | 7 | 42 | 2 | 0 | 37 | 0 | 4 | 12 | 13 | 1 | 225 |
| Total Fights Aired | | 0 | 7 | 18 | 50 | 15 | 62 | 7 | 42 | 39 | 4 | 40 | 20 | 4 | 12 | 13 | 1 | 334 |
| PBC Percent of Fights | | N/A | 100% | 56% | 22% | 0% | 27% | 0% | 0% | 95% | 100% | 8% | 100% | 0% | 0% | 0% | 0% | 33% |

| Year: 2014 | | BET | BOUNCE | CBS | ESPN | ESTRELLA | FOX SPORTS 1 | FOX | HBO | NBC | NBCSN | SHOWTIME | SPIKE | TELEMUNDO | TRUTV | UNIMAS | OTHER | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Station | | | | | | | | | | | | | | | | | |
| PBC Fights | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Non-PBC Fights | | 0 | 0 | 2 | 67 | 0 | 62 | 6 | 50 | 19 | 0 | 61 | 0 | 0 | 0 | 0 | 0 | 267 |
| Total Fights Aired | | 0 | 0 | 2 | 67 | 0 | 62 | 6 | 50 | 19 | 0 | 61 | 0 | 0 | 0 | 0 | 0 | 267 |
| PBC Percent of Fights | | N/A | N/A | 0% | 0% | N/A | 0% | 0% | 0% | 0% | N/A | 0% | N/A | N/A | N/A | N/A | N/A | 0% |

Notes:
A single fight aired on multiple stations is counted among each station's fight totals.

Sources:
See workpaper "Events_with_Promoter.xls."