# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN BOY PROMOTIONS, LLC, GOLDEN BOY PROMOTIONS, INC. And BERNARD HOPKINS,<br><br>          Plaintiffs,<br><br>     v.<br><br>ALAN HAYMON, ALAN HAYMON DEVELOPMENT, INC., HAYMON HOLDINGS, LLC, HAYMON SPORTS, LLC, HAYMON BOXING MANAGEMENT, HAYMON BOXING LLC, and RYAN CALDWELL,<br><br>          Defendants. | Case 2:15-cv-03378 JFW (MRWx) |

**Expert Report of
Gene Deetz, CPA/ABV, ASA, CFF**
September 6, 2016

Expert Report of Gene Deetz, September 6, 2016

## II. BACKGROUND

6. Plaintiff Golden Boy Promotions, LLC is a California limited liability company. Plaintiff Golden Boy Promotions, Inc. is a California corporation. Together they are called "Golden Boy."[1]

7. Defendant Alan Haymon owns Alan Haymon Development, Inc., Haymon Sports, LLC, Haymon Holdings, LLC (f/k/a KO Holdings, LLC, f/k/a Haymon Sports, LLC), Haymon Boxing LLC and Haymon Boxing Management LLC,[2] together referred to throughout this report as "Haymon".

8. As disclosed in Golden Boy's audited financial statements for the year ended December 31, 2014, the nature of Golden Boy's operations were described as follows:

> "The Company is primarily in the business of promoting professional boxers and arranging, staging, marketing, and otherwise exploiting boxing events and related activities."[3]

9. Golden Boy maintains their financial records on an event-by-event basis, with its largest revenue source from promoting events carried on broadcast media.[4] The relationship between Golden Boy and the broadcast media (HBO, Showtime, FOX, among others), and Golden Boy's ability to promote successful events requires, among other things, championship caliber boxers[5] and network timeslot availability.[6] The requirement for these two fundamental inputs for success is described by Golden Boy's Industry Expert, Gary Shaw ("Shaw"), as "product" and "platform."

10. From December 2014 through January 2016, Haymon was using the $500,000,000 received from Media Group Holdings ("MGH") for "Television Costs", "Fighter Costs", and "On-air Broadcast Fees."[7]

11. During 2015, certain of the network and cable broadcasters of the professional boxing matches entered into exclusive contracts with Haymon.[8]

---

[1] Second Amended Complaint, filed May 5, 2015 at ¶5.
[2] Second Amended Complaint at ¶6.
[3] Golden Boy Boxing, LLC and Subsidiaries. Consolidated Financial Statements Year Ended December 31, 2014 at page 5, footnote 1(a). (GBP008063 at 69).
[4] See Exhibit 1.
[5] On September 6, 2016 Robert Kneuper, PhD issued his Expert Report in this matter ("Kneuper Report"). As defined in the Kneuper Report, the base criteria for championship caliber boxers are those with a US based manager or promoter, as well as a television appearance within the preceding eighteen months and a current period top ten ranking in any of the fourteen weight classes, additionally including any former televised world champions within the last eighteen months.
[6] See the Expert Report of Gary Shaw ("Shaw Report") at pages 5 and 6.
[7] HAYMON_00002200 through HAYMON_00002335.
[8] See Appendix IV.

HIGHLY CONFIDENTIAL

3

12. In 2016 Haymon entered into a settlement with Top Rank (a promoter of championship caliber professional boxing matches), which included, among other things, Haymon's agreement to waive exclusivity provisions contained in Haymon's contracts with network and cable broadcasters of professional boxing matches.[9]

13. Issued on September 6, 2016, the Kneuper Report concludes that Haymon has reached a position of market power through "tying" and other exclusionary practices.[10]

    a. In summary, the Kneuper Report opines that[11]:

        i. Haymon has market power in the US market for managing championship caliber boxers and in the US market for promoting championship caliber boxers.

        ii. Haymon's anticompetitive actions have allowed it to lock up key inputs essential to effectively compete as a promoter, including championship caliber boxers and key broadcasters.

        iii. Haymon's anticompetitive actions have injured key competing boxing promoters, including Golden Boy.

        iv. Haymon's anticompetitive actions have also harmed, and are likely to harm, non-Haymon championship caliber boxers.

