1  **GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP**
2  Bertram Fields (SBN 024199)
   BFields@ggfirm.com
3  Ricardo P. Cestero (SBN 203230)
   RCestero@GreenbergGlusker.com
4  1900 Avenue of the Stars, 21st Floor
   Los Angeles, California 90067-4590
5  Telephone: 310.553.3610
   Fax: 310.553.0687
6
   *Attorneys for Plaintiffs Golden Boy Promotions,*
7  *LLC, Golden Boy Promotions, Inc. and*
   *Bernard Hopkins*
8
   **QUINN EMANUEL URQUHART &**
9  **SULLIVAN, LLP**
   John B. Quinn (SBN 90378)
10 johnquinn@quinnemanuel.com
   Michael E. Williams (SBN 108542)
11 michaelwilliams@quinnemanuel.com
   Adam B. Wolfson (SBN 262125)
12 adamwolfson@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
13 Los Angeles, California 90017
   Telephone: 213.443.3000
14 Facsimile:  213.443.3100
15 *Attorneys for Defendants Haymon Boxing LLC,*
   *Haymon Sports LLC, Haymon Boxing*
16 *Management, and  Haymon Holdings LLC*
17 *[Additional counsel listed on signature page]*

18              **UNITED STATES DISTRICT COURT**

19      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

20 GOLDEN BOY PROMOTIONS,          | Case No. 2:15-cv-3378-JFW-MRW
21 LLC, *et al.*,                  |
                                   | **DEFENDANTS' MOTION IN**
22          Plaintiffs,            | **LIMINE NO. 2 TO EXCLUDE THE**
                                   | **TESTIMONY OF PLAINTIFFS'**
23                                 | **EXPERT ROBERT KNEUPER**
24          v.                     |
                                   | Hearing Date for Motions *in Limine*:
25 ALAN HAYMON, *et al.*,          | February 10, 2017 at 9:00 a.m.
                                   | Judge:  Hon. John F. Walter
26          Defendants.            | Courtroom:  7A
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pre-Trial Conference Date:  January 20, 2017 at 9:00 a.m.

Filing Date:  May 5, 2015
Trial Date:  March 14, 2017

DEFENDANTS' MOTION IN LIMINE NO. 2_TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT ROBERT KNEUPER

## IDENTIFICATION OF MATTERS IN DISPUTE

Defendants Alan Haymon, Alan Haymon Development, Inc., Haymon Boxing LLC, Haymon Boxing Management, Haymon Holdings LLC, and Haymon Sports LLC (collectively, the "Haymon Defendants") hereby move the Court to exclude the opinions of Robert Kneuper, Ph.D. offered by Plaintiffs Golden Boy Promotions, LLC and Golden Boy Promotions, Inc. (collectively, "GBP").  Dr. Kneuper was retained by GBP "to evaluate whether [the Haymon] Defendants have market power in a relevant U.S. market for managing Championship-Caliber Boxers and in a relevant U.S. market for promoting Championship-Caliber Boxers" and "to evaluate the past and likely future competitive effects of [the Haymon Defendants'] actions on boxers, boxing managers, and boxing promoters."  (Declaration of Adam B. Wolfson ("Wolfson Decl."), Ex. A (Expert Report of Robert Kneuper, Ph.D., dated September 6, 2016 ("Kneuper Rep.") at 5-6).)

In his Report, Dr. Kneuper expresses, *inter alia*, four opinions that the Haymon Defendants believe constitute inadmissible testimony under Federal Rule of Evidence 702:

- His definition of "Championship-Caliber Boxers" (*Id.* at 6);

- That there is a "U.S. market for managing Championship-Caliber Boxers" and a "U.S. market for promoting Championship-Caliber Boxers" (*Id.* at 6);

- That the Haymon Defendants had market power in "the U.S. market for managing Championship-Caliber Boxers" and "the U.S. market for promoting Championship-Caliber Boxers" (*Id.* at 6); and

- That the Haymon Defendants' alleged market power in these two markets stems from "'tying' the management of Haymon boxers to the promotion of Haymon boxers." (*Id.* at 6.)  According to Dr. Kneuper, "[t]he tie between managing and promoting creates a barrier to competition (at both the management level and the

DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT ROBERT KNEUPER

promotion level) and allows for the exercise of market power in both the tied and tying market." (*Id.* at 22.)

The Haymon Defendants dispute the admissibility of each of these opinions because Dr. Kneuper's testimony is not based upon sufficient facts or data, is not the product of reliable principles and methods, and is not the product of principals and methods applied reliably to the facts. *See* FED. R. EVID. 702. If the Haymon Defendants' motion to exclude Dr. Kneuper's testimony is not granted, Dr. Kneuper's testimony risks unfair prejudice in the form of confusing the issues and misleading or unduly influencing the jury, causing prejudice to the Haymon Defendants. As such, the Haymon Defendants respectfully request an order precluding Dr. Kneuper from offering these four opinions.

## SUMMARY OF THE PARTIES' POSITIONS

### The Haymon Defendants' Contentions

This Court serves an important gatekeeping function to ensure that an expert's testimony is both reliable and relevant. *U.S. v. Redlightning*, 624 F.3d 1090, 1111 (9th Cir. 2010); see Fed. R. Evid. 702 (expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue," and to be admissible "(1) the testimony [must be] based upon sufficient facts or data, (2) the testimony [must be] the product of reliable principles and methods, and (3) the witness [must] appl[y] the principles and methods reliably to the facts of the case."). "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F.Supp.3d 1050, 1068-69 (C.D. Cal. 2015) (quoting *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, 2007 WL 935703, *4 (S.D. Cal. Mar. 7, 2007)).

"Before admitting expert testimony, the trial court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*,

-2-

509 U.S. 579, 592-93 (1993)).  Expert testimony that "contain[ed] no empirical data or analysis to support many of its key assumptions" must be excluded.  *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031 (N.D. Cal. 2001).

Dr. Kneuper's testimony regarding the concept of a "Championship-Caliber Boxer," his definition of U.S.-limited markets for the promotion and management of those boxers, and his determination that the Haymon Defendants have market power in those markets is fundamentally flawed and does not meet the standard required by Federal Rule of Evidence 702.  *First*, Dr. Kneuper's concept of a "Championship-Caliber Boxer" is not an industry-recognized term, is not supported by the authority he cites, and is a manufactured-for-litigation term divorced from what boxers achieve elite levels and recognition in the industry.  *Second*, Dr. Kneuper's definition of U.S.-limited markets for the promotion and managing of those boxers fails because he cannot justify his geographical limitation, which does not reflect the economic reality of the boxing industry.  *Third*, Dr. Kneuper cannot demonstrate that the Haymon Defendants have market power in these purported markets because, while he admits that the absence of barriers to entry preclude a would-be monopolist from exercising market power, he did not analyze the barriers in his proposed markets and other testimony indicates that there are no such barriers.  *Fourth and finally*, Dr. Kneuper cannot demonstrate that the Haymon Defendants have market power in either market because, contrary to Ninth Circuit law, Dr. Kneuper assumes that a defendant with no market power in either of two separate markets can have market power in both if the defendant ties its products in each market together.  For each of the foregoing reasons, Dr. Kneuper's testimony fails to meet the standard required by Federal Rule of Evidence 702 and should be excluded.

