UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES -- GENERAL</u>

Case No.   **CV 15-3378-JFW (MRWx)**                    Date: January 26, 2017

Title:        Golden Boy Promotions LLC, et al. -v- Alan Haymon, et al.

**PRESENT:**
               **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

        **Shannon Reilly**                        **None Present**
        **Courtroom Deputy**                      **Court Reporter**


**ATTORNEYS PRESENT FOR PLAINTIFFS:**     **ATTORNEYS PRESENT FOR DEFENDANTS:**
               None                                       None

**PROCEEDINGS (IN CHAMBERS):**       **ORDER GRANTING DEFENDANT ALAN HAYMON'S
                                     MOTION FOR SUMMARY JUDGMENT [filed
                                     10/31/2016; Docket Nos. 147, 310]**;

                                     **ORDER GRANTING DEFENDANTS ALAN HAYMON
                                     DEVELOPMENT, INC., HAYMON BOXING LLC,
                                     HAYMON BOXING MANAGEMENT, HAYMON
                                     HOLDINGS LLC, AND HAYMON SPORTS LLC'S
                                     MOTION FOR SUMMARY JUDGMENT
                                     [filed 10/31/2016; Docket Nos. 158, 311]**

        On October 31, 2016, Defendant Alan Haymon ("Haymon") filed a Motion for Summary
Judgment [Docket Nos. 147, 310].  On November 9, 2016, Plaintiffs Golden Boy Promotions, LLC,
Golden Boy Promotions, Inc., and Bernard Hopkins (collectively, "Plaintiffs") filed their Opposition
[Docket Nos. 212, 215, 255].  On November 14, 2016,  Haymon filed a Reply [Docket Nos. 270,
272, 274].

        On October 31, 2016, Defendants Alan Haymon Development, Inc., Haymon Boxing LLC,
Haymon Boxing Management, Haymon Holdings LLC, and Haymon Sports LLC (collectively, the
"Haymon Entities") filed a Motion for Summary Judgment [Docket Nos. 158, 311].  On November
9, 2016, Plaintiffs filed their Opposition [Docket Nos. 217, 218, 256].  On November 14, 2016, the
Haymon Entities filed a Reply [Docket Nos. 271, 275].

        Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court
found these matters appropriate for submission on the papers without oral argument.  The matters
were, therefore, removed from the Court's November 28, 2016 hearing calendar and the parties
were given advance notice.  After considering the moving, opposing, and reply papers, and the

arguments therein, the Court rules as follows:

For the reasons that follow, the Court concludes that Plaintiffs have failed to demonstrate that there is a genuine issue of material fact as to any of their federal claims for relief.

I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

This antitrust action involves two separate, but related markets: the management and promotion of elite boxers in the United States.  Boxing managers "receive[ ] compensation for service as an agent or representative of a boxer." 15 U.S.C. § 6301(5).  Managers have a fiduciary relationship with the boxers they manage, and typically are paid a percentage of the boxer's purse. Boxing promoters, on the other hand, are "primarily responsible for organizing, promoting, and producing a professional boxing match." 15 U.S.C. § 6301(9).  Promoters are generally responsible for putting on the event, dealing with the venues, sponsors, and televisions networks, and paying the boxers' share of the purse.

Plaintiffs Golden Boy Promotions, Inc. and Golden Boy Promotions, LLC (collectively, "Golden Boy") are licensed boxing promoters. Oscar De La Hoya, a champion boxer, is the majority owner of Golden Boy.  Plaintiff Bernard Hopkins, also a champion boxer, is a minority owner of Golden Boy.

In approximately 2001, with a background in the music and television industries, Defendant Alan Haymon entered the market as a boxing manager. In 2013, he founded Haymon Sports LLC ("Haymon Sports") which provides boxing management services, as did its predecessor, Alan Haymon Development, Inc ("AHD").  By the end of 2013, Haymon Sports represented or managed over one hundred boxers, and it currently represents or manages over two hundred boxers. Haymon Sports has managed or advised, among others, Floyd Mayweather, Jr., the world's highest-paid athlete in 2014 and 2015; Amir Khan; and current welterweight champions Danny Garcia and Keith Thurman.

In their Second Amended Complaint filed on January 20, 2016, Plaintiffs allege that Defendants have attempted to monopolize the sport of boxing, and in particular the market for the promotion of "Championship Caliber Boxers," by engaging in the following anti-competitive and predatory conduct since January 1, 2015:[2] (1) requiring boxers who want to be managed by Defendants to sign long-term exclusionary contracts giving Defendants total control over their boxing careers, including the exclusive right to render any boxing-related services and the right to veto any boxing-related contract; (2) preventing boxers from signing promotional agreements with

---

[1]To the extent any of these facts are disputed, they are not material to the disposition of this motion. In addition, to the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court.

[2]As a result of a Settlement and Release Agreement executed on December 19, 2014, Plaintiffs' Second Amended Complaint is limited to Defendants' acts since January 1, 2015 (hereinafter, the "Covered Period").

Initials of Deputy Clerk _sr_

Golden Boy or any other "legitimate" promoter; (3) entering into multi-year exclusive contracts with key television networks; (4) acting as both a boxing manager and promoter in violation of the Muhammad Ali Boxing Reform Act (the "Ali Act"), 15 U.S.C. §§ 6301, *et. seq.*; (5) engaging in predatory pricing by "reversing the ordinary flow of money from the network to the promoter" and instead buying air time on key television networks; and (6) blocking Plaintiffs' access to venues for boxing bouts.

Plaintiffs allege the following claims for relief: (1) attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) unlawful "tie out" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (3) injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26; (4) violation of the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17000 *et seq.*; and (5) unfair competition in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* Notwithstanding the unnecessary sparring in the parties' Combined Statements of Facts, the facts relevant to these claims are largely undisputed.

### A.     Haymon Sports' Management of Boxers

Haymon Sports currently advises or manages over 200 boxers.  Haymon Sports provides boxers -- whose careers are very short and who face enormous risks each time they enter the ring -- more compensation and more leverage when negotiating with promoters.  Haymon Sports, like its predecessor, takes a smaller percentage in management commissions (10-15%, compared to the prevailing rate of 33%), and such commissions are generally not payable until the boxer's purse reaches a negotiated floor, frequently in the amount of $100,000 to $1,000,000, but sometimes as high as $3,000,000.

The majority of the boxers managed by Haymon Sports have signed exclusive, multi-year management contracts. The standard management contract expressly grants Haymon the "sole and exclusive right and opportunity to manage, represent and advise Fighter throughout the world in connection with Fighter's participating in professional boxing contests . . . and with respect to all of Fighter's activities within boxing . . . ."  In addition, the contract provides:

(ii) <u>Fighter Actions</u>.  From and after the Effective Date and continuing for the duration of the Term, Fighter shall not (directly or indirectly) enter into any agreement or arrangement (written or verbal), or grant any authority or power, relating to any Boxing Activities, without the prior written consent of Manager, subject to applicable law.

and

(iii) <u>Promotional Agreements</u>.  If during the Term hereof, Fighter desires to enter into any promotional agreement or bout agreement to which Fighter is not then bound, selection of the promoter shall be at the sole discretion of the Manager.[3]

---

[3]Haymon Sports waived this provision in May 2016 pursuant to a settlement agreement with another promoter, Top Rank, which resulted in a dismissal of a related case in this Court, *Top Rank, Inc. v. Alan Haymon, et al.*, Case No. CV 15-4961-JFW (MRWx) (C.D. Cal.).