---

[9] Settlement Agreement and Release of Claims by and between Top Rank, Inc. and Alan Haymon effective May 5, 2016.
[10] Second Amended Complaint at ¶15.  *See also,* 15 U.S.C. § 6308(b).
[11] Kneuper Report.

HIGHLY CONFIDENTIAL

4

### III. SCOPE OF ENGAGEMENT

14. I have been asked by counsel for the Plaintiff, Golden Boy, to review and analyze financial data and documents related to the above-referenced litigation and to provide my expert opinions regarding damages, if any, suffered by Golden Boy as a result of Haymon's alleged anticompetitive practices in the boxing industry.

15. In addition to the financial data and documents, I have also reviewed the various filings in this matter, including Plaintiffs' complaints, Defendants' answer, and interrogatories, as well as the Kneuper and Shaw Reports. Appendix II contains a list of materials I considered.

16. My opinions are based on the facts of this case as I now understand them and the analyses described in this report. My work on this case is continuing and I reserve the right to revise or augment the findings and opinions set forth here in the event that additional information relevant to the issues I examined becomes available, in response to questions raised in my deposition, to take into account or reply to analyses offered by experts retained by Defendants, or for other reasons.

17. Navigant is charging an hourly rate of $750 for my time. Other Navigant personnel working under my direction assisted in my analyses. Navigant personnel are being compensated for their work at customary rates. This compensation is not contingent upon the substance of my testimony, my report, or the outcome of this matter.

HIGHLY CONFIDENTIAL

## IV. SUMMARY OF OPINIONS

18. I am relying on the opinions in the Kneuper Report and the Shaw Report, which conclude that Haymon is functioning as both a promoter of professional boxing matches and a manager of professional boxers.[12] I am further relying on the Kneuper Report's conclusions regarding the nature of the anticompetitive harm from Haymon's actions.[13] In performing my damages analyses, I assume antitrust liability.

19. Golden Boy's financial condition, measured by income from boxing operations, deteriorated from the end of 2014 through June 2016.

20. In 2015 and 2016, Golden Boy experienced a decline in the number of Golden Boy promoted championship caliber broadcast television events and associated revenues, and a decline in the number of championship caliber boxers on televised events.

21. From the end of 2014 through January 2016, Haymon spent a significant portion of the $500 million received from MGH on "Television Costs," "Fighter Costs," and "On-air Broadcast Fees."

22. I have evaluated Golden Boy's damages based on the hypothetical but-for analysis where Haymon only acts as a manager. Comparing that hypothetical scenario to the opinions as presented to me by the Kneuper and Shaw Reports, and assuming Haymon continues to block access to television broadcasters and fighters, Golden Boy's lost profits attributable to Haymon's alleged anticompetitive practices, measured by the decline in Golden Boy's income from boxing operations, are estimated to be $20.0 million. In the event that Haymon is forced to, either by court order or by market forces, or otherwise voluntarily lifts restrictions on boxers and television networks, such that Golden Boy is able to begin recovering, Golden Boy's lost profits are estimated to be in a range of $7.0 million to $8.4 million.[14]

---

[12] Kneuper Report. *See also,* Shaw Report at page 12.
[13] *See* ¶13
[14] The above damaged calculations incorporate a general negative industry growth rate assumption, taken from Integra Industry Growth Outlook Report 197.3 7941 PROFESSIONAL SPORTS CLUBS AND PROMOTERS. In Exhibit 5, in calculating the Net Damages, I have assumed the growth rates indicated from the Integra Industry Growth Outlook Report. I have selected these growth rates because they are the closest reported to the boxing industry. However, based on my work in this matter, I believe it is unlikely that the boxing industry will suffer these negative growth rates. Estimating damages using a conservative 2% long-term growth rate would increase the Scenario 2 Net Damages to $10.8m, the Scenario 3 Net Damages to $13.5m and the Scenario 4 Net Damages to $36.2m.