**Plaintiffs' Contentions**

Once a court makes the "preliminary" determination that a witness qualifies as an expert,[1] the focus shifts to that witness's proffered testimony.  *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1153 (E.D. Wash. 2009) (citing *Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001)).  Under a two-part inquiry for determining admissibility of expert opinion testimony, expert testimony must be both relevant and reliable, which requires consideration of (1) whether the reasoning or methodology underlying the testimony is reliable, and (2) whether that reasoning or methodology properly can be applied to the facts in issue, such that it is relevant.  *Id*. (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993).

Importantly however, the Federal Rules of Evidence are intended to relax "the traditional barriers to opinion testimony."  *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993) (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)).  As such, the burden for establishing that an expert's opinion is admissible is not extraordinarily high.  For example, the proper approach to expert testimony that is purportedly "shaky" is to attack it "by cross examination, contrary evidence, and attention to the burden of proof *not exclusion*."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (emphasis added).  "When an expert meets the threshold established by Rule 702…the expert may testify and the jury decides how much weight to give that testimony."  *Id*.; *See also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("[M]ere weaknesses in the factual basis of an expert witness' opinion…bear on the weight of the evidence rather than on its admissibility") (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336,342 (6th Cir. 1993)).  Moreover, experts are permitted to speculate in reaching their conclusions.

---

[1] The parties do not dispute that Dr. Kneuper qualifies as an expert.

Case No. 2:15-cv-3378-JFW-MRW
DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT ROBERT KNEUPER

*Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003) ("A certain amount of speculation is necessary, an even greater amount is permissible (*and goes to the weight of the testimony*), but too much is fatal to admission.").

As explained in more detail below, and contrary to Defendants' contentions, Dr. Kneuper's opinions are supported by accepted antitrust economic theories and are sufficiently based the available facts and data, making them admissible.

Specifically, Dr. Kneuper's definition of what constitutes a "Championship Caliber Boxer" ("CCB") is based on objective criteria developed by interviewing Golden Boy Promotions ("GBP") principals, reviewing the expert report of Gary Shaw who is a boxing industry expert and reviewing boxing industry trade publications and academic articles. Likewise, Dr. Kneuper appropriately limited his geographic market definition to the U.S. after considering whether the inclusion of foreign managers and/or promoters would have a significant economic impact on his market limitation—it does not. Dr. Kneuper considered and analyzed barriers to entry in both the U.S. market for management of CCBs and the U.S. market for promotion of CCBs in concluding that Defendants have market power in both of the relevant markets. Finally, Dr. Kneuper properly determined that Defendants have market power in both of the relevant markets by establishing that Defendants have market dominance in the U.S. market for boxing management of CCBs and that— through various anticompetitive means recognized among economists—achieved market power by tying the U.S. markets for boxing management and promotion of CCBs.

Dr. Kneuper's opinions are based on sufficient facts and data and are therefore admissible. To the extent Defendants contend that Dr. Kneuper's opinions are speculative and/or have a weak foundation in fact—which they do not—the proper remedy is for Defendants to attack the credibility of Dr. Kneuper's testimony at trial.

# ARGUMENT

## I.   Opinion:  Definition of "Championship-Caliber Boxers"

### The Haymon Defendants' Arguments

Dr. Kneuper's market analysis rests on a fundamentally flawed concept:  that of a "Championship-Caliber Boxer" (a "CCB").  He uses this concept to extrapolate two markets—those for promotion and managing U.S.-based Championship-Caliber Boxers.  (Wolfson Decl., Ex. A (Kneuper Rep. at 19-24).)   He finds that the Haymon Defendants have market power in these alleged markets (*Id.* at 24-30), and that the Haymon Defendants have excluded GBP from these markets (*Id.* at 30-46).  However, because the concept of a "Championship-Caliber Boxer" is fundamentally flawed (because it is made up and against the evidence), Dr. Kneuper's entire analysis is neither reliable nor relevant.  *U.S. v. Redlightning*, 624 F.3d 1090, 1111 (9th Cir. 2010).

Dr. Kneuper's definition of a CCB purportedly "focus[ed]  on industry-recognized objective measures that are associated with boxers that have relatively high economic value including that they are highly ranked (e.g., in the top 5 or 10 in a weight class), that they are former champions, that they command a high purse size and that they have value to the television networks."  (Wolfson Decl., Ex. A (Kneuper Rep. ¶ 26).)  More specifically, Dr. Kneuper states that he:

> include[d] any boxer: (1) who has been ranked in the top 10 in any of the 14 weight classes by any of the four sanctioning bodies (WBA, WBC, WBF and IBF) during 2016; and (2) who has appeared on U.S. television at least one time since January 2015; I additionally add[ed] any boxer: (1) who has been classified as a worldwide champion (a number one ranking) in any of the 14 weight classes by any of the sanctioning bodies since January 2014; and (2) who have appeared on U.S. television since January 2015.

(*Id.* at ¶ 61.)  However, even while doing so, Dr. Kneuper acknowledged that "the specific definition of what constitutes a Championship-Caliber Boxer may differ

1  somewhat within the boxing industry." (*Id.* at ¶ 26.)  He again conceded this at his

2  deposition.  (Wolfson Decl., Ex. B (Deposition of Robert Kneuper ("Kneuper

3  Dep.") 210:16-212:3).)

4      Dr. Kneuper purported to base his definition and the criteria he used to

5  categorize CCBs on a single interview with Eric Gomez, Robert Diaz and Julio

6  Ramirez of GBP, conducted on August 30, 2016.  (Wolfson Decl., Ex. A (Kneuper

7  Rep. ¶ 26 at n. 28, 29 & 30).)  However, this interview cannot have provided the

8  "facts or data" underlying Dr. Kneuper's report because Dr. Kneuper's definition of

9  a CCB is wholly inconsistent with what those GBP principals actually told him.

10     Mr. Gomez, for example, testified that a CCB is (i) the actual champion in

11 one of the 17 weight divisions of the four major sanctioning bodies' rankings, or

12 (ii) a contender that is ranked in the top three to five boxers of a weight division in

13 each major sanctioning body's rankings.  (Wolfson Decl., Ex. F (Gomez Dep.

14 320:11-25; 321:19-322:6; 323:14-324:7; 428:18-22.)  Mr. Gomez acknowledged

15 that these rankings change monthly, such that a boxer could be a CCB one month,

16 but not in another month depending on the rankings.  (*Id.* at 326:1-12.)  Mr. Gomez

17 told Dr. Kneuper this definition in their interview.  (*Id.* at 428:3-429:6.)  Mr. Diaz

18 and Mr. Ramirez also participated in that interview, and neither of them disagreed

19 with Mr. Gomez's definition.  (Wolfson Decl., Exs. C (Deposition of Roberto Diaz

20 ("Diaz Dep.") 337:25-338:4) and D (Deposition of Julio Ramirez ("Ramirez Dep."