Initials of Deputy Clerk _sr_

Plaintiffs contend that Haymon Sports has used these provisions to force its boxers to work with "sham" promoters and/or prevent its fighters from entering into contracts with Golden Boy and other "legitimate" promoters. However, not a single boxer has testified that he has been coerced into selecting a particular promoter or prevented from selecting the promoter of his choice. In fact, Defendants have submitted the declarations of six boxers who testify directly to the contrary. In addition, it is undisputed that Haymon Sports has worked with promoters across the industry (including Golden Boy, Top Rank, DiBella Entertainment, and others) to secure high-paid bouts and title fights. Since January 1, 2015, at least three fights have taken place involving Haymon-managed boxers and boxers promoted by Golden Boy; including (1) the Siverne-Wilder fight on January 17, 2015; (2) the Alvarez-Khan fight on May 7, 2016; and (3) the Castellanos-Escandon fight in March 2016.[4]  The Alvarez-Khan fight was Golden Boy's most lucrative fight of 2016.

## B.    The PBC

In addition to providing managerial services to its stable of boxers, Haymon Sports produces the "Premier Boxing Champions" or "PBC" which is a boxing series aired on various television networks. According to Haymon, "[t]he PBC was an attempt to bring boxing back to free television, to reverse the long-term trend of declining interest in the sport, and to improve the opportunities available to the fighters and particularly, those that Haymon Sports managed or advised." Haymon Decl. at ¶ 12. Haymon Sports' initial goal was to establish the PBC brand, attract solid television audiences for PBC events, and attract major advertisers. Ultimately, Haymon Sports hoped to turn the PBC into a "major sports property" with a league-like structure, akin to the NFL, NHL, or UFC, which would ultimately be owned by Haymon Sports. Waddell & Reed, a private equity firm, invested $585 million into the PBC venture.

Television networks have traditionally paid license fees to promoters to air boxing matches. However, in 2014, when Haymon Sports approached NBC with a proposal for it to broadcast PBC events in return for a modest rights fee, NBC flatly rejected that proposal.[5]  Thereafter, Haymon Sports decided to pursue a different strategy, buying time across a number of television platforms in an attempt to demonstrate the viability of its PBC business model. As part of its plan, Haymon Sports hoped to "flip the model" approximately two to three years after the launch of PBC, and return to the networks with a renewed proposal in which they would resume paying license fees.

Ultimately, Haymon Sports successfully entered into exclusive agreements with NBC, CBS, ESPN, Fox Sports 1, and SpikeTV. In addition, as part of its agreement with CBS, Haymon Sports entered into a non-exclusive agreement with Showtime, a CBS affiliate, to broadcast non-PBC events. Haymon Sports also has a non-exclusive oral agreement with BounceTV to air PBC events. The agreements with NBC, CBS, ESPN, and Fox Sports 1 were "time-buy" agreements , i.e., Haymon Sports paid fees to the networks in exchange for airtime for its PBC series. Haymon

---

[4]The Court recently became aware from newspaper articles that another fight between a Haymon-advised boxer and a Golden Boy-promoted boxer was announced – Canelo Alvarez v. Julio Cesar Chavez Jr., scheduled for May 6, 2017. This fight is being touted, and will undoubtedly will be promoted, as the "biggest all-Mexican fight in boxing history."

[5]NBC rejected Haymon Sports' proposal despite the fact that it had paid license fees to Main Events for its "NBC Sports Fight Night Series" as recently as 2013 and 2014.

Initials of Deputy Clerk  _sr_

Sports, however, was able to successfully negotiate the payment of license fees from SpikeTV and Showtime.[6]

The agreements with NBC, CBS, ESPN, Fox Sports 1, and SpikeTV had two- to three-year terms, all of which commenced sometime in 2015.  These exclusive agreements initially prevented the networks from allowing Plaintiffs and other competitors to promote fights on these networks as well as certain affiliated networks, including NBCSN, CBSSN, ABC, ESPN2, Fox, Fox Sports 2, FX, FXX.[7]  The exclusivity provisions, however, were short-lived.  The agreement with CBS was mutually terminated sometime in late 2015 or early 2016, and Haymon Sports, as part of a settlement agreement with another promoter (Top Rank), waived the exclusivity provisions in the remaining agreements in May 2016.  In addition, the Haymon Entities never had nor sought exclusive agreements with HBO or PPV (or Showtime) for the PBC series.

The launch of the PBC was first publicly announced in January 2015, and its first broadcast was on NBC on March 7, 2015.  Since then, the PBC series has televised over 80 boxing shows, with a total of at least 59 million US viewers.  It is undisputed that televised boxing has grown substantially since the beginning of the PBC.  The Nielsen data reflect a 25 percent increase, from 267 to 334, in televised boxing matches from 2014 to 2015, as well as an increase in total viewers of televised boxing matches from 2014 to 2015.

### C.      Promotion of PBC Fights

Plaintiffs allege that Haymon Sports employs "fake" or "sham" promoters for the fights aired on PBC, and that Haymon Sports functions, not just as a manager, but as a promoter for these fights in violation of the Ali Act.[8]

It is undisputed that every single PBC event has a fully-licensed and experienced promoter affiliated with it.  Haymon Sports pays a flat fee to those promoters for their services.  To the extent that a promoter's expenses exceed the revenues from the fight, Haymon Sports also reimburses those expenses, which often includes the boxers' purses for the fight.

Despite the fact that every PBC event has an experienced and licensed promoter affiliated

---

[6]Haymon Sports does not pay for air time on BounceTV, nor does it receive a license fee. Instead, they have a "revenue share" agreement.

[7]There were some exceptions to the exclusivity provisions.  For example, the Spanish-language Fox affiliate, Fox Deportes, was not contractually precluded from exhibiting boxing programming provided by another supplier.  Similarly, local ABC affiliates were not precluded from exhibiting boxing programming provided by another supplier.

[8]The Ali Act, enacted in 2000, requires a "firewall" between managers and promoters.  It makes it unlawful for "a promoter to have a direct or indirect financial interest in the management of a boxer;" or "a manager—(i) to have a direct or indirect financial interest in the promotion of a boxer; or "(ii) to be employed by or receive compensation or other benefits from a promoter, except for amounts received as consideration under the manager's contract with the boxer." 15 U.S.C. § 6308.

Initials of Deputy Clerk  _sr_

with it, Plaintiffs contend that Haymon Sports is the true promoter of the PBC fights because it performs certain traditional functions of promoters, including, for example: (1) contracting with the television networks for airtime; (2) facilitating the selection of the venue; (3) purchasing advertising on television and the internet to stimulate interest for PBC events; (4) entering into agreements with sponsors for television exposure; (5) receiving revenue from advertising sales and sponsorship sales; and (6) paying the boxer's purse.[9]

Notwithstanding Plaintiffs' pejorative label, the promoters that work with the PBC vehemently disagree that they are "sham" promoters.  They have testified that their duties are substantially the same as their duties for non-PBC events, which include, for example: maximizing event revenues and generating media attention for the event; coordinating with the pertinent state boxing commission regarding the promoter's various safety, financial, and technical obligations, including by ensuring the presence of medical personnel and safety equipment; executing bout agreements with the boxer, negotiating and entering into the venue agreement and pertinent sponsorship agreements, selling tickets, assisting with television production elements, and collecting the proceeds from ticket sales, gate revenue, and local sponsorship sales.  In the cases where the television networks pay a license fee, the promoters collect those fees as well. The so-called "sham" promoters are also responsible for overseeing the creation of advertising for the event and purchasing targeted advertising in various forms of the media.  In addition, the promoters for PBC events handle event logistics, including travel, accommodations, and on-site coordination with the fighters, their camps, the media, and all other stakeholders.[10]

### D.    Golden Boy's Business

Although the number of televised boxing events has increased since the advent of the PBC, the number of Golden Boy's televised boxing events has decreased.  For example, Golden Boy's fights broadcast on English-language television diminished from 37 in 2014 to 17 in 2015 to only 2 in 2016.  Of these broadcasts, 24 were on Fox Sports 1 in 2014,[11] 12 were on Fox Sports 1 in 2015, and none were on English-language basic cable in 2016. Not a single Golden Boy-promoted boxer has appeared on the PBC series.