HIGHLY CONFIDENTIAL

33. During this same time period, Haymon entered into exclusive media contracts with CBS, ESPN, FOX, and NBC, and entered into a high volume event agreement with Spike TV. Tied to these contracts' exclusivity provisions, Haymon paid the networks substantial amounts of money as follows and as further described in Appendix IV.

| Network Contract | Net Amounts to be paid under Contract by Haymon | Reference to Exclusivity Provision |
|---|---|---|
| CBS | $ 4,225,000 | Per paragraph IV (i), "As additional consideration for the compensation paid by Licensor hereunder during the Term and within the Territory, neither CBS nor CBSSN (nor their affiliated websites) shall broadcast any professional boxing bouts (on a live or delayed basis)..." |
| ESPN | $ 8,000,000 | Per paragraph 1 (d), "ESPN shall provide Haymon Sports with exclusivity pertaining to live full length boxing Events appearing on ESPN, ESPN2, and ABC (on a national basis) as specified herein, and Haymon Sports shall pay to ESPN the monetary consideration set forth in Paragraph 4 of this agreement" |
| FOX | $ 12,500,000 | Per the "EVENT(S)" section, "During the Term, HAYMON shall be the exclusive live boxing match provider on FBC, FOX Sports 1, FOX Sports 2, FX, FXX and any other English-language national sports and/or entertainment television networks launched by and wholly owned and operated by FOX during the Term in the United States..." |
| NBC (Second Amended) | $ 13,500,000 | Per paragraph 3(b): "During the License Term, NBCUniversal shall work exclusively with Licensor in connection with any and all live or delayed professional boxing-related programming to be Exhibited on any English language NBC Sports platform..." |

34. The acquisition of exclusive broadcast network contracts (which include *the payment of fees to the networks*) and executing management and advisory contracts, that give control over the selection of promoter to Haymon (and include *a guaranteed higher purse than previously paid*) are considered in the Kneuper Report (and the Shaw Report) in reaching the opinion that Haymon was using anticompetitive business practices.[18]

---

[18] *See* ¶13. *Also see* Shaw Report at page 10.

HIGHLY CONFIDENTIAL

10

Expert Report of Gene Deetz, September 6, 2016

35. In Exhibits 1 and 3, I present my period-over-period analyses from 2014 through June 30, 2016, including the TV revenues and related events, as well as the boxers in these events, noting boxers of championship caliber. The analyses summarized in this exhibit show declines in Golden Boy's TV revenue, total revenue, and income from boxing operations, consistent with the anticompetitive impact of Haymon's business practices.[19]

36. In Appendix V, I have done a separate analysis of Golden Boy's contracts with broadcast networks. That analysis reveals that as Haymon began signing contracts with network broadcasters, Golden Boy's network contracts were not renewed on terms previously acceptable to the networks.[20]

37. The continuous and dramatic decline of Golden Boy's on-air events and revenues is occurring at the same time as Haymon enters into the aforementioned exclusivity clauses and makes the related cash payments to the various broadcast networks. *See* Exhibit 1 and Appendix IV.

38. The number of broadcast events and their associated revenues declined in 2015 and 2016, when compared to 2014, as presented in Exhibit 1. As I stated above, the relationship between Golden Boy and the broadcast media (HBO, Showtime, FOX, among others), and Golden Boy's ability to promote successful events requires, among other things, championship caliber boxers[21] and network timeslot availability.[22]

39. Appendices IV and V reflect both the Haymon and Golden Boy media contracts during 2014, 2015, and through June 30, 2016. These appendices demonstrate both the decrease in Golden Boy's access to broadcast media for potential promotion of championship caliber events and the results of Haymon's significant investment in network and cable broadcast timeslots.

40. Consistent with the decline in TV Revenue is a decline in both the number of championship caliber boxing events and the number of Golden Boy promoted championship caliber boxers. *See* Exhibit 1.

---

[19] *See* ¶13
[20] *See* Appendices IV and V.
[21] As defined in the Kneuper Report, the base criteria for championship caliber boxers are those with a US based manager or promoter, as well as a television appearance within the preceding eighteen months and a current period top ten ranking in any of the fourteen weight classes, additionally including any former televised world champions within the last eighteen months.
[22] The Shaw Report at pages 5 and 10 describes the promoters' requirement for both product and platform.