21 155:24-156:7).)

22     However, at his deposition, Mr. Diaz contradicted both Mr. Gomez and Dr.

23 Kneuper.  Mr. Diaz testified that in his view, a CCB is only a current champion, a

24 former champion, or someone who at least fought for a championship belt; to him,

25 unlike to Dr. Kneuper or Mr. Gomez, rankings have nothing to do with the inquiry.

26 (Wolfson Decl., Ex. C (Diaz Dep. 34:11-35:12; 105:14-106:4; 113:13-25; 114:22-

27 115:4; 115:9-16; 159:8-160:10).)

28     And Gary Shaw, GBP's proffered boxing industry expert, offered a fourth set

-7-

of criteria.  He testified that he believes the definition of a CCB is an *inherently subjective question* based on factors such as "skill," "looks," and "personality." (Wolfson Decl., Ex. E (Deposition of Gary Shaw ("Shaw Dep.") 256:2-257:3; 261:11-18).)

This disagreement between GBP's principals exemplifies why GBP cannot bear its burden of demonstrating that Dr. Kneuper's testimony "is based on sufficient facts or data." FED. R. EVID. 702(b).  Dr. Kneuper's opinion has been contradicted by *the primary authority* he cites for his facts—his interview with the GBP principals.[2]  Those principals acknowledged that there is no recognized or objective industry meaning of CCB; as such, a market definition based on that concept must be rejected.  *See U.S. v. Oracle*, 331 F. Supp. 2d 1098, 1102 (N.D. Cal. 2004) (rejecting market definition in part because the term "high-function software" "as defined by plaintiffs, has no recognized meaning in the industry"); ; *Mesirow v. Pepperidge Farm, Inc.*, 1981 WL 2138, at *9 (N.D. Cal. Aug. 31, 1981), *aff'd*, 703 F.2d 339 (9th Cir. 1983) (subjective criteria are insufficient to define a relevant market where they are incapable of objective evaluation).

### Plaintiffs' Arguments

Defendants attempt to undermine Dr. Kneuper's definition of Championship Caliber Boxer ("CCB") by focusing on his purported admission that the "definition of what constitutes a Championship Caliber Boxer may differ somewhat within the industry."  However, in doing so, Defendants ignore that Dr. Kneuper's criteria for defining a CCB is based *exclusively* on objective facts and data.  Thus, Dr.

---

[2]  That the notion of a "Championship-Caliber Boxer" is a subjective, amorphous, and made-for-litigation concept is underscored further by the fact that GBP's damages expert categorized *47* boxers as "Championship-Caliber" that Dr. Kneuper's Report did not, even though GBP's proffered damages expert claimed to apply the same methodology as Dr. Kneuper.  (*See* Defendants' Motion *in Limine* No. 1)

-8-

Case No. 2:15-cv-3378-JFW-MRW
DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT ROBERT KNEUPER

1   Kneuper's opinion as to what constitutes a CCB is admissible under Fed. R. Evid.

2   702.

3           Specifically, Dr. Kneuper's criteria for categorizing a boxer as a CCB

4   focuses on "industry-recognized objective measures that are associated with boxers

5   who have relatively high economic value including that they are highly ranked (e.g.,

6   in the top 5 or 10 in a weight class), they are former champions, that they command

7   a high purse size and they have value to television networks." Kneuper Report at

8   ¶26.  As Dr. Kneuper notes, "these are useful objective measures recognized in the

9   industry as indicating that a boxer has substantial economic value to a manager

10  and/or promoter." *Id.*

11          Defendants repeatedly allege that Dr. Kneuper's "primary authority" for his

12  facts was an interview with two GBP principals.  However, this misstates the facts.

13  Dr. Kneuper's "primary authority" for his definition of what constitutes a CCB is

14  the objective criteria he cites.  Dr. Kneuper developed that criteria by interviewing

15  GBP principals, reviewing the expert report of Gary Shaw who is a boxing industry

16  expert, and reviewing boxing industry trade publications and academic articles.

17  Kneuper Report at ¶¶26-30, Ex. 2.  After developing the relevant set of objective

18  criteria, Dr. Kneuper reviewed the relevant facts and data—e.g., rankings from the

19  boxing industry's sanctioning bodies and participation in televised bouts—and

20  applied this criteria to determine which boxers can objectively be defined as CCBs.

21  *Id.* at ¶¶26-30

22          The cases Defendants cite for their contention that Dr. Kneuper's

23  definition of what constitutes a CCB is "made up" and/or "made –for-litigation" are

24  inapposite.  Specifically, Defendants rely on *U.S. v. Redlightning* in asserting that

25  Dr. Kneuper's definition is "neither reliable nor relevant" because it is "made up and

26  against the evidence."  However, in *Redlightning*, there was "nothing in the record"

27  to support the defendant's theory of false confession and in fact, "the record

28  affirmatively showed no probability" for the expert's proffered opinion.  *U.S. v.*

-9-

*Redlightning,* 624 F.3d 1090, 1111 (9th Cir. 2010) (Expert testified "that nothing in the record…showed than any coercive tactic that may lead to a false confession was used when the FBI questioned Redlightning").

Here, on the other hand, Dr. Kneuper painstakingly sets forth in great detail the evidence on which he bases his opinion of what constitutes a CCB. *See*, Kneuper Report at ¶¶26-30, 61. As the Court in *Redlightning* expressly noted, "an expert's opinion must be based on sufficient facts or data, and the witness must be able to apply the principles and methods reliably to the facts of the case." *Id.* As noted above, Dr. Kneuper reviewed the facts and data, developed objective criteria for determining what constitutes an economically valuable boxer, and applied that criteria—in light of the available facts and data—to determine which boxers meet the definition of a CCB.

Defendants' reliance on *U.S. v. Oracle* is likewise misplaced. There, the Court was not deciding whether to admit an expert's testimony regarding product definition. Rather, the Court was deciding—after hearing conflicting testimony from experts on the topic, whether to find in favor of the plaintiff's product definition. In discussing the product definition, the Court noted that the term "high function software" was a term adopted by the plaintiffs to describe "the separate and distinct line of commerce" at issue in the case. 331 F.Supp.2d 1098, 1102. However, the fact that the term was not recognized within the relevant industry was not determinative of the Court's decision.[3] Rather, there the Court rejected plaintiff's product definition because "[i]n resolving the battle of the expert witnesses on product definition…Oracle's witnesses presented the better and more

---

[3] Plaintiffs contend that Championship Caliber Boxer is an industry-recognized term. *See e.g.* Kneuper Report, ¶26, note 31. However, for purposes of defining the product at issue in this case, its recognition among the industry is irrelevant.

1  convincing case." *Id.* at 1158.  The *Oracle* decision makes no finding regarding the

2  admissibility of expert testimony, and in fact, the Court admitted and considered the

3  testimony of both plaintiff's and defendant's experts on the topic of product

4  definition.