Although Golden Boy has experienced a reduction of televised fights since PBC entered the market, the two most profitable distribution channels used by Golden Boy in recent history – HBO and Showtime – have remained open to it.  Moreover, after the PBC series began, Golden Boy was able to negotiate a new agreement with Estrella TV, a Spanish language-network, to air its

---

[9]Although Defendants deny that Haymon Sports acts as a promoter, Haymon Sports has indicated that, at some point in the future, it may decide to become a promoter.

[10]Although the Court recognizes that there is a genuine dispute as to whether Defendants act as promoters, this dispute does not preclude the Court from granting summary judgment as to Plaintiffs' federal claims for relief.

[11]For several years prior to 2015, Golden Boy had a long term deal pursuant to which 24 Golden Boy events per year were telecast on Fox Deportes in Spanish, and simulcast on Fox Sports 1 in English. Golden Boy received a license fee for these events.

Initials of Deputy Clerk  _sr_

fights.[12]  Golden Boy was also offered, but refused, a time-buy arrangement with Fox Deportes, Fox's Spanish-language network.

## II.    LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial. *Id.* at 250; Fed. R. Civ. P. 56(c), (e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data.").  In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case." *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party.  *Anderson*, 477 U.S. at 248.  "This requires evidence, not speculation." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999).  The Court must assume the truth of direct evidence set forth by the opposing party.  *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).  However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom.  *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987).  Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37.  In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

## III.    DISCUSSION

As the Ninth Circuit recently stated in *Aerotec International, Inc. v. Honeywell International, Inc.*, 836 F.3d 1171 (9th Cir. 2016):

This case serves as a reminder that anecdotal speculation and supposition are not a substitute for evidence, and that evidence decoupled from harm to competition -- the

---

[12]In addition, after Haymon Sports waived the exclusivity provisions in all of its television contracts, Golden Boy entered into negotiations with ESPN for a multi-year deal.

Initials of Deputy Clerk __sr__

> bellweather of antitrust -- is insufficient to defeat summary judgment.  As the Supreme Court reminds us, "[t]he law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."

*Id.* at 1175 (internal citations omitted).  Likewise, in this case, where the undisputed evidence demonstrates that Defendants' conduct has resulted in an increase in televised boxing matches and improved compensation for boxers, the Court concludes that Plaintiffs have failed to present sufficient evidence to defeat summary judgment.

### A.     Tying in Violation of Section 1 of the Sherman Act

In their second claim for relief, Plaintiffs allege a claim for violation of Section 1 of the Sherman Act.  Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations. . . ."  15 U.S.C. § 1.  "To establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *Aerotec International, Inc. v. Honeywell International, Inc.*, 836 F.3d 1171, 1178  (9th Cir. 2016). Plaintiffs rely on a single theory of liability under Section 1, i.e., that Defendants have restrained trade by entering into unlawful "tying" or "tie out" arrangements.  Specifically, Plaintiffs allege that the Defendants condition the provision of their management services on the boxers' agreement "to not contract with legitimate boxing promoters."  Second Amended Complaint ("SAC") at ¶ 109.

"A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008).  "To accomplish this objective, the competitor agrees 'to sell one product (the tying product) but only on the condition that the buyer also purchase a different product (the tied product), or at least agrees that he will not purchase the tied product from any other supplier.'" *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992)).  "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force* the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) (emphasis added). "Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Cascade*, 515 F.3d at 912.

A tying arrangement is a *per se* violation[13] of Section 1 of the Sherman Act if the plaintiff

---

[13]"*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Texaco v. Dagher*, 547 U.S.  1, 5 (2006) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)).  Although tying arrangements may also be analyzed under the "rule of reason," Plaintiffs have not relied on the "rule of reason" in their Oppositions to Defendants' Motions for Summary judgment.  Even if Plaintiffs had relied on that theory, the Court would have still granted summary

Initials of Deputy Clerk  _sr_

establishes that: "(1) the defendant tied together the sale of two distinct products or services; (2) the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market."  *See Cascade*, 515 F.3d at 912; *Paladin Assocs.*, 328 F.3d at 1159 (citing *Eastman Kodak*, 504 U.S. at 461-62).

In this case, the Court concludes that Plaintiffs have failed to raise a genuine issue of material fact that Defendants tied together the sale of two products or that Defendants possess sufficient economic power over the tying product to coerce its customers into purchasing the tied product.

> 1.  <u>Plaintiffs have failed to demonstrate that Defendants tied together the sale of two products</u>.

Plaintiffs claim that Defendants "tie" their boxing management services to the "rejection of competitors' boxing promotion services in favor of their own."  Plaintiffs' Opposition to Haymon's Motion at 1.  More specifically, Plaintiffs claim that Haymon Sports' management contracts "prevent the boxer from entering into any contract with a promoter, without Haymon Sports' express written consent," and that Haymon Sports "use[s] these contracts to prevent boxers from being promoted by competitors in the promotional market, including Golden Boy, Main Events, and others." Plaintiffs' Opposition to Haymon's Motion at 13.

Although Haymon Sports' management contracts do not expressly "tie" or "tie out" specific promoters, Illegal tying arrangements need not be express, and "consent" clauses may practically function as unlawful tying arrangements.[14]  *See, e.g.,*  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1753g ("To be sure, a tie-in would exist if the willingness to approve others is merely a charade."); *Tix-X-Press, Inc. v. Omni Promotions Co. of Ga*., 815 F.2d 1407, 1416 (11th Cir 1987) ("Where a contract . . . provides that buyers shall use only the seller or a source 'approved' by the seller to purchase the tied product, the courts have looked to see if the approval clause was reasonable and permitted the buyer meaningful freedom of choice, or whether it is manipulated by the seller to force the buyer to purchase the tied product from the seller."); *Aerotec International, Inc. v. Honeywell International, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ("We readily acknowledge that tying conditions need not be spelled out in express contractual terms to fall within the Sherman Act's prohibitions.").  "[T]he main question is whether the defendant has made the first product effectively unavailable to those who do not buy its second product."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1752b.

The Court concludes that Plaintiffs have failed to demonstrate that Haymon Sports' management contracts practically function as unlawful tying arrangements.  Indeed, Plaintiffs have not submitted testimony from a single boxer, the supposed victim of the tie, that states that he has

---

judgment.

[14]Plaintiffs do not appear to contend that Haymon Sports' management contracts constitute an express tie.  Regardless, such a claim would fail because Plaintiffs have failed to demonstrate that Defendants had sufficient economic power to coerce boxers into accepting the tie at the time the boxers entered into these contracts. *See infra* Section III.A.2.

Initials of Deputy Clerk  _sr_

been pressured or coerced into working with a particular promoter or prevented from working with Golden Boy (or other so-called "legitimate promoters").  In contrast, six boxers (Daniel Jacobs, John Molina, Oyewale Omotoso, Shawn Porter, Julian Williams, and Leo Santa Cruz) have submitted declarations that unequivocally state, "[n]either Mr. Alan Haymon, Haymon Sports, nor anyone acting on their behalf has ever pressured or coerced me to either (i) work with any particular promoter (including Golden Boy), or (ii) not work with any particular promoter (including Golden Boy)."

Moreover, it is undisputed that Haymon Sports has, on several occasions, permitted its boxers to be promoted by Golden Boy and other so-called legitimate promoters.  Tellingly, some of the most lucrative fights during the Covered Period of this lawsuit (January 1, 2015 to the present) have occurred between boxers managed by Haymon Sports and boxers promoted by Golden Boy and Top Rank, including the Canelo Alvarez v. Amir Khan fight on May 7, 2016 (Golden Boy) and the Floyd Mayweather, Jr. v. Manny Pacquiao fight on May 2, 2015 (Top Rank). This evidence clearly demonstrates that when it is in the best interests of Haymon Sports' boxers, and consistent with its fiduciary duties, Haymon Sports freely permits its boxers to participate in bouts promoted by Golden Boy and other "legitimate" promoters. Moreover, the fact that these fights were extremely lucrative for these so-called "legitimate" promoters demonstrates that Haymon Sports is not attempting to harm competition by unlawfully tying out or destroying these promoters.