HIGHLY CONFIDENTIAL

11

    D. *Assuming Haymon continues to block access to television broadcasters and fighters, Golden Boy's lost profits attributable to Haymon's alleged anticompetitive practices, measured by the decline in Golden Boy's income from boxing operations, are estimated to be $20.0 million. In the event that Haymon is forced to, either by court order or by market forces, or otherwise voluntarily lifts restrictions on boxers and television networks, such that Golden Boy is able to begin recovering, Golden Boy's lost profits are estimated to be in a range of $7.0 million to $8.4 million.*

48. In considering damages in this matter, I have employed the following methodology:

    a. I have assumed in constructing a comparative but-for analysis that Haymon functions only as a manager during 2015 through June 30, 2016 (historical damage period). Additionally, I have incorporated this assumption into my analysis of damages subsequent to June 30, 2016.

    b. I obtained a list of all boxers under contract to Golden Boy during 2014, 2015, and through June 30, 2016.

        i. Based on the criteria as outlined in the Kneuper Report, I sort these lists into two categories, championship caliber boxer and all others.

    c. I analyzed all revenue and expenses associated with each event promoted by Golden Boy from January 1, 2014 through June 30, 2016. *See* Exhibit 3 and Appendix III.

        i. Each event contains a specific number of bouts. The total event revenues are listed by category, and those categories were allocated to specific boxers based on that individual boxers' TV appearance and each boxers' specific purse.

        ii. The expenses for each event were also allocated to individual boxers based on TV appearances and purse.

        iii. The resulting analysis computes a Golden Boy promoted income from boxing operations per event, also subdivided by championship caliber boxer.

    d. From the data analyzed in the preceding paragraph I present the year-over-year decline in the Golden Boy income from boxing operations (including Golden Boy promoted championship caliber broadcast television events and associated revenues). S*ee* Exhibit 3.

    e. I compare the 2014 income from boxing operations to the income from boxing operations from boxing from 2015 and June 30, 2016. *See* Exhibit 4.

    f. The difference in income from boxing operations earned in 2014 and the income from boxing operations earned in 2015 through June 30, 2016, adjusted for industry growth, is historical damages as reflected in Exhibit 5.

    g. For purposes of future damages and the possibility of Golden Boy recovering during some time period subsequent to June 30, 2016, I have presented a range of recovery assumptions and therefore a range of future damages as well as total damages. One recovery assumption is that Haymon continues his anticompetitive conduct and Golden Boy is unable to recover its lost profits. In the event that Haymon ceases his anticompetitive conduct, either voluntarily or by virtue of market forces or court order, I assume recovery periods which are generally within the current and extension periods of the Haymon TV contracts. *See* Exhibit 5 and Appendix IV.

49. During January and February of 2015, Haymon made certain payments totaling $14 million, addressing 22 fighters' relationships with Golden Boy.[23] Based on my review of the Settlement Agreement which governs these payments, I understand that these payments were designed to terminate certain exclusive promotional rights held by Golden Boy. However, nothing in the Settlement Agreement precludes Golden Boy from working with those fighters in the future (or alternative replacements, assuming Haymon does not engage in anticompetitive actions). Accordingly, for purposes of my damages analysis, I have assumed that this transaction did not negatively affect Golden Boy's ability to perform in 2015 and thereafter.

---

[23] Settlement and Release Agreement, dated as of August 5, 2014 and executed December 19, 2014 by and among Golden Boy and Haymon (GBP016201).

HIGHLY CONFIDENTIAL

50. In the but-for world, Haymon is operating only as a manager facing the entire market of boxing promoters. That market for boxing promotions would continue to include Golden Boy, and as various boxers within the promotions market rise or change in the various rankings, or for other reasons, such as an increase in popularity, there would be interaction between Haymon as a manager and all members of the boxing promotions market, including Golden Boy.[24]

51. Also, in the but-for world, Golden Boy would not lack the availability of traditional broadcast networks that were actually subject to Haymon's exclusive contract relations.