5       *Mesirow v. Pepperidge Farm, Inc.,* 1981 WL 2138 (N. D. Cal. Aug. 31, 1981)

6  is similarly distinguishable.  There, plaintiffs contended that the relevant product

7  market was "premium cookies" "made with top quality ingredients." *Id.* at *9.  The

8  Court specifically noted that plaintiffs did not offer any objective standards by

9  which to determine what constitutes a "premium cookie." *Id.* ("The relevant

10  product market is not to be defined by advertising slogans and plaintiffs have

11  submitted no authorities to help in this process.").  Unlike plaintiffs in *Mesirow*, as

12  explained in detail above, here Dr. Kneuper provided ample evidence of objective

13  criteria in support of his product definition.  Moreover, as in *Oracle*, the *Mesirow*

14  Court's discussion of the relevant product market was not in the *Daubert* context.

15  Rather, the issues before the Court were cross-motions for summary judgment.

16  Therefore, the Court's discussion of the sufficiency of the product market definition

17  is wholly irrelevant to the admissibility of Dr. Kneuper's opinion regarding product

18  definition.

19       Moreover, Defendants' contention that Dr. Kneuper's definition is contrary to

20  the testimony of Golden Boy's witnesses is simply not true.  Eric Gomez testified

21  that, to him, the words Championship Caliber Boxer included boxers who were

22  highly ranked or were world champions.  Gomez Depo., 320:11-25.  Mr. Diaz

23  similarly testified that Championship Caliber Boxers include world champions and

24  those who are highly ranked enough to fight for a world title.  Diaz Depo., 106:1-18;

25  113:13-25.  Plaintiffs' boxing expert, Gary Shaw has also made clear that numerous

26  factors go into determining whether a fighter is a Championship Caliber Boxer,

27  including, among others, record, ranking, television appearances and the like.

28

1  Declaration of Gary Shaw in Support of Oppositions to Motions for Summary

2  Judgment, Dkt. 235, ("Shaw Decl."), ¶ 19.

3       All of this testimony is fully consistent with Dr. Kneuper's conclusions.  Each

4  of these witnesses focuses on winning championships, obtaining a high ranking and

5  appearing on television.  That Dr. Kneuper chose a top 10 ranking, rather than top 5

6  or top 15 does not make his opinions inadmissible.  Rather, it demonstrates that Dr.

7  Kneuper did exactly what an economist should do.  He collected the relevant data,

8  applied numerous stress tests to that data and came to a fully reasoned opinion as to

9  the most accurate objective measure of what constitutes a Championship Caliber

10 Boxer.  That is all that is required of an expert witness.

11      Simply put, Defendants may disagree with Dr. Kneuper's definition of CCBs.

12 They also may attack that opinion by pointing to alternate criteria.  However, all of

13 this goes to the weight of Dr. Kneuper's opinions and does not justify exclusion of

14 his testimony in its entirety.

15 **II.**    **Opinion:  That There Is A "U.S. Market For Managing Championship-**
      **Caliber Boxers" And A "U.S. Market For Promoting Championship-**

16       **Caliber Boxers"**

17

18                 **The Haymon Defendants' Arguments**

19      Building on his concept of CCBs, Dr. Kneuper opines in his report that the

20 relevant antitrust markets in this case are the "U.S. market for managing

21 Championship-Caliber Boxers" and the "U.S. market for promoting Championship-

22 Caliber Boxers."  (Wolfson Decl., Ex. A (Kneuper Rep. at 6).)  Dr. Kneuper

23 attempts to justify his geographic market limit by stating that foreign promoters

24 "lack . . . localized knowledge, relationships and experience.  (*Id.* at ¶ 54.)  He does

25 not provide any basis for excluding foreign *managers*; while he asserts that they do

26 not "directly compete" with U.S.-based managers, he provides no evidence to

27 support that claim.  (*Id.*, Ex. B (Kneuper Dep. 265:10-25).)

28

-12-

"Antitrust law requires allegation of both a product market and a geographic market." *IGT v. All. Gaming Corp.*, No. 2:04-CV-1676-RCJ-RJJ, 2008 WL 7071468, at *6 (D. Nev. Oct. 21, 2008) (quoting *Newcal Indus., Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1045 n. 4 (9th Cir. 2008)). "For antitrust purposes, a market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 983-84 (C.D. Cal. 2012) (quoting *Paladin Assocs. v. Montana Power Co.,* 328 F.3d 1145, 1163 (9th Cir. 2003). "The boundaries of [a market or] a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Olin Corp. v. FTC,* 986 F.2d 1295, 1299 (9th Cir. 1993) (the *Brown Shoe* "factors are relevant even in determining the primary market"). Dr. Kneuper has not demonstrated that his alleged market definitions meet this standard.

*First*, as discussed above, Dr. Kneuper's market definitions fail because they are improperly based on the concept of a "Championship-Caliber Boxer," which is a made-for-litigation concept. *Ramirez v. Hobart Corp.*, No. CV1210023ABAGRX, 2015 WL 10939541, at *9 (C.D. Cal. Feb. 18, 2015) (excluding expert when he "developed his opinions for the sole purpose of testifying, and wholly failed to test his [theory] – instead assuming the very fact that he was hired to prove"). Dr. Kneuper's proposed market definition is so inherently subjective and ill-defined that he cannot show markets based on that concept are "composed of"—and limited to— "products that have reasonable interchangeability for the purposes for which they are produced." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 983-84.

*Second*, Dr. Kneuper's market definitions fail because they are improperly

limited to the "U.S. market" for promotional and managerial services, respectively. The correct "'geographic market' is the area of effective competition where buyers can turn for *alternate sources of supply*." *Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.*, No. CV 00-1693-PA, 2003 WL 23715981, at *5 (D. Or. Jan. 21, 2003) (citing *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484, 1490 (9th Cir. 1991)) (emphasis added).

Even accepting that there is a recognized definition of a CCB, Dr. Kneuper offers literally no evidence to show that CCBs—the buyers of promotional and managerial services—are limited to U.S.-based promoters and managers as "alternate sources of supply." He does not cite any statements from GBP's principals, from their proffered industry expert, nor any documents suggesting there is a U.S.-based limitation. Without such basic empirical evidence, the trier of fact would simply be left to accept Dr. Kneuper's assertions that foreign promoters and managers are unable to compete with U.S.-based individuals. Because this testimony "contains  no empirical data or analysis to support . . . its key assumptions," it must be excluded. *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031 (N.D. Cal. 2001).

These deficiencies are compounded by facts indicating that Dr. Kneuper's market definitions also contradict economic reality. Under Dr. Kneuper's definition of the relevant market for managers of Championship-Caliber Boxers, a manager that manages a Championship-Caliber Boxer that participates in bouts in the U.S., but himself lives outside of the U.S., is not considered part of the market. (Wolfson Decl., Ex. B (Kneuper Dep. 246:17-249:22; 250:22-253:6; 254:23-255:25).) However, GBP's principals admit that managers residing outside of the U.S. regularly manage boxers in major events in the U.S., on U.S. television, and for major sanctioning body championships. (Wolfson Decl., Ex. F (Deposition of Eric Gomez ("Gomez Dep.") 326:18-24; 327:12-17) and Ex. C (Diaz Dep. 65:6-66:22).) They further admit that certain boxers they considered CCBs have fought the

"majority" of their fights outside the United States.  (*Id.*, Ex. C (Diaz Dep. 60:13-61:11, 32:2-33:24).)  GBP itself regularly promotes fights for or against CCBs whose managers or promoters live outside of the U.S.  (Wolfson Decl., Ex. F (Gomez Dep. 195:7-22); Ex. C (Diaz Dep. 32:2-33:24, 60:2-61:24, 109:7-110:2); *Id.*, Ex. D (Ramirez Dep. 105:24-106:5).).  Therefore, markets limited to the United States do not reflect the economic reality of GBP's own business.