Although Plaintiffs correctly argue that the number of fights involving a Haymon-managed boxer and a Golden-Boy promoted boxer is substantially less than one would expect given Golden Boy's share of the promotion market, the significance of this disparity is eliminated when one considers other market-based explanations.  It is undisputed that Golden Boy typically offers boxers long-term promotional agreements. *See, e.g.,* Gomez Decl. at ¶¶ 29-30.  It is also undisputed that Haymon advises his clients to avoid such long-term promotional agreements (because he believes they primarily benefit the promoter).  Consistent with this advice, only *one* boxer managed or advised by Haymon Sports has entered into a long-term or multi-fight promotional agreement since January 1, 2015.  Thus, it is not surprising that, statistically speaking, Haymon-managed boxers are less likely to be promoted by Golden Boy.  *Cf. It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) ("A successful tying claim in particular needs to rule out alternative market-based explanations for why the consumer might prefer to purchase the tied product along with the tying product.").

Finally, the Court concludes that no reasonable jury could find the existence of a tie, when Golden Boy has not submitted a single proposal to Haymon, Haymon Sports, or any of the other Haymon Entities for the promotion of any Haymon Sports' boxers during the Covered Period.  As such, there is absolutely no evidence that Haymon Sports has ever refused a request by Golden Boy to promote one of its boxers during the Covered Period.[15]  Plaintiffs' argument that directly contacting Defendants would have been futile is belied by the fact that Defendants have allowed,

---

[15]In fact, the evidence suggests that it is Golden Boy, not Defendants, that has refused to deal with the Haymon Entities during the pendency of this lawsuit. Indeed, in May 2015, Robert Diaz (Golden Boy's matchmaker) received a suggestion from the manager of then Golden Boy-promoted heavyweight, Luis Ortiz, to try to place Mr. Ortiz in a bout that is featured within a PBC show.  Mr. Diaz responded, "Are you serious? You do know we have sued Haymon right?".

Initials of Deputy Clerk  sr

on multiple occasions, their fighters to participate in events promoted by Golden Boy.

To support the existence of a tie, Plaintiffs primarily rely on certain informal, vague, and hearsay conversations that Golden Boy's President, Eric Gomez, had with several boxers and/or their representatives in 2015 about potential promotion deals with Golden Boy.  Tellingly, Plaintiffs never deposed any of these boxers to explore the details of these conversations.  In addition, all but two of these boxers have submitted a declaration on behalf of Defendants that unequivocally state that Defendants have never pressured or coerced them to either work or not work with any particular promoter.  And one of the boxers who did not submit a declaration (Amir Khan) has in fact fought in a Golden Boy-promoted fight during the Covered Period.  *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 685 (4th Cir. 2016) ("[I]f pure speculation by a competitor were enough to prove the opposite of what consumers describe is happening in the market, then antitrust defendants should surrender every time a rival files a complaint."); *It's My Party, Inc. v. Live Nation, Inc.*, 88 F.Supp.3d 475, 495 (D. Md. 2015) ("Overall, these individual instances of alleged unlawful behavior by Live Nation are not facial evidence of coercion, and they do not permit a reasonable inference of coercion.  These same artists, managers, and agents who make comments interpreted by plaintiffs as indicia of coercion often explicitly deny being coerced by Live Nation.").

Moreover, a careful examination of these conversations exposes the lack of merit of Plaintiffs' tying claim.  In most of these conversations, Eric Gomez, at best, suggested that Golden Boy and these boxers might work together sometime in the future, and did not present any specific offers or even speak to Haymon Sports about trying to promote them.  In response to his overtures, the boxers ambiguously said something to the effect of "we're with Al now" or truthfully said, "you know we can't sign anything unless Al approves it."  Notably, one of the conversations in fact entirely undermines Plaintiffs' claim of a tie.  The father of Haymon-managed boxer Shawn Porter reached out to Eric Gomez about a potential fight with Golden Boy-promoted boxer Canelo Alvarez.  Although Shawn Porter ultimately decided to wait for a different fight arranged by Al Haymon, Shawn Porter was apparently not precluded from fighting in a bout promoted by Golden Boy.  Accordingly, Plaintiffs' utter speculation as to the meaning of these conversations is insufficient to support a finding by the jury that Defendants "tie" their boxing management services to the "rejection of competitors' boxing promotion services in favor of their own."[16]

For the foregoing reasons, the Court concludes that no reasonable jury could find the existence of a tie, and thus Plaintiffs' Section 1 claim fails.

---

[16]To establish the existence of the tie, Plaintiffs also rely on the fact that four boxers terminated their promotional agreements with Golden Boy pursuant to a January 2015 settlement agreement with Defendants. However, the settlement agreement expressly contemplated the termination of these four agreements and Golden Boy was paid handsomely for these terminations in accordance with the agreement.  The Court does not consider this negotiated settlement evidence of a tie.  In addition, Golden Boy relies on the fact that other Haymon-managed fighters terminated their promotional contracts with Golden Boy pursuant to "key man" clauses in their contracts (or merely let their contracts expire). Not only did these terminations occur outside of the Covered Period, Golden Boy merely speculates as to the reasons for these terminations.

Initials of Deputy Clerk _sr_

2.   <u>Plaintiffs have failed to demonstrate that Defendants possess economic power in the tying product</u>.

Plaintiffs' tying clam also fails for another independent reason: Plaintiffs have failed to demonstrate that Defendants possess economic or market power in the tying product.

"[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28, 46 (2006). Market power may be demonstrated through either of two types of proof: (1) direct evidence of the injurious exercise of market power, i.e., restricted output and supracompetitive prices; or (2) circumstantial evidence pertaining to the structure of the market. *Rebel Oil Co., Inc. v. Atlantic Richfield Co*., 51 F.3d 1421, 1434 (9th Cir. 1995). In this case, there is no evidence of restricted output and/or supracompetitve prices.   In fact, the evidence demonstrates the opposite – increased output of televised boxing matches and lower management fees and higher purses for boxers. Thus, not surprisingly, Plaintiffs have attempted to establish market power through circumstantial evidence pertaining to the structure of the market.

"To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* at 1434. "[T]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition . . . ." *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986).

The Court concludes that Plaintiffs have failed to: (1) properly define the market, or (2) show that there are significant barriers to entry in that market.

(a)   *Market definition and market share*

"Market definition is crucial.  Without a definition of the relevant market, it is impossible to determine market share." *Rebel Oil*, 51 F.3d at 1434.  The relevant market definition must include both a product market and a geographic market. *Newcal Indus., Inc. v. Ikon Office Sol*., 513 F.3d 1038, 1044, 1045 n.4 (9th Cir. 2008).  The product market "must encompass the product at issue as well as all economic substitutes for the product." *Id.* at 1045; *see also Brown Shoe v. United States*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").  The geographic market extends to the area of effective competition ... where buyers can turn for alternative sources of supply." *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir.2001) (quotation marks and citations omitted).

Although the definition of the relevant market is generally a factual question for the jury, summary judgment is appropriate if Plaintiffs' evidence is insufficient to support a jury verdict as to that definition. *Rebel Oil Co., Inc. v. Atlantic Richfield* Co., 51 F.3d 1421, 1435 (9th Cir. 1995). "In the context of antitrust law, if there are undisputed facts about the structure of the market that render the inference economically unreasonable, the expert opinion is insufficient to support a jury verdict." *Rebel Oil Co., Inc. v. Atlantic Richfield* Co., 51 F.3d 1421, 1435 (9th Cir. 1995); *see also It's My Party, Inc. v. Live Nation, Inc*., 811 F.3d 676, 683 (4th Cir. 2016) ("But the court was not

required to accept uncritically two market definitions . . . that coincidently fit plaintiff's precise circumstances.  No party can expect to gerrymander its way to an antitrust victory without due regard for market realities.").