E. *I have considered and rejected as highly unlikely the hypothetical but-for analysis where Haymon acts only as a promoter.*

52. Haymon as a promoter-only market participant has been considered as an unlikely possibility. Haymon in a manager-only setting is consistent with the settlement Haymon reached with Top Rank, specifically Haymon's agreement to allow his managed fighters to enter into contractual promotional arrangements with any particular promoter.[25]

---

[24] In conducting my damage analysis, I have reviewed the financial and other promotional details, including each individual fighter and their respective opponents, for every event promoted by Golden Boy from 2014 through June 30, 2016. I have also reviewed a redacted version of the settlement between "Top Rank," who, according to http://www.toprank.com/about, bills themselves as the country's premiere boxing promotions company, and Haymon, which, among other things, required Haymon's best efforts in sending an irrevocable waiver of "all rights and benefits under each such Haymon Exclusivity Provision." *See also,* Shaw Report e.g., at pages 7 – 8.

[25] Settlement Agreement and Release of Claims by and between Top Rank, Inc. and Alan Haymon effective May 5, 2016.

HIGHLY CONFIDENTIAL

## VI. CONCLUSION

53. Based on my analysis, in the event that Haymon continues his anticompetitive conduct, including blocking Golden Boy and other promoters from television networks, I estimate Golden Boy's damages to be $20.0 million. This conclusion assumes that Haymon's anticompetitive conduct has permanently affected Golden Boy's ability to generate profits from its boxing promotions operations.

54. In the event that Haymon ceases his anticompetitive conduct, either voluntarily or by court order or market forces, I estimate Golden Boy's damages to be in a range of $7.0 million to $8.4 million. This conclusion assumes that Golden Boy will recover back to a state of normalcy sometime between the end of 2017 and the end of 2018. To the extent that recovery period takes longer, Golden Boy's damages would be greater.

By:

*/s/ Gene Deetz/*

Gene Deetz

Date: September 6, 2016

HIGHLY CONFIDENTIAL

16

**EXHIBIT 3**
**Analysis of Revenues and Expenses on an Event-by-Event, Boxer-by-Boxer Basis**

| 2014 Metrics | TV Revenue | Ticket Sales | Merchandise Royalty | Sponsorship Revenue | Co-Promotion Revenue Share | Other Revenue | Total Revenue | Fighter COGS | Other Expenses | Income from Boxing Operations |
|---|---|---|---|---|---|---|---|---|---|---|
| Not under contract - championship caliber | 18,540,738 | 8,468,935 | 17,506 | 865,028 | | 587,880 | 28,480,088 | 16,650,987 | 9,334,761 | 2,494,339 |
| Not under contract - not championship caliber | 46,182,928 | 20,833,965 | 57,319 | 2,039,902 | | 894,340 | 70,008,454 | 46,133,051 | 22,000,313 | 1,875,089 |
| Under contract - championship caliber | 28,972,751 | 8,582,634 | 16,413 | 855,513 | | 211,525 | 38,638,836 | 24,827,789 | 9,383,695 | 4,427,352 |
| Under contract - not championship caliber | 2,387,256 | 254,667 | 306 | 636,229 | | 42,951 | 3,321,409 | 1,732,290 | 1,556,056 | 33,063 |
| **Total 2014** | **96,083,673** | **38,140,201** | **91,545** | **4,396,672** | **-** | **1,736,696** | **140,448,787** | **89,344,118** | **42,274,826** | **8,829,843** |