Moreover, Dr. Kneuper does not consider that limiting the relevant markets to the U.S.-based managers or promoters excludes some of the biggest names in boxing (including several of GBP's own stars) because they are managed by an individual outside of the U.S. (*e.g.*, Canelo Alvarez, Jorge Linares, David Lemieux, Lucas Matthysse).  (Wolfson Decl., Ex. C (Diaz Dep. 102:1-11, 108:15-21, 109:2-110:2, 113:1-7, 115:18-25); *Id.*, Ex. B (Kneuper Dep. 251:16-53:6; 271:9-72:14).).  While Dr. Kneuper makes conclusory allegations regarding the distinct attributes of foreign promoters, he does not consider the numerous real-world examples of foreign promoters who have operated in the United States; for example, Group Yvon Michel and Matchroom are not based in the United States but promote fights here.  Moreover, Dr. Kneuper's Report does not even separately discuss a basis for excluding foreign managers; when pressed to explain where this analysis was contained in this Report, Dr. Kneuper could only offer that it was "described throughout."  (*Id.* at 173:3-22.)  And Dr. Kneuper did not address the numerous real-world examples of foreign managers who manage CCBs; for example, important boxers as Tyson Fury, Wladimir Klitschko, Miguel Cotto, and Canelo Alvarez are promoted by foreign managers.

Because Dr. Kneuper does not allege a proper product market (because he relies on the improper concept of a CCB); does not allege a proper geographical market (because he has not shown that the United States is the proper "area of effective competition" for managerial and promotional services); and does not allege markets that reflect economic reality (because he did not consider the numerous

real-world examples of CCBs who use foreign promoters and managers), his market definitions will not "assist the trier of fact to understand the evidence or to determine a fact in issue" and should be excluded under Federal Rule of Evidence 702.

### Plaintiffs' Arguments

Defendants' arguments to exclude Dr. Kneuper's opinion that there is a U.S. market for the management of CCBs and a U.S. market for the promotion of CCBs are convoluted to say the least. Defendants contend that "Dr. Kneuper offers literally no evidence to show that CCBs—the buyers of promotional and managerial services—are limited to a U.S.-based promoters and managers as 'alternate sources of supply.'" However, Defendants' misapply and misunderstand the law and misstate Dr. Kneuper's opinions and testimony.

First, Defendants yet again rely on a case regarding a motion for summary judgment rather than a determination of the admissibility of expert testimony for their argument that Dr. Kneuper's testimony must be excluded because he purportedly offers "no evidence to show that" the relevant markets should be limited to the United States. *See*, *Confederated Tribes of Siletz Indians of Oregan v. Weyerhaeuser Co.*, (D. Or. Jan. 21, 2003) 2003 WL 23715981, at *5 ("The definition of the relevant market is, ultimately, a mixed question of fact and law for the jury…Defendant's expert disputes many of [Plaintiff's expert's] assertions, but the court cannot resolve that dispute on summary judgment").

Second, Defendants misunderstand, or perhaps misrepresent, the relevant test for determining the geographic market. Defendants correctly state the "geographic market is the area of effective competition where buyers can turn for alternate sources of supply." *Id*. However, Defendants disregard the very important phrase "area of *effective* competition" in stating that a geographic market can only exist if the buyers of services are limited only to a certain geographic market. Importantly,

Case No. 2:15-cv-3378-JFW-MRW
DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT ROBERT KNEUPER

1   a "geographic market must correspond **to the commercial realities of the industry**

2   **and be economically significant**…The relevant market is one in which the seller

3   operates, and to which the purchaser **can practicably** turn for suppliers." *Solyndra*

4   *Residual Trust, by and through Neilson v. Suntech Power Holdings Co., Ltd.*, 62 F.

5   Supp. 3d 1027, 1045 (N.D. Cal. 2014).  Accordingly, as Dr. Kneuper explained in

6   detail at his deposition, the relevant geographic market is determined by the

7   consumers and their alternatives.  (Kneuper Depo., 167:1-168:5).

8      In determining whether the relevant market should be limited to the U.S., Dr.

9   Kneuper analyzed whether the inclusion of foreign managed and/or foreign

10  promoted boxers undermines the hypothetical monopolist test[4]— i.e., whether the

11  inclusion of foreign manager and/or foreign promoters is economically significant to

12  the geographic market.  Ultimately, Dr. Kneuper determined that the markets for

13  boxing management and promotion are appropriately limited to the U.S. because the

14  foreign managers and/or promoters would not provide a "sufficient enough

15  constraint…to defeat the hypothetical monopoly test." (Kneuper Depo. 171:21-25;

16  *See generally Id.*168:6-172:23).

17     Specifically, Dr. Kneuper analyzed data relating to foreign managers and

18  foreign promoters of CCBs and found:

19        • Most CCBs managed by foreign promoters fight the majority of their

---

20     [4] The "hypothetical monopolist test" is a standard and widely accepted

21  method for defining markets derived from the U.S. Department of Justice and

    Federal Trade Commission's *Horizontal Merger Guidelines* (the "Merger

22  Guidelines").  "The test requires that a hypothetical profit-maximizing firm, not

23  subject to price regulation, that was the only present and future seller of those

    products ("hypothetical monopolist") likely would impose at least a small but

24  significant and non-transitory increase in price ("SSNIP") on at least one product in

    the market.  The same general framework for defining a product market is

25  appropriate for defining geographic markets.  Kneuper Report, ¶¶41-42, notes 65-

26  66, 68. *See also*, Declaration of Robert Kneuper in support of Oppositions to

27  Motions of Summary Judgment, Dkt. 236 ("Kneuper Decl."), ¶¶11-12.

28

1   fights abroad.  (Kneuper Depo., 169:14-17; 266:19-21);

2   • Those CCBs that fight in the U.S. typically use a U.S. promoter, and

3   were thus included in the U.S. market for promotion of CCBs.  (*Id.* at

4   169:20-23).

5   • Fighters such as Canelo Alvarez, David Lemieux or Lucas Matthysse

6   are not excluded from Dr. Kneuper's market definition.  Those fighters

7   are appropriately excluded from the market for U.S. boxing

8   management of CCBs because they have foreign-based managers and

9   there is no indication that any of them is seeking a U.S.-based manager.