Plaintiffs' expert, Dr. Kneuper, identifies the tying product market as: the U.S. market for managing "Championship-Caliber Boxers."  In order to determine the members of this market, Dr. Kneuper first defines "Championship-Caliber Boxers" as those boxers who (i) have been ranked in the top 10 by any of the four major sanctioning bodies (WBA, WBC, WBF, or IBF) during 2016 *or* have been classified as a champion since January 2015, and (ii) appeared on U.S. television since January 2015.  Dr. Kneuper then excludes any "Championship-Caliber Boxers" who have managers residing outside of the United States.  Dr. Kneuper's management market only includes managers of the boxers that satisfy these initial filters.  Adopting this definition, Dr. Kneuper calculates Haymon Sports' market share as 47.5%.  Kneuper Decl. at ¶ 23.

The Court concludes that there are fundamental flaws with Dr. Kneuper's market definition, and that his opinions are insufficient to support a jury verdict in favor of Plaintiffs.  Specifically, based on the undisputed facts and economic realities of the boxing industry, the Court concludes that: (1) Dr. Kneuper's product market fails to encompass all economic substitutes of the product; and (2) Dr. Kneuper's geographic market fails to extend to the area of effective competition where buyers can seek alternative sources of supply.

A proper product market should include the available managers (and other alternatives) that a significant number of boxers would turn to in the event of a small but significant non-transitory increase in price ("SSNIP") by a hypothetical monopolist.[17]  However, Dr. Kneuper did not analyze the qualifications or backgrounds of managers of Championship-Caliber Boxers to assess their reasonable interchangeability with potential substitutes, as the law requires, and he merely assumes that the only alternatives available to Championship-Caliber Boxers are those managers that are currently managing other Championship-Caliber Boxers.  *See* Cameron Dep. 109:6-12. Indeed, he offers no explanation why managers of non-Championship-Caliber Boxers would not be in the same economic market as managers of a Championship-Caliber Boxers, particularly in light of the fact that a non-Championship-Caliber Boxer can become a Championship-Caliber Boxer as the result of a single fight.  For example, Joe Smith, Jr., who in May 2016 was ranked #33 in the World Boxing Council ("WBC") rankings, became WBC's #2 ranked contender after he scored a knockout against Andzrev Fonfara in June 2016 (on a PBC primetime telecast on NBC). According to Dr. Kneuper, as a result of this victory, Joe Smith, Jr. instantly moved from a non-Championship-Caliber Boxer to a Championship-Caliber Boxer.  As a result, Joe Smith, Jr.'s manager would now be included in the market for managers of Championship-Caliber Boxers, presumably without any change in his qualifications or background.  Accordingly, in light of Dr. Kneuper's failure to analyze the qualifications or backgrounds of the current managers of Championship-Caliber Boxers and determine whether there are any viable economic substitutes,

---

[17]A common method for determining the relevant market is the "hypothetical monopolist test."  *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015). The test asks whether "a hypothetical monopolist could impose a 'small but significant nontransitory increase in price' ("SSNIP") in the proposed market."  *Id.* "If enough consumers would respond to a SSNIP by purchasing the product from outside the proposed . . . market, making the SSNIP unprofitable, the proposed market definition is too narrow."  *Id.*

Initials of Deputy Clerk  _sr_

the Court concludes that Plaintiffs' product market is not sustainable.

In addition, the Court concludes that, Dr. Kneuper's geographic market fails to extend to the area of effective competition where buyers would seek alternative sources of supply in the event of a SSNIP.  Dr. Kneuper limits the management market for "Championship-Caliber Boxers" to managers that are U.S.-based.  Accordingly, under Dr. Kneuper's definition of the relevant market, a manager that manages a Championship-Caliber Boxer, but happens to reside outside of the United States, is not considered part of the relevant market.  Dr. Kneuper, however, does not provide any basis or supporting evidence that would justify the exclusion of foreign managers.  Instead, he merely asserts in a circular and conclusory fashion: "I include only Championship-Caliber boxers who are U.S. managed in measuring market shares since foreign managers are not in the U.S. market for managing Championship-Caliber Boxers." Kneuper Report at ¶ 62.[18]

Not only does Dr. Kneuper fail to provide any empirical data or other reliable basis for his geographic limitation, the geographical limitation is not supported by the undisputed facts.  Indeed, the undisputed facts demonstrate that a significant number of "Championship-Caliber Boxers" can and do turn to foreign managers as alterative sources of supply.  For example, the managers of such important fighters as Manny Pacquiao, Tyson Fury, Wladimir Klitschko, Miguel Cotto, and Canelo Alvarez do not reside in the United States.  In fact, somewhere between 61 and 71 Championship-Caliber boxers already have foreign managers.  *See* Kneuper Dep. 171:17-172:8; 248:25-249:16; Cameron Dep. 128:15-17.  All of these foreign-managed boxers have been ranked in the top 10 by one of the four major sanctioning bodies during 2016 or have been classified as a champion since January 2015, and have appeared on U.S. television since January 2015, and thus, except for their foreign addresses, the managers of these boxers would otherwise qualify as part of Dr. Kneuper's market. These undisputed market facts demonstrate that it is totally unnecessary to have a U.S.-based manager to successfully fight in a U.S.-televised bout.  Dr. Kneuper presents no analysis to demonstrate why foreign managers could not constrain Haymon Sports' exercise of market power (especially given that, based on the Court's calculations, approximately 35% of the "Championship-Caliber Boxers" managed by Haymon Sports are themselves not from the United States).  *See* Kneuper Report, Exhibits 3, 5.  Boxers who are not from the United States, at the very least, may switch to a manager who resides in their home country in response to a SSNIP by a hypothetical monopolist.  *See* Cameron Dep. 111:4-113:23.

--------------------------------------------------

[18]Although Dr. Kneuper in his deposition and in his declaration attempts to elaborate on his reasoning, he provides absolutely no evidentiary support for his conclusion that foreign managers should not be included in the market.  For example, although Dr. Kneuper testified at his deposition that foreign managers would not provide a "sufficient enough constraint . . . to defeat the hypothetical monopoly test," *see* Kneuper Dep. 171:17-173:2, Dr. Kneuper did not provide any empirical data to justify this conclusion.  Moreover, although he testified that foreign-managed Championship-Caliber Boxers only have a limited television presence in the U.S., *see* Kneuper Dep. 248:25-249:16, this fact is not a sufficient basis to exclude foreign managers from the market, especially given that these foreign-managed boxers meet the television filters he applied to define a Championship-Caliber Boxer.  If Dr. Kneuper truly believed a single appearance on U.S. television since January 1, 2015 was insufficient to demonstrate that the boxer had economic value, he should have modified his filters and re-applied them to both U.S.-managed Championship-Caliber Boxers and foreign-managed Championship-Caliber Boxers.

Initials of Deputy Clerk   sr

Without a properly-defined market, it is impossible to accurately determine Defendants' market share.  What is clear, however, is that Plaintiffs have grossly overestimated Defendants' market share and have failed to demonstrate that Defendants have a substantial share of a properly-defined market.

        (b)    *Barriers to entry*

Moreover, even assuming that Defendants have a substantial market share, "[a] mere showing of substantial or even dominant market share alone cannot establish market power . . . ." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995).   "A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors." *United States v. Syufy Enterprises*, 993 F.2d 659, 664 (9th Cir. 1990) (quoting *Oahu Gas Serv., Inc. v. Pacific Resources, Inc.*, 838 F.2d 360, 366 (9th Cir. 1988)).