| 2015 Metrics | TV Revenue | Ticket Sales | Merchandise Royalty | Sponsorship Revenue | Co-Promotion Revenue Share | Other Revenue | Total Revenue | Fighter COGS | Other Expenses | Income from Boxing Operations |
|---|---|---|---|---|---|---|---|---|---|---|
| Not under contract - championship caliber | 1,155,832 | - | - | - | - | (786,014) | 369,819 | 46,580 | 5,432 | 317,807 |
| Not under contract - not championship caliber | 2,070,179 | 1,286,869 | 2,179 | 770,673 | 25,200 | 139,584 | 4,294,684 | 2,896,388 | 1,872,290 | (473,994) |
| Under contract - championship caliber | 23,067,055 | 11,208,612 | 70,743 | 1,475,715 | 1,973,547 | 1,520,128 | 39,315,798 | 24,723,222 | 9,221,395 | 5,371,180 |
| Under contract - not championship caliber | 1,122,510 | 426,882 | 361 | 782,595 | 12,748 | (1,557) | 2,343,540 | 1,197,983 | 1,669,363 | (523,806) |
| **Total 2015** | **27,415,576** | **12,922,363** | **73,282** | **3,028,983** | **2,011,495** | **872,140** | **46,323,840** | **28,864,172** | **12,768,480** | **4,691,187** |

| 2016 Metrics | TV Revenue | Ticket Sales | Merchandise Royalty | Sponsorship Revenue | Co-Promotion Revenue Share | Other Revenue | Total Revenue | Fighter COGS | Other Expenses | Income from Boxing Operations |
|---|---|---|---|---|---|---|---|---|---|---|
| Not under contract - championship caliber | 2,552,411 | 927,047 | 6,508 | 150,363 | - | - | 3,636,328 | 2,050,000 | 1,211,661 | 374,667 |
| Not under contract - not championship caliber | 600,787 | 391,362 | 1,676 | 361,218 | - | - | 1,355,042 | 902,135 | 788,244 | (335,337) |
| Under contract - championship caliber | 19,000,689 | 6,664,961 | 49,762 | 1,214,355 | - | - | 26,929,767 | 14,711,458 | 9,087,663 | 3,130,645 |
| Under contract - not championship caliber | 191,508 | 230,493 | 1,315 | 260,064 | - | - | 683,381 | 542,630 | 510,097 | (369,347) |
| **Total 2016** | **22,345,395** | **8,213,863** | **59,260** | **1,986,000** | **-** | **-** | **32,604,518** | **18,206,224** | **11,597,665** | **2,800,629** |

Sources:
GBP008103
GBP008105
GBP008107
GBP016225
GBP016257
GBP016300
Rankings from http://www.ibfusbaregistration.com/
Rankings from http://www.wbaboxing.com/
Rankings from http://wbcboxing.com/
Rankings from http://www.wboboxing.com/
Rankings from http://www.fightnews.com/

HIGHLY CONFIDENTIAL

3

**EXHIBIT 5**
**Calculation of Damages**

| Haymon TV contracts (as reflected in Appendix IV) | Beginning Date of Agreement | End Date of Agreement (See Appendix IV) | | Extension Periods | Waiver Date of Exclusivity Provision Based on Top Rank Settlement |
|---|---|---|---|---|---|
| CBS | January 1, 2015 | December 31, 2016 | | December 31, 2017 | |
| ESPN | July 1, 2015 | | June 30, 2017 | December 31, 2017 | |
| FOX | March 31, 2015 | | | September 30, 2018 | |
| NBC | January 1, 2015 | December 31, 2016 | | December 31, 2017 | May 13, 2016 |
| Spike TV | January 1, 2015 | December 31, 2016 | | December 31, 2017 | |