10  However, these boxers ***are*** included in the market for U.S. boxing

11  promotion of CCBs because they use U.S. promoters for their fights in

12  the U.S.  (Kneuper Decl., ¶42);

13  • Assigning a manager or promoter to the U.S. market if they are located

14  in the U.S. is an approach frequently used in antitrust analysis.  The

15  facts of this case do not support assigning any of the relevant foreign

16  based managers or promoters to the U.S. market because the facts do

17  not indicate that these managers or promoters effectively compete

18  within the U.S. (e.g. are licensed to manage or promote in the U.S.).

19  *Id.* at ¶43.

20  • The probability of enough foreign managers beginning to manage in

21  the U.S. to constrain a hypothetical monopolist of the U.S. market for

22  management of CCBs is low. (Kneuper Depo. at 171:4-12, 21-25;

23  172:9-173:2; 255:18-25; 264:22-24; 367:2-5)

24  In short, Dr. Kneuper determined—after reviewing the evidence—that it was neither

25  practical that CCBs would turn to foreign managers and/or promoters as alternatives

26  in the event that Defendants and/or a hypothetical monopolist increased prices nor

27  economically significant.

28  Defendants spend pages arguing that Dr. Kneuper's testimony regarding the

-18-

geographic market definitions should be excluded because he purportedly did not consider the practical effects of limiting the relevant markets to the U.S. and did not consider real world examples of CCBs who use foreign promoters and managers. However, Dr. Kneuper's testimony clearly shows that he adequately considered these issues, analyzed the relevant facts and data, and was satisfied that the geographic market is appropriately limited to the U.S.  *See e.g.*, Kneuper Depo, 276:8-277:8; Kneuper Decl., ¶¶42-43.

Whether Dr. Kneuper did enough research in this regard, or made assumptions that Defendants believe can be disproved by other witnesses goes to the weight of his opinions, not their admissibility.  *See Primiano supra*, 598 F.3d at 564 (9th Cir. 2010); *Group Health Plan supra,* 44 F.3d at 760 (8th Cir. 2003).

III.   <u>**Opinion:  That the Haymon Defendants Had Market Power In The "U.S. Market For Managing Championship-Caliber Boxers" And The "U.S. Market For Promoting Championship-Caliber Boxers"**</u>

**Defendants' Arguments**

Dr. Kneuper should also be precluded from offering the opinion that the Haymon Defendants had market power in the U.S. market for managing Championship-Caliber Boxers and the U.S. market for promoting Championship-Caliber Boxers.  Circumstantial evidence of market power requires a showing of "significant barriers to entry." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).  "Barriers to entry" are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns."  *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993).  "'A Section 2 plaintiff, establishing monopoly power by circumstantial evidence, must . . . 'show that new competitors face high market barriers to entry

-19-

and that current competitors lack the ability to expand their output to challenge a monopolist's high prices.'" *IGT v. All. Gaming Corp.*, No. 2:04-CV-1676-RCJ-RJJ, 2008 WL 7071468, at *13 (D. Nev. Oct. 21, 2008) (quoting *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997)); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995). Because Dr. Kneuper did not properly consider barriers to entry in his analysis, his opinions regarding monopoly power must be excluded under Federal Rule of Evidence 702 because they are contrary to law.

In his Report, Dr. Kneuper opined that "economic factors . . . indicate that if Haymon has a market share that is in the 40-50% range, or above that range, in both the relevant markets in this case, then Haymon likely possesses market power." (Wolfson Decl., Ex. A (Kneuper Rep. ¶ 60).) Using his flawed construct of a CCB (*see* Section A), and his unsupportable limitation of the markets to United States-based promoters and managers (*see* Section B), Dr. Kneuper concludes that the Haymon Defendants have "a market share [of the U.S. market for managing Championship-Caliber Boxers] of 49.1% while the other competing managers each of market have shares that are under 5%." (*Id.* at ¶ 65.) Dr. Kneuper also concludes that the Haymon Defendants have "a market share [of he U.S. market for promoting Championship-Caliber Boxers] of 44.2% while the group of alleged Haymon-sham promoters[5] have a market share of 6.1%," (*Id.* at ¶ 66.) He concludes that

_____

[5] Dr. Kneuper neither defines nor lists these "sham" promoters, stating only that "[a]ccording to the Golden Boy Complaint, Haymon acted in conjunction with various 'sham' promoters." (Wolfson Decl., Ex. A (Kneuper Rep. ¶ 85).) Dr. Kneuper did not investigate what activities the Haymon Defendants engaged in that would supposedly make them boxing promoters, nor did either investigate what activities the promoters listed for each PBC fight engaged in. (Wolfson Decl., Ex. B (Kneuper Dep. 302:15-23).) The Haymon Defendants dispute that they have worked with any "sham" promoters or that "sham" promoters have promoted the bouts of Haymon Sports-managed boxers. To the extent Dr. Kneuper relies upon

"[t]hrough a combination of contracting practices and market practices," this has allowed the Haymon Defendants to "achieve[] a position of market power" in both markets.  (*Id.* at ¶ 88.)

However, Dr. Kneuper nowhere acknowledges that "[i]f entry into the alleged relevant market is easy, then competitive effects are unlikely even in a highly-concentrated market."  *F.T.C. v. Lab. Corp. of Am.*, No. SACV 10-1873 AG MLGX, 2011 WL 3100372, at *19 (C.D. Cal. Feb. 22, 2011) (*State of Ca. v. Am. Stores. Co.*, 872 F.2d 837, 842-43 (9th Cir. 1989) ("An absence of entry barriers into a market constrains anticompetitive conduct, irrespective of the market's degree of concentration."), *rev'd on other grounds*, 495 U.S. 271 (1990); *see also U.S. v. Syufy Enters.,* 903 F.2d 659, 664-65 (9th Cir. 1990), *aff'd,* 903 F.2d 659 (9th Cir. 1990); *U.S. v. Waste Mgmt., Inc.,* 743 F.2d 976, 981-83 (2d Cir. 1984) (finding a 48.8% market share insufficient to establish market power because of easy entry). Evaluation of barriers to entry focuses on how factors endemic to the market constrain "those who would enter but are prevented from doing so." *United States v. Syufy Enter.*, 903 F.2d 659, 672 n.21 (9th Cir. 1990).  At his deposition, Dr. Kneuper admitted that, economically speaking, low barriers to entry preclude the ability to obtain or exercise market power.  (Kneuper Dep. 57:13-19.)

As several GBP witnesses acknowledge, there are no substantial barriers to entry to the market for boxing manager or promoter.  (Wolfson Decl., Ex. F (Gomez Dep. 180:18-181:23); *Id.,* Ex. E (Shaw Dep. 56:3-57:16).)  Numerous boxers (including alleged "Championship-Caliber Boxers") are managed or otherwise represented by relatives, friends, trainers, former fighters, attorneys, and others that lack any formal business training or specific boxing background.  (Wolfson Decl.,

---

GBP's allegations of "sham" promoters,  he again fails to base his testimony on "sufficient facts or data," FED. R. EVID. 702(b), and his opinions should be excluded on this basis.

DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT ROBERT KNEUPER

Ex. F (Gomez Dep. 180:18-181:23); *Id.*, Ex. E (Shaw Dep. 56:3-57:16).)  Promoters have had varied backgrounds before entering the sport of boxing and new promoters, such as Roc Nation Sports, have entered the boxing promotion market in recent years and immediately signed major boxers.