 As the Ninth Circuit explained in *Rebel Oil Co. v. Atlantic Richfield Co.,* 51 F.3d 1421 (9th Cir 1995):

> Entry barriers are additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants, or factors in the market that deter entry while permitting incumbent firms to earn monopoly returns. The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale. In evaluating entry barriers, we focus on their ability to constrain not those already in the market, but those who would enter but are prevented from doing so.

> To justify a finding that a defendant has the power to control prices, entry barriers must be significant—they must be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting.  Barriers to entry are insignificant when natural market forces will likely cure the problem. In such cases, judicial intervention into the market is unwarranted.

 *Id.* at 1439 (internal quotations and citations omitted).  Plaintiffs have the burden of establishing barriers to entry into a properly-defined relevant market.

The undisputed facts demonstrate that the barriers to entry are very low in the management market for Championship-Caliber Boxers.  Indeed, to become a manager, one need only fill out an application, pay a fee between $30 to $100 in most states, and possibly subject themselves to a background check.  *See* Haymon Dep. 296:4-20; Gomez Dep. 180:18-181:23.; Shaw Dep. 56:3-57:16.  Moreover, it is undisputed that many boxers, including Championship-Caliber Boxers, are managed by relatives, friends, trainers, former fighters, attorneys, and others.  *Cf.* Gomez Decl. at ¶ 36; Gomez Dep. 56:3-57:16; Cameron Dep. 109:13-18; 109:24-111:3.

Plaintiffs contend that managing "Championship-Caliber Boxers" requires "industry experience, knowledge of boxing and its key players, the rules and regulations governing the sport

and the economic factors that go into negotiating boxing contracts for top level boxers." Plaintiffs' Opposition to Haymon's Motion at 23. However, these requirements do not constitute relevant "barriers to entry" as they are not "additional long-run costs that were not incurred by the incumbent firms but must be incurred by new entrants" or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." Moreover, even if these requirements could somehow be considered to constitute barriers to entry, they are certainly not significant.

Other than relying on these minimal and insignificant requirements to become a boxing manager, Plaintiffs argue that there are barriers to entry in the management market because of so-called "network effects." As described by Dr. Kneuper, a "network effect" exists when "desired behavior of an individual depends on some average action of others." Kneuper Report at ¶ 22 n.24. This concept was concisely explained by the D.C. Circuit:

> In markets characterized by network effects, one product or standard tends towards dominance, because 'the utility that a user derives from consumption of the good increases with the number of other agents consuming the good. For example, an individual consumer's demand to use (and hence her benefit from) the telephone network increases with the number of other users on the network whom she can call or from whom she can receive calls.  Once a product or standard achieves wide acceptance, it becomes more or less entrenched. Competition in such industries is "for the field" rather than "within the field."

*United States v. Microsoft Corp.*, 253 F.3d 34, 49 (D.C. Cir. 2001) (quotations, alterations, and internal citations omitted).

Although elite boxers generally benefit from competing against other elite boxers, the boxing management and promotion markets have not traditionally suffered from significant barriers to entry due to "network effects." As recognized by Dr. Kneuper, boxing and boxing management have not naturally tended towards dominance or monopoly. *See* Kneuper Report at ¶ 24 ("Historically, boxing has solved this organizational problem through competition against managers and separate and distinct competition amongst promoters. Unlike other sports, such as football, baseball, and golf, boxing has not naturally evolved towards having a single entity controlling most or all of the professionally televised events in the sport.").

Although recognizing that "network effects" have not traditionally raised significant barriers to entry in the management market, Plaintiffs believe that Haymon Sports' alleged anti-competitive conduct has resulted in enhanced network effects and thus raised barriers to entry in the management market.   Plaintiffs' "network effects" theory rests on the erroneous assumption that PBC already operates as a league, in which only Haymon-managed boxers fight other Haymon-managed boxers, and that only Haymon-managed boxers appear on the PBC.   In other words, it rests on the assumption that Haymon Sports has not only tied its management services (the tying product) to promotion services (the tied product), but that it has tied its promotion services to its management services as well.  *See* Plaintiffs' Opposition to Haymon's Motion at 22 ("Haymon has created significant barriers to entry in both the management and promotional markets by creating his network of exclusive contracts which prevent other promoters and managers from signing boxers or getting those boxers on television."); Kneuper Decl. at ¶ 44 ("[T]he barriers to entry in the management market (as well as the promotion market) result from the 'network effect' required to

compete with Haymon and other successful managers of championship boxers.  This 'network effect' results from Haymon's current ability to attract boxers by promising them television air time and fights against other prominent boxers managed by Haymon.").

However, the undisputed facts do not support Plaintiffs' theory.  Indeed, non-Haymon managed boxers have not been prevented or foreclosed from fighting against Haymon-managed boxers, nor have they been prevented or foreclosed from fighting in PBC televised bouts.  *See*, Haymon Decl. at ¶ 18 ("And more than a third of the boxers who have competed in the PBC series are not managed or advised by Haymon Sports.").  Moreover, as discussed *infra*, aside from the PBC, there are many other television platforms available to attract Championship-Caliber Boxers. Not surprisingly, Plaintiffs have failed to present any evidence that managers have found it difficult to enter the management market in recent years.  Accordingly, the Court concludes that Plaintiffs have not demonstrated that "network effects" have created significant barriers to entry in the management market.

Finally, to the extent that Plaintiffs argue that Haymon Sports' five-year exclusive management contracts create significant barriers to entry in the management market, the Court rejects that argument. As an initial matter, there is no evidence that five-year exclusive management agreements are standard in the industry.  Moreover, even if they are standard, presumably 20% of boxers would be available to new managers each year.

Accordingly, because Plaintiffs' market definition is not supported by the evidence and because Plaintiffs have not shown that there are significant barriers to entry with respect to the management market, Plaintiffs have failed to present a genuine issue of material fact as to Defendants' market power.[19]  As a result, Plaintiffs' tying claim fails as a matter of law on this alternate ground.  *See Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 972 (9th Cir. 2008) ("If Equilon lacks market power in the gasoline-franchise market, there can be no cognizable tying claim. For, in that case, Equilon has no power to force, exploit, or coerce a franchisee to purchase a tied product . . . or to affect competition in the tied-product market.").

For the foregoing reasons, Haymon's and the Haymon Entities' Motions for Summary Judgment as to Plaintiffs' second claim for relief for violation of Section 1 of the Sherman Act are **GRANTED**.

### B.    Attempted Monopolization In Violation of Section 2 of the Sherman Act

In their first claim for relief, Plaintiffs allege that Defendants have attempted to obtain a monopoly in the market for promoting bouts of Championship-Caliber Boxers in violation of Section 2 of the Sherman Act.   In order to establish their claim for attempted monopolization in violation of Section 2 of the Sherman Act, Plaintiffs must demonstrate the following four elements: (1) specific

---

[19]The Court also notes that the majority of Haymon Sports' management services contracts were signed *prior* to January 1, 2015, before the PBC was ever announced and before the majority of the television agreements were signed.  At that time, there were no conceivable barriers to entry in the management market, evidencing that boxers signed the Haymon Sports' management services contracts with the consent clause, not because of Haymon Sports' market power or coercion, but because Haymon Sports offered boxers better service and better compensation.

Initials of Deputy Clerk  sr

intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving "monopoly power"; and (4) causal antitrust injury.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432–33 (9th Cir. 1995).

Plaintiffs allege that, since January 1, 2015, Defendants have engaged in the following anticompetitive conduct: (1)  entering into unlawful "tying" or tie out" arrangements, whereby they prevent Championship-Caliber Boxers from contracting with Golden Boy or with other "legitimate" promoters;[20]  (2) entering into exclusive agreements with television networks and boxers; (3) venue blocking; (4) predatory pricing; and (5) violating the Ali Act. SAC at ¶ 103.

Based on the undisputed facts, the Court concludes that Defendants are entitled to summary judgment on their Section 2 claim.