| | 2014 | 2015 | 6-months ending June 30, 2016 | 2016 (annualized)[2] | Historical Damages before impact of Negative Industry Growth | 12/31/16 | 2017 | 2018 | Future Periods | Damages before Discounting and Adjustment for Forecast Industry Growth | Damages Adjusted for Discounting and Forecast Industry Growth[3] | Net Damages |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Income from Boxing Operations [1] | $ 8,829,843 | $ 4,691,187 | $ 2,800,629 | $ 5,601,257 | | | | | | | | |
| | | [2014 income from boxing less 2015] | [50% of 2014 income from boxing 6-months ending 2016] | [2014 income less annualized 2016] | | | | | | | | |
| | | 4,138,656 | 1,614,293 | 3,228,586 | $ 5,752,949 | | | | | | | |
| Scenario 1: Calculating damages based on the assumption that Haymon immediately ceases his anticompetitive conduct and there is a minimum effect on the time required for Golden Boy to re-establish network TV relationships and return to historical profitability. This calculation also assumes that Golden Boy, in a very short period of time, can mitigate all of the financial damage it has experienced in 2015 and 2016. In my opinion, this damage scenario is highly unlikely. | | | | | $ 5,752,949 | 1,614,293 | | | - | $ 7,367,242 | 2,003,874 | $ 5,363,368 |
| Scenario 2: Calculating damages based on the assumption that Haymon ceases his anticompetitive conduct and Golden Boy is able to mitigate all the financial damage it has experienced in 2015 and 2016 by the end of Haymon's TV contracts including extension periods. In my opinion, this a conservative damage scenario considering the full results of my analysis in this case. | | | | | $ 5,752,949 | 1,614,293 | 3,228,586 | | - | $ 10,595,828 | 3,607,339 | $ 6,988,490 |
| Scenario 3: Considers all of the effects of Scenario 2 and adds an additional year of damages to take into account the likelihood that there has been an extensive change in the way that boxing promoters and network television contract with each other, and even under these circumstances Golden Boy through all of its efforts returns to normal profitability by the end of 2018. In my opinion, this a reasonable damage scenario considering the full results of my analysis in this case.[4] | | | | | $ 5,752,949 | 1,614,293 | 3,228,586 | 3,228,586 | - | $ 13,824,414 | 5,447,899 | $ 8,376,515 |
| Scenario 4: Considers all of the effects summarized in Scenario 2 and Scenario 3, but also considers the possibility that either Haymon does not cease his anticompetitive conduct, or there is a permanent change in Golden Boy's relationship with the major TV networks (all but HBO continue not to pay licensing fees), and that the cost structure in the amounts paid to boxers remains at an increased level and even with Golden Boy's best efforts in other available areas to make additional profit, they do not return to normal levels of profitability. This damage calculation considers the damage to Golden Boy to be permanent in nature. | | | | | $ 5,752,949 | $ 1,614,293 | $ 3,228,586 | $ 3,228,586 | $ 30,173,701 | $ 43,998,115 | 23,960,632 | $ 20,037,483 |

Sources:

[1] *See* Exhibit 3

[2] The 6-month period ending June 30, 2016 operating income has been annualized by multiplying the amount by 2. The Company does not have current financial projections for the second half of 2016, and I am unaware of any other specific financial data that would inform this annualization differently. In my use of annualizing calculations and creating comparative 6-month time periods, I have considered both the first 6 months of performance in 2014 and the second 6 months of performance in 2014.

[3] Estimated cost of capital for Golden Boy, as per *2015 Valuation Handbook - Industry Cost of Capital*, from "Division I: Services, SIC 79, Amusement and Recreation Services. The major group includes establishments engaged in providing amusement or entertainment services, not elsewhere classified." Cost of Capital 13.0% (midpoint between CAPM+size premium and DCF 1-stage). Long-term growth estimated at 2.3% inflation rate (per BVR Economic Update 1Q2016 Summary). Discrete period Industry Growth/Decline rates as shown in the table below.

[4] Shaw Report, pages 8 -12.

Notes:

In calculating the Net Damages, I have assumed the growth rates indicated below from the Integra Industry Growth Outlook Report. I have selected these growth rates because they are the closest reported to the boxing industry. However, based on my work in this matter, I believe it is unlikely that the boxing industry will suffer these negative growth rates. Estimating damages using a conservative 2% long-term growth rate would increase the Scenario 2 Net Damages to $10.8m, the Scenario 3 Net Damages to $13.5m and the Scenario 4 Net Damages to $36.2m.

Source: Integra Industry Growth Outlook Report 197.3 7941 PROFESSIONAL SPORTS CLUBS AND PROMOTERS

**INDUSTRY REVENUE GROWTH**

| Historical Years | | Forecasted Years | |
|---|---|---|---|
| 2011 | 3.8% | 2016 | -5.0% |
| 2012 | 1.7% | 2017 | -4.1% |
| 2013 | 6.5% | 2018 | -2.8% |
| 2014 | 9.1% | 2019 | -2.1% |
| 2015 | -8.7% | 2020 | -1.4% |

HIGHLY CONFIDENTIAL

5