In his Report, Dr. Kneuper did not separately analyze the barriers to entry in *either* of this two defined markets, as he admitted in his deposition.  (Wolfson Decl., Ex. A (Kneuper Rep. ¶104-105); *Id.*, Ex. B (Kneuper Dep. 216:25-217:5 ("Q. Do you believe there are any barriers to entry to become a manager of a boxer? A. As I said, I didn't specifically do that analysis because I approached if differently. And I didn't believe that analysis was necessary, so I don't have an opinion on that." )).) Having failed to consider the question of barriers to entry, as well as available evidence showing there are virtually no such barriers to the markets for U.S.-based managers and promoters, Dr. Kneuper's opinions regarding market power are not based upon sufficient facts or data, are not the product of reliable principles and methods, and are not the product of principals and methods applied reliably to the facts of the fact.  *See* FED. R. EVID. 702.  As such, they should be excluded.

### Plaintiffs' Arguments

Again, Defendants have not cited one case standing for the proposition that Dr. Kneuper's opinions regarding Defendants' market power must be excluded for purportedly failing to address barriers to entry.  In fact, the only case to which they cite in the *Daubert* context, held that the expert's opinions were admissible because "[w]hether barriers to entry exist is usually a fact-intensive question…When the parties' experts rely on conflicting sets of facts, an expert may testify as to his party's version of the disputed facts."  *IGT v. Alliance Gaming Corp.* (D. Nev., Oct. 21, 2008, No. 2:04-CV-1676-RCJ-RJJ) 2008 WL 7071468, at *14. The Court went on that there is no exclusive set of "barriers to entry at which a court may look to evaluate this part of the monopoly power analysis," ultimately determining that the

expert's testimony on market share and market power in the relevant market were not "improper or unreliable under Rule 702." *Id.*

As part of his analysis of Defendants' market share and market power, Dr. Kneuper explained—in both his report and at his deposition—his consideration of entry barriers in the U.S. markets for the management and promotion of CCBs.

Citing the Merger Guidelines[6], Dr. Kneuper notes that "in assessing entry barriers, the economic question is whether the threat of entry is likely to prevent the anticompetitive harm at issue in the case." Kneuper Report at ¶104. The *Merger Guidelines* specifically "focus on whether entry is 'timely, likely and sufficient in its magnitude, character and scope to deter or counteract competitive effects of concern." *Id.* In analyzing the relevant facts and data, Dr. Kneuper determined that Defendants' "contracting practices and market behavior substantially limited and continue to limit the ability of new entrants to access Championship-Caliber Boxers, and certainly prevented, and will prevent, new entrants from undercutting Haymon's market power or otherwise prevent Haymon from acting anticompetitively." *Id.* at ¶105.

In order to come to his conclusion that entry of new competitors was not "timely, likely or sufficient in its magnitude," Dr. Kneuper considered many different barriers to entry and approaches to the barriers to entry question. For example, relying on the American Bar Association's Monopolization and Dominance Handbook and other relevant academic publications, Dr. Kneuper determined that "exclusive contracts can be used to create barriers limiting the ability of competitors to access key market inputs." Kneuper Report at ¶71-72. Dr. Kneuper noted that the "network effect" created by Defendants' exclusive dealings with boxers and total control over televised boxing on broadcast networks, reduces

---

[6] U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* (2010), Section 9.

the financial incentives for a boxer to switch to a new promoter and/or manager. Kneuper Depo., ¶220:10-221:2.  This is because the boxer's career opportunities would be severely diminished as a result because he would no longer be part of Defendants' network.  *Id*.  Therefore, the "network effect" creates a systemic barrier to entry in either market because legitimate managers or promoters are unable to offer those promotional or management services.  In this regard, Dr. Kneuper opined that Defendants locked in key boxers by aggressively signing them to long-term contracts giving Defendants exclusive control over the boxers, refused to deal with key promoters and tied management services to promotion services through the use of sham promoters, and locked up nearly every television broadcaster for boxing events in exclusive agreements.  *See generally* Kneuper Report at ¶¶78-86.

In *U.S. v. Syufy Enterprises*, cited by Defendants above, the Ninth Circuit specifically opined that such "network[s] of exclusive contracts or distribution arrangements designed to lock out potential competitors" can constitute sufficient barriers to entry to establish an antitrust claim.  903 F.2d 659, 667 (9th Cir. 1990).

Moreover, in developing his theory regarding the "network effect" and its ability to serve as an entry barrier, Dr. Kneuper considered that "promoters need to have sufficient business acumen and knowledge and experience to be able to put together fairly sophisticated business deals with the networks."  Kneuper Depo., 317:3-16.  In addition, "reputational effects"—the fact that it "can take time to be able to develop a reputation" as a promoter can serve as a barrier to entry." *Id.* at 317:21-318:6.

Dr. Kneuper also found that barriers to entry in the management market result from the "network effect."  Kneuper Decl. ¶44.  Defendants' ability to promise the boxers they manage television airtime and fights against other prominent boxers they manage creates a barrier to existing competitors and new entrants.  *Id.*  This is because "a new entrant into the boxing management business who has neither a stable of fighters it can use to attract new fighters, nor extensive relationships with

promoters, nor…exclusive arrangements with television networks, has a very limited ability to compete against a manager with all those connections." *Id.*

Thus, at the very least, Dr. Kneuper's opinions have created a question of fact for the jury to decide regarding the sufficiency of entry barriers in the relevant markets.

## IV.    Opinion:  That the Haymon Defendants' Alleged Market Power In These Two Markets Stems From "'Tying' The Management Of Haymon Boxers To The Promotion Of Haymon Boxers."

### The Haymon Defendants' Arguments

Dr. Kneuper's testimony regarding the Haymon Defendants' market power in the markets for U.S.-based managers and promoters should be excluded under Rule 702 because, contrary to Ninth Circuit law, Dr. Kneuper assumes that a defendant with no market power in either of two separate markets can have market power in both if the defendant ties its products in each market together.

In his Report, Dr. Kneuper asserts that the Haymon Defendants "acted in conjunction with various 'sham' promoters effectively to 'tie' management with promotion."  (Wolfson Decl., Ex. A (Kneuper Rep. ¶ 85).)  He then argues that through this and other "contracting practices and market practices," the Haymon Defendants have "achieved a position of market power in two relevant antitrust markets."  (*Id.* at ¶ 88.)  More specifically, Dr. Kneuper testified at his deposition that "even if someone doesn't have market power in one of the two markets . . . by tying them together, one can achieve market power potentially through the tie." (Wolfson Decl., Ex. B (Kneuper Dep. 176:13-22).)

Dr. Kneuper does not offer a single citation to economic literature for this extraordinary proposition.  (Wolfson Decl., Ex. B (Kneuper Rep. pp. 36-39, n. 104-07).)  He does not because he cannot.  Market power is the ability to profitably raise prices by limiting output to non-competitive levels.  *Rebel Oil*, 51 F.3d at 1434.  Dr.