> 1.    <u>Plaintiffs have failed to demonstrate that Plaintiffs' exclusive television agreements were anticompetitive.</u>

Because there are "well-recognized economic benefits to exclusive dealing arrangements" including "the enhancement of interbrand competition," they are analyzed under the rule of reason. *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).  Under the rule of reason, an exclusive dealing arrangement is anticompetitive if it "foreclose[s] competition in a substantial share of the line of commerce affected."  *Id.*  Moreover, "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern."  *Omega Envtl., Inc.*, 127 F.3d at 1162; *see also Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215, 1235 (8th Cir.1987)("Where the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, we require a higher standard of proof of 'substantial foreclosure.' ").  "If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part of the relevant market."  *Omega Envtl., Inc.*, 127 F.3d at 1163.

The Court concludes that Plaintiffs have failed to demonstrate that Defendants' exclusive dealing agreements substantially foreclosed Golden Boy and other promoters from access to television networks.  Indeed, there were both existing and potential alternative channels of distribution available to Golden Boy. Significantly, Defendants never had any exclusive dealing agreements with HBO, Showtime, nor any other pay-per-view outlets, which have been the *most profitable* distribution channels for boxing programming throughout the Covered Period.  In addition, there were existing Spanish-language channels of distribution available to promoters, including Fox Deportes and Univision.  *See* Gomez Decl. at ¶¶ 15-16.  More importantly, the undisputed evidence demonstrates that there are numerous, potential alternative channels of distribution in the market.  Indeed, there have been several recent examples of networks that have not historically shown boxing agreeing to do so.  For example, Defendants were able to convince both SpikeTV and BounceTV to show boxing, even though they had not done so at all in 2014, and

---

[20]For the reasons stated *supra*, Plaintiffs have failed establish their tying claim, and thus cannot support its Section 2 claim with such conduct.  In addition, to the extent that Plaintiffs have raised a "refusal to deal" claim, that claim fails for the reasons stated in the Haymon Entities' Motion and Reply.

Initials of Deputy Clerk  _sr_

even convinced SpikeTV to pay a license fee.  *See* Kneuper Report at Exhibit 7 (showing zero televised fights on these networks in 2014); Cameron Decl. at ¶ 3 ("Haymon Sports has also made boxing events available on cable networks that did not previously televise boxing, including SpikeTV and Bounce . . . .").   In addition, in 2015, Golden Boy itself signed a multi-year agreement with Estrella TV (a Spanish language network), which had not traditionally shown boxing. Furthermore, it appears that BET, TruTV, Unimas, and Telemundo have also recently begun to televise boxing.  *See* Kneuper Report at Exhibit 7.  Clearly, the universe of available cable networks is not just limited to these networks.  These undisputed facts, and the reality of the extensive media platforms available today, demonstrate that there are many alternative channels of distribution (both English-language, Spanish-language, and basic cable) available to Golden Boy and other promoters.[21]

Plaintiffs argue that the availability of Spanish-language alternatives, such as Estrella TV, hardly makes up for the being foreclosed from English-language networks.  *See* Plaintiffs' Opposition to Haymon Entities' Motion at 13.  However, as discussed, there were many other English-language alternatives available to promoters (both existing and new), including HBO, Showtime, BET, TruTV, and *any* other network that Plaintiffs wished to develop.  Moreover, there is no evidence that Golden Boy even attempted to develop a relationship with any alternative English-language network during the Covered Period.

As the Ninth Circuit stated in *Omega*, "[c]ompetitors are free to sell directly, to develop alternative distributors, or to compete for the services of the existing distributors. Antitrust laws require no more."  *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997). Accordingly, the Court concludes that Plaintiffs have failed to raise a genuine issue of material fact that Plaintiffs' exclusive television agreements were anticompetitive.[22]

### 2.    Plaintiffs have failed to demonstrate that Defendants' alleged "venue blocking" was anticompetitve.

In their Second Amended Complaint, Plaintiffs alleged that the Haymon Entities "locked up" desirable dates in major arenas to prevent Plaintiffs from promoting bouts at those arenas on those dates.  In their Opposition to the Haymon Entities' Motion for Summary Judgment, Plaintiffs failed to even address this "venue blocking" claim, apparently recognizing that they have no evidence to support this claim.  Accordingly, the Court will summarily dispose of this issue.

As discussed, exclusive dealing arrangements are analyzed under the rule of reason, and

---

[21]Furthermore, the Court notes that Defendants waived all of the exclusivity provisions in their television agreements in May 2016, and Golden Boy and other promoters are now able to negotiate with these networks.  In fact, Golden Boy has entered into negotiations with ESPN for a multi-year deal.

[22]Plaintiffs also argue that Defendants' exclusive management contracts with boxers are anticompetitive, because Defendants have used these contracts to terminate promotional agreements with Plaintiffs and to prevent their fighters from entering into such agreements.  As discussed *supra*, the Court has concluded that Plaintiffs have failed to demonstrate that Defendants have prevented boxers from working with Golden Boy and other promoters.

Initials of Deputy Clerk  _sr_

are only anticompetitive if they "foreclose competition in a substantial share of the line of
commerce affected." *Omega*, 127 F.3d at 1162. The undisputed evidence demonstrates that
Defendants did not block a "substantial share" of available dates or venues; there are numerous
alternative venues in most major metropolitan areas of the United States, and specifically in Los
Angeles, where Plaintiffs contend that the Haymon Entities "locked up" just one venue for a limited
set of dates.

Accordingly, the Court concludes that Plaintiffs have failed to present any evidence that
Defendants' alleged "venue blocking" was anticompetitive.

> 3.    <u>Plaintiffs have failed to demonstrate that Golden Boy committed "predatory
> pricing"</u>.

Plaintiffs allege that Defendants incurred large losses in buying air time on networks with the
goal of excluding competition and later recouping those losses. As the Supreme Court has
recognized, "predatory pricing schemes are rarely tried, and even more rarely successful."
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 589 (1986). "[T]he
mechanism by which a firm engages in predatory pricing—lowering prices—is the same
mechanism by which a firm stimulates competition; because 'cutting prices in order to increase
business often is the very essence of competition . . . [;] mistaken inferences . . . are especially
costly, because they chill the very conduct the antitrust laws are designed to protect.'" *Cargill v.
Monfort of Colorado*, 479 U.S. 104, 122 n.17 (1986) (quoting *Matsushita*, 475 U.S. at 594).

Accordingly, in order for a plaintiff to establish predatory pricing, it must prove: (1) below
cost pricing; and (2) "a reasonable expectation of recovering, in the form of later monopoly profits,
more than the losses suffered." *Matsushita*, 475 U.S. at 588-589. Without the probability of
recoupment, "predatory pricing produces lower aggregate prices in the market, and consumer
welfare is enhanced," eliminating a predatory pricing claim. *Brooke Grp. Ltd. v. Brown &
Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993).

The Court concludes that Plaintiff has failed to demonstrate that Defendants have a
"reasonable expectation of recovering . . . more than the losses suffered."  Plaintiffs' expert, Dr.
Kneuper did not perform a recoupment analysis, and in fact, states: "the available evidence
indicates Haymon's alleged 'free tv' growth strategy has not achieved the success that Haymon
had hoped for and that Haymon has lost substantially more money than the hundreds of millions of
dollars he anticipated when forming this risky business venture." Kneuper Report at ¶ 17.

Plaintiffs' only effort to establish a reasonable probability of recoupment is to point to the
fact that Defendants intended to "flip the model" and ultimately obtain license fees from the
networks, and that Defendants "believed" that there was a reasonable probability of recoupment.
*See* Plaintiffs' Opposition to Haymon Entities' Motion at 18.  However, "[i]n *Brooke Group*, the
Supreme Court made it clear that predatory intent alone, no matter how clear and convincing the
evidence, cannot substitute for a plaintiff's failure to demonstrate a reasonable prospect of
recoupment."  *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 146 F.3d 1088. 1097 (9th Cir. 1998).

In the absence of any evidence from which a reasonable jury could find a reasonable
probability of recoupment, Plaintiffs cannot establish that Defendants have engaged in predatory

pricing.

> 4.   Plaintiffs have not suffered antitrust injury as a result of Defendants' alleged
> violation of the Ali Act

Plaintiffs contend that Defendants have violated the Ali Act by acting as both a manager and promoter of Championship-Caliber Boxers, and that this violation has given Defendants an unfair advantage over their competitors.  The Ali Act, enacted in 2000, requires a "firewall" between managers and promoters.  It makes it unlawful for "a promoter to have a direct or indirect financial interest in the management of a boxer;" or "a manager—(i) to have a direct or indirect financial interest in the promotion of a boxer; or "(ii) to be employed by or receive compensation or other benefits from a promoter, except for amounts received as consideration under the manager's contract with the boxer." 15 U.S.C. § 6308.

A plaintiff may only pursue an antitrust action if it can show "antitrust injury," i.e., "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  The four requirements for antitrust injury are: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999). "Injury of the type antitrust laws were intended to prevent" means harm to competition, not harm to individual competitors. *See Brunswick*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)) ("The antitrust laws . . . were enacted for 'the protection of competition not competitors.'").

Plaintiffs cannot establish antitrust injury based on alleged violations of the Ali Act because the only parties with standing to assert a violation of the Ali Act are boxers or government agencies. *See* 15 U.S.C. § 6309(a).  As such, any alleged harm to Plaintiffs would not "flow[ ] from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).   Indeed, the specific provision that Plaintiffs claim that Defendants violated, 15 U.S.C. § 6308, was intended to protect *boxers* from promoters and managers.  As the Senate Report states:

> The final protection for boxers established in this section is the prohibition of conflicts of interests between promoters and managers. Most boxers have limited educational backgrounds and, as the top promoters in the sport readily concede, are no match for experienced promoters during contractual discussions. While the role of managers has been diminished in the sport over the last decade, it remains essential that managers, if a boxer does hire a manager, that the manager serve and protect the interests of the boxer. They should not be serving the financial interests of the promoter, while simultaneously taking a 33% earnings cut from the boxer for biased representation as manager. It is not plausible for a boxer to receive proper representation and counsel from a manager if the manager is also on the payroll of a promoter. This is an obvious conflict of interest which works to the detriment of the boxer and the advantage of the promoter. The Committee received testimony about instances wherein boxers had suffered significant career and economic injury due to

their manager's clear conflicting interests. A manager must be a determined
advocate for the boxer's interests and not be influenced by financial inducements
from a promoter. This provision tracks a similar regulation of many State boxing
commissions.

S. REP. 106-83, at 11 (1999). The Court concludes that the conflict of interest provision in the Ali
Act was not intended to compensate promoters for lost profits.

Moreover, absent some other antitrust violation (such as tying, exclusive dealing or
predatory pricing), Plaintiffs' claimed injury as a result of the Defendants' alleged violation of the Ali
Act would be exactly the same as if a new competitor entered the promotion market.  In other
words, Plaintiffs' injury was caused by conduct that was beneficial to competition in the promotion
market. "If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to
competition, there is no antitrust injury, even if the defendant's conduct is illegal per se." *Rebel Oil*,
51 F.3d 1433.

Accordingly, the Court concludes that Plaintiffs have failed to demonstrate the requisite
antitrust injury as a result of Defendants' alleged violations of the Ali Act.

For the foregoing reasons, Haymon's and the Haymon Entities' Motions for Summary
Judgment as to Plaintiffs' first claim for relief for attempted monopolization in violation of Section 2
of the Sherman Act are **GRANTED**.

## C.    Injunctive Relief Under Section 16 of the Clayton Act

Section 16 of the Clayton Act "does not furnish an independent cause of action."  *Kendall v.
Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008).  "Rather, it allows the court to fashion relief
upon a showing of a separate violation of the antitrust laws."  *Id.*  Because the Court has granted
summary judgment on Plaintiffs' claims for violation of Section 1 and Section 2 of the Sherman Act,
Haymon's and the Haymon Entities' Motions for Summary Judgment as to Plaintiffs' third claim for
injunctive relief pursuant to Section 16 of the Clayton Act are also **GRANTED**.

## D.    State Law Claims

"The district court may decline to exercise supplemental jurisdiction over a claim . . . if the
district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).
"[A] federal court should consider and weigh in each case, and at every stage of the litigation, the
values of judicial economy, convenience, fairness, and comity in order to decide whether to
exercise jurisdiction over a case brought in that court involving pendent state-law claims."
*Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 (1988).  "'[I]n the usual case in which all
federal-law claims are eliminated before trial, the balance of factors to be considered under the
pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point
toward declining to exercise jurisdiction over the remaining state law claims.'" *Satey v. JPMorgan
Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484
U.S. 343, 351 (1988)).

In light of the fact that the Court has granted summary judgment on the only claims over

Initials of Deputy Clerk  sr

which this Court has original jurisdiction, and after considering judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.[23]  Indeed, although Plaintiffs' state and federal law claims are based on similar facts and theories, their state law claims cannot be easily or summarily disposed of based on the Court's ruling on the federal claims.  The state law claims have unique elements and involve complex issues, which are more appropriately resolved by the state court.  "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  Accordingly, the balance of factors strongly point toward declining to exercise jurisdiction over the remaining state law claims, and Plaintiffs' state law claims for violation of the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17000 *et seq.* and unfair competition in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* are **DISMISSED without prejudice**.

## IV.    CONCLUSION

In this case, after conducting substantial discovery, Plaintiffs have been unable to present any evidence of harm to competition.  Instead, Plaintiffs have merely presented evidence of harm to themselves.  As the Ninth Circuit once said:

It can't be said often enough that the antitrust laws protect competition, *not* competitors. . . . [C]ompetition is essential to the effective operation of the free market because it encourages efficiency, promotes consumer satisfaction and prevents the accumulation of monopoly profits.  When a producer is shielded from competition, he is likely to provide lesser service at a higher price; the victim is the consumer who gets a raw deal.  This is the evil the antitrust laws are meant to avert. But when a producer deters competitors by supplying a better product at a lower price, when he eschews monopoly profits, when he operates his business so as to meet consumer demand and increase consumer satisfaction, the goals of competition are served . . . . While the successful competitor should not be raised above the law, neither should he be held down by the law.

*United States v. Syufy Enterprises*, 903 F.2d 659, 668 (9th Cir. 1990).

For the foregoing reasons, Haymon's and the Haymon Entities' Motions for Summary Judgment are **GRANTED** as to Plaintiffs' claims for: (1) attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) unlawful "tie out" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and (3) injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

---

[23]In the Pretrial Conference Order, Defendants agree that the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims.  *See* Final Pretrial Conference Order [Docket No. 323-1] ("Defendants believe that the Court should decline to exercise supplemental subject matter jurisdiction under 28 U.S.C. § 1367(c) if the first, second, and third causes of action are dismissed.").

Initials of Deputy Clerk __sr__

Accordingly,  Plaintiffs' claims for violation of the California Unfair Practices Act, Cal. Bus. & Prof. Code §§ 17000 *et seq.*, and unfair competition in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* are **DISMISSED without prejudice**.

The parties are ordered to meet and confer and prepare a joint proposed Judgment which is consistent with this Order. The parties shall lodge the joint proposed Judgment with the Court on or before **February 1, 2017**.  In the unlikely event that counsel are unable to agree upon a joint proposed Judgment, the parties shall each submit separate versions of a proposed Judgment along with a declaration outlining their objections to the opposing party's version no later than **February 1, 2017**.

IT IS SO ORDERED.

Initials of Deputy Clerk __sr__