Kneuper does not explain or offer any economic research showing how a market participant that is unable to achieve those results in either market suddenly obtains the ability to both simply because they supposedly tie their consumers together. (*See generally* Wolfson Decl., Ex. A (Kneuper Rep. ¶¶ 70-103).)

Dr. Kneuper's analysis is contrary to clear Ninth Circuit precedent because it presupposes market power where he needs to first establish independent market power in the tying market. Specifically, the Ninth Circuit notes that that the elements of tying claim are: "(1) the defendant tied together the sale of two distinct products or services; (2) ***the defendant possesses enough economic power in the tying product market to coerce its customers*** into purchasing the tied product; and (3) the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008) (emphasis added). As the Supreme Court has further stated, "in *all cases* involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works Inc. v. Indep. Ink,* 547 U.S. 28, 45 (2006) (emphasis added). Dr. Kneuper does not take the step of showing enough economic power in the tying product market to coerce; he just concludes there is power because he thinks there may have been tying (even though he offers no opinion on whether there was actually a tie). (Wolfson Decl., Ex. A (Kneuper Rep. ¶ 85 n.105).) Such unsubstantiated speculation does not stand in for legitimate expert analysis, *see Ramirez v. Hobart Corp.*, 2015 WL 10939541, at *9, and therefore cannot assist the trier of fact to understand the evidence or to determine a fact in issue. *See* Fed. R. Evid. 702. As such, Dr. Kneuper's testimony regarding the Haymon Defendants' market power in the markets for U.S.-based managers and promoters should be excluded.

**Plaintiffs' Arguments**

Defendants once again misstate Dr. Kneuper's opinions and testimony in arguing that his opinions regarding Defendants market power in the U.S. markets for managing and promoting CCBs should be excluded.

Defendants contend that Dr. Kneuper did not establish that Defendants have market power in the tying market (U.S. management of CCBs), and thus that Plaintiffs cannot establish Defendants' market power in the tied market (U.S. management of CCBs).  Not so.  In accordance with Ninth Circuit law, Dr. Kneuper's report establishes that Defendants are the dominant player in the market for managing CCBs. Kneuper Report at ¶¶60-65 (establishing that Defendants' share of the U.S. market for boxing management is approximately 49%).

Dr. Kneuper noted that whether market power can be exercised by a dominant player in the market depends on various economic factors, including having substantial competitive advantages over one's competitors. *Id.*at ¶¶59-60.  Relying on relevant economic literature relating to "Raising Rivals Costs,"[7] Dr. Kneuper opined that "certain types of behavior," including entering into exclusive contracts, "raise competitive concerns because they are designed to competitively disadvantage rivals and thereby allow a firm to possess or enhance market power." *Id.* at ¶¶70-72.  Specifically, tying is a recognized way of "raising rivals costs," which allows a dominant player in the market to exercise market power in the tied and tying markets.  *Id.* at ¶74, notes 90-92.

---

[7] *See generally* Kneuper Report at notes 85-88 citing: Salop, Steven and Scheffman, David, "Raising Rivals' Costs," *American Economic Review* 73(2), (May 1983), pp. 267-271; Monopolization and Dominance Handbook, American Bar Association, 2011, p. 40; Carlton, Dennis and Perloff, Jeffrey, *Modern Industrial Organization*, Fourth Edition, 2005, p. 668; Krattenmaker, Thomas and Salop, Steven, "Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price," *The Yale Law Journal*, Vol. 96, No. 2 (Dec., 1986), pp. 209-293.

1    Dr. Kneuper then analyzed Defendants' conduct and determined that

2    Defendants used exclusive management contracts to require that boxers under

3    Defendants' management grant them unlimited power to veto any contract

4    contemplated by the boxer relating to boxing—including contracts with competing

5    promoters.  *Id.*at 78-80.  Based on his review of the evidence, Dr. Kneuper

6    determined that Defendants used the exclusivity provisions in the management

7    agreements to prevent boxers under their management from being promoted by

8    Plaintiffs and other legitimate promoters.  *Id.* at 81-84.  This allowed Defendants to

9    gain market power in the U.S. markets for boxing management and boxing

10   promotion by tying the U.S. markets for boxing management and promotion.  *See*

11   *Generally id.*at ¶¶87-103.

12   Thus, contrary to Defendants' assertions, Dr. Kneuper established (1) that

13   Defendants possessed economic power in the U.S. market for boxing management;

14   (2) that Defendants used that position to engage in conduct which "raised rivals

15   costs" by entering into exclusive management agreements and using those

16   agreements to limit boxers' access to legitimate promoters and increase their own

17   market power; and (3) ultimately tied the U.S. markets for boxing management and

18   promotion to gain market dominance in both markets.

19

20

21   DATED:  January 6, 2017           **QUINN EMANUEL URQUHART &**
22                                     **SULLIVAN LLP**
23                                     By:    */s/ Michael E. Williams*
24                                            Michael E. Williams
25                                     Attorneys for Defendants
26                                     Haymon Boxing LLC, Haymon Sports
                                       LLC, Haymon Boxing Management, and
27                                     Haymon Holdings LLC
28

DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE THE
TESTIMONY OF PLAINTIFFS' EXPERT ROBERT KNEUPER

1   DATED:  January 6, 2017          **KINSELLA WEITZMAN ISER**
2                                    **KUMP & ALDISERT LLP**

3                                    By:   _/s/ Jeremiah T. Reynolds_
4                                          Jeremiah T. Reynolds

5                                          Howard Weitzman (SBN 38723)
6                                          hweitzman@kwikalaw.com
                                           Jeremiah T. Reynolds (SBN 223554)
7                                          jreynolds@kwikalaw.com
                                           808 Wilshire Boulevard, 3rd Floor
8                                          Santa Monica, California 90401
                                           Telephone: 310.566.9800
9                                          Facsimile: 310.566.9850
10

11                                         Attorneys for Defendant
12                                         Alan Haymon Development, Inc.

13  DATED:  January 6, 2017          **KRAMER LEVIN NAFTALIS &**
                                     **FRANKEL LLP**
14

15                                   By:   _/s/ Barry H. Berke_
16                                         Barry H. Berke

17                                         Barry H. Berke (pro hac vice)
18                                         bberke@kramerlevin.com
                                           Norman C. Simon (pro hac vice)
19                                         nsimon@kramerlevin.com
                                           Marjorie H. Sheldon (pro hac vice)
20                                         msheldon@kramerlevin.com
                                           1177 Avenue of the Americas
21                                         New York, New York 10036
                                           Telephone: (212) 715-9100
22                                         Facsimile: (212) 715-8000
23

24                                         Attorney for Defendant
25                                         Alan Haymon
26
27
28

1

DATED:  January 6, 2017

2

**GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP**

3

By: _____*/s/ Ricardo P. Cestero*_____

Ricardo P. Cestero

4

5

Attorneys for Plaintiffs Golden Boy Promotions, LLC, Golden Boy Promotions, Inc. and Bernard Hopkins

6

7

8

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other

9

signatories listed, and on whose behalf the filing is submitted, concur in the filing's

10

content and have authorized the filing.